IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

F I L E D

JAN 2 6 2001

Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| DANIEL W. MAHON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 00-CV1008E (E) |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF COMBINED
MOTION TO DISMISS OR ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT AMERICAN AIRLINES, INC.**

Respectfully submitted,

DAVID R. CORDELL, OBA #11272
JASON S. TAYLOR, OBA #17755

BY:   David R. Cordell
      3700 First Place Tower
      15 East Fifth Street
      Tulsa, OK 74103-4344
      (918) 586-5711
      (918) 586-8547 (Facsimile)

OF COUNSEL:

CONNER & WINTERS
3700 First National Tower
15 E. Fifth Street
Tulsa, Oklahoma 74103-4344
(918) 586-5711

Attorneys for Defendant,
AMERICAN AIRLINES, INC.

## **TABLE OF CONTENTS**

Page

I.    STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

      A.   FIRST CAUSE OF ACTION - BREACH OF EXPRESS AND
           IMPLIED CONTRACTUAL OBLIGATIONS . . . . . . . . . . . . . . . . . . . . .  3

      B.   SECOND CAUSE OF ACTION - DENIAL OF
           DUE PROCESS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

      C.   THIRD CAUSE OF ACTION - DENIAL OF
           FREE SPEECH AND EXPRESSION  . . . . . . . . . . . . . . . . . . . . . . . . .  4

      D.   FOURTH CAUSE OF ACTION - DENIAL OF
           EQUAL PROTECTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      E.   FIFTH CAUSE OF ACTION - INTENTIONAL INFLICTION
           OF EMOTIONAL DISTRESS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      F.   SIXTH CAUSE OF ACTION - NEGLIGENT INFLICTION OF
           EMOTIONAL DISTRESS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      G.   SEVENTH CAUSE OF ACTION - INTENTIONAL INTERFERENCE
           WITH CONTRACTUAL RELATIONS  . . . . . . . . . . . . . . . . . . . . . . . .  5

III.  MOTION TO DISMISS STANDARD  . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

IV.   ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

      A.   PLAINTIFF'S CONTRACT CLAIM IS PREEMPTED BY THE RLA.  . . . .  6

      B.   PLAINTIFF'S CLAIM FOR DENIAL OF DUE PROCESS
           SHOULD BE DISMISSED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

           1.   Plaintiff's § 1981 Claim Should Be Dismissed. . . . . . . . . . . . .  12

                a.   Plaintiff's § 1981 Claim Is Subject To RLA Preemption . .  12
                b.   In the Alternative, American Is Entitled To Judgment As A
                     Matter Of Law With Respect to Plaintiff's Contract Claim
                     and § 1981 Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

     i.  Collateral Estoppel Precludes Plaintiff From
       Relitigating The Veracity Of American's Reasons
       For Terminating Plaintiff . . . . . . . . . . . . . . . . . . . . . 13

     ii.  All Collateral Estoppel Elements are Met and Bar
       Plaintiff's Relitigation of the Veracity of American's
       Basis for Terminating Plaintiff. . . . . . . . . . . . . . . 14

   2.  The Arbitration Award Is Not Subject To Review
     In This Matter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   3.  Plaintiff's § 1983 Claim Should Be Dismissed. . . . . . . . . . . . . . 18

   4.  Plaintiff's § 1985 Claim Should Be Dismissed. . . . . . . . . . . . . . 19

 C.  PLAINTIFF'S DENIAL OF FREE SPEECH AND EXPRESSION
   SHOULD BE DISMISSED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   1.  Plaintiff Has Not Alleged A Cognizable
     First Amendment Violation. . . . . . . . . . . . . . . . . . . . . . . . . . 23

   2.  Plaintiff's Claim For Deprivation Of Free Speech Rights
     Under § 1983 Should Be Dismissed. . . . . . . . . . . . . . . . . . . . . 24

 D.  Plaintiff's Claim for Denial of Equal Protection of the Laws Should Be
   Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

 E.  Plaintiff's Claim For Intentional Infliction of Emotional Distress & Negligent
   Infliction of Emotional Distress Should Be Dismissed. . . . . . . . . . . . . 26

 F.  Plaintiff's Claim For Intentional Interference With Contractual Relations
   Claim Should Be Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# **TABLE OF AUTHORITIES**

*Allis-Chalmers*, 471 U.S. at 215-16, 105 S.Ct. at 1913-14 . . . . . . . . . . . . . . . . . . . . . 10

*American Home Ins. Co. v. Cessna Aircraft Co.*, 551 F.2d 804 (10th Cir. 1977) . . . . . . 5

*American Train Dispatchers Dept. of Intern. Broth. of
    Locomotive Engineers v. Norfolk Southern Ry. Co.*, 857 F.Supp. 1276,
    (N.D. Ill. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Andrews v. Louisville and Nashville R. Co.*, 406 U.S. 320, 322-325,
    92 S.Ct. 1562, 1564-65, 32 L.Ed. 2d 95 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Associated General Contractors v. California State Council of Carpenterrs,*
    459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983) . . . . . . . . . . . 6

*Barnett v. United Airlines, Inc.*, 738 F.2d 358, 361 (10th Cir.), cert. denied,
    469 U.S. 1087, 105 S.Ct. 594, 83 L.Ed.2d 703 (1984) . . . . . . . . . . . . . . . . . . 7

*Bedford v. Southeastern Penn. Trans. Authority*, 867 F.Supp. 288
    (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bishop v. Federal Intermediate Credit Bank of Wichita*, 908 F.2d 658, 662
    (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Boyer v. Board Of County Commissioners*, 922 F.Supp. 476, 482,
    (D.Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

*Brice v. Norfolk Southern Ry. Co.*, 894 F.Supp. 323 (E.D. Tenn. 1994) . . . . . . . . . . . 18

*City of Cleburne, Tex. V. Cleburne Living Center*, 473 U.S. 432, 439,
    105 S.Ct. 3249, 87 L.E.d2d 313 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Conley v. Gibson*, 355 U.S. 41, __, 78 S.Ct. 99, __, 2 L.Ed.2d 80 (1957) . . . . . . . . . 5

*Consolidated Rail v. Railway Labor Exec. Ass'n*,
    491 U.S. 299, 307, 109 S.Ct. 2477, 2483, 105 L.Ed. 2d 250 (1989) . . . . . . . . 7

*Davies v. American Airlines, Inc.*, 971 F.2d 463, 465 (10th Cir. 1992),
    cert. denied, 508 U.S. 950 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Fry v. Airline Pilots Association, International*, 88 F.3d 831
    (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 12, 27

*Gilmore v. Salt Lake Community Action Prog.*, 710 F.2d 632, 635
    (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Great American Federal Savings & Loan Association v. Novotny*,
    442 U.S. 366, 380-81, 99 S.Ct. 2345, 2353,
    60 L.Ed.2dd 957 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Haines v. Fisher*, 82 F.3d 1503, 1508 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 19

*Hall v. Bellmon*, 935 F.2d 1106, 110 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307
    (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hawaiian Airlines, Inc. v. Norris*, ____U.S. ____,
    114 S.Ct. 2239, 2244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*Katz v. City of Aurora*, 85 F.Supp.2d 1012, 1020 (D.Colo. 2000) . . . . . . . . . . . . . . . 25

*Katzer v. Baldor Elec. Co.*, 969 F.2d 935 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . 26, 27

*Kraszewski v. Baptist Medical*, 916 P.2d 241 (Okla. 1996) . . . . . . . . . . . . . . . . . . . . 26

*Lingle [v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877,
    100 L.Ed. 2d 410 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Longhorn Securities*, 573 F.Supp. 278, 279 (W.D. Okla. 1983) . . . . . . . . . . . . . . . . . . 6

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . . . . . . . . . 17

*Messa v. Rubin*, 897 F.Supp. 883, 885 (E.D. PA. 1995) . . . . . . . . . . . . . . . . . . . . . . . 21

*Miller v. Board of County Comm'rs,County of Rogers*,
    46 F.Supp.2d 1210, 1214 (N.D.Okla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Murphy v. Villanova University*, 520 F.Supp. 560, 563 (E.D. Pa. 1981) . . . . . . . . . . . 21

*Murray v. Kaple*, 66 F.Supp.2d 745 (D.S.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992) . . . . . . . . . . . . . . . . . 19

*Plair*, 105 F.3d 343, 348 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1470 (9th Cir. 1991) . . . . . . . . . . 8

*Ray v. American Nat. Bank & Trust Co. of Sapulpa*, 894 P.2d 1056
 (Okla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Smith v. Farmers Co-Op Ass'n of Butler*, 825 P.2d 1323 (Okla. 1992) . . . . . . . . . 26, 27

*Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 302-304 (1943) . . . . . . . 8

*Szaflarski v. Lurie Co. et al.*, 1991 U.S. Dist. LEXIS 11937, at 15
 (N.D. Ill. Aug. 23, 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 20

*Trans World Airlines, Inc. v. Sinicropi*, 887 F.Supp. 595
 (S.D. N.Y. 1995) *aff'd* 84 F.3d 116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
 363 U.S. 574, 578-69, 80 S.Ct. 1347, 1350-51, 4 L.Ed.2d 1409 (1960) . . . . . 10

*Weaver v. Haworth*, 410 F.Supp. 1032 (W.D. Okla. 1975) . . . . . . . . . . . . . . . . . . . . . 20

*Williams v. Air Wisconsin, Inc.*, 874 F.Supp. 719, 715 n.4 (E.D.Va. 1995)
 cert denied, 116 S.Ct. 2553 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) . . . . . . . 19

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DANIEL W. MAHON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 00-CV1008E (E) |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF IN SUPPORT OF COMBINED
## MOTION TO DISMISS OR ALTERNATIVE MOTION FOR
## SUMMARY JUDGMENT OF DEFENDANT AMERICAN AIRLINES, INC.

Defendant American Airlines, Inc. ("American" or "American Airlines") submits this brief in support of its combined motion to dismiss and alternative motion for summary judgment against Plaintiff Daniel W. Mahon ("Mahon").  As demonstrated herein, Plaintiff's Complaint fails to assert a claim against American upon which relief can be granted.  Accordingly, pursuant to Fed. R. Civ. P. 12(b)(6), the Court should dismiss all claims against American with prejudice.  In the alternative, American should be granted summary judgment pursuant to Fed.R.Civ.P. 56.[1]

## I. STATEMENT OF THE CASE

> "...in the final analysis, something must be said in plain and simple terms. At the root of Grievant's conduct was hate.  At the root of his conduct was a philosophy based on hate for blacks, jews and other minorities.  This philosophy has no place being expressed in the workplace.  This is especially true where the Employer has engaged in so many efforts to establish a work environment free from racial hostility and harassment. Under these circumstances, discharge was appropriate."

Opinion and Award, Exhibit "A", page 26.

---

[1]Because American has attached and incorporated an Opinion and Award by Tulsa Area Board of Adjustment in the matter of the arbitration between American Airlines, Inc. and the Transport Workers Union of America, Local 514, Case No. M-766-99 (Discharge of Daniel Mahon, March 8, 2000), attached hereto and incorporated herein as Exhibit "A", Fed.R.Civ.P. 56 may dictate that this Motion may need to be treated as one for summary judgment.

Mahon, a white male, is a white supremacist, like his identical twin brother Dennis Mahon. American is a private commercial airline company which terminated Plaintiff's employment after he manifested his racial animosity in the workplace by harassing and intimidating fellow employees. Mahon's conduct is an anathema to American's corporate ideals and that of its employees. American has not condoned, and will not condone, a hostile or intimidating work environment.

Mahon was a member of the Transport Workers Union of America, AFL-CIO-CLC, Local 514 ("Union"). The Union and American are parties to a Collective Bargaining Agreement ("CBA") which deals with, among many other things, discharge of Union employees. The CBA between American and the Union, and the arbitration procedure established to decide grievances over disputes arising out of or involving the terms and conditions of the CBA, are mandated by the Railway Labor Act, 45 U.S.C. 151 *et seq.*, ("RLA").

American, as part of its corporate diversity program, encouraged the formation of Employee Resource Groups ("ERG")[2]. On March 11, 1999, American held a diversity fair for various employee groups at the American maintenance and engineering ("M&E") facility in Tulsa, Oklahoma. At this particular fair, the Caucasian Employee Resource Group ("CERG"), which was in the process of recruiting members, distributed a pamphlet contributed by Plaintiff Mahon which contained white supremacist rhetoric. Following this incident, for violation of ERG rules, American suspended CERG's privileges for six months.

---

[2]These groups represented groups of employees with unique racial, ethnic, cultural, and lifestyle differences. For example, some the groups at Tulsa were the African-American ERG, the Asian Cultural Association, the Christian ERG, the Employees with Disabilities ERG, the Gay, Lesbian, Bisexual, and Transgender ERG and the Jewish ERG.

The CERG asked for a meeting with management.  At the scheduled meeting at M&E regarding the matter, which was attended by African-American management employees of American,  including the Manager of Diversity Programs, Plaintiff attended wearing a t-shirt depicting the cover of the "Turner Diaries"[3].  That t-shirt sent a clear message of hate to those persons attending the meeting.  Mahon wore the "Turner Diaries" t-shirt in other work areas during the day of the meeting.

Due to the repeated hostile and threatening conduct of Plaintiff and its impact on the work place, American instituted an investigation of Plaintiff and considered discharge pursuant to the CBA.  As a result of this investigation, American terminated Plaintiff for his violation of long standing written work rules which prohibit threatening and intimidating behavior towards other employees and conduct detrimental to other employees and American.  In response, Plaintiff, as was his right, filed a grievance under Article 30 of the CBA regarding his termination. The grievance went to a several day long binding arbitration (at which he was represented by the Union and a lawyer) and the termination was upheld by the Tulsa Area Board of Adjustment (the "Board").

## II. SUMMARY OF ARGUMENT

EACH OF PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW FOR THE FOLLOWING REASONS:

### First Cause of Action - Breach of Express and Implied Contractual Obligations

- Plaintiff's contract claim is a "minor" dispute subject to preemption and exclusive jurisdiction under the RLA.

---

[3]"The "Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country.  It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of 'Jews', 'non-whites', and 'race traitors' in order to establish an 'Aryan' world.  The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City.  The cover of the book shows a drawing of two people pointing firearms as if in combat." Exhibit "A", page 10.

## Second Cause of Action - Denial of Due Process of Law

- Because American is not a public employer Plaintiff is not entitled to state or federal constitutional protection from American's employment decisions.

  § 1981 claim

- The only contract between the parties is the CBA which is subject to preemption and exclusive jurisdiction under the RLA.

- Collateral estoppel precludes Plaintiff from re-litigating his termination.

  § 1983 claim

- There is no State action asserted, thus, the claim fails.

- Even if there was a State action, American was not acting under color of State law.

  § 1985 claim

- American is not an officer of the State.

- Plaintiff does not allege the existence of a conspiracy.

- This statute is not applicable to due process claims.

## Third Cause of Action - Denial of Free Speech and Expression

- Violation of First Amendment

  - The First Amendment is not applicable because American is not a public employer

- Deprivation of rights under State law

  - Plaintiff has not alleged any facts which support a showing of State action.

  - American was not acting under color of State law.

-4-

### Fourth Cause of Action - Denial of Equal Protection

- Plaintiff has not alleged the existence of any State action which is essential for claims under the Fifth and Fourteenth Amendments.

### Fifth Cause of Action - Intentional Infliction of Emotional Distress

- Plaintiff's only allegation of outrageous conduct is that he was fired. Under Oklahoma law, loss of employment by itself is insufficient to maintain a cause of action of intentional infliction of emotional distress.

### Sixth Cause of Action - Negligent Infliction of Emotional Distress

- American moves for a dismissal of this cause of action based on the same grounds as the Intentional Infliction of Emotional Distress Claim - loss of employment by itself is insufficient to maintain this cause of action.

### Seventh Cause of Action - Intentional Interference with Contractual Relations

- Under Oklahoma law, American cannot interfere with its own contract.

- Plaintiff's contract claim is a "minor" dispute subject to RLA preemption.

### III. MOTION TO DISMISS STANDARD

Under Fed.R.Civ.P. 12(b)(6), a complaint should be dismissed for failure to state a claim for which relief may be granted if it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also American Home Ins. Co. v. Cessna Aircraft Co.*, 551 F.2d 804 (10th Cir. 1977). "In the context of a motion to dismiss, the Court must construe the challenged pleading in the light most favorable to the plaintiff, must accept as true all well-pleaded factual allegations and reasonable inferences therefrom, and must disregard all legal or unsupported conclusions."

In re Longhorn Securities, 573 F.Supp. 278, 279 (W.D. Okla. 1983)(*citing* Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976)).

Notwithstanding these deferential rules, the Court is not "to assume that a plaintiff can prove facts that it has not alleged or that the defendants have violated the...laws in ways that have not been alleged.'" Boyer v. Board Of County Commissioners, 922 F.Supp. 476, 482, (D.Kan. 1996)(*quoting* Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983)). Indeed, the "court need accept as true only the plaintiff's well pleaded factual contentions, not his conclusory allegations." Hall v. Bellmon, 935 F.2d 1106, 110 (10th Cir. 1991).

As shown below, even considered in the light most favorable to Plaintiff, all of the claims alleged in the Complaint fail to state a claim against American upon which this Court can grant relief, and each therefore must be dismissed.

## IV. ARGUMENT AND AUTHORITIES

### A.   PLAINTIFF'S CONTRACT CLAIM IS PREEMPTED BY THE RLA.

In the Complaint, Plaintiff alleges that American breached the terms of the Plaintiff's employment contract with American (the "Contract Claim").  (*See* Complaint, ¶ XXVII). Included in this claim is the express allegation that American violated the terms of the CBA. *Id.* Consequently, American submits that  Plaintiff's Contract Claim is preempted by the RLA since the claim cannot be determined without interpreting and applying the terms of the CBA.[4]

---

[5] As more fully set forth below, Plaintiff's claims for denial of due process, intentional infliction of emotional distress and intentional interference with contractual relations should also be dismissed because, *inter alia*, such claims are preempted by the RLA.

In 1936, Congress extended coverage of the RLA to the air transportation industry. 45 U.S.C. § 181 et seq. Generally, the RLA organizes disputes into two categories: (1) "major" disputes, which relate to the formation of collective bargaining agreements or efforts to secure them; and (2) "minor" disputes, which involve the interpretation of a collective bargaining agreement, the existence of which is not in dispute. Barnett v. United Airlines, Inc., 738 F.2d 358, 361 (10th Cir.), cert. denied, 469 U.S. 1087, 105 S.Ct. 594, 83 L.Ed.2d 703 (1984). The RLA specifically defines minor disputes as those "between an employee or group of employees and a carrier or carriers *growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.*" 45 U.S.C. § 153 First (i) and § 184 (emphasis added). Further, the Supreme Court has stated that "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." Consolidated Rail v. Railway Labor Exec. Ass'n, 491 U.S. 299, 307, 109 S.Ct. 2477, 2483, 105 L.Ed. 2d 250 (1989).

With respect to minor disputes, the RLA contains *compulsory dispute resolution provisions*, i.e., binding arbitration before an adjustment board whose award is enforceable in the district courts. *See* 45 U.S.C. § 153 First (i)(m)(p) and § 184.

> A minor dispute . . . is subject to *compulsory* and *binding* arbitration before the National Railroad Adjustment Board, . . . or before an adjustment board established by the employer and the unions representing the employees. . . . The Board (as we shall refer to any adjustment board under the RLA) has exclusive jurisdiction over minor disputes. (emphasis added)

-7-

Conrail, 491 U.S. at 303-04, 109 S.Ct. at 2481 (*citing* § § 3 and 3 Second of the RLA, 45

U.S.C. § § 153 and 153 Second).[5]  For that reason, "minor" disputes "must be resolved

only through the RLA mechanisms, including the carrier's internal dispute-resolution

processes and an adjustment board established by the employer and the union." Hawaiian

Airlines, Inc. v. Norris, 512 U.S. 246, 114 S.Ct. 2239, 2244 (1994); *See also*, Andrews v.

Louisville and Nashville R. Co., 406 U.S. 320, 322-325, 92 S.Ct. 1562, 1564-65, 32 L.Ed.

2d 95 (1972) (arbitral remedy under section 153 of RLA is mandatory and exclusive for

"minor" disputes) and Switchmen's Union v. National Mediation Bd., 320 U.S. 297, 302-304

(1943) (Adjustment Board jurisdiction of minor disputes is exclusive). Thus, federal courts

do not have jurisdiction over minor disputes.  Davies v. American Airlines, Inc., 971 F.2d

463, 465 (10th Cir. 1992), cert. denied, 508 U.S. 950 (1993) (courts generally lack

jurisdiction to hear "minor" disputes); Polich v. Burlington Northern, Inc., 942 F.2d 1467,

1470 (9th Cir. 1991).

Recently, the Tenth Circuit revisited the issue of RLA preemption in Fry v. Airline

Pilots Association, International, 88 F.3d 831 (10th Cir. 1996). In Fry, nine nonstriking

pilots for United Airlines brought suit against the airline and the Airline Pilots Association

based on post-strike harassment of the nonstriking pilots.  The district court granted the

airline's summary judgment motion on all claims, including the intentional infliction claims,

because the claims were either preempted by the RLA or barred by the exclusive remedy

provisions of the Colorado Worker's Compensation Act.

---

[5] In the airline industry, there is no national adjustment board and minor disputes are resolved by an adjustment board established by the airline and the unions.  *Conrail*, 491 U.S. at 304 n. 4, 109 S.Ct. 2481 n. 4.

Initially, citing the Hawaiian Airlines, Inc. v. Norris case, the Fry court defined "minor" disputes as "disputes arising over duties 'rooted firmly in the collective-bargaining agreement' so that 'any attempt to assess liability here inevitably will involve [labor] contract interpretation,' or as disputes that are dependent on the interpretation of CBAs." Fry, 88 F.3d at 835 (citing Norris, 512 U.S. 246, 114 S.Ct. 2239 at 2247-49). The Fry court then discussed the impact of the Norris case on RLA preemption.

> The Court's ruling in *Norris* did not change the fundamental fact that employment related "minor disputes" will continue to be subject to the exclusive and mandatory jurisdiction of the system board of adjustment. Nor did *Norris* necessarily narrow the scope of federal preemption under the RLA as the plaintiffs contend. *Norris* expressly adopted the *Lingle* [*v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed. 2d 410 (1988)] standard (used for determining § 301 of the Labor Management Relations Act ("§ 301") preemption claims) for resolving claims of RLA preemption. As indicated above, that standard requires preemption whenever a claim's resolution calls for interpretation of a CBA.
>
> *       *       *       *       *
>
> **Under both *Norris* and *Lingle*, the threshold question remains whether resolution of the federal and state law claims of the plaintiffs requires interpretation or application of the CBAs.** *Norris*, 512 U.S. 246, 114 S.Ct. at 2247; *Lingle*, 486 U.S. at 405-06, 108 S.Ct. at 1881-82. *Norris* also confirmed labor law's longstanding recognition that a CBA is more than the sum of its parts. It comprises express provisions, industry standards, and "norm[s] that the parties have created but have omitted from the collective bargaining agreement's *explicit* language." *Norris*, 512 U.S. 246, 114 S.Ct. at 2250; *see also Allis-Chalmers*, 471 U.S. at 215-16, 105 S.Ct. at 1913-14 (CBAs may contain implied as well as express terms); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578-69, 80 S.Ct. 1347, 1350-51, 4 L.Ed.2d 1409 (1960) (CBAs are intended to cover the entire employment relationship). Thus, plaintiff's claims are minor disputes if they depend not only on a right found in the CBAs, but also if they implicate practices, procedures, implied authority, or codes of conduct that are part of the working relationship.

Fry, 88 F.3d at 835-36 (footnotes omitted; emphasis added). Thus, Fry held that preemption of "minor" disputes under the RLA extends to any suit that "is inextricably

intertwined with consideration of the terms of the labor contract." <u>Fry</u>, 88 F.3d at 836 (cite omitted).

In the instant matter, there can be no question that Plaintiff's Contract Claim is a "minor" dispute subject to preemption under the RLA. Plaintiff was a Union employee. The contract is the CBA. In his Complaint, Plaintiff alleges American breached its employment contract with Plaintiff due to its failure "to adhere to *written provisions governing employment relations*, as provided in its own policies and procedures under the PEAK Performance program," and the CBA. (*See* Complaint, ¶ 18.) (emphasis added). This is the epitome of the type of claim that the RLA was intended to preempt, i.e., one founded upon alleged violation of the CBA and its implicit terms.

For the above reasons, it is undeniable that Plaintiff's Contract Claim is preempted by the RLA. Pursuant to the RLA the dispute is one between an employee and a carrier growing out of a grievance or out of interpretation or application of agreements concerning rules or working conditions. (*See* 45 U.S.C. § 153 First(i) and § 184.) Further, because the dispute involves the very terms of the CBA and other implicit terms of the labor contract, it may be conclusively resolved by interpreting the existing CBA. <u>Davies</u>, 971 F.2d at 465; <u>Williams v. Air Wisconsin, Inc.</u>, 874 F.Supp. 719, 715 n.4 (E.D.Va. 1995) <u>cert denied</u>, 116 S.Ct. 2553 (1996)(dispute in action was "minor" dispute under RLA where employee alleged breach of existing collective bargaining agreement.)  Consequently, Plaintiff's Contract Claim fails to state a claim for which relief can be granted.

**B.    PLAINTIFF'S CLAIM FOR DENIAL OF DUE PROCESS SHOULD BE DISMISSED.**

In his Complaint, Plaintiff contends that he was denied constitutional due process as a result of his rights being violated under 42 U.S.C. §§ 1981, 1983, and 1985. (*See* Complaint, ¶ XXI.) However, Plaintiff has not pled, and cannot sufficiently plead, such claims because the law and the facts of this matter do not support a civil rights claim. Plaintiff is not entitled to Constitutional protection from American's employment decisions because American is not a public employer.   American was not acting under color of law and no State action was involved.  Plaintiff does not allege the existence of a conspiracy to violate his civil rights.  Further, Plaintiff's due process claim is nothing more than a restatement of his Contract Claim which, as noted above, fails to state a claim upon which relief may be granted.

In addition to Plaintiff failing to sufficiently allege a claim for denial of due process, such a claim is contrary to the facts of this case.  As set forth in the Opinion and Award attached hereto as Exhibit "A" and incorporated herein by reference, Plaintiff has been accorded substantial due process. American conduct an investigation of Plaintiff's conduct according to CBA provisions.  Following the investigation, American terminated Plaintiff which Plaintiff contested through the Union.  The matter went to the Tulsa Area Board of Adjustment (the "Board") where Plaintiff was represented by counsel and the Union. Following a hearing in which both sides advocated their respective positions, the Board found that American terminated Plaintiff for just cause and denied Plaintiff's grievance. The interests of justice and fairness were abundantly provided for in this case.  Simply

because Plaintiff lost his grievance before the Board of Adjustment does not mean that he was denied due process.

### 1.     Plaintiff's § 1981 Claim Should Be Dismissed.

#### a.     Plaintiff's § 1981 Claim Is Subject To RLA Preemption

Like his Contract Claim, Plaintiff's claim under § 1981 is subject to RLA preemption. It is clear that Plaintiff's claim under § 1981 is founded upon assertions that American violated the terms of the CBA. (*See* Complaint, ¶¶, XIX, XX).   Specifically, Plaintiff contends that his due process rights were violated by American terminating the Plaintiff in contravention of "written representations" made to Plaintiff by American. Id.

Again, the only "written representation" and/or contract alleged in the Complaint is the CBA.  Under Fry, as set forth above, preemption of "minor" disputes under the RLA extends to any suit that "is inextricably intertwined with consideration of the terms of the labor contract."  Fry, 88 F.3d at 836.  In sum, under the reasoning of Fry, all Plaintiff's claims in this case regarding the manner in which American discharged Plaintiff, including his § 1981 claim, are preempted by the RLA because they all require a determination of whether the CBA and the other implicit terms of the working relationship were properly interpreted and applied.

#### b.     In the Alternative, American Is Entitled To Judgment As A Matter Of Law With Respect to Plaintiff's Contract Claim and § 1981 Claim.

In the alternative to its Motion to Dismiss Plaintiff's Contract Claim and § 1981 Denial of Due Process Claim, American submits that it is entitled to judgment as a matter of law with respect to such claim.  Plaintiff's claims are barred by collateral estoppel due

to the Arbitration Award between the parties dated March 8, 2000. *See* Exhibit "A" attached hereto and incorporated herein.  Plaintiff cannot relitigate issues which have already been disposed of by the Adjustment Board.  In addition, Plaintiff cannot reverse the Arbitration Award in favor of American simply by bringing a claim in this Court. Plaintiff has ignored the standard for review of such awards.  As such, judgment should be entered in favor of American.

   **i. Collateral Estoppel Precludes Plaintiff From Relitigating The Veracity Of American's Reasons For Terminating Plaintiff**

   Pursuant to the CBA, Plaintiff filed a grievance challenging American's decision to terminate him.  The grievance was denied by American and Mahon took the grievance to binding arbitration before the Adjustment Board.  The precise issue in this arbitration was whether American could establish by a preponderance of evidence that it had just cause to terminate Plaintiff under the CBA.  The bases for the termination were: Rule 32 - - "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited"; Rule 24 - - "Consider the welfare of the Company and your fellow employees. Perform no act detrimental to either"; and, Rule 22 - - "See that your conduct reflects credit upon AA.  This includes paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings." *See* Exhibit A, p. 10.  In defense, Plaintiff argued that he had not threatened anyone and that the alleged rule violations were "manufactured" by American management.

   Based on these conflicting positions and after an extensive and full hearing, the Adjustment Board, on March 8, 2000, found that American established by a clear

preponderance of evidence that Plaintiff engaged in misconduct consisting of threatening and intimidating employees and that American had just cause to terminate Plaintiff for the foregoing conduct.

> ii.   **All Collateral Estoppel Elements are Met and Bar Plaintiff's Relitigation of the Veracity of American's Basis for Terminating Plaintiff.**

To determine if an arbitration award has preclusive collateral estoppel effect on a subsequent issue raised in federal court, the Court must determine whether: (1) the party against whom the collateral estoppel doctrine is asserted was a party to the earlier arbitration; (2) the issue was actually litigated and decided on the merits; (3) the resolution of the issue was essential to the final judgment; and (4) the issues are identical. <u>Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.</u>, 58 F.3d 303, 307 (7th Cir. 1995); <u>Szaflarski</u>, 1991 U.S. Dist. LEXIS 11937, at 15 (N.D. Ill. Aug. 23, 1991).

In the present case, there is no question that collateral estoppel prevents Plaintiff from re-litigating the very issues he already raised at arbitration.

**(1)   Plaintiff was a party to the arbitration.**  There is no question that Plaintiff was a party to the arbitration and is a party in the present case.  Here, Mahon is the Plaintiff; in the arbitration, he was the Grievant.[6]

**(2)   The issue was actually litigated and decided on the merits.**  The Court must also find that Plaintiff actually litigated and the Adjustment Board actually decided the issues American now seeks to preclude from relitigation.  At arbitration the parties

---

[6]  Notwithstanding that the Union brought the grievance on Plaintiff s behalf, Plaintiff is still deemed a party to the arbitration.  <i>See</i> e.g., <u>Szaflarski v. Lurie Co. et al.</u>, 1991 U.S. Dist. LEXIS 11937, at 15 (N.D. Ill. Aug. 23, 1991).

stipulated that the issue for resolution was whether the grievant, the Plaintiff here, was discharged for just cause. *See* Exhibit A. Resolving this issue required the Adjustment Board to consider and decide whether Grievant's actions served to harass and intimidate other employees and tend to create a racially hostile work environment in violation of Rules 22, 24, and 32.

The Adjustment Board decided each and every issue with absolute clarity and certainty. The Adjustment Board held that:

a.      Grievant's harassing and intimidating conduct toward his fellow employees, which consisted of the distribution of the white supremacist pamphlet and the wearing of the related T-Shirt constituted an unwarranted intent to cause fear in others in violation of Rule 32. (*See* Exhibit "A", *seriatim.*)

b.      Such conduct constituted a violation of Rule 22 and 24. (*See* Exhibit "A", *seriatim.*)

c.      Based on Grievant's total conduct American had just cause to terminate his employment for proven Rule 22, Rule 24  and Rule 32 violations. (*See* Exhibit "A", page 26.)

There is no question that the Adjustment Board decided the issues regarding Plaintiffs misconduct regarding the distribution of the pamphlet and wearing of the T-Shirt and whether his total conduct violated Rules 22, 24 and 32. In fact, these issues were at the center of the ultimate issue in the arbitration, i.e., did American have just cause to terminate Plaintiff.

(3)   **Resolution of the issues was essential to the final judgment in the arbitration.**  Whether American justifiably terminated Plaintiff for violation of American Airlines' work rules was the ultimate issue for the Adjustment Board in Plaintiff's arbitration. The only way the Adjustment Board could conclude that American had just cause to terminate Plaintiff was to determine that Plaintiff's distribution of the pamphlet and wearing of the T-Shirt constituted violations of American's work rules. If the Adjustment Board had not resolved these exact issues, it could not have found that American had just cause to terminate Plaintiff because they were the basis for Mahon's termination.

(4)   **The issues here and at arbitration are identical.**  In order to apply collateral estoppel, the issues at arbitration and in this case must be identical.  As previously discussed, at arbitration, Mahon argued that American did not have just cause to terminate him for violation of American Airlines' work rules prohibiting detrimental conduct to fellow employees and the Company and threatening and intimidating American Airlines employees.  In this case, the issue is whether American's termination of Plaintiff for violation of American rules and regulations regarding detrimental conduct to fellow employees and the Company and threatening and intimidating American employees was the genuine reason for his termination.

The issues, therefore, are identical. Cf. <u>Szaflarski</u>, 1991 U.S. Dist. LEXIS 11937, at 15 (N.D. Ill. August 23, 1991) (applying collateral estoppel effect to arbitrators' finding that employer had "just cause" to terminate employee for insubordination and barring Plaintiff from relitigating that issue).

To be successful under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Plaintiff must ultimately prove by a preponderance of evidence that American's reason for terminating him is not American's honestly held reason but instead, is pretext for discrimination.  *See*, <u>Plair</u>, 105 F.3d 343, 348 (7th Cir. 1997).   As demonstrated above, the Adjustment Board specifically concluded that American proved by a preponderance of evidence that (1) Plaintiff engaged in conduct that violated American rules and regulations and (2) American terminated Plaintiff for engaging in such conduct. (*See* Exhibit "A", page 27.)   Under these circumstances, Plaintiff should not be permitted to relitigate the truthfulness of American's honestly held reasons for terminating him.  As such, Plaintiff is barred by collateral estoppel and judgment should be entered in favor of American with respect to Plaintiff's § 1981 claim.

## C.    The Arbitration Award Is Not Subject To Review In This Matter.

Without specifically asserting it, Plaintiff is attacking the final determination of the Arbitration Board via the allegations contained in the Complaint.  However, the Arbitration Award is final and binding and may be set aside only under narrow grounds.  Plaintiff has not met the specific requirements for judicial review of the Arbitration Award.  As a result, judgment should be entered in favor of American as a matter of law.

Decisions of the RLA system boards are final and binding upon both parties to the dispute.  <u>Trans World Airlines, Inc. v. Sinicropi</u>, 887 F.Supp. 595 (S.D. N.Y. 1995) *aff'd* 84 F.3d 116.  The scope of review of arbitration awards under the RLA "is among the narrowest known to law." <u>American Train Dispatchers Dept. of Intern. Broth. of Locomotive Engineers v. Norfolk Southern Ry. Co.</u>, 857 F.Supp. 1276, (N.D. Ill. 1994).  Judicial review

-17-

of decisions of arbitral boards under the RLA is limited by three statutory grounds: (i) failure to comply with RLA; (ii) failure of the order to conform or confine itself to matters with scope of board's jurisdiction; or (iii) for fraud or corruption by member of board making decision. <u>Brice v. Norfolk Southern Ry. Co.</u>, 894 F.Supp. 323 (E.D. Tenn. 1994).

Plaintiff has failed to assert **any** grounds for review of the Arbitration Award, much less under the narrow scope of review provided for under the RLA. Plaintiff has not alleged that the Arbitration Award failed to comply with the RLA in any way. Plaintiff has not alleged that the order failed to conform or confine itself to matters within the scope of the Arbitration Board's jurisdiction. Plaintiff has not alleged the existence of any fraud or corruption on the part of any member of the Arbitration Board. Because Plaintiff has wholly failed to meet the standard for review under the RLA, the Arbitration Award must stand and judgment should be entered on behalf of American on this claim.

### 2.    Plaintiff's § 1983 Claim Should Be Dismissed.

Plaintiff's assertion of § 1983 claim is misguided and inadequately pled. As set forth below, § 1983 is intended to protect the constitutional rights of individuals from those acting under the **color of State law**. However, Plaintiff asserts that American, a <u>private</u> employer, allegedly violated Plaintiff's rights under § 1983 by terminating his employment at American without "due process of law." (*See* Complaint, ¶ XXI).

This Court outlined the purpose of § 1983 as follows:

> **Section 1983 imposes civil liability only upon one who, under color of law, subjects or causes to be subjected, any person to the deprivation of any rights, privileges or immunities secured by the Constitutional laws.**

<u>Miller v. Board of County Comm'rs, County of Rogers</u>, 46 F.Supp.2d 1210, 1214 (N.D.Okla. 1999)(emphasis added.) *See also* <u>Haines v. Fisher</u>, 82 F.3d 1503, 1508 (10th Cir. 1996)

(purpose of § 1983 is to provide a remedy to parties deprived of constitutional rights by a state official's abuse of his position while acting under color of state law.)

To state a claim under § 1983, a plaintiff must assert "that the [1] defendants **acted under color of State law** [2] to deprive him of a constitutional right." Miller, supra, 46 F.Supp.2d at 1214. (quoting Northington v. Jackson, 973 F.2d 1518, 1523 (10th Cir. 1992)); See also Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)(purpose of § 1983 is to deter **State actors** from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.)

Plaintiff has failed to state a claim under § 1983.  Plaintiff did not allege that American acted under the color of law.  (See Complaint, Second Cause of Action, pp. 5-6.) Plaintiff has not, and cannot, meet this threshold pleading requirement for §1983 because American is a private employer and not a State actor.  Such an omission evidences Plaintiff's disregard for the central purpose of this statute.

### 3.    Plaintiff's § 1985 Claim Should Be Dismissed.

As with the §1983 claim, Plaintiff's claim under §1985 fails to meet even the most elementary pleading requirements.  Although §1985 is entitled "**Conspiracy** to interfere with civil rights" (See 42 U.S.C. §1985), the Complaint does not allege the existence of a conspiracy, much less set forth any factual claims to support the existence of a conspiracy. (See Complaint, ¶XXI).  Similarly,  §1985(3)[7] provides a cause of action for "depriving any

_____

[7] 42 U.S.C. §1985(1), (2) provide a cause of action for preventing an officer from performing duties, and obstructing justice - intimidating party, witness or juror, respectively.  Though the specific provision of §1985 is not stated in the Complaint, Plaintiff does not allege that American prevented Plaintiff from performing an official duty or obstructed justice by intimidating Plaintiff as a witness or juror.

person . . . of equal protection of laws." (*See* 42 U.S.C. § 1985(3).)   However, the

Complaint alleges a cause of action for denial of <u>due process</u>."   (*See* Complaint,

¶XXI)(emphasis added).   Regardless, the right to any particular private employment is not

enforceable under § 1985(3).

Plaintiff's failure to allege the existence of a conspiracy is fatal to this claim.

According to the Tenth Circuit, "[F]irstly, a valid (§ 1985) claim must, of course, involve a

conspiracy." <u>Tilton v. Richardson</u>, 6 F.3d 683, 686 (10th Cir. 1993).   The "essential

elements" of a § 1985(3) claim:

> 1.   a **conspiracy**;
> 2.   to deprive the plaintiff of **equal protection** or equal privileges and immunities;
> 3.   an act in furtherance of the conspiracy; and
> 4.   an injury or deprivation resulting therefrom.

<u>Tilton</u>, <u>supra</u>, 6 F.3d at 686.

Bearing this principle in mind, the trial court in <u>Messa v. Rubin</u>, 897 F.Supp. 883,

885 (E.D. PA. 1995) addressed the issue of whether to dismiss claims under § 1985(2)(3)

where the Complaint failed to allege the existence of a conspiracy. *Id.* at 885.   In

dismissing the § 1985(2)(3) claims, the <u>Messa</u> court held that "such claims require an

allegation of conspiracy", which plaintiff did not make. *Id.*

Plaintiff's attempt to use § 1985 to support his denial of due process claim is

contrary to law.   "42 U.S.C. § 1985 does not give a cause of action for denial of due

process." <u>Weaver v. Haworth</u>, 410 F.Supp. 1032 (W.D. Okla. 1975); *See also* <u>Bedford v.</u>

<u>Southeastern Penn. Trans. Authority</u>, 867 F.Supp. 288 (E.D. Pa. 1994)(§ 1985 does not

_____

(*See* Complaint, Second Cause of Action).  Instead, the Complaint makes the conclusory allegation that American "violated Plaintiff's rights as secured by . . . §1985" (*See* Complaint, ¶XXI)

-20-

encompass conspiracies to deny due process.)  Instead, §1985 prohibits <u>conspiracies</u> to deprive persons of <u>equal protection</u> of laws or equal privileges and immunities under the law. *Id.*

Even if Plaintiff had alleged the existence of a conspiracy, which he cannot, § 1985 does not provide Plaintiff with any relief in this matter.  "'The right to any particular private employment simply is not enforceable under § 1985(3)." <u>Murphy v. Villanova University</u>, 520 F.Supp. 560, 563 (E.D. Pa. 1981)(*quoting* <u>Great American Federal Savings & Loan Association v. Novotny</u>, 442 U.S. 366, 380-81, 99 S.Ct.  2345, 2353, 60 L.Ed.2dd 957 (1979)).

For example, the <u>Murphy</u> court held that the complaint failed to state a claim against the <u>Murphy</u> plaintiff's former employer for conspiracy to deprive plaintiff of employment. According to the <u>Murphy</u> court, the proffered fundamental right - the right to work for a particular private employer - "will not qualify" under § 1985(3). <u>Murphy</u>, 560 F.Supp. at 563. Likewise, Plaintiff's proffered fundamental right - the right to work at American as a mechanic - is simply not enforceable under § 1985(3).

In sum, Plaintiff's Complaint has not stated a viable claim under § 1985.  First, Plaintiff does not allege in his Complaint the existence of a conspiracy which is essential to such a claim.  Second, Plaintiff is apparently attempting to assert a cause of action for denial of due process based on a statute that does not provide for such a claim.  Third, there is no right to any particular private employment under § 1985(3).  As a result, Plaintiff's § 1985 claim should be dismissed.

## C.   PLAINTIFF'S DENIAL OF FREE SPEECH AND EXPRESSION SHOULD BE DISMISSED.

In the Complaint, Plaintiff asserts that American "deprived Plaintiff of his Constitutional Rights under the First Amendment." (*See* Complaint, ¶ XXII.)  Plaintiff also alleges that American deprived Plaintiff of his free speech rights under 42 U.S.C. §1983. (*See* Complaint, ¶ XXIII.)   Again, Plaintiff is undeterred by the law or the pleading requirements to assert a constitutional claim.  As with his civil rights claims, Plaintiff has failed to allege any facts which show that American is a public employer, acted under color of state law, or was involved in state action.  As a result, Plaintiff's denial of free speech claim should be dismissed for failure to state a claim for which relief can be granted.

The Arbitration Board put it well:

> What is protected free speech away from work is not necessarily protected free speech at work.  The law requires that employers regulate speech and conduct at work that contributes to a racially or sexually hostile work environment.   Such conduct constitutes prohibited discrimination if the employer allows it to exist.  The employer has a duty to eradicate such employee behavior from the workplace.  The employer also has the right to regulate political and social speech when that speech interferes with the operation of the business.  For example, if the discussion of political or social issues creates distractions and tensions between employees where it significantly affects productivity, the employer would be allowed to address it in a reasonable manner.  The employer can also expect its workers to treat each other with civility, respect and dignity.

> The Grievant can carry around in his head whatever thoughts about race and ethnicity he wants at work.  He could stand on the street corner away from work and scream at the top of his lungs about his related views on race, religion, ethnicity, government oppression, gun control and armed revolution.  However, he can't do the same at work.

(*See* Exhibit "A", page 24.)

1.      **Plaintiff Has Not Alleged A Cognizable First Amendment Violation.**

Plaintiff has not sufficiently alleged a First Amendment claim against American. According to the Tenth Circuit, "a cognizable constitutional deprivation requires that the deprivation be the result of **government action**." Bishop v. Federal Intermediate Credit Bank of Wichita, 908 F.2d 658, 662 (10th Cir. 1990) (*emphasis added*). See Gilmore v. Salt Lake Community Action Prog., 710 F.2d 632, 635 (10th Cir. 1983).

In Bishop, the plaintiff alleged that the defendants, a federal intermediate credit bank and individual employees of the bank, wrongfully discharged him as president of the bank in violation of Oklahoma law and the First Amendment. Bishop, 908 F.2d at 659. Bearing in mind the principal set forth above, the United States District Court for the Western District of Oklahoma granted the defendants' Rule 12(b)(6) motion to dismiss by ruling that the plaintiff "had failed to assert a cognizable first amendment violation because defendants were not government actors for purposes of establishing constitutional deprivations." Id. The Tenth Circuit agreed with the trial court's assessment that the defendant was "not a government actor for purposes of establishing constitutional deprivations" and affirmed the dismissal. Id.

As in Bishop, Plaintiff has failed to assert a cognizable first amendment violation. Plaintiff has not alleged that American is a "government actor", nor any facts which would support such a claim. Instead, Plaintiff relies on conclusory pleading to support his First Amendment claim:

> Defendant Corporation, by and through it's policies and practices, deprived Plaintiff of his Constitutional Rights under the First Amendment of the United States Constitution by terminating Plaintiff for his exercise of protected free speech and expression, and Plaintiff suffered injury.

-23-

(Complaint, ¶ XXII.) This is the epitome of the type of pleading which the Court need not accept. Again, Plaintiff has not, and cannot, accurately allege that American is a government actor because, like the credit bank in <u>Bishop</u>, American is a private employer. Therefore, Plaintiff's First Amendment claim must fail.

**2.    Plaintiff's Claim For Deprivation Of Free Speech Rights Under § 1983 Should Be Dismissed.**

Similar to his Denial of Due Process Claim, Plaintiff has not averred any facts to support a § 1983 claim regarding free speech. Plaintiff has not alleged the existence of any state action, nor any facts to support such a claim. Likewise, Plaintiff has not alleged any facts to support an allegation that American acted under "color of law." Instead, the sole support is the conclusory and ambiguous allegation that American "deprived Plaintiff of his rights under color of state law pursuant to" § 1983. (*See* Complaint, ¶ XXIII.)

In judging the sufficiency of this Complaint, the Court must accept as true "the well pleaded factual allegations" contained therein. <u>Boyer</u>, 922 F.Supp. at 482. However, this rule does not allow the Court to assume that Plaintiff can prove facts that he has not alleged. <u>Id.</u> Here, like he does throughout the Complaint, Plaintiff has relied on a conclusory allegation and leaves the Court to assume that he can prove facts which he has not alleged. Again, however, the Court cannot assume that Plaintiff can prove facts supporting his reference to American acting under color of law when any facts to support such a claim are absent from the Complaint. As a result, Plaintiff has failed to state a claim under Rule 12.

### D.   PLAINTIFF'S CLAIM FOR DENIAL OF EQUAL PROTECTION OF THE LAWS SHOULD BE DISMISSED.

In his Complaint, Plaintiff avers that American "denied Plaintiff Equal Protection of the Laws by treating Plaintiff unequal to others who were similarly situated" in violation of the Fifth and Fourteenth Amendments of the United States Constitution.  (*See* Complaint, ¶ XXIV.)  More importantly, Plaintiff **does not** allege any state action to support such a claim.  As a result, this case of action must fail.

State action is required to assert a claim under the Fourteenth Amendment.  "The Equal Protection clause provides that no **state** may 'deny to any person within its jurisdiction the equal protection of the Laws.'" <u>Katz v. City of Aurora</u>, 85 F.Supp.2d 1012, 1020 (D.Colo. 2000).  Indeed, the clause is  "triggered **only when the government** treats someone differently than another who is similarly situated." <u>Id.</u> *See also* <u>City of Cleburne, Tex. V. Cleburne Living Center</u>, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.E.d2d 313 (1985).  The Equal Protection Clause of the Fourteenth Amendment is not a source of substantive rights or liberties, "but is a right to be free from invidious discrimination in **statutory classifications** and **other governmental activity**." <u>Murray v. Kaple</u>, 66 F.Supp.2d 745 (D.S.C. 1999)(emphasis added.)

Again, Plaintiff disregards the law and relies on conclusory pleading. There is no State action involved in this matter and Plaintiff has alleged none.  Because the Complaint does not allege that the "government" has treated Plaintiff differently than someone similarly situated the Equal Protection clause is not triggered in this case.  Simply alleging that one's Constitutional rights have been violated, without alleging a viable party or any facts to support such a claim, is insufficient to state a claim upon which relief can be granted.

**E.    PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS SHOULD BE DISMISSED.**

As for Plaintiff's intentional infliction of emotional distress ("IIED"[8]) claim, Plaintiff alleges that American "acted in an intentional and reckless manner" in terminating Plaintiff. (*See* Complaint, ¶ XXV.)  However, loss of employment by itself is insufficient to maintain a cause of action for IIED under Oklahoma law.  In addition, Plaintiff's claim is subject to preemption under the RLA.

Plaintiff's discharge by American, without more, is insufficient to maintain a cause of action of IIED.  For example, in <u>Smith v. Farmers Co-Op Ass'n of Butler</u>, 825 P.2d 1323 (Okla. 1992), the plaintiff brought a host of claims, including intentional infliction of emotional distress, following his termination by the defendant. <u>Id.</u> at 1327-28.  The trial court granted summary judgment in favor of the defendant on the IIED claim.  The Oklahoma Supreme Court affirmed because the plaintiff's allegations were limited to the termination itself without any allegations of "extreme or outrageous conduct" to sustain such a claim. <u>Id.</u>  *See also* <u>Katzer v. Baldor Elec. Co.</u>, 969 F.2d 935 (10th Cir. 1992)(employee who had been diagnosed as having MS did not establish <u>prima facie</u> case of intentional infliction of emotional distress based solely on termination.)   Like in <u>Smith</u> and <u>Katzer</u>, Plaintiff's Complaint is absent of any allegation of extreme or outrageous conduct other than the termination of Plaintiff's employment.  Without more, such a claim must fail.

---

[8] American treats the cause of action as one with Plaintiff's claim for negligent infliction of emotion distress ("NIED") because under Oklahoma law *NIED* is not a separate and distinct cause of action, but a factual distinction on the theory of recovery.  *See* <u>Kraszewski v. Baptist Medical</u>, 916 P.2d 241 (Okla. 1996).

With respect to preemption, the Tenth Circuit has "consistently held that a cause of action of intentional infliction of emotional distress or outrageous conduct is preempted by § 301 [of the Labor Management Relations Act] and the same logic prevails under the RLA." Fry, supra. 88 F.3d at p. 839. Where, as here, the allegations supporting the intentional infliction of emotional distress claim are based upon the interpretation of the CBA, the claim is preempted by the RLA.

### F.   PLAINTIFF'S CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIM SHOULD BE DISMISSED.

Plaintiff has failed to state a claim against American for intentionally interfering with Plaintiff's employment contract with American.  Such a claim is squarely against Oklahoma law.  According to the Oklahoma Supreme Court:

> A cause of action for wrongful interference with a contract can only arise when one who is not a party to a contract interferes with that contract by convincing one of the contracting parties to breach its terms.

Ray v. American Nat. Bank & Trust Co. of Sapulpa, 894 P.2d 1056 (Okla. 1994).

In addition, Plaintiff is again asserting a claim based upon interpreting the CBA.  As set forth above, any claim which requires interpretation of the CBA, including tortious interference with contract,  is preempted by the RLA.  (See Fry, 88 F.3d 831)

In his Complaint, Plaintiff contends that American wrongfully interfered with its contract with Plaintiff.  Plaintiff's states that his "expectation or entitlement of employment" was "predicated on . . . written representations made to this Plaintiff by American."  (See Complaint, ¶ XXVII.) In other words, Plaintiff is alleging exactly what the Ray court held was not actionable - - asserting a claim for interference with a contract against a party to the

contract.  Ray, 894 P.2d at 1057.  Therefore, Plaintiff's cause of action is contrary to Oklahoma law and should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, American respectfully requests: (i) that Plaintiff's claims be dismissed with prejudice; (ii) that Plaintiff take nothing; (iii) that judgment be granted in favor of American and against Plaintiff; (iv) that American be awarded its costs and reasonable attorneys' fees; and (v) that the Court grant such other and further relief as may be just and equitable.

Respectfully submitted,

DAVID R. CORDELL, OBA #11272
JASON S. TAYLOR, OBA #17755

BY: _____
David R. Cordell
3700 First Place Tower
15 East Fifth Street
Tulsa, OK 74103-4344
(918) 586-5711
(918) 586-8547 (Facsimile)

Attorneys for Defendant,
AMERICAN AIRLINES, INC.

OF COUNSEL:

CONNER & WINTERS
3700 First National Tower
15 E. Fifth Street
Tulsa, Oklahoma 74103-4344
(918) 586-5711

# TULSA AREA BOARD OF ADJUSTMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE MATTER OF ARBITRATION          OPINION AND AWARD

between

AMERICAN AIRLINES, INC.                              Case No. M-766-99
                                                     (Discharge of Daniel Mahon)

and

TRANSPORT WORKERS UNION OF AMERICA
        Local 514

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## APPEARANCES:

**On behalf of the Employer**:   Joseph P. Harkins, Attorney-Littler Mendelson and David Stewart, Human Resources-American Airlines

**On behalf of the Union**:   Mike Rial and Kevin Creaser-Local 514 and Steve Hickman, Attorney

## I.   ISSUE

The issue before the Board can be framed as follows:

"Did the Employer have just cause to terminate the Grievant, and if not, what shall be the remedy?"

EXHIBIT

A

## II.   <u>BACKGROUND AND FACTS</u>

The Grievant Daniel Mahon was first employed in 1986.  His assignment at the time of termination was on Dock 2-B as an Avionics Technician.  His job performance was good throughout his tenure.

The Final Advisory sets forth the basis of the discharge.  To understand the advisory letter, it is necessary to provide some background.  The backdrop for the factual scenario leading up to termination is the Company's corporate diversity program.  In simple terms, the principal objectives are to (1) promote tolerance and respect among a diverse workforce and (2) to identify business objectives as they relate to the Company's diverse  customers.  At the grassroots level, these objectives were addressed by self-organized groups (within a specific structure and procedure).  These groups, called Employee Resource Groups (ERG), represented groups of employees with "unique racial, ethnic, cultural or lifestyle differences."  For purposes of illustration, some of the groups at Tulsa were: (1) the African-American ERG, (2) the Asian Cultural Association, (3) the Christian ERG, (4) Employees with Disabilities ERG, (5) Gay, Lesbian, Bisexual, Transgender ERG, (6) Indian ERG and (7) Jewish ERG.

Any employee could join any ERG or form an ERG.  There was a set of

2

guidelines for groups.  For example, each group was required to support company policies on a harassment-free workplace and non-discrimination.  Another rule was that the ERGs were to have no relationship (financial or organizational) with outside groups.

In addition to promoting tolerance and respect among the diverse groups, the Employer hoped these groups would provide ideas on how to develop and promote business relationships with diverse groups in the marketplace.  For example, an ERG of employees with disabilities might make suggestions to the Company on how disabled customers could be better served by the airline.

One of the opportunities the Company provided to ERGs to promote diversity was to hold "Diversity Fairs".  ERGs were encouraged to get a booth at the fair and to do some project that would provide information about their particular group with the object of promoting understanding.  The Diversity Fair in question was March 11, 1999.

One of the diversity groups with a booth at this fair was the Caucasian Employee Resource  Group (CERG) of which Grievant was a member.  Grievant was not present that day but he did write the pamphlet handed out at the fair.  The Company found the flyer objectionable and ultimately it formed part of the basis for the Grievant's discharge.

3

The history of the pamphlet is relevant. There is no dispute that Grievant suggested in a meeting of the CERG that the group do a flyer on "Caucasians in Aviation" for the diversity fair. There is no dispute he volunteered to write it. There is no dispute he wrote the flyer with no assistance from other group members.

The exact nature of the conversation amongst the group during which the Grievant volunteered to write the flyer is disputed. A management employee (K. Kelly) testified he attended the CERG meeting. According to his testimony, when the Grievant raised the idea of doing a flyer on "Caucasians in Aviation", Grievant also said his brother could help him, that his brother had research skills at the library and on the Internet, that his brother could make the flyer "mild to wild" and that he would ask his brother to keep it "mild". Two employee witnesses (G. Nichols, and L. Dill ) sharply deny the Grievant said any of these things and in fact claim he had left the CERG meeting by the time the remainder of the group became engaged in a conversation with the management employee.

The Grievant's brother (Dennis Mahon-an identical twin to Grievant) is well known in the Tulsa area and has seen some national and international attention in connection with his white supremacy and neo-nazi beliefs and activities. He ran for Mayor of Tulsa. He was the founder of the Oklahoma White Knights of the

4

Ku Klux Klan. He is the Oklahoma leader of the White Aryan Resistance (WAR).

He operates a "Dial-a-Racist Hotline". He was quoted in a Tulsa newspaper

editorial as saying the Oklahoma City bombing of the Federal Building in which

160 people died was "a fine thing".

When the flyer was handed out at the Diversity Fair, it caught the attention

of several management employees. The flyer raised several concerns. To

summarize, in the Board's words, there were concerns that the flyer had white

supremacist/neo-nazi overtones. This related among other things to the use of the

term "White Race" and "noble Race" and the fact that the terms white and race

were capitalized.

The two-page flyer is described as follows: the heading of the first sheet

printed on 8 ½ x 11 plain paper read "American Airlines Caucasian Employees

Resource Group Salute the Following Aviation Pioneers". Pictures of the

following people along with a graphic of a plane appeared on the first page with

their name and a brief description of their aviation accomplishment: Wilbur

Wright, Bleriot, James Doolittle, Fransisco Brack-Papa, Werner Von Braun, Hugo

Junkers, Amelia Earbart and Helene Dutrieu. The top two-thirds of the second

page contained four pictures of people (Edward Rickenbacker, Chuck Yeager,

Charles Lindbergh and a fourth person whose name did not print clearly) and five

pictures of airplanes.  Below these pictures was the following verbiage:

> "These famous men and women who made aviation history all have one thing in
> common.  They are all members of the White Race.  A race of EXPLORERS,
> discoverers, scientists, and philosophers.  We are proud of the accomplishments of our
> noble Race in the past, present, and future."

The Company decided to suspend the privileges of the CERG for six

months.  A meeting was held in Tulsa on April 20, 1999, to explain to the CERG

the Company's decision to suspend the group.  The meeting was conducted by

Robert Hosey, Manager of Diversity Programs, and was attended by, among

others, the Vice President in charge of the Tulsa base.  Information concerning the

meeting was posted by the officers of the CERG well in advance (perhaps as much

as two weeks earlier).  There is testimony in the record from two officers of the

CERG that they had separate conversations with the Grievant in advance of the

meeting asking that he not attend.

The Grievant did attend the April 20 meeting.  The decision to suspend the

group was explained.  The base Vice President explained the Company did not

condone the flyer and would not condone or tolerate white supremacist activity on

the base.  At one point, the Grievant acknowledged being the author of the flyer.

The Grievant questioned what was wrong with the flyer and didn't understand why

anybody would take issue with its language.

Robert Hosey noticed at the April 20 meeting that Grievant was wearing a T-shirt that showed the cover to a book titled "The Turner Diaries" by Andrew MacDonald. This concerned Hosey. He explained at the hearing that he was familiar with the book. In his view, it was a "manifesto" on violence, racism and white supremacy. It also needs to be noted that this is the book that Timothy McVeigh read prior to the Oklahoma City bombing and that was found in his car at the time of his arrest. Hosey, an African-American was concerned that Grievant was sending a message by wearing the shirt. After the meeting, Hosey shared his concerns with the Vice President and officers of the CERG.

Subsequently, the Company conducted an investigation into the flyer and the Grievant's wearing of the T-shirt. This included two interviews with Grievant (April 26 and May 10, 1999) and one written interrogatory under the umbrella of Section 29-F of the contract. The interrogatory was presented to Grievant on April 26, 1999. It consisted of 15 written questions to which the Grievant answered in his own handwriting. Of the fifteen questions and answers, some are ultimately irrelevant to the discharge. The other questions vary in relevance. For example, Grievant acknowledged discussing at the CERG the subject of his brother's termination. It is not clear whether this discussion pertained to his brother's discharge at TWA (that related in part to an appearance he made with

7

other white supremacists on the Oprah Winfrey Show) or his brother's more recent termination from American during his probationary period.  He also stated in one of his written answers that he believed his brother was discharged because of his political beliefs.

There were also questions on the interrogatory about the "Turner Diaries". To summarize, Grievant only had a passing familiarity (having read only the first chapter).  It seemed to him to be "controversial in nature".  The T-shirt was purchased at a gun show along with several other shirts.  He received a discount for buying five T-shirts at the same time and this was merely one of the shirts he picked up in order to get the discount.  The last five questions and answers are particularly relevant:

"11.  Why did you wear the "Turner Diaries" T-shirt on that particular day?

A-No particular reason, only clean shirt I had that day.

12.  Are you a member of a white supremacist organization?

A-No

13.  Do you have ties to a white supremacist organization?

A-Have a brother who has ties to a white separatist group.

14.  What personal philosophies regarding white supremacism do you discuss at work?

A-Don't discuss supremacist topics at work, only current events, and plane talk.

15.  Are you known in the community as being associated with white supremacists or

white supremacists groups?

A-Don't really know."

The interviews were more detailed.  To Grievant the T-shirt stood for "anti-government" or "anti-establishment".  (It is noted that on the back of the T-shirt was an anti-gun control message).  When asked whether there was some relationship between his attendance at the April 20 meeting and his wearing of the T-shirt, he had "no idea".  When asked when he learned of the April 20 meeting and if anyone told him about the meeting, the Grievant (according to non-verbatim notes taken by a Human Resources representative) said he learned of the meeting that morning from a flyer and did not discuss the meeting with anybody.  He also said that he didn't believe in white supremacist organizations at all.  There was no particular reason that the words race and white were capitalized in the flyer he created.  He suggested it was a typographical error.

The May 10, 1999 interview concluded with the Grievant being given his final advisory.  It read as follows:

"On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee Resource Group.  The purpose of the meeting, which senior Maintenance and Engineering management also attended, was to discuss the role of American Airlines' employee resource groups in supporting diversity in our workplace and to discuss the recent 6-month suspension of the Caucasian Employee Resource Group.  American suspended the Group after it handed out a flyer that advocated white supremacy at the Diversity Info Fair, a company event.  The Group's conduct violated a basic tenet of the AMR Diversity Advisory Council.  This tenet is that no group can form and be recognized as an Employee Resource Group that is in opposition to another group.  You

9

admitted during the April 20 meeting that you wrote the flyer and supplied it to the group for distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with the words "The Turner Diaries" printed on it. "The Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country. It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of "Jews", "non-whites", and "race traitors" in order to establish an "Aryan" world. The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City. The cover of the book shows a drawing of two people pointing firearms as if in combat. Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your T-shirt, as well as the flyer that you wrote. In response to your actions and to the complaints received, American conducted an investigation. The 29(f) investigation was initiated on Monday, April 26, 1999. The investigation covered the complaints received, as well as your actions with white supremacist organizations and their members.

As a result of this investigation, American has concluded that:

> By writing the flyer and supplying it for distribution at the Diversity Info Fair and by wearing your "The Turner Diaries" T-shirt to work and to the April 20 meeting, you harassed and intimidated other employees in a manner that tended to create a racially hostile work environment.

> Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

> Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

> Rule 32 -     "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

> Rule 24 -     "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

> Rule 22 -     "See that your conduct reflects credit upon AA. This includes

10

paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."

As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.

You are hereby discharged from your employment with American Airlines, effective this date.  All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter.  Any pay due to you will be paid upon surrender of all Company property.  Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have."

A grievance was subsequently filed protesting the Company's decision.  The

matter could not be resolved and was ultimately appealed to the Area Board.  A

hearing was conducted in Tulsa, Oklahoma on November 2, 3 and 4, 1999.  The

transcript was received December 10, 1999.  The board discussed the case in

executive session in Dallas, Texas on January 20, 2000 and March 8, 2000 in

Tulsa, Oklahoma.

## III.   <u>OPINION AND DISCUSSION</u>

Most discipline cases present two fundamental questions.  The first is

whether, and if so to what extent, did the Grievant commit misconduct.  The

second question is dependent on the first: If there was misconduct, is the

designated disciplinary penalty appropriate?  The answer to these questions define

in any particular set of facts and circumstances whether just cause exists.  These

11

questions will be addressed in order.

## A.    The Question of Misconduct

Before addressing the first of these two questions (whether misconduct occurred) it is appropriate to state what conduct the Grievant cannot be disciplined for. He cannot be discharged for being Dennis Mahon's brother. He cannot be disciplined for how he thinks. He cannot be disciplined merely for holding unpopular political views or those that are contrary to the mainstream. The Grievant can only be disciplined for _his_ conduct and behavior as it affects the Employer's legitimate business interest.

The Grievant's conduct is basically undisputed. He wrote the flyer knowing it would be distributed to employees. He wore the T-shirt to a meeting with high level management. The record offers two alternative explanations for his conduct.

The Company's view is (1) that the flyer was purposefully written and reflects neo-nazi/white supremacist ideology and (2) that the T-shirt was intentionally worn to send an intimidating and threatening message to management. Since the Grievant chose not to testify at the arbitration hearing, his explanation for his conduct must be gleaned from his statements made during the investigation. It was his position the flyer did not express white supremacist

ideology.  He claimed not to be a white supremacist.  The capital R in Race (and

evidently the W in White) were probably typographical errors.  He only wore the

"Turner Diaries" T-shirt because it was his only clean shirt that day and that he

only found out about the meeting that morning at work.  In short, the Union

suggested in essence that the nature of the flyer and wearing of the T-shirt were

coincidental and had no ill intent.

The Board's job is to decide which of these two alternative views of

Grievant's actions is correct.  More precisely, the critical question is—whether there

is more evidence supporting the Company's view than the Union's view that

Grievant's conduct was innocent.  It is the conclusion of the Board that there is

much more evidence supporting the Company's view than suggestions to the

contrary.

A review of the record demonstrates the preponderance of the evidence, to a

convincing degree, supports the view the flyer was a product of neo-nazi/white

supremacist ideology and that the wearing of the T-shirt was purposeful and was

intended to be a statement.  The Grievant's explanation simply didn't deserve as

much weight and was not as credible as other evidence.  A review and comparison

of the evidence presented by the Company with that presented by the Union shows

13

this to be true.[1]  The evidence discussed below relates to the nature of his conduct

not the separate question of penalty.

---

[1]The Union objected to certain evidence (such as examples of white supremacist literature
written by Dennis Mahon that were introduced through an expert witness) because it was not in
possession of the Employer at the time of the discharge decision.  The Board overruled the
objection noting that both parties are free to collect and present evidence, even if it was not
known at the time of the discharge, that support their respective positions so long as the evidence
is not presented to establish a new or additional basis for discharge.  This is particularly true if
the evidence reflects on credibility.  Arbitrators generally admit new proof of the old conduct
(that is known at the time of the discharge letter) but not new evidence of new conduct unknown
at the time of discharge as an additional basis for discharge.  Some arbitrators even make
exceptions to this rule.  For a general discussion see Chapter 5 on "Evidence in Arbitration" in
Labor and Employment Arbitration 2nd Edition Bornstein, Gosline and Greenbaum, General
Editors (Matthew Bender Publisher, Chapter by Steven Wolf).  The Employer's evidence
objected to by the Union was accepted for credibility purposes.  This evidence was relevant and
admissible not as a new basis for discipline but because it reflected on the credibility of
Grievant's defense in the 29-F hearings.

## The Company's Evidence

The significant evidence on the issue of misconduct submitted by the Company includes and is summarized below.

(1) Submitted by the Company were various white supremacist publications (KKK) written by Dennis Mahon thanking Daniel Mahon for his work and numerous financial contributions to various white supremacist projects and causes. This included nomination as "White Patriot of the Month". One publication stated:

"Daniel M. of the Tulsa area is white patriot of the month for his tremendous efforts in the financial support of this struggle. Daniel has purchased for this Order a professional duty state of the art VHS camcorder to help us with our cable TV programs and to video tape our gatherings. Daniel also built the cross, supplied the public address system, portable generator, and large tent for our rally in Oklahoma on Sept. 23. Dan also has a large collection of Klan and National Socialist white power merchandise. Dan has also supplied many white resistance groups with "T" shirts. Dan is one of those unsung heros who for the last 8 years has given sacrificially in money, sweat, and blood, who never asks for glory or power. Every organization needs more men like Daniel. These people are the back bone of the movement. Thank you Dan.

(2) There was testimony from two Union witnesses that Grievant knew about the April 20 meeting well in advance and was counseled not to come. This contradicts Grievant's statement in the 29-F hearing that he only found out about the meeting that day and had not discussed the meeting with anyone. It also significantly undermines his claim that the wearing of the "Turner Diaries" T-shirt was coincidental. Clearly he was sending a message.

15

(3) The "Turner Diaries" is rank with tales of murder and terrorism based on ethnic and racial matters reaped upon minorities. It also contains a virtual bomb making recipe used to create the source of "immense" damage reaped upon a government building. While technically fictitious, it is all too real to the some 160 victims (and their families) of Timothy McVeigh. Such references have a special significance in Oklahoma which cannot immediately be appreciated by others from other areas of the country.

(4) The Grievant's flyer was nearly identical in essential style and substance to a flyer distributed by the White Knights of the Ku Klux Klan controlled at the time by Dennis Mahon. The words "White" and "Race" were capitalized throughout. It had pictures of an old airplane and a rocket and extolled the virtues of named historical figures (all Caucasian) as members of a mighty race described as "explorers, philosophers and cultivators". The Company presented expert testimony by a researcher who had followed and collected vast amounts of information on neo-nazi and white supremacist groups. He has been an expert witness in many court proceedings through the United States and Canada. It was his opinion that the kind of conjunctive use of capitalization of "White" and "Race" is only found in the popular literature of white supremacists and neo-nazi groups. The concept of a noble race and superior race is at the heart of nazism. It

16

was his opinion the capitalization was no typographical error and the theme was clearly white superiority. The expert also produced a Tulsa newspaper article about Dennis Mahon's neo-nazi activities in Canada and Germany. The article quoted Grievant and indicated he supported his brother's views.

(5) There was testimony by two supervisors that on two separate occasions in the past the Grievant had been warned about bringing KKK/White Aryan symbols into the workplace. One incident involved the wearing of a KKK hat and KKK belt buckle. Another incident involved employee complaints about using a KKK knife in the workplace. The knife is an accepted tool in the shop but the symbols on it were the problem. Although Grievant denied it was his knife, he was told hate symbols at work would not be tolerated.

(6) There was testimony by a now supervisor who spoke about his first day on the job as a mechanic in the bargaining unit in 1986. The Grievant talked about the government and social problems with "jews and niggers." He was invited to Grievant's house where a similar conversation occurred. On another occasion Grievant and his brother showed a racially violent movie. Also in the fall of 1988 this same employee was employed in his off-duty hours as a reserve police officer. He worked as security at a gun show. He had a conversation there with the Grievant who was working at a booth where Aryan Nation materials and

17

T-shirts were displayed and sold.  In fact, Grievant tried to give a Aryan Nation T-shirt to the witness.

(7) There was post-discharge evidence that Grievant's discharge was discussed in local and national neo-nazi/white supremacists communiques.  This is not a basis for discharge but the fact it drew so much attention undermined Grievant's claims that he had no ties to white supremacist groups.  Dennis Mahon was heard publicly stating that if his brother didn't get his job back "We're going to blow the place up."  This implied violence was reinforced in other communiques.

### The Union's Evidence

(1) On cross examination the discharging manager admitted Grievant was a good mechanic and there had been no problems with his performance.

(2) Three crew chiefs testified that Grievant was an exceptional if not model mechanic.  They also testified that he had never talked about the KKK or his political views at work, never was intimidating and in one case was described as the most polite and courteous mechanic he had ever worked with.

(3) A number of other employees echoed the crew chiefs' sentiment.  The Grievant was kind to animals and helpful to people.  He would "give you the shirt off his back".

(4) Nichols and Dill strongly dispute Kelly's statement about what Grievant supposedly said in the CERG meeting about writing the flyer.

(5) The Grievant denied having ties to white supremacist groups in his 29-F. It was also not his decision to distribute the flyer.

(6) The word "African-American" is capitalized through other employee resource group literature.

(7) Several employees weren't offended by the wording of the CERG flyer.

## A Weighing of the Evidence: The True Nature of the Grievant's Conduct

Was the flyer an expression of neo-nazi/white supremacist ideology or was the wording innocent and coincidental?  Similarly, was the wearing of the shirt coincidental or was it a message?  As noted above, the Board concluded the clear weight of evidence shows that the flyer was an expression of his social and political views and that the T-shirt was a message.

The evidence is convincing that the flyer was an expression of neo-nazi/white supremacist ideology.  The wording of the White Knights of the Ku Klux Klan literature and the Grievant's flyer are strikingly similar.  They are different to some degree, but nonetheless are spots on the same leopard.  There is also the expert's testimony that the flyer was consistent with neo-nazi/white

supremacist verbiage and themes. There was no countervailing evidence or testimony offered.

It is true that much of the Company's evidence showing the Grievant was personally involved in neo-nazi/white supremacist activities and financially supported them is not recent. However, it is very significant that Grievant chose not to testify. He did not come forward to deny or repudiate these actions. He did not come forward and say I did not do these things or say I did them but I am a changed man and no longer act in this manner.

Again the Board stresses Grievant cannot be disciplined because he is involved in unpopular political and social activities. His activities are relevant only to the credibility of his denial that the flyer (which is on duty conduct) wasn't racist and that the T-shirt wasn't a message of intimidation. The credibility of these denials in turn rests indirectly on the credibility of his claim that he was not a white supremacist and did not have ties to white supremacist activities.

The evidence shows the Grievant's defense in the 29-F proceeding was not credible. Clearly he holds white supremacist beliefs and has ties and involvement in such organizations. This reflects highly unfavorably on the underlying intent of the flyer. He cannot be disciplined for being Dennis Mahon's brother but the fact they live together in the same small house, share the same phone number (used in

20

various White Aryan/KKK communiques) taken together with Daniel's financial support and personal involvement in these activities also sheds unfavorable light on any question as to the underlying nature of the flyer.  There was also evidence that Grievant's involvement with these activities had the hallmark of independence as demonstrated by his manning a White Aryan booth at a gun show.  Even without having to resolve the conflict in Kelly's testimony and the testimony of Nichols and Dill as to whether Grievant said he would enlist his brother's help, the evidence is clear as to what tone the wording of the flyer took on.

As for the T-shirt, the most glaring evidence is the lack of credibility of Grievant's claim in the 29-F hearing that he did not have notice of the meeting and had not discussed it with anybody.  Clearly he had discussed it and knew when the meeting was.  This in turn undermines the notion that the wearing of the "Turner's Diaries" T-shirt was just an accidental function of what was clean or not clean in his closet.

The Grievant wore the shirt on purpose.  Given his failure to testify, given all the other evidence about his personal and political beliefs and given the nature of this book, the Board is left to conclude it was purposefully worn for its intimidating and threatening effect.

The Union's character testimony was accepted as sincere and truthful.

However, the fact he was technically proficient and nice to some people doesn't outweigh all the other evidence nor is it directly related to the specific nature of his conduct in this case.

In summary, the wearing of the T-shirt and authoring of the flyer constitute misconduct for which discipline is appropriate.

### The Penalty

The question now before the Board is whether discharge is an appropriate disciplinary penalty for authoring a flyer for distribution by the CERG with neo-nazi/white supremacist overtones and wearing a T-shirt for its intimidating and threatening effect.

A substantial part of the Union's evidence related to the fact that many employees wear what can be categorized as offensive T-shirts and are never disciplined. Instead, employees are either told to change them or turn them inside out. However, the Board notes many of these T-shirts were sexual in nature or related to internal union matters. T-shirts making a word play on the phrase "Big Johnson" are hardly comparable to T-shirts related to ethnic, racial and political terrorism.

There were T-shirts about black pride and Malcolm-X and in fact, another

22

employee claims to have worn a "Turner Diaries" T-shirt. Indeed the Company should be concerned about double standards. However, the Malcolm-X shirt is equivocal. As far as the others, ultimately they do not establish a basis for a convincing disparate treatment argument since the facts do not show they were worn in the same context as Grievant. Grievant wore his in the context of discussions about a racially/ethnically questionable document. The wearing of questionable T-shirts by others may have been misguided, but the evidence in this case shows Grievant's conduct was a deliberate expression of deeply held racist social and political beliefs. The evidence does not show the wearing of the other T-shirts was done in conjunction with other misconduct involving the expression of racist ideology.

So the Grievant's conduct is unlike anyone else, does this mean he should be discharged? This is just one of many challenging questions raised by this case. After all, the expressions of some of the other employee resource groups were found to be offensive to some employees. Isn't some tension inevitable as people work through their differences? And isn't there a natural potential for tension when groups are allowed to form along racial, ethnic or sexual lines? To some extent isn't tension and friction part of the process of diversification and diversity education? And, if undesirable employee attitudes are going to change, shouldn't

23

people in the context of the diversity program be free to speak their minds on the theory it is easier to change attitudes when they are out in the open and "on the table"?  And in the United States generally isn't there "freedom of speech"?

What is protected free speech away from work is not necessarily protected free speech at work.  The law requires that employers regulate speech and conduct at work that contributes to a racially or sexually hostile work environment.  Such conduct constitutes prohibited discrimination if the employer allows it to exist. The employer has a duty to eradicate such employee behavior from the workplace. The employer also has the right to regulate political and social speech when that speech interferes with the operation of the business.  For example, if the discussion of political or social issues creates distractions and tensions between employees where it significantly affects productivity, the employer would be allowed to address it in a reasonable manner.  The employer can also expect its workers to treat each other with civility, respect and dignity.

The Grievant can carry around in his head whatever thoughts about race and ethnicity he wants to at work.  He could stand on the street corner away from work and scream at the top of his lungs about his related views on race, religion, ethnicity, government oppression, gun control and armed revolution.  However, he can't do the same at work.

24

The Union also claimed there was no notice that his conduct was prohibited and subject to discharge.  This is not accurate.  In general, the policy against harassment and discrimination is known to be a "zero tolerance" policy.  More specifically, the Grievant had been put on notice in the context of displaying symbols of racial hatred by two different supervisors that such symbols and expression of political views would not be tolerated.  It cannot be said that he did not know that such expressions might result in discharge.

Not only did management put Grievant on notice that controversial political and social views at work would not be tolerated, not only was he told that symbols would not be tolerated, he was warned by friends not to come to the April 20 meeting.  Evidently, he was also warned by someone within the "movement" not to wear the "Turner Diaries" shirt to the meeting.  It doesn't bode well for him that his first error in judgment (writing a racially inappropriate flyer) was compounded by going to the meeting and wearing the shirt.  These multiple errors in judgment strongly suggest that if reinstated, he could not or would not control himself or keep his racial and ethnic hatred from oozing once again from its ugly depths.

It is true that Grievant's writing could be taken two ways.  It is true the wearing of the T-shirt could be taken two ways.  However, the Employer has provided much evidence to which the Grievant failed to respond.  Given this, it

25

was reasonable for them to interpret his actions in the worst possible light. His message was subtle but, in clearly resonant tones, rang true only to the sad song of racial superiority. Clever equivocation and veiled threats are part and parcel of the Grievant's ilk and he can't hide behind this cleverness at the expense of the security, dignity and respect of other workers who do not share his race or ethnicity or his attitudes of racial nobility. His expressions went well beyond the normal learning process involved in corporate diversity. His conduct is incompatible with the Employer's right to have a diverse workforce free from racial and ethnic hostility.

Much is debated in this record. However, in the final analysis, something must be said in plain and simple terms. At the root of Grievant's conduct was hate. At the root of his conduct was a philosophy based on hate for blacks, jews and other minorities. This philosophy has no place being expressed in the workplace. This is especially true where the Employer has engaged in so many efforts to establish a work environment free from racial hostility and harassment. Under these circumstances, discharge was appropriate.

26

## <u>AWARD</u>

The final advisory was for just cause and the grievance is denied.


_____
Gil Vernon, Arbitrator


_____
Mary Tinsman


_____
J. C. Brown


Dated this _____ day of March, 2000.


27

## CERTIFICATE OF SERVICE

I, David R. Cordell, hereby certify that on the 26th day of January 2001, a true and correct copy of the above and foregoing instrument was mailed to the following via first class mail, with proper postage thereon fully prepaid:

Robert E. Frazier, III, Esq.
The Robert L. Rode Law Firm
324 South Main, Suite 600
Tulsa, Oklahoma 74103

David R. Cordell