## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DANIEL W. MAHON,           )
                                     )

      Plaintiff,            )
                                     )

v.                            )      Case No:  00-CV-1008-E
                                     )

AMERICAN AIRLINES, INC.,    )
a Delaware Corporation,       )
                                     )

      Defendant.         )

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT APPENDIX**

**CONNER & WINTERS, P.C.**
DAVID R. CORDELL, OBA #11272
JASON S. TAYLOR, OBA #17755
3700 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma  74133-4344
(918) 586-5711 (Telephone)
(918) 586-8547 (Facsimile)

**ATTORNEYS FOR DEFENDANT
AMERICAN AIRLINES, INC.**

# TABLE OF CONTENTS

TWU Notice-Union Membership ................................................................................ A

Tulsa Area Board of Adjustment, Arbitration Opinion and Award,
dated March 8, 2000 ............................................................................................... B

Dial-A-Racist Business Card .................................................................................. C

Deposition of Daniel W. Mahon, dated October 29, 2003 ...................................... D

AMR's Diversity Advisory Council Pamphlet .......................................................... E

AMR's Diversity Advisory Council (DAC)
Questions and Answers for Diversity Information Fairs ........................................... F

AMR's Diversity Advisory Council (DAC) Special Session,
Talking Points for ERG Members 3/25/99 ............................................................. G

CERG Flyer ........................................................................................................... H

The Turner Diaries T-Shirt ...................................................................................... I

Final Advisory (Discharge) dated May 10, 1999 ................................................... J

Daniel W. Mahon Letter to Rex Thompson, Esq. .................................................. K

# EXHIBIT A

# EXHIBIT A

AA FORM C42C
PRINTED IN U.S.A.

## NOTICE – UNION MEMBERSHIP

To: __Daniel W. Mahon__     __56628__     __TULE__
       (NAME)                      (EMPL. NO.)              (STATION)

You are being employed as a __Mech/Overhaul__ Effective __3-17-86__
                                (CLASSIFICATION)                          (DATE)

Your job classification is covered by an agreement between American Airlines and the Transport Workers Union of America, AFL-CIO.

All new employees are required by the terms of the agreement to become members of the union within 60 days of employment and, as a condition of employment, to maintain membership in the union so long as the agreement remains in effect to the extent of paying initiation fees and membership dues.

You must pay your initiation fee directly to the Union. You may pay your membership dues either directly to the union or by having them deducted from your paycheck. If you want your dues deducted from your paycheck, you may sign a "Check-off Form" which will be furnished to you by the union. Please see the local union representative (but not on company time). His name and address:

__Mr. Ed Wilson__

__Local 514, TWU, AFL-CIO__                Signed __D. B. F. H.__
                                                             (COMPANY REPRESENTATIVE)

__11929 E. Pine, Tulsa, OK 74116__         Date __3-17-86__

I have read the above notice and I understand it.

Signed __Daniel W. Mahon__
           (EMPLOYEE)

Employee __Daniel W. Mahon__              Original To:    Employee
                                                             Duplicate To:   Union Representative
Address __KOA, 193rd, CATOOSA, OKLA.__    Triplicate To:  Field Personnel File

                                                             SHOP __225-4__

EXHIBIT
Arbitration
Company 7



# EXHIBIT B

# EXHIBIT B

# TULSA AREA BOARD OF ADJUSTMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE MATTER OF ARBITRATION      OPINION AND AWARD

between

AMERICAN AIRLINES, INC.              Case No. M-766-99
                                  (Discharge of Daniel Mahon)

and

TRANSPORT WORKERS UNION OF AMERICA
Local 514

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**APPEARANCES:**

    **On behalf of the Employer**:   Joseph P. Harkins, Attorney-Littler Mendelson and David Stewart, Human Resources-American Airlines

    **On behalf of the Union**:   Mike Rial and Kevin Creaser-Local 514 and Steve Hickman, Attorney

I.    **ISSUE**

The issue before the Board can be framed as follows:

    "Did the Employer have just cause to terminate the Grievant, and if not, what shall be the remedy?"

DEFENDANT'S DEPOSIT
EXHIBIT
9

## II.    BACKGROUND AND FACTS

The Grievant Daniel Mahon was first employed in 1986. His assignment at the time of termination was on Dock 2-B as an Avionics Technician. His job performance was good throughout his tenure.

The Final Advisory sets forth the basis of the discharge. To understand the advisory letter, it is necessary to provide some background. The backdrop for the factual scenario leading up to termination is the Company's corporate diversity program. In simple terms, the principal objectives are to (1) promote tolerance and respect among a diverse workforce and (2) to identify business objectives as they relate to the Company's diverse customers. At the grassroots level, these objectives were addressed by self-organized groups (within a specific structure and procedure). These groups, called Employee Resource Groups (ERG), represented groups of employees with "unique racial, ethnic, cultural or lifestyle differences." For purposes of illustration, some of the groups at Tulsa were: (1) the African-American ERG, (2) the Asian Cultural Association, (3) the Christian ERG, (4) Employees with Disabilities ERG, (5) Gay, Lesbian, Bisexual, Transgender ERG, (6) Indian ERG and (7) Jewish ERG.

Any employee could join any ERG or form an ERG. There was a set of

2

guidelines for groups. For example, each group was required to support company policies on a harassment-free workplace and non-discrimination. Another rule was that the ERGs were to have no relationship (financial or organizational) with outside groups.

In addition to promoting tolerance and respect among the diverse groups, the Employer hoped these groups would provide ideas on how to develop and promote business relationships with diverse groups in the marketplace. For example, an ERG of employees with disabilities might make suggestions to the Company on how disabled customers could be better served by the airline.

One of the opportunities the Company provided to ERGs to promote diversity was to hold "Diversity Fairs". ERGs were encouraged to get a booth at the fair and to do some project that would provide information about their particular group with the object of promoting understanding. The Diversity Fair in question was March 11, 1999.

One of the diversity groups with a booth at this fair was the Caucasian Employee Resource Group (CERG) of which Grievant was a member. Grievant was not present that day but he did write the pamphlet handed out at the fair. The Company found the flyer objectionable and ultimately it formed part of the basis for the Grievant's discharge.

3

The history of the pamphlet is relevant. There is no dispute that Grievant suggested in a meeting of the CERG that the group do a flyer on "Caucasians in Aviation" for the diversity fair. There is no dispute he volunteered to write it. There is no dispute he wrote the flyer with no assistance from other group members.

The exact nature of the conversation amongst the group during which the Grievant volunteered to write the flyer is disputed. A management employee (K. Kelly) testified he attended the CERG meeting. According to his testimony, when the Grievant raised the idea of doing a flyer on "Caucasians in Aviation", Grievant also said his brother could help him, that his brother had research skills at the library and on the Internet, that his brother could make the flyer "mild to wild" and that he would ask his brother to keep it "mild". Two employee witnesses (G. Nichols, and L. Dill ) sharply deny the Grievant said any of these things and in fact claim he had left the CERG meeting by the time the remainder of the group became engaged in a conversation with the management employee.

The Grievant's brother (Dennis Mahon-an identical twin to Grievant) is well known in the Tulsa area and has seen some national and international attention in connection with his white supremacy and neo-nazi beliefs and activities. He ran for Mayor of Tulsa. He was the founder of the Oklahoma White Knights of the

4

Ku Klux Klan. He is the Oklahoma leader of the White Aryan Resistance (WAR). He operates a "Dial-a-Racist Hotline". He was quoted in a Tulsa newspaper editorial as saying the Oklahoma City bombing of the Federal Building in which 160 people died was "a fine thing".

When the flyer was handed out at the Diversity Fair, it caught the attention of several management employees. The flyer raised several concerns. To summarize, in the Board's words, there were concerns that the flyer had white supremacist/neo-nazi overtones. This related among other things to the use of the term "White Race" and "noble Race" and the fact that the terms white and race were capitalized.

The two-page flyer is described as follows: the heading of the first sheet printed on 8 ½ x 11 plain paper read "American Airlines Caucasian Employees Resource Group Salute the Following Aviation Pioneers". Pictures of the following people along with a graphic of a plane appeared on the first page with their name and a brief description of their aviation accomplishment: Wilbur Wright, Bleriot, James Doolittle, Fransisco Brack-Papa, Werner Von Braun, Hugo Junkers, Amelia Earhart and Helene Dutrieu. The top two-thirds of the second page contained four pictures of people (Edward Rickenbacker, Chuck Yeager, Charles Lindbergh and a fourth person whose name did not print clearly) and five

5

pictures of airplanes. Below these pictures was the following verbiage:

> "These famous men and women who made aviation history all have one thing in common. They are all members of the White Race. A race of EXPLORERS, discoverers, scientists, and philosophers. We are proud of the accomplishments of our noble Race in the past, present, and future."

The Company decided to suspend the privileges of the CERG for six months. A meeting was held in Tulsa on April 20, 1999, to explain to the CERG the Company's decision to suspend the group. The meeting was conducted by Robert Hosey, Manager of Diversity Programs, and was attended by, among others, the Vice President in charge of the Tulsa base. Information concerning the meeting was posted by the officers of the CERG well in advance (perhaps as much as two weeks earlier). There is testimony in the record from two officers of the CERG that they had separate conversations with the Grievant in advance of the meeting asking that he not attend.

The Grievant did attend the April 20 meeting. The decision to suspend the group was explained. The base Vice President explained the Company did not condone the flyer and would not condone or tolerate white supremacist activity on the base. At one point, the Grievant acknowledged being the author of the flyer. The Grievant questioned what was wrong with the flyer and didn't understand why anybody would take issue with its language.

Robert Hosey noticed at the April 20 meeting that Grievant was wearing a T-shirt that showed the cover to a book titled "The Turner Diaries" by Andrew MacDonald. This concerned Hosey. He explained at the hearing that he was familiar with the book. In his view, it was a "manifesto" on violence, racism and white supremacy. It also needs to be noted that this is the book that Timothy McVeigh read prior to the Oklahoma City bombing and that was found in his car at the time of his arrest. Hosey, an African-American was concerned that Grievant was sending a message by wearing the shirt. After the meeting, Hosey shared his concerns with the Vice President and officers of the CERG.

Subsequently, the Company conducted an investigation into the flyer and the Grievant's wearing of the T-shirt. This included two interviews with Grievant (April 26 and May 10, 1999) and one written interrogatory under the umbrella of Section 29-F of the contract. The interrogatory was presented to Grievant on April 26, 1999. It consisted of 15 written questions to which the Grievant answered in his own handwriting. Of the fifteen questions and answers, some are ultimately irrelevant to the discharge. The other questions vary in relevance. For example, Grievant acknowledged discussing at the CERG the subject of his brother's termination. It is not clear whether this discussion pertained to his brother's discharge at TWA (that related in part to an appearance he made with

7

other white supremacists on the Oprah Winfrey Show) or his brother's more recent termination from American during his probationary period. He also stated in one of his written answers that he believed his brother was discharged because of his political beliefs.

There were also questions on the interrogatory about the "Turner Diaries". To summarize, Grievant only had a passing familiarity (having read only the first chapter). It seemed to him to be "controversial in nature". The T-shirt was purchased at a gun show along with several other shirts. He received a discount for buying five T-shirts at the same time and this was merely one of the shirts he picked up in order to get the discount. The last five questions and answers are particularly relevant:

"11. Why did you wear the "Turner Diaries" T-shirt on that particular day?

A-No particular reason, only clean shirt I had that day.

12. Are you a member of a white supremacist organization?

A-No

13. Do you have ties to a white supremacist organization?

A-Have a brother who has ties to a white separatist group.

14. What personal philosophies regarding white supremacism do you discuss at work?

A-Don't discuss supremacist topics at work, only current events, and plane talk

15. Are you known in the community as being associated with white supremacists or

white supremacists groups?

A-Don't really know."

The interviews were more detailed. To Grievant the T-shirt stood for "anti-government" or "anti-establishment". (It is noted that on the back of the T-shirt was an anti-gun control message). When asked whether there was some relationship between his attendance at the April 20 meeting and his wearing of the T-shirt, he had "no idea". When asked when he learned of the April 20 meeting and if anyone told him about the meeting, the Grievant (according to non-verbatim notes taken by a Human Resources representative) said he learned of the meeting that morning from a flyer and did not discuss the meeting with anybody. He also said that he didn't believe in white supremacist organizations at all. There was no particular reason that the words race and white were capitalized in the flyer he created. He suggested it was a typographical error.

The May 10, 1999 interview concluded with the Grievant being given his final advisory. It read as follows:

"On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee Resource Group. The purpose of the meeting, which senior Maintenance and Engineering management also attended, was to discuss the role of American Airlines' employee resource groups in supporting diversity in our workplace and to discuss the recent 6-month suspension of the Caucasian Employee Resource Group. American suspended the Group after it handed out a flyer that advocated white supremacy at the Diversity Info Fair, a company event. The Group's conduct violated a basic tenet of the AMR Diversity Advisory Council. This tenet is that no group can form and be recognized as an Employee Resource Group that is in opposition to another group. You

9

admitted during the April 20 meeting that you wrote the flyer and supplied it to the group for distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with the words "The Turner Diaries" printed on it. "The Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country. It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of "Jews", "non-whites", and "race traitors" in order to establish an "Aryan" world. The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City. The cover of the book shows a drawing of two people pointing firearms as if in combat. Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your T-shirt, as well as the flyer that you wrote. In response to your actions and to the complaints received, American conducted an investigation. The 29(f) investigation was initiated on Monday, April 26, 1999. The investigation covered the complaints received, as well as your actions with white supremacist organizations and their members.

As a result of this investigation, American has concluded that:

> By writing the flyer and supplying it for distribution at the Diversity Info Fair and by wearing your "The Turner Diaries" T-shirt to work and to the April 20 meeting, you harassed and intimidated other employees in a manner that tended to create a racially hostile work environment.

> Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

> Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

> Rule 32 - "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

> Rule 24 - "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

> Rule 22 - "See that your conduct reflects credit upon AA. This includes

> paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."
>
> As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.
>
> You are hereby discharged from your employment with American Airlines, effective this date. All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter. Any pay due to you will be paid upon surrender of all Company property. Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have."

A grievance was subsequently filed protesting the Company's decision. The matter could not be resolved and was ultimately appealed to the Area Board. A hearing was conducted in Tulsa, Oklahoma on November 2, 3 and 4, 1999. The transcript was received December 10, 1999. The board discussed the case in executive session in Dallas, Texas on January 20, 2000 and March 8, 2000 in Tulsa, Oklahoma.

## III.    OPINION AND DISCUSSION

Most discipline cases present two fundamental questions. The first is whether, and if so to what extent, did the Grievant commit misconduct. The second question is dependent on the first: If there was misconduct, is the designated disciplinary penalty appropriate? The answer to these questions define in any particular set of facts and circumstances whether just cause exists. These

questions will be addressed in order.

A.    **The Question of Misconduct**

Before addressing the first of these two questions (whether misconduct occurred) it is appropriate to state what conduct the Grievant cannot be disciplined for. He cannot be discharged for being Dennis Mahon's brother. He cannot be disciplined for how he thinks. He cannot be disciplined merely for holding unpopular political views or those that are contrary to the mainstream. The Grievant can only be disciplined for his conduct and behavior as it affects the Employer's legitimate business interest.

The Grievant's conduct is basically undisputed. He wrote the flyer knowing it would be distributed to employees. He wore the T-shirt to a meeting with high level management. The record offers two alternative explanations for his conduct.

The Company's view is (1) that the flyer was purposefully written and reflects neo-nazi/white supremacist ideology and (2) that the T-shirt was intentionally worn to send an intimidating and threatening message to management. Since the Grievant chose not to testify at the arbitration hearing, his explanation for his conduct must be gleaned from his statements made during the investigation. It was his position the flyer did not express white supremacist

12

ideology. He claimed not to be a white supremacist. The capital <u>R</u> in Race (and evidently the <u>W</u> in White) were probably typographical errors. He only wore the "Turner Diaries" T-shirt because it was his only clean shirt that day and that he only found out about the meeting that morning at work. In short, the Union suggested in essence that the nature of the flyer and wearing of the T-shirt were coincidental and had no ill intent.

The Board's job is to decide which of these two alternative views of Grievant's actions is correct. More precisely, the critical question is--whether there is more evidence supporting the Company's view than the Union's view that Grievant's conduct was innocent. It is the conclusion of the Board that there is much more evidence supporting the Company's view than suggestions to the contrary.

A review of the record demonstrates the preponderance of the evidence, to a convincing degree, supports the view the flyer was a product of neo-nazi/white supremacist ideology and that the wearing of the T-shirt was purposeful and was intended to be a statement. The Grievant's explanation simply didn't deserve as much weight and was not as credible as other evidence. A review and comparison of the evidence presented by the Company with that presented by the Union shows

this to be true.[1]  The evidence discussed below relates to the nature of his conduct

not the separate question of penalty.

---

[1]The Union objected to certain evidence (such as examples of white supremacist literature written by Dennis Mahon that were introduced through an expert witness) because it was not in possession of the Employer at the time of the discharge decision.  The Board overruled the objection noting that both parties are free to collect and present evidence, even if it was not known at the time of the discharge, that support their respective positions so long as the evidence is not presented to establish a new or additional basis for discharge.  This is particularly true if the evidence reflects on credibility.  Arbitrators generally admit new proof of the old conduct (that is known at the time of the discharge letter) but not new evidence of new conduct unknown at the time of discharge as an additional basis for discharge.  Some arbitrators even make exceptions to this rule.  For a general discussion see Chapter 5 on "Evidence in Arbitration" in Labor and Employment Arbitration 2nd Edition Bornstein, Gosline and Greenbaum, General Editors (Matthew Bender Publisher, Chapter by Steven Wolf).  The Employer's evidence objected to by the Union was accepted for credibility purposes.  This evidence was relevant and admissable not as a new basis for discipline but because it reflected on the credibility of Grievant's defense in the 29-F hearings.

## The Company's Evidence

The significant evidence on the issue of misconduct submitted by the Company includes and is summarized below.

(1) Submitted by the Company were various white supremacist publications (KKK) written by Dennis Mahon thanking Daniel Mahon for his work and numerous financial contributions to various white supremacist projects and causes. This included nomination as "White Patriot of the Month". One publication stated:

"Daniel M. of the Tulsa area is white patriot of the month for his tremendous efforts in the financial support of this struggle. Daniel has purchased for this Order a professional duty state of the art VHS camcorder to help us with our cable TV programs and to video tape our gatherings. Daniel also built the cross, supplied the public address system, portable generator, and large tent for our rally in Oklahoma on Sept. 23. Dan also has a large collection of Klan and National Socialist white power merchandise. Dan has also supplied many white resistance groups with "T" shirts. Dan is one of those unsung heros who for the last 8 years has given sacrificially in money, sweat, and blood, who never asks for glory or power. Every organization needs more men like Daniel. These people are the back bone of the movement. Thank you Dan.

(2) There was testimony from two Union witnesses that Grievant knew about the April 20 meeting well in advance and was counseled not to come. This contradicts Grievant's statement in the 29-F hearing that he only found out about the meeting that day and had not discussed the meeting with anyone. It also significantly undermines his claim that the wearing of the "Turner Diaries" T-shirt was coincidental. Clearly he was sending a message.

(3) The "Turner Diaries" is rank with tales of murder and terrorism based on ethnic and racial matters reaped upon minorities. It also contains a virtual bomb making recipe used to create the source of "immense" damage reaped upon a government building. While technically fictitious, it is all too real to the some 160 victims (and their families) of Timothy McVeigh. Such references have a special significance in Oklahoma which cannot immediately be appreciated by others from other areas of the country.

(4) The Grievant's flyer was nearly identical in essential style and substance to a flyer distributed by the White Knights of the Ku Klux Klan controlled at the time by Dennis Mahon. The words "White" and "Race" were capitalized throughout. It had pictures of an old airplane and a rocket and extolled the virtues of named historical figures (all Caucasian) as members of a mighty race described as "explorers, philosophers and cultivators". The Company presented expert testimony by a researcher who had followed and collected vast amounts of information on neo-nazi and white supremacist groups. He has been an expert witness in many court proceedings through the United States and Canada. It was his opinion that the kind of conjunctive use of capitalization of "White" and "Race" is only found in the popular literature of white supremacists and neo-nazi groups. The concept of a noble race and superior race is at the heart of nazism. It

16

was his opinion the capitalization was no typographical error and the theme was clearly white superiority. The expert also produced a Tulsa newspaper article about Dennis Mahon's neo-nazi activities in Canada and Germany. The article quoted Grievant and indicated he supported his brother's views.

(5) There was testimony by two supervisors that on two separate occasions in the past the Grievant had been warned about bringing KKK/White Aryan symbols into the workplace. One incident involved the wearing of a KKK hat and KKK belt buckle. Another incident involved employee complaints about using a KKK knife in the workplace. The knife is an accepted tool in the shop but the symbols on it were the problem. Although Grievant denied it was his knife, he was told hate symbols at work would not be tolerated.

(6) There was testimony by a now supervisor who spoke about his first day on the job as a mechanic in the bargaining unit in 1986. The Grievant talked about the government and social problems with "jews and niggers." He was invited to Grievant's house where a similar conversation occurred. On another occasion Grievant and his brother showed a racially violent movie. Also in the fall of 1988 this same employee was employed in his off-duty hours as a reserve police officer. He worked as security at a gun show. He had a conversation there with the Grievant who was working at a booth where Aryan Nation materials and

17

T-shirts were displayed and sold. In fact, Grievant tried to give a Aryan Nation T-shirt to the witness.

(7) There was post-discharge evidence that Grievant's discharge was discussed in local and national neo-nazi/white supremacists communiques. This is not a basis for discharge but the fact it drew so much attention undermined Grievant's claims that he had no ties to white supremacist groups. Dennis Mahon was heard publicly stating that if his brother didn't get his job back "We're going to blow the place up." This implied violence was reinforced in other communiques.

### The Union's Evidence

(1) On cross examination the discharging manager admitted Grievant was a good mechanic and there had been no problems with his performance.

(2) Three crew chiefs testified that Grievant was an exceptional if not model mechanic. They also testified that he had never talked about the KKK or his political views at work, never was intimidating and in one case was described as the most polite and courteous mechanic he had ever worked with.

(3) A number of other employees echoed the crew chiefs' sentiment. The Grievant was kind to animals and helpful to people. He would "give you the shirt off his back".

(4) Nichols and Dill strongly dispute Kelly's statement about what Grievant supposedly said in the CERG meeting about writing the flyer.

(5) The Grievant denied having ties to white supremacist groups in his 29-F. It was also not his decision to distribute the flyer.

(6) The word "African-American" is capitalized through other employee resource group literature.

(7) Several employees weren't offended by the wording of the CERG flyer.

## A Weighing of the Evidence: The True Nature of the Grievant's Conduct

Was the flyer an expression of neo-nazi/white supremacist ideology or was the wording innocent and coincidental? Similarly, was the wearing of the shirt coincidental or was it a message? As noted above, the Board concluded the clear weight of evidence shows that the flyer was an expression of his social and political views and that the T-shirt was a message.

The evidence is convincing that the flyer was an expression of neo-nazi/white supremacist ideology. The wording of the White Knights of the Ku Klux Klan literature and the Grievant's flyer are strikingly similar. They are different to some degree, but nonetheless are spots on the same leopard. There is also the expert's testimony that the flyer was consistent with neo-nazi/white

19

supremacist verbiage and themes. There was no countervailing evidence or testimony offered.

It is true that much of the Company's evidence showing the Grievant was personally involved in neo-nazi/white supremacist activities and financially supported them is not recent. However, it is very significant that Grievant chose not to testify. He did not come forward to deny or repudiate these actions. He did not come forward and say I did not do these things or say I did them but I am a changed man and no longer act in this manner.

Again the Board stresses Grievant cannot be disciplined because he is involved in unpopular political and social activities. His activities are relevant only to the credibility of his denial that the flyer (which is on duty conduct) wasn't racist and that the T-shirt wasn't a message of intimidation. The credibility of these denials in turn rests indirectly on the credibility of his claim that he was not a white supremacist and did not have ties to white supremacist activities.

The evidence shows the Grievant's defense in the 29-F proceeding was not credible. Clearly he holds white supremacist beliefs and has ties and involvement in such organizations. This reflects highly unfavorably on the underlying intent of the flyer. He cannot be disciplined for being Dennis Mahon's brother but the fact they live together in the same small house, share the same phone number (used in

20

various White Aryan/KKK communiques) taken together with Daniel's financial support and personal involvement in these activities also sheds unfavorable light on any question as to the underlying nature of the flyer. There was also evidence that Grievant's involvement with these activities had the hallmark of independence as demonstrated by his manning a White Aryan booth at a gun show. Even without having to resolve the conflict in Kelly's testimony and the testimony of Nichols and Dill as to whether Grievant said he would enlist his brother's help, the evidence is clear as to what tone the wording of the flyer took on.

As for the T-shirt, the most glaring evidence is the lack of credibility of Grievant's claim in the 29-F hearing that he did not have notice of the meeting and had not discussed it with anybody. Clearly he had discussed it and knew when the meeting was. This in turn undermines the notion that the wearing of the "Turner's Diaries" T-shirt was just an accidental function of what was clean or not clean in his closet.

The Grievant wore the shirt on purpose. Given his failure to testify, given all the other evidence about his personal and political beliefs and given the nature of this book, the Board is left to conclude it was purposefully worn for its intimidating and threatening effect.

The Union's character testimony was accepted as sincere and truthful.

However, the fact he was technically proficient and nice to some people doesn't outweigh all the other evidence nor is it directly related to the specific nature of his conduct in this case.

In summary, the wearing of the T-shirt and authoring of the flyer constitute misconduct for which discipline is appropriate.

## The Penalty

The question now before the Board is whether discharge is an appropriate disciplinary penalty for authoring a flyer for distribution by the CERG with neo-nazi/white supremacist overtones and wearing a T-shirt for its intimidating and threatening effect.

A substantial part of the Union's evidence related to the fact that many employees wear what can be categorized as offensive T-shirts and are never disciplined. Instead, employees are either told to change them or turn them inside out. However, the Board notes many of these T-shirts were sexual in nature or related to internal union matters. T-shirts making a word play on the phrase "Big Johnson" are hardly comparable to T-shirts related to ethnic, racial and political terrorism.

There were T-shirts about black pride and Malcolm-X and in fact, another

employee claims to have worn a "Turner Diaries" T-shirt. Indeed the Company should be concerned about double standards. However, the Malcolm-X shirt is equivocal. As far as the others, ultimately they do not establish a basis for a convincing disparate treatment argument since the facts do not show they were worn in the same context as Grievant. Grievant wore his in the context of discussions about a racially/ethnically questionable document. The wearing of questionable T-shirts by others may have been misguided, but the evidence in this case shows Grievant's conduct was a deliberate expression of deeply held racist social and political beliefs. The evidence does not show the wearing of the other T-shirts was done in conjunction with other misconduct involving the expression of racist ideology.

So the Grievant's conduct is unlike anyone else, does this mean he should be discharged? This is just one of many challenging questions raised by this case. After all, the expressions of some of the other employee resource groups were found to be offensive to some employees. Isn't some tension inevitable as people work through their differences? And isn't there a natural potential for tension when groups are allowed to form along racial, ethnic or sexual lines? To some extent isn't tension and friction part of the process of diversification and diversity education? And, if undesirable employee attitudes are going to change, shouldn't

23

people in the context of the diversity program be free to speak their minds on the theory it is easier to change attitudes when they are out in the open and "on the table"? And in the United States generally isn't there "freedom of speech"?

What is protected free speech away from work is not necessarily protected free speech at work. The law requires that employers regulate speech and conduct at work that contributes to a racially or sexually hostile work environment. Such conduct constitutes prohibited discrimination if the employer allows it to exist. The employer has a duty to eradicate such employee behavior from the workplace. The employer also has the right to regulate political and social speech when that speech interferes with the operation of the business. For example, if the discussion of political or social issues creates distractions and tensions between employees where it significantly affects productivity, the employer would be allowed to address it in a reasonable manner. The employer can also expect its workers to treat each other with civility, respect and dignity.

The Grievant can carry around in his head whatever thoughts about race and ethnicity he wants to at work. He could stand on the street corner away from work and scream at the top of his lungs about his related views on race, religion, ethnicity, government oppression, gun control and armed revolution. However, he can't do the same at work.

24

The Union also claimed there was no notice that his conduct was prohibited and subject to discharge. This is not accurate. In general, the policy against harassment and discrimination is known to be a "zero tolerance" policy. More specifically, the Grievant had been put on notice in the context of displaying symbols of racial hatred by two different supervisors that such symbols and expression of political views would not be tolerated. It cannot be said that he did not know that such expressions might result in discharge.

Not only did management put Grievant on notice that controversial political and social views at work would not be tolerated, not only was he told that symbols would not be tolerated, he was warned by friends not to come to the April 20 meeting.—Evidently, he was also warned by someone within the "movement" not to wear the "Turner Diaries" shirt to the meeting. It doesn't bode well for him that his first error in judgment (writing a racially inappropriate flyer) was compounded by going to the meeting and wearing the shirt. These multiple errors in judgment strongly suggest that if reinstated, he could not or would not control himself or keep his racial and ethnic hatred from oozing once again from its ugly depths.

It is true that Grievant's writing could be taken two ways. It is true the wearing of the T-shirt could be taken two ways. However, the Employer has provided much evidence to which the Grievant failed to respond. Given this, it

25

was reasonable for them to interpret his actions in the worst possible light. His message was subtle but, in clearly resonant tones, rang true only to the sad song of racial superiority. Clever equivocation and veiled threats are part and parcel of the Grievant's ilk and he can't hide behind this cleverness at the expense of the security, dignity and respect of other workers who do not share his race or ethnicity or his attitudes of racial nobility. His expressions went well beyond the normal learning process involved in corporate diversity. His conduct is incompatible with the Employer's right to have a diverse workforce free from racial and ethnic hostility.

Much is debated in this record. However, in the final analysis, something must be said in plain and simple terms. At the root of Grievant's conduct was hate. At the root of his conduct was a philosophy based on hate for blacks, jews and other minorities. This philosophy has no place being expressed in the workplace. This is especially true where the Employer has engaged in so many efforts to establish a work environment free from racial hostility and harassment. Under these circumstances, discharge was appropriate.

## AWARD

The final advisory was for just cause and the grievance is denied.

_____
Gil Vernon, Arbitrator

_____
Mary Tinsman

_____
J. C. Brown

Dated this _____ day of March, 2000.

27

# EXHIBIT C

# EXHIBIT C



DIAL-A-RACIST
24 HOUR RECORDED MESSAGE

FOR PROUD WHITE
AMERICANS

WHITE NATIONALISTS
POLITICALLY INCORRECT

W.A.R.
834-4272
O.A.S.P.
832-8870

OKLAHOMA
WHITE ARYAN RESISTANCE
P.O. BOX 364
CATOOSA, OK 74015

OKLAHOMA
ARYAN SEPARATIST PARTY
P.O. BOX 868
GLENPOOL, OK 74034

DEFENDANT'S DEPOSITION
EXHIBIT
14



# EXHIBIT D

# EXHIBIT D

DEPO OF DANIEL W. MAHON, 10-29-03

Page 1

1        IN THE UNITED STATES DISTRICT COURT FOR THE
2                NORTHERN DISTRICT OF OKLAHOMA

4
5    DANIEL W. MAHON,
6           Plaintiff,
     vs.                              NO. 00-CV-1008-E
7
8    AMERICAN AIRLINES, INC.,
     A Delaware Corporation,
9           Defendant.
10   - - - - - - - - - - - - - - - -
11            THE VIDEOTAPED DEPOSITION OF
12   DANIEL W. MAHON, produced as a witness on behalf
13   of the Defendant in the above styled and numbered
14   cause, taken on the 29th day of October, 2003, in
15   the City of Tulsa, County of Tulsa, State of
16   Oklahoma, before me, Lisa A. Steinmeyer, a Certified
17   Shorthand Reporter, duly certified under and by
18   virtue of the laws of the State of Oklahoma.
19
20
21
22
23
24
25

Page 2

1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:        Mr. Robert Frazier
                               Attorney at Law
4                              4150 South 100th East
                               Ave
5                              Suite 200-B
                               Tulsa, OK 74146
6

7    FOR THE DEFENDANT:        Mr. David Cordell
                               Attorney at Law
8                              15 East 5th Street
                               Suite 3700
9                              Tulsa, OK 74103
                               -and-
10                             Mr. Robert Taylor
                               Attorney at Law
11                             P.O. Box 619616
                               MD-56765
12                             Dallas/Fort Worth
                               Airport, TX 5261
13
14   ALSO PRESENT:             Ms. Pamela Terrazas
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3
4    W I T N E S S                              P A G
5    DANIEL W. MAHON
6
       Examination by Mr. Cordell            4
7      Examination by Mr. Frazier          230
       Cont. Examination by Mr. Cordell    245
8      Cont. Examination by Mr. Frazier    250
       Cont. Examination by Mr. Cordell    251
9
10   Signature Page                         252
     Reporter's Certificate                 253
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            (Whereupon, the deposition began at
2    9:15 a.m.)
3               DANIEL W. MAHON,
4    having first been duly sworn to testify the trut
5    the whole truth and nothing but the truth, testi
6    as follows:
7               EXAMINATION
8    BY MR. CORDELL:
9    Q    What is your full legal name, please?
10   A    Full legal name is Daniel Wallace Mahon.
11   Q    Is that still your legal name?
12   A    Yes, it is.
13   Q    Have you been known by any other names?
14   A    No other name.
15   Q    My name is David Cordell. We've met once
16   before I believe. I represent American Airlines
17   this case where you have sued the company here i
18   federal court claiming certain violations of you
19   civil rights resulting from the termination of y
20   employment at American. Are you represented by
21   counsel today?
22   A    Yes, I am.
23   Q    The court reporter has administered you an
24   oath. Do you understand that you're sworn to te
25   the truth?

DEPO OF DANIEL W. MAHON, 10-29-03

Page 5

1  A    Yes.

2  Q    Do you understand there are consequences or
3  possible consequences if you do not tell the truth?

4  A    Yes.

5  Q    The oath that was given to you asked you to
6  swear under God that you would tell the truth. Is
7  that of any significance of you? Some people have
8  different ideas of God and things like that. So I
9  need to ask whether you believe that is binding on
10 you.

11 A    Yes, I do, yeah.

12 Q    Let me do a little bit of housekeeping here.
13 This deposition, while certainly very serious and
14 very formal, is intended to allow me to understand,
15 whether I agree with it or not, the basis of your
16 claims against my client. So as you know, I'm going
17 to ask you several questions today. I'm going to do
18 my best to ask you straightforward and fair
19 questions but in any event, at any time you believe
20 you don't understand one of my questions, feel free
21 to point that out and tell me. Okay?

22 A    Okay.

23 Q    Answer out loud. The court reporter can't
24 take down head shakes, and we'll need to remind one
25 another if we start talking non-verbally. Okay?

TULSA FREELANCE REPORTERS
918-587-2878

Page 6

1  A    Yes.

2  Q    Is it fair to me to presume that if I ask a
3  question and you answer it without telling me you
4  didn't understand it, that at least at the time I
5  asked the question, you believed you understood the
6  question?

7  A    I understand what you mean. In other words,
8  if you ask a question and if I don't understand what
9  the question is --

10 Q    Yes.

11 A    -- I have a right to ask you to repeat the
12 question?

13 Q    Yes.

14 A    Yeah.

15 Q    But if you go ahead and answer it, it's fair
16 to me to assume at the time you did understand it?

17 A    If I answer it, I definitely will understand
18 the question if I answer it.

19 Q    Are you feeling well today?

20 A    Not bad. How are you?

21 Q    Other than being nervous, are you feeling
22 physically okay?

23 A    Pretty good, yeah.

24 Q    Are you on any kind of medication that would
25 affect your ability to recall events in the past?

TULSA FREELANCE REPORTERS
918-587-2878

Page 7

1  A    Not anything that would affect my ability
2  answer a question, no.

3  Q    Are you on any kind of medication, whether
4  it's over-the-counter or prescription?

5  A    Yeah, I'm on some medication, yeah. I'm o
6  high cholesterol medication and some psoriasis
7  medications.

8  Q    Do you remember the names of them? I neve
9  can.

10 A    I'm not a medical person so --

11 Q    Are these medications that were prescribed
12 you by Dr. Karen Baten?

13 A    Bader, B-A-D-E-R.

14 Q    And she is your physician; is that right?

15 A    Right. She's my personal physician.

16 Q    How long has she been your personal physic

17 A    Oh, three years.

18 Q    Since you left Tulsa and moved to Arizona;
19 that correct?

20 A    My HMO, yes.

21 Q    And the problems regarding psoriasis and h
22 cholesterol, those started when?

23 A    About a month after I was terminated.

24 Q    Is it your testimony that prior to that ti
25 you never had any health problems whatsoever?

TULSA FREELANCE REPORTERS
918-587-2878

Page 8

1  A    No health problems at all.

2  Q    You're 53; is that right?

3  A    That's correct, 53.

4  Q    Birthday is August 29th, 1950?

5  A    That is correct.

6  Q    Where were you born, sir?

7  A    I was born in Rockford, R-O-C-K-F-O-R-D,
8  Rockford, Illinois.

9  Q    Are either of your parents still alive?

10 A    Both parents are still alive and well.

11 Q    Where do they live?

12 A    They live in Davis Junction, Illinois.

13 Q    How far away from Rockford is that?

14 A    Approximately ten miles.

15 Q    I understand that after a stint working fo
16 White Beret Enterprises, you moved to Illinois to
17 went to work for Rockford Aero Taxi?

18 A    Rockford Aero Taxi. It's an air cargo
19 operator.

20 Q    Where was that particular business located

21 A    Rockford Airport.

22 Q    In Rockford, Illinois?

23 A    Yeah, Rockford Airport right there outside
24 town.

25 Q    In essence, you moved back to your home to

TULSA FREELANCE REPORTERS
918-587-2878

Page 9

1  for a job after leaving American?
2  A    Yes.  I moved there -- well, not after.  I
3  worked in the appliance repair business for about
4  nine months first.
5  Q    And when you moved back to Rockford, did you
6  move in with your parents?
7  A    I resided on the property, not in their house,
8  no.
9  Q    Do they have another building on the property
10 or something?
11 A    Yeah, several.
12 Q    Family farm?  I'm trying to get a picture.
13 A    Yeah, six acres.
14 Q    Do you know your Social Security number by
15 memory?
16 A    Yes, I do.  It's 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.
17 Q    And I understand you're an FAA licensed
18 aircraft and power plant mechanic; is that right?
19 A    Well, I don't actually work as that.  I work
20 as an avionics, FCC license, but I do have all the
21 ratings.
22 Q    What is your A & P license number, if you
23 know?
24 A    1943502.
25 Q    Do you know what your FCC license is?

Page 10

1  A    I can get it.
2  Q    Mind checking real quick for me?
3  A    Okay.
4  Q    Do you need to borrow these?
5  A    Yeah.  I forgot my reading glasses.  It's kind
6  of hard.  Okay.  PG, as in papa golf, dash, GB, as
7  golf bravo, dash, 079703.  You don't need the
8  issuance or anything like that; right?
9  Q    No, sir.  I need my glasses back.
10 A    I'm sorry.  I'm used to wearing mine all the
11 time.
12 Q    As we know, this is a case about you and not
13 about your brother, Dennis.  Certainly because of
14 the history of this matter, there will be questions
15 that have to do either directly or indirectly with
16 him.  At this point my question is, are you and your
17 brother, Dennis', Social Security numbers different
18 by only one digit?
19 A    One digit, right.
20 Q    Do you happen to know whose number is higher
21 or lower?
22 A    His number is one digit higher.
23 Q    So you're the older brother?  What's the birth
24 sequence?
25 A    He was born first.  I was born five minutes

Page 11

1  later.
2  Q    You're identical twins; right?
3  A    Yes, sir.
4  Q    I believe your twin brother also is Dennis
5  Mahon; is that correct?
6  A    That's correct.
7  Q    Do you know what his middle name is?
8  A    William.
9  Q    Other than Dennis, do you have any other
10 siblings, brothers or sisters?
11 A    I have two siblings, older sister and a
12 younger brother.
13 Q    Please tell me their names and where they
14 live.
15 A    Gary is my younger brother and he lives in
16 Seattle, Washington.
17 Q    Does he go by Gary Mahon?
18 A    Yeah, uh-huh.
19 Q    Am I pronouncing your name correctly?
20 A    You mean --
21 Q    Mahon?
22 A    Yeah, that's correct, exactly.
23 Q    Seattle, do you know what he does for a
24 living?
25 A    He's in the window washing business.

Page 12

1  Q    And your older sister, what is her name and
2  where does she live?
3  A    Her name is Margie and she lives in Milwaukee,
4  Wisconsin.
5  Q    Is she married?
6  A    No.  She's single.
7  Q    Does she still use the last name Mahon?
8  A    That's correct.
9  Q    I understand at one point in time -- I'm
10 sorry, I asked about your parents.  I didn't get
11 their names.  What are their names?
12 A    Barbara and William Mahon.
13 Q    I understand at one point in time you were
14 married to a woman named Myrna?
15 A    Right.
16 Q    What was her full name or is her full name?
17 A    Right now it's -- she's twice married again
18 so her last name is Faracion, and I don't know how
19 to spell that, just Myrna.  F-A-R-A-C-I-O-N, that's
20 as close as I can get it.
21 Q    When she married you, was that her first
22 marriage?
23 A    Yeah, first marriage.
24 Q    You say she's been twice married, so she's on
25 her third marriage?

Page 13

1  A    Yeah, third marriage.
2  Q    Of your marriage, there was one child born;
3  Willie or William; is that right?
4  A    William R., yeah.
5  Q    What does the R stand for?
6  A    Ricardo.
7  Q    Now, some people use the term married in
8  different contexts.  When you were married to Myrna,
9  were you legally married?
10  A    Yeah.  We had a license, yeah.
11  Q    License, wedding the whole deal?
12  A    We went to a church wedding, yeah.
13  Q    Where were you married, and I understand you
14  were divorced.  When were you divorced?
15  A    You want to know when I was married first?
16  Q    Sure.
17  A    Okay.  We were married in Coupeville,
18  Washington in 1979 in October.
19  Q    Were you still in the Service at the time?
20  A    U. S. Navy, right.
21  Q    And when were you divorced?
22  A    1984.  It was in the fall.  I forget exactly
23  when.
24  Q    Were you living in Tulsa at the time of your
25  divorce?

TULSA FREELANCE REPORTERS
918-587-2878

Page 14

1  A    No.  We were living in Florida, Hollywood,
2  Florida.
3  Q    And you hadn't gone to work for American
4  Airlines by then?
5  A    I was still with Eastern.  Eastern Airlines
6  when it was still in business.
7  Q    How old is your son now?
8  A    He's 23.
9  Q    We'll review a little bit of your employment
10  background leading up to going to work for American.
11  At the time you were working for Eastern down in
12  Florida, what was the reason that you left that
13  employment?
14  A    They were going belly up.  They were in an
15  extremely bad way financially, and I wanted to leave
16  before they quit, before they went under, which they
17  did.
18  Q    Did you go to work directly for American
19  Airlines at that point?
20  A    No.  I went to an operator in Michigan called
21  Activaero.  I worked up there for -- before I went
22  with American.
23  Q    I'm going to hand you what's been marked as
24  Defendant's Exhibit 5.  This exhibit, while we're
25  marking it, I believe is an application for

TULSA FREELANCE REPORTERS
918-587-2878

Page 15

1  employment with American Airlines, a copy of whi
2  was also in the papers that you produced yesterd
3  Sir, will you identify that as being the case; i
4  that your complete employment application to
5  American Airlines as far as you can tell?
6  A    As far as I can tell, it looks like it is.
7  Q    Sir, at the time you applied for American,
8  is customary, there's a provision, a portion on
9  3 of this application that outlines your employm
10  history.  Do you see that?
11  A    Uh-huh.
12  Q    This is a shortcut so you don't have to tel
13  me from memory everything that you did after leav
14  Eastern.  Reviewing that now, do you recall or ca
15  you tell me that the employment history that you
16  gave American at the time you went -- applied to
17  work there is accurate?
18  A    Accurate as far as I can see.
19  Q    Are any jobs missing?
20  A    No jobs missing.
21  Q    Now, I note on the one that pertains to
22  Eastern Airlines that your reason given for leav
23  there was for, quote, various reasons, closed qu
24  A    Uh-huh.
25  Q    Were there any reasons besides the spectre

TULSA FREELANCE REPORTERS
918-587-2878

Page 16

1  bankruptcy?
2  A    Well, basically just they were going bankru
3  and that was it.  I got divorced.  That was all.
4  Just felt like leaving the situation.
5  Q    No other reasons?
6  A    No other reasons I know of.
7  Q    Is it your testimony you were not fired fro
8  Eastern?
9  A    No, I was not fired from Eastern.  They beg
10  me to stay.
11  Q    Directing your attention to Defendant's
12  Exhibit 5 still, does that bear your signature on
13  the last page?
14  A    That's my signature.
15  Q    Above your signature there are some paragra
16  that relate to the terms and conditions of your
17  employment by American.  At the time that you sig
18  your application, did you agree to abide by those
19  terms and conditions if, in fact, you took a job
20  American?
21  A    I signed it, so I must have agreed to it.
22  Q    But for any limiting provisions of the
23  collective bargaining agreement between the union
24  and the company, the contract, did you understand
25  that you were an at-will employee, that is to say

TULSA FREELANCE REPORTERS
918-587-2878

**DEPO OF DANIEL W. MAHON, 10-29-03**

Page 17

1 the company could fire you at any time for any
2 reason, good or bad?
3 A    During the probationary period of six months,
4 right.
5 Q    After the probationary period, except for
6 limitations caused by the union contract, i.e., that
7 there had to be just cause to fire you, but for that
8 restriction, did you understand you were an at-will
9 employee of American Airlines?
10 A    Yes, yes, I did.
11 Q    Other than the union contract, do you believe
12 that you had any contract of employment with
13 American Airlines?
14 A    Excuse me. I'm sorry, I didn't --
15 Q    Other than the union contract, did you believe
16 you had any other contract of employment with
17 American Airlines?
18 A    Any other contract?
19 Q    Yes, sir.
20 A    In other words, another job that conflicted
21 with American?
22 Q    No. Let me clear it up. Was there any signed
23 contract between you and American Airlines?
24 A    No, there wasn't.
25 Q    Were there any agreements between you and

TULSA FREELANCE REPORTERS
918-587-2878

Page 18

1 American Airlines regarding continued employment
2 other than the contract that the company had with
3 the union?
4 A    There was no other contract.
5 Q    Since your divorce from Myrna in roughly 1984,
6 have you been married?
7 A    Not remarried, no.
8 Q    Did you ever get back with Myrna?
9 A    Yeah, we did get back.
10 Q    When did you two get back together?
11 A    She lost her job in Florida and I told her of
12 some job openings in Tulsa, and I would have my son
13 close by to help him grow up, and she came back. I
14 got her a house in late '89.
15 Q    Purchased a house for her?
16 A    Helped, yeah, helped her purchase a house.
17 Q    But I take it, you all never remarried?
18 A    No, we didn't.
19 Q    Did you live together as husband and wife
20 under common law?
21 A    Yeah, for a certain time.
22 Q    I take it you've split up again; right?
23 A    Right. It didn't work out.
24 Q    When did you all split up again?
25 A    Oh, about 1990.

TULSA FREELANCE REPORTERS
918-587-2878

Page 19

1 Q    And did she move away from Tulsa about that
2 time?
3 A    Right. She remarried a gentleman that had a
4 lot of family in the southwest and she moved to
5 Phoenix.
6 Q    Do you have any family in Arizona other than
7 perhaps your brother?
8 A    Just my son and the ex-wife lives there and
9 brother. That's it.
10 Q    Do you live -- I'm not that familiar with
11 Arizona. Do you live close by where your ex-wife
12 and your son live?
13 A    Yeah, within a fifteen-minute drive, yeah.
14 Q    Do you have any grandchildren?
15 A    One.
16 Q    What is that grandchild's name?
17 A    Clayton.
18 Q    Is your son, Willie, still married?
19 A    No. It was out of wedlock type of situation.
20 Q    And what is Clayton's last name?
21 A    It's his girlfriend's. I forget her last name
22 now. I just can't remember.
23 Q    Does Clayton live in Arizona?
24 A    Yeah. He lives with my son. They share joint
25 custody. He stays at each place.

TULSA FREELANCE REPORTERS
918-587-2878

Page 20

1 Q    I realize that your son is now an adult, but
2 at the time of your divorce from Myrna, who received
3 custody of Willie?
4 A    She did, although he spent a lot of time with
5 me.
6 Q    If I were looking for your divorce papers,
7 should I look in Florida for them?
8 A    Yeah. That's where it was filed.
9 Q    Other than your divorce, have you ever been
10 involved in any other kind of litigation besides
11 this case?
12 A    No other litigation at all, nothing.
13 Q    Never been sued by a creditor, for example?
14 A    Never been sued for any reason.
15 Q    Never evicted from an apartment?
16 A    Never evicted from any place of residence.
17 Q    Other than documents that we're going to look
18 at later today, do you recall ever giving a sworn
19 statement, and let me give some examples. Somet-
20 -- obviously when you applied for employment at
21 American, you made a sworn statement. Often times
22 when people between jobs apply for unemployment
23 insurance, they fill out affidavits and things of
24 that nature. Have you ever given any other kind of
25 sworn statements ever in your life?

TULSA FREELANCE REPORTERS
918-587-2878

# DEPO OF DANIEL W. MAHON, 10-29-03

1 A    Not that I know of.

2 Q    I understand that before you left Tulsa after

3 your termination from American, that you lived with

4 a neighbor for awhile. Back up one place behind

5 that. In terms of where your home was in Tulsa,

6 where was it located?

7 A    Okay. Talking about just before I left or

8 after I got fired?

9 Q    At the time you got fired, where were you

10 living?

11 A    I was 1448 North College.

12 Q    How long had you lived at that address?

13 A    1990. That was the house I bought for the

14 ex-wife, and I just took over payments, quit claim.

15 Q    And is that the location where from time to

16 time your brother, Dennis, would live with you?

17 A    Yeah. He rented a room.

18 Q    Was the house on North College in your name

19 and only your name?

20 A    Yes, it was in my name. I finally sold it.

21 Q    Did you have a phone number at that house?

22 A    Yes, I did.

23 Q    Do you recall the number?

24 A    My phone number was 834 --

25 Q    1042?

1 A    Yeah, 1042.

2 Q    All right. As it respects your employment at

3 American, when you were fired, you exercised your

4 rights under the collective bargaining agreement and

5 filed a grievance?

6 A    Right, I did.

7 Q    And at the arbitration that was finally held

8 in this matter, you were represented by your union;

9 correct?

10 A    Correct. I was represented by TWU.

11 Q    And at that hearing the union also had a

12 lawyer present; is that right?

13 A    They had a lawyer present, Frasier, Frasier

14 Law Firm, Steve --

15 Q    Steve Hickman; right?

16 A    Steve Hickman.

17 Q    Was Steve Hickman your lawyer at that matter

18 or a combination of your lawyer and the union's

19 lawyer; what was he there?

20 A    As far as my understanding goes, he was

21 strictly the union's contracted lawyer.

22 Q    But there to help with the arbitration; is

23 that right?

24 A    He was there supposed to be helping with the

25 arbitration.

1 Q    I take it you don't think he helped very mu

2 A    I didn't hear him talk very much. Let's pu

3 it that way.

4 Q    Whether you agree with the decision or not,

5 assuming -- and I assume you don't, but whether

6 agree with it or not, you understand that your

7 grievance and arbitration was heard and went aga

8 you, i.e., it was determined that the company ha

9 just cause under its rules to terminate your

10 employment?

11 A    Right. I read that decision, yeah.

12 Q    How long did that hearing go on?

13 A    That hearing was a record-setting three-day

14 hearing. The arbitration hearing was three days

15 Q    I'm going to hand you what's been marked as

16 Defendant's Exhibit 9. While she is doing that,

17 you attend all the arbitration?

18 A    Yes, I did, all four or three days.

19 Q    Were you present when all witnesses were

20 testifying?

21 A    Yes, I was.

22 Q    Would you please identify Defendant's Exhib

23 9 as a copy of the decision of the three member

24 board adjustment upholding American's terminatio

25 your employment?

1 A    Yeah. This is a copy of that decision.

2 Q    Prior to today, have you actually reviewed

3 that decision?

4 A    I've gone through it.

5 Q    Have you looked at it closely?

6 A    As close as I wanted to.

7 Q    Now, at the arbitration you chose -- or str

8 that. At the arbitration you did not testify; i

9 that right?

10 A    I was informed not to testify by the union.

11 Q    Who at the union told you not to testify?

12 A    The committee man in charge, Mike Rial,

13 requested that we didn't have time, enough time,

14 we had plenty of witnesses that testified, so --

15 Q    It was a decision made during the course of

16 the arbitration?

17 A    Yeah, the union decision not to let me

18 testify.

19 Q    Is it fair to assume from the way you answe

20 that question, that you wanted to testify?

21 A    Yeah. I was looking forward to it, but the

22 union basically ran the show, so I let their

23 judgment stand.

24 Q    Let's begin at the beginning in terms of th

25 case here. I'm going to direct your attention t

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 25

1  Defendant's Exhibit 1. At some point in time you
2  were notified in writing that your employment had
3  been terminated; is that correct?
4  A    That's correct.
5  Q    Did you receive that notification by virtue of
6  Defendant's Exhibit 1, the May 10, 1999 final
7  advisory?
8  A    Final advisory, yeah.
9  Q    You did receive this?
10  A    I did receive this copy, yeah.
11  Q    Once you received the copy, did you read it?
12  A    Yes, I read that.
13  Q    Did you read it closely for accuracy?
14  A    Oh, I went through it. I didn't put a
15  magnifying glass on it but I did go through it.
16  Q    Skipping any conclusions that are reached in
17  this and focusing on the facts only, is it true that
18  on April 20, 1999 you attended a meeting of what was
19  then known as the Caucasian employee resource group?
20  A    Yes. I was notified by a crew member that a
21  flyer was on the bulletin board. At the time I
22  received permission to go to the meeting, so I did
23  go that meeting, a little late but --
24  Q    Did you understand going into that, and we'll
25  discuss this in more detail. Right now I'm looking

TULSA FREELANCE REPORTERS
918-587-2878

Page 26

1  for overview, sir, okay? Did you understand going
2  into that meeting on April 20, 1999 that the purpose
3  of the meeting was to discuss the role of American
4  Airlines employee resource groups in supporting
5  diversity in the workplace?
6  A    Yes. There were some other issues that were
7  going to be raised, that were raised at the meeting.
8  Q    Among those issues, did you understand one of
9  the purposes of the meeting was to discuss the
10  recent six-month suspension of the Caucasian
11  employee resource group as a result of the flyer
12  that you authored and was handed out at the
13  diversity fair?
14  A    Actually I didn't know of the meeting at all
15  until I was notified by a crewman in my shop, but I
16  wanted to attend the meeting because there was
17  several issues that were going to be talked about,
18  among those, that particular issue.
19  Q    Okay. During the April 20 meeting did you
20  speak up and admit that you wrote the flyer and
21  supplied it to the CERG for distribution?
22  A    Well, an individual, Greg Hall, started
23  calling me another name. He called me Dennis, and
24  he said, Dennis, we're not going to have this type
25  of radical extremist literature in the workplace.

TULSA FREELANCE REPORTERS
918-587-2878

Page 27

1  So I asked him to explain in particular what was
2  wrong with the literature, and then that's how the
3  discussion proceeded after that.
4  Q    At that time, though, did you admit you wrote
5  the pamphlet?
6  A    It was -- absolutely. I was directed by the
7  head of the group on four different occasions that
8  they would like to have some literature made up.
9  Q    The head of the group is Linda Dill?
10  A    Linda Dill and Mr. -- oh, wow.
11  Q    Craig Nichols?
12  A    Craig Nichols, right.
13  Q    Once again, what I'm doing is tracking the
14  language of the advisory here as an overview and
15  we'll give you the chance to give us details of
16  opinions on it later, okay, but as reflected in the
17  final advisory, on April 20, 1999 at that meeting
18  did you wear a T-shirt with the words and a picture
19  on the front saying The Turner Diaries?
20  A    Yes, I did.
21  Q    And the front side of the shirt had a
22  depiction of the cover of the book; is that right?
23  A    It was, right.
24  Q    Now, you have a copy of that book; is that
25  right? I'm handing to you and I'd like for you to

TULSA FREELANCE REPORTERS
918-587-2878

Page 28

1  look at it and hold it up for the camera. It
2  appears to be a copy of a book called The Turner
3  Diaries that was produced to us from your files
4  yesterday afternoon.
5  A    Yes.
6  Q    Is that your book?
7  A    That's not my book but it's a copy of the
8  book.
9  Q    Did you have a copy of the book?
10  A    For a little while.
11  Q    What happened to your copy?
12  A    It was borrowed. I read the first chapter,
13  it was the last I saw of it.
14  Q    Who borrowed it?
15  A    I'm not sure. I think a neighbor.
16  Q    Who do you think it was?
17  A    Dennis said he let someone else see it or he
18  mailed it off to somebody and that was it. It was
19  very busy household there. I was involved in a lot
20  of repair work on people's TV's and a car outside,
21  an overhaul; my engine was torn down on my own car.
22  I didn't have a chance to get past the first
23  chapter. Plus a lot of overtime, so it was a very
24  busy time.
25  Q    How did you originally obtain a copy of The

TULSA FREELANCE REPORTERS
918-587-2878

Page 29

1  Turner Diaries?

2  A    Gun show, one of the big gun shows here in

3  Tulsa.

4  Q    The Wanamaker Gun Show?

5  A    I'm not really sure if it was the Wanamaker or

6  the other one. It was about a month or two before

7  the problem we had, talking about at the time I

8  bought the T-shirt and the book, and the T-shirt was

9  on sale, so it was a package deal on it, so --

10  Q    Since we're talking about that, I've lived in

11  Tulsa for awhile and have also gone to the gun

12  shows. If I represent to you that in the first

13  quarter of 1999, prior to the time of your

14  termination, there was a gun show held in Tulsa

15  sponsored by a company or the people named Wanamaker

16  during the weekend of April 10 through 11, assuming

17  for the time being that my information is correct,

18  which I believe it to be, is that the gun show that

19  you attended where you bought a copy of The Turner

20  Diaries and a Turner Diaries T-shirt?

21  A    That probably would have been the one.

22  Q    Returning to the final advisory, turning to

23  the allegations covered in that, The Turner Diaries

24  T-shirt that you bought, as you just testified, did

25  you wear it to the management meeting?

TULSA FREELANCE REPORTERS
918-587-2878

Page 30

1  A    What management meeting are we discussing now?

2  Q    The Caucasian employee resource group, at

3  which members of management were present.

4  A    Well, management was present at all meetings.

5  This was an open meeting on a flyer. It described

6  an open meeting to all members and guests. So it

7  was not exactly a membership meeting because they

8  were always represented at those meetings.

9  Q    Did you understand that members of management

10  were likely to be at that meeting?

11  A    Well, there's always some at every meeting, so

12  I didn't know if there would be or not.

13  Q    Now, prior to your purchasing of The Turner

14  Diaries book at the April 10 or 11 Wanamaker Gun

15  Show in 1999, had you previously read The Turner

16  Diaries or any portion of it?

17  A    No, I never read the book before then.

18  Q    What caused you to purchase the book?

19  A    I've heard about it. In the McVeigh trial

20  they mentioned it and USA Today in many articles,

21  and I decided to see what people were talking about,

22  better buy a copy of it and check it out and see

23  what it has to say.

24  Q    Prior to buying it and checking it out, what

25  did you understand The Turner Diaries was about?

TULSA FREELANCE REPORTERS
918-587-2878

Page 31

1  A    I thought it was anti-government, pro-gun

2  book, a novel.

3  Q    Did you understand that part of the infamy of

4  it was that Timothy McVeigh had a copy of it or a

5  portion of it in his car when he was arrested?

6  A    That was part of the reason it piqued an

7  interest.

8  Q    Did you understand at the time you bought the

9  book that it was believed that Timothy McVeigh

10  followed the scenario in the book in terms of making

11  a fertilizer bomb, parking it in a rent truck in

12  front of a federal government building and

13  detonating it?

14  A    All I understood about the McVeigh situation

15  at the trial news reports was that his motivation

16  behind what he did was what he witnessed firsthand

17  at Waco, Texas and also the massacre up in Idaho

18  with the Weaver family. That was the biggest

19  motivation he had for his retaliatory act. As far

20  as I know, The Turner Diaries, the guy I bought

21  from said over 300,000 copies were sold in the last

22  several years. So McVey may have had it and never

23  even read it. Who knows?

24  Q    Before you bought the book, did you understand

25  that a least a portion of it deals with the

TULSA FREELANCE REPORTERS
918-587-2878

Page 32

1  systematic murder of non-whites?

2  A    No, I didn't know it until I read the first

3  chapter that dealt with a big gun confiscation

4  program that the federal government initiated. I

5  got through the first chapter and I got involved in

6  other activities around the house and that's as far

7  as I got.

8  Q    When you bought the book at the April 10 or 11

9  gun show, were you alone; in other words, gun shop

10  by yourself; were you there with your brother; what

11  was the situation?

12  A    I don't think he was with me that day. I

13  think he was out of town. I think he was up in

14  Illinois. I'm pretty sure he was out of town.

15  Q    Do you know who you bought the book from?

16  A    No.

17  Q    Was it a fellow in a booth or something?

18  A    Numerous vendors had the book. I just don't

19  remember. That's a pretty good-sized gun show.

20  Q    Did you buy it at some booth advertising it or

21  was it randomly at some gun seller?

22  A    It was a large area, had T-shirts, books,

23  everything, all kinds of stuff.

24  Q    Do you remember the name on the display?

25  A    No.

TULSA FREELANCE REPORTERS
918-587-2878

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 33

1  Q    Were you familiar with any people that were
2  working at what I'm calling the booth at the time
3  you bought this booth?
4  A    No.  I have no idea who I bought it from.
5  Q    My question was, did you know any of the
6  people that were running the booth?
7  A    No, no knowledge of any people that ran the
8  booth.
9  Q    At the time -- I'm referring to Exhibit 1
10  still in terms of the allegations that were made
11  supporting your termination.  At the time you went
12  in to the April 20, 1999 meeting, were you aware
13  that American Airlines had received a number of
14  complaints by other employees concerning the flyer
15  or the pamphlet you had written?
16  A    I heard rumors to that effect, just a few
17  people.
18  Q    Had any of the members of the Caucasian
19  employee resource group told you that people were
20  upset about your pamphlet?
21  A    I received one phone call.
22  Q    From who?
23  A    Linda.
24  Q    What did she tell you?
25  A    She said there's just an issue about it with

TULSA FREELANCE REPORTERS
918-587-2878

Page 34

1  high management and so she didn't say anybody else,
2  just that the management was having an issue with
3  it.  That's all she told me.
4  Q    Was that a matter of concern at the time going
5  into the meeting on April 20?
6  A    Not really because I didn't have anything in
7  that literature that was derogatory to any culture
8  or race or anything.
9  Q    Did she, Linda Dill, tell you what it was that
10  management found offensive about your --
11  A    No.  She just said that it -- they said it was
12  improper and it showed a hint of white supremacy to
13  certain high management people.
14  Q    For the purposes of the chronology, was the
15  last day of your employment at American Airlines May
16  10, 1999?
17  A    Right.  May 10th was it.
18  Q    Sir, I'm going to direct your attention to
19  what's been marked as Defendant's Exhibit 15, which
20  I'll represent to you is a copy of the exhibit
21  showing a picture of The Turner Diaries T-shirt or
22  the exhibit that was used at your arbitration.
23  Starting with a copy of a picture of it, look at
24  that and tell me if that happens to be a copy of the
25  T-shirt as it was shown and used in your

TULSA FREELANCE REPORTERS
918-587-2878

Page 35

1  arbitration.
2  A    Yeah.  It's dark; it should be lighter.  It
3  looks like it's gray.  That is the T-shirt right
4  there.
5  Q    Let me hand this to you and have you hold
6  up to the camera so we've got a better picture of
7  it.
8  A    You want the front first?
9  Q    Front first, please, and then flip the back
10  around.
11  A    (Witness complied).
12  Q    Sir, there's some confusion in my mind based
13  upon statements you've made to various people at
14  various times, so let me ask a couple of questions
15  about that.  Is that the actual T-shirt you wore
16  the April 20, 1999 meeting of the Caucasian employee
17  resource group?
18  A    No, this is not it.
19  Q    What happened to that T-shirt?
20  A    I don't know.  I think it just got thrown
21  away.
22  Q    At some point I've seen some reference that
23  lady friend threw it away.
24  A    Yeah.
25  Q    Does my recall bring a recollection to your

TULSA FREELANCE REPORTERS
918-587-2878

Page 36

1  A    Yeah, a girlfriend.  She got kind of irate
2  about it and she took it and last I saw of it.
3  Q    Who is that person?
4  A    Lisa.
5  Q    Lisa what?
6  A    She's a married lady, and I don't feel
7  comfortable about giving that information out.
8  Q    Well, were you having an affair with her at
9  the time she was married; is that the point?
10  A    Yeah.
11  Q    Does Lisa still live here in town?
12  A    No.  She's not in the state anymore.
13  Q    Subject to an agreement that I could make with
14  your counsel on a protective order and about how I
15  approach this person, would you agree on a break
16  here to consult with your lawyer and give me this
17  person's last name?
18  A    I don't think it's appropriate.  Does it have
19  anything to do with the case?  I admit I wore that
20  T-shirt to the meeting, not that exact T-shirt but a
21  T-shirt of that exact make and style.  This T-shirt
22  has some unusual marks on it.  I don't know what
23  those marks are of some type, but that's not the
24  T-shirt I wore.
25  Q    Obviously that's a T-shirt that's been worn

TULSA FREELANCE REPORTERS
918-587-2878

Page 37

1  fair amount. It's yellow and stained?
2  A   Yeah, it's stained. Actually is this an extra
3  large. That may be my brother's T-shirt. I think
4  he had one, too. Looks like an extra large.
5  Probably too big for me. I wear a medium.
6  Q   Let me get the timing of it this and I'll let
7  you and Mr. Frazier consult on the break about the
8  issue I've raised. Was the original -- I'll call it
9  the original -- the original T-shirt that you wore
10 to the April 20 meeting destroyed by your lady
11 friend between that meeting and the time of the
12 arbitration?
13 A   It was destroyed just after I was put out of
14 work, before the arbitration.
15 Q   Sometime shortly after May 10, 1999?
16 A   Yeah, before the arbitration.
17 Q   And what was the nature, as you recall, of her
18 being upset about it to the extent she trashed your
19 shirt?
20 A   I just told her to go ahead -- it cost me my
21 job, go ahead and destroy it. So I directed her to
22 just go ahead and dispose of it.
23 Q   The T-shirt you produced that we've been
24 looking at here today, do you know where you got
25 that one?

Page 38

1  A   The T-shirt, this T-shirt here?
2  Q   The one here on the table.
3  A   I don't know where that shirt came from. Oh,
4  the shirt, I know where it came from. It came from
5  a neighbor, a guy named Steve because I remember we
6  went to his house and got it.
7  Q   Who is Steve; what's his last name?
8  A   Steve Waddel.
9  Q   He's one of the people that you've listed as a
10 witness in this case; right?
11 A   Right. He's a neighbor and a friend. I've
12 done a lot of work for him.
13 Q   So he himself had one of these T-shirts?
14 A   Yeah, he actually had one.
15 Q   You said we went and got it from him. Who is
16 we?
17 A   Me and my attorney.
18 Q   And did that occur after the arbitration?
19 A   Way after the arbitration.
20 Q   So the picture that's in Exhibit 15 that was
21 used at the arbitration is not a picture of the
22 T-shirt that's on the table; is that correct?
23 A   I'm not sure where we got the T-shirt at the
24 arbitration.
25 Q   Were you present at the time that the picture

Page 39

1  taken and then made as an exhibit, Exhibit 15, w
2  done?
3  A   You know, I can't recall really what T-shir
4  how they got that T-shirt. I'm trying to think
5  that far. My memory is not good. I know when I
6  the attorney, my attorney, we went and got that
7  T-shirt from Steve. That's where this T-shirt c
8  from. The T-shirt at the arbitration, I'm not s
9  I just can't recall where that T-shirt came from
10 whether they ordered one from the Internet or
11 whatever.
12 Q   Do you happen to know where the T-shirt tha
13 they took a picture of that's in Exhibit 15 is
14 located now?
15 A   That's probably the one at the arbitration
16 Q   So it was borrowed from Waddel, a picture w
17 taken and returned to Waddel; is that what you t
18 happened?
19 A   That's probably what happened, yeah, becaus
20 when I got the attorney, we went back to his hou
21 and got that T-shirt.
22 Q   When the three of us were in Denver arguing
23 the appeal of this case, your counsel showed the
24 panel members a Turner Diaries T-shirt. Is the
25 he showed them the one that's on the table in f

Page 40

1  of us as far as you know?
2  A   As far as I know, that's the one he showed
3  the judges.
4  Q   When you bought the T-shirt and The Turner
5  Diaries book April 10 or 11, 1999, you've testi
6  that you purchased more than one T-shirt at that
7  time; is that right?
8  A   Yeah. I think I purchased three or four
9  T-shirts around the gun show.
10 Q   From the same vendor, same seller?
11 A   No. Different vendors.
12 Q   Did you buy more than one Turner Diaries
13 T-shirt?
14 A   No. One T-shirt I bought from him and I
15 bought three other T-shirts from three other
16 vendors.
17 Q   Do you recall what the other T-shirts were
18 A   One was Bill Clinton, something about Bill
19 Clinton, and another one was -- oh, wow. One w
20 pro-gun T-shirt but I forget what it said, and t
21 were two about Clinton, two T-shirts with Clint
22 picture on the front, and one said -- it had a
23 target thing on it but I didn't know what it sa
24 It just had a target thing and he was like smil
25 and one was talking about Clinton in a sexual

**DEPO OF DANIEL W. MAHON, 10-29-03**

Page 41

1  manner. I don't remember what it was; it was a
2  comical T-shirt is all.
3  Q    Do you remember what the third one was?
4  A    I don't remember.
5  Q    Of the total of four T-shirts you bought at
6  the gun show that day --
7  A    I think it was four of them I bought and
8  several other things.
9  Q    Had you worn any of the T-shirts you bought
10 that day besides the Turner Diaries ones to work?
11 A    I think I wore the Clinton one one time, once
12 or twice.
13 Q    So you wore the Clinton -- let's make sure we
14 understand the chronology. You purchased the shirts
15 on the weekend of April 10 and 11, 1999?
16 A    Uh-huh.
17 Q    And you were terminated May 10, 1999, almost
18 exactly a month later; is that correct?
19 A    Uh-huh, right.
20 Q    And in the meantime after you bought the
21 shirts and the Turner Diaries book, we know you
22 attended the meeting on April 20, 1999 where you
23 wore a Turner Diaries T-shirt?
24 A    Right.
25 Q    So is it your testimony that between April 10

TULSA FREELANCE REPORTERS
918-587-2878

Page 42

1  or 11, 1999, that weekend, and the meeting on April
2  20, that you had worn one or more of the other
3  shirts you bought at the gun show?
4  A    Probably one of them anyway on a weekend.
5  More than likely I -- I worked a lot of overtime
6  during that time and I probably wore it once or
7  twice.
8  Q    Do you know for sure?
9  A    Not for sure.
10 Q    What shift were you working at the time you
11 were terminated?
12 A    I was back on second shift.
13 Q    When does that start and when does it end?
14 A    I think it started at 2:30 and went to I think
15 11:15, something around that, the second, what do
16 you call it, night shift.
17 Q    The copy of the Turner Diaries T-shirt that
18 you bought the weekend of April 10th -- I said
19 T-shirt, didn't I. The copy of The Turner Diaries
20 book that you bought during the weekend of April 10,
21 1999, you said you read a chapter of it; your
22 brother or somebody loaned it to somebody else, and
23 you never saw it again?
24 A    It disappeared.
25 Q    The book that's here at the deposition today,

TULSA FREELANCE REPORTERS
918-587-2878

Page 43

1  where did you get that one?
2  A    I don't recall ever getting that book. As a
3  matter of fact, that's a large -- that's a bigger
4  book. The one I bought was small; it was much
5  smaller. That's a much -- I don't know how they
6  that book.
7  Q    Do you know when this version of the book
8  into your possession?
9  A    I don't recall ever buying that book unless
10 the union -- I think the union may have gotten
11 somehow because I don't recall buying -- the one
12 bought was small; it was a smaller version. It
13 wasn't that large version. That's a larger vers
14 Q    Obviously as part of the controversy leading
15 up to your termination and all the testimony at
16 arbitration, you understand that the beliefs
17 espoused in The Turner Diaries were considered
18 inappropriate in the workplace; is that right?
19 A    Yeah. Now that I know the contents, yeah,
20 probably wouldn't be the right kind of book to
21 distributing if that's what you mean.
22 Q    Between May 10, 1999, the termination date
23 and your hearing in the arbitration in November
24 1999, did you read The Turner Diaries?
25 A    Yeah, I went through it after the controve

TULSA FREELANCE REPORTERS
918-587-2878

Page 44

1  When the union produced it. I paged through it
2  it did have some pretty radical stuff, but I di
3  see anything about making of a bomb in there, a
4  fertilizer bomb. I never saw the instructions,
5  know.
6  Q    Would you agree with me it's a pretty nast
7  book in terms of expressing hatred and --
8  A    Well, I've read Road Warrior books. I've
9  read books -- the Holy Bible talks about wholes
10 destruction of entire tribes in the Old Testame
11 It was just about as nasty as any other book I'
12 read. It has some ugly points in it, some ugly
13 parts, yeah.
14 Q    Would you grab the book there for a second
15 please. Turn to Page 62.
16 A    (Witness complied.)
17 Q    When you read the book, did you see the
18 reference to an airliner being shot down? Help
19 yourself.
20 A    My Lasix surgery didn't do too good.
21 Q    So you had the surgery?
22 A    Yeah. It failed in my right eye. Okay.
23 Q    I believe it's the second paragraph. See
24 reference to the airliner being shot down?
25 A    A bazooka to shoot down an airliner which

TULSA FREELANCE REPORTERS
918-587-2878

Page 45

1  just taken off at Tel Aviv and -- there were no
2  survivors. A bazooka was a portable launcher for
3  small rockets used primarily against tanks in World
4  War II. Okay.
5  Q    As having had a career and I guess a
6  continuing career in the airline industry, you know
7  one of the most serious things or one of the things
8  airlines take most seriously is the safety of their
9  passenger and their aircraft?
10 A    Absolutely.
11 Q    In essence, you, as a licensed mechanic, have
12 taken an oath to do everything in your power to make
13 sure that operating aircraft are safe; is that
14 right?
15 A    Absolutely. I've been doing it for 30 years
16 now.
17 Q    Let's talk a little bit -- before we get too
18 far, I'm handing you what's been marked as
19 Defendant's Exhibit 15A for purposes of the Record.
20 This is a copy of the Turner Diaries. Would you
21 identify it as such, please?
22 A    It appears to be a complete copy of it. How
23 many pages is this?
24 Q    It's a copy of a different version of it, I'll
25 represent to you.

TULSA FREELANCE REPORTERS
918-587-2878

Page 46

1  A    The page numbers don't agree.
2  Q    For the purpose of the Record, the reference
3  to Page 62 was from your copy of the book that you
4  brought; right?
5  A    Uh-huh, right.
6  Q    Let me hand you what's been marked as
7  Defendant's Exhibit 2. This is a copy of the
8  complaint that you filed in this case on November
9  27, 2000 by your lawyer that's here today. Do you
10 recognize that as a copy of the pleading that your
11 lawyer filed on your behalf?
12 A    Yep. That's a copy of the initial pleading,
13 brief.
14 Q    That was some six months or so after the
15 arbitration board made the decision upholding the
16 termination; is that correct?
17 A    That's correct.
18 Q    For the purpose of determining when an
19 applicable privilege might apply, when did you first
20 hire Mr. Frazier as your attorney?
21 A    About a year after I got fired, which would
22 have been probably three months after the
23 arbitration decision came down. I can't give you an
24 exact date.
25 Q    Other than to the extent that Mr. Hickman

TULSA FREELANCE REPORTERS
918-587-2878

Page 47

1  might be perceived as being your attorney in tha
2  arbitration, other than Mr. Frazier, have you ha
3  any other attorneys represent you in connection
4  your claims against American Airlines?
5  A    No other attorneys. Just Mr. Frazier, Bob
6  Frazier.
7  Q    Whether you hired them or not, did you cons
8  with any other attorneys besides Mr. Frazier
9  regarding your claims against American?
10 A    I had interviews with other attorneys, yes.
11 Q    One of the people that's on your witness li
12 and who we're going to talk about a little later
13 today is a man by the name of Eugene Hough?
14 A    Gene Hough.
15 Q    Hough?
16 A    Yeah.
17 Q    I apologize. Did you consult with Mr. Houg
18 in his capacity as an attorney or merely as you
19 listed as a witness, as a friend?
20 A    Basically casual talk, not -- I didn't
21 consider him to take the case because he's not
22 specialized in this type of litigation.
23 Q    How did you come to find out about Mr. Fraz
24 and ask him to represent you?
25 A    Initial meeting, Mr. Frazier answered an ad

TULSA FREELANCE REPORTERS
918-587-2878

Page 48

1  the paper concerning my boat. I sold him my 195
2  Crestliner, and it came up that he was an attorn
3  and I asked him what he specialized in and he sa
4  basic accident type, insurance claims, this type
5  thing, and about a month later came back to have
6  sign some paperwork for the boat and at that tim
7  asked me some questions about my termination and
8  concerning the conditions of it, and he asked me
9  come to his office the next day, which I did.
10 Q    And that's where your official attorney-cl
11 relationship started?
12 A    That's where we officially signed the
13 paperwork and he became my attorney.
14 Q    There are seven what lawyers call causes o
15 action in your complaint; do you see that?
16 A    Uh-huh.
17 Q    One was -- the first one was for breach of
18 express or implied contractual obligations. Do
19 understand that that claim was ruled against yo
20 that the Tenth Circuit Court of Appeals says tha
21 claim is no longer viable?
22 A    Right. They said it was no longer viable,
23 that claim.
24 Q    And as a matter of a shortcut, since it
25 appears you understand what questions I'm asking

TULSA FREELANCE REPORTERS
918-587-2878

Page 49

1  you understand that the only claim that you have
2  left as a matter of law to pursue against American
3  Airlines is your claim that your rights of equal
4  protection were violated?
5  A    Right. That's our claim, yeah.
6  Q    Do you understand that the underlying
7  discharge, your firing from American Airlines has
8  been upheld by the Tenth Circuit?
9  A    Right, the firing itself.
10  Q    In your own words, tell me how you think
11  American Airlines denied you equal protection of
12  law.
13  A    Okay. To put it very simply, the people in
14  charge of this group put heavy pressure on me to
15  make up some literature, custom made for this
16  particular group. On several occasions before I
17  manufactured this piece of literature, I asked for a
18  list of guidelines for this piece of literature,
19  which they could not produce. So I went to the
20  library and got several books on aviation, and I
21  contacted her again and I said I still don't know
22  what to put on here, and she said put down something
23  that concerns the history of aviation and the
24  Caucasian people. I said there's plenty of books at
25  the library and made this up. I did put down -- at

Page 50

1  the diversity fair I put down on the literature,
2  please proofread before distribution, which I don't
3  know if they did or not, but they distributed the
4  literature.
5      When this issue came up about this literature
6  being fit for distribution, none of these other
7  people were in any way disciplined, either
8  termination or other type of disciplinary action. I
9  was the only one that was, shall we say, targeted
10  for dismissal. I feel that many other people wore
11  T-shirts at this facility, including one that showed
12  an Adolph Hitler face. Numerous T-shirts showed
13  female body parts, pro-homosexual T-shirts and some
14  T-shirts -- Malcolm X showing a violent act against
15  a police officer, which I didn't complain about but
16  some people did, and they were not disciplined for
17  any of these types of T-shirts. I was the only one
18  in the history of American Airlines who was
19  terminated for wearing a T-shirt.
20      Also there did not -- they did not follow
21  established policies, called a peak performance
22  program, which before a person can be terminated has
23  to go a three-step program. First step is a
24  counseling. Second step that if the person still
25  violates a certain rule, then they're put out of

Page 51

1  service for one day, called a career day, and th
2  third time, if they still violate the same rule,
3  then they're terminated. American Airlines did
4  follow that procedure, established agreement wit
5  the union. So that's my claim of unequal
6  protection.
7  Q    Let's start with number three and go
8  backwards. Number three in terms of application
9  what is known as the peak performance or commitm
10  policy, that was an issue regarding company poli
11  that was raised, litigated and decided against y
12  in the arbitration; correct?
13  A    Correct.
14  Q    Do you understand that that is no longer fa
15  game in this lawsuit?
16  A    Right. You asked me my opinion why.
17  Q    I appreciate that. I'm just trying to kee
18  focused so we use our time adequately.
19  A    Okay.
20  Q    Number two, I have characterized it as oth
21  people wearing T-shirts who were not terminated
22  Okay?
23  A    Right.
24  Q    There was evidence, and we will look at
25  exhibits that were introduced at the arbitratio

Page 52

1  the effect of other T-shirts that were worn and
2  person that wore them was not terminated.
3  A    Right.
4  Q    Okay. I don't expect you to remember them
5  -- all of them. My question is, do you have an
6  examples of any other T-shirts from your person
7  knowledge that have been worn by other employee
8  American Airlines other than those that were
9  introduced in your arbitration?
10  A    I did not make it a personal hobby of
11  observing people's T-shirts; however, I had rec
12  many complaints of fellow workers of other peop
13  wearing T-shirts, in particular some that were
14  well, I'll say this. I didn't make it an issue
15  go to management about things that offended me
16  where some people may do it but I did not ever
17  that. I never went to HR with complaints, alth
18  some things did bother me occasionally.
19  Q    Let's try it this way. We're skipping aro
20  a little bit. Is the answer to my question, oth
21  than what the union introduced on your behalf a
22  arbitration, you don't have any current evidenc
23  other T-shirts that other employees wore and wh
24  were not terminated?
25  A    Yeah, just at the arbitration, the ones th

DEPO OF DANIEL W. MAHON, 10-29-03

1 were brought up as far as I know.

2 Q    Then skipping back to the first item, nobody

3 else in the Caucasian employee resource group was

4 disciplined for the flyer, let me ask the first

5 question.  Were all members of the Caucasian

6 employee resource group white?

7 A    I don't really know because I had no list.  I

8 was only a member one month.

9 Q    Do you ever recall a non-white attending any

10 meeting of the Caucasian employee resource group?

11 A    Absolutely, many times, the two meetings I

12 went to.

13 Q    Do you recall, or strike that.  Do you know

14 whether that person was there as a member or as

15 you've testified earlier, a management

16 representative from the diversity action council?

17 A    Diversity action council, as far as I know I

18 don't know whether they were management or not

19 because there was so many people attended those

20 meetings but there were people of different ethnic

21 people there.

22 Q    Let me approach it a little differently.  Were

23 all the people that you dealt with at the Caucasian

24 employee resource group white?

25 A    For the most part, yeah, they were white.

1 Q    Let's go down the list of people you know.

2 Linda Dill, is she white?

3 A    Yes.

4 Q    Craig Nichols, is she (sic) white?

5 A    He's white.

6 Q    Give me the names of the people you know by

7 name that were in the Caucasian employee resource

8 group.

9 A    I don't know if the people were actually

10 members or not because I don't really know.  It was

11 people that were there.  As I said, I only joined

12 six weeks before the thing went wrong, and the group

13 was in operation for six months before I went and

14 attended some of the meetings.  There were several

15 people on the list of potential witnesses that

16 attended those meetings.  They're all there.

17 Q    Were all those people white?

18 A    White or part Indian.  There were some people

19 that had some Indian heritage but they were for the

20 most part I would say white.  I don't know what the

21 total definition of white really is, but they're all

22 employees, union people for the most part.  I don't

23 know of any management people that were in the group

24 at all.

25 Q    Were all the officers or the leaders of the

1 group that you dealt with white people?

2 A    The two I knew, yeah.

3 Q    Focusing on your first subject area of the

4 complaint about nobody else from the CERG being

5 disciplined, did you believe that the treatment

6 received as opposed to the consequences to the

7 leaders of the group was unfair?

8 A    Yes, I believe it was unfair.

9 Q    What do you believe the company should have

10 done to discipline the leaders of the Caucasian

11 employee resource group as a result of the pamphlet

12 A    Well, first thing, I believe they should all

13 be treated equal, all people involved.  I think a

14 letter in the file, a letter, disciplinary letter

15 the file, in their files would have been

16 appropriate.  Possibly counseling at the very m

17 maybe some time off without pay, possibly, but

18 nothing approaching termination.

19 Q    And had the company administered any

20 combination of that discipline to you and the o

21 leaders of the -- or to you and the leaders of

22 Caucasian employee resource group, would you ha

23 any complaint at this point in time?

24 A    Well, personally I think that the infracti

25 or whatever was presented at the meeting, the g

1 was that there was no guidelines given, which d

2 warrant any real disciplinary action.  If there

3 would have been actual guidelines of this liter

4 and if guidelines were violated, then I could s

5 problem.  The reason I think they had the meeti

6 was to describe what went wrong with this

7 literature, what was wrong with it that people

8 certainly a few people got upset about, but I d

9 think the fact that I was the only one targeted

10 this situation was not right.  It violated all

11 of fairness.

12 Q    By the time of the April 20, 1999 meeting

13 the Caucasian employee resource group where you

14 The Turner Diaries T-shirt, by that point in ti

15 the group had already been suspended; is that

16 correct?

17 A    I wasn't sure if the group was because whe

18 was notified of a meeting on a flyer on a wall,

19 said the meeting was that day, all members invi

20 So -- and all non-members.  It was basically an

21 meeting, and it was established on the same day

22 ever had a meeting.  It was on Tuesday, so --

23 Q    So is it your testimony you didn't know th

24 group had been suspended prior to going to the

25 20 meeting?

Page 57

1  A    I thought that's what the meeting was about,
2  that they were going to suspend it, but I didn't
3  know it was suspended at that time.  I thought the
4  meeting would be about that situation, but I didn't
5  know if it was actually suspended at that time.
6  Q    You testified earlier today that you found out
7  about the April 20 meeting from another crew member;
8  is that correct?
9  A    Yeah, Eric Hanson.
10 Q    Describe that to me.
11 A    Well, I got to work and punched in and went
12 into the shop.
13 Q    That would be around 2:30; correct?
14 A    Probably around a quarter until 3:00.  We were
15 already in the area, awaiting what we call the
16 tie-in, the work orders.
17 Q    Tell us which area.  I'm sorry.
18 A    Hangar 2B where I worked 727 light, C check.
19 We had a small, real small little shop we met in
20 around a small table, and Eric said I see on the
21 bulletin board there's a flyer, a green flyer
22 talking about the resource group has a meeting
23 today, and I said, well, let me see if I can go to
24 it, I would like to see what's going on.  I went to
25 Tom Snyder, the supervisor, and asked if I could --

Page 58

1  the work load wasn't too bad, so I said can I be
2  dismissed for an hour to attend this meeting and he
3  said go ahead.
4  Q    Was Eric Hanson involved in the group.
5  A    No, I don't think he was.  He just notified me
6  the bulletin board had it on there.
7  Q    He was a co-worker?
8  A    Yeah, he was my avionics co-worker.  I worked
9  with him quite a bit, did.
10 Q    To your personal knowledge, were there any
11 leaders or members of the Caucasian employee
12 resource group that were non-white and were
13 disciplined in a fashion other than yourself?
14 A    Not to my knowledge.
15 Q    Now, Mr. Mahon, when you attended the April 20
16 meeting wearing The Turner Diaries T-shirt, did you
17 recognize that those who had an appreciation for
18 what that book was about might be offended?
19 A    Well, first of all, the book is not well
20 publicized.  Most people -- I wore the T-shirt all
21 day and nobody mentioned it, nobody looked at it,
22 and most people -- one guy said is that Ted Turner,
23 and I said, well, not quite Ted Turner, but most
24 people had no idea what it was about.  As a matter
25 of fact, nobody in the meeting -- I was sitting

Page 59

1  about 25 feet away from anybody from management,
2  in the corner so they would have had to have pre
3  good eyesight to read the T-shirt from 25 feet a
4  It took them basically, what, ten days from the
5  I was put out of service until the time they cal
6  me in to terminate me to determine that that T-s
7  was inappropriate during the investigation.  So
8  nobody told me at the meeting at all that there
9  a problem with the T-shirt.
10 Q    Did you understand at the time you wore the
11 T-shirt if in fact somebody did know what it was
12 about, you were running a risk by wearing that
13 T-shirt to work?
14 A    Well, it was the only T-shirt I had that wa
15 clean enough to wear and I wore it.  I didn't th
16 it would cause a problem.  As a matter of fact,
17 didn't think anybody would be at the meeting to
18 you the truth, but I was sitting at the far end
19 the table.  I didn't get up there and put it in
20 anybody's face so to speak, but I didn't notice
21 anybody staring at me or giving me any kind of a
22 look at all.  I saw no unusual facial expression
23 upon wearing the T-shirt.
24 Q    Well, I asked you a slightly different
25 question.  My question was, if somebody knew wha

Page 60

1  the Turner Diaries T-shirt were about at work, v
2  you understand you were running a risk by wearin
3  that T-shirt to work?
4  A    If they read the book from cover to cover,
5  they would be, but the initial statement on the
6  T-shirt is a pro-gun, what would the government
7  do -- what will you do when the government come
8  take away your guns.  It also admonishes not to
9  the book.  It says the FBI considers the book
10 dangerous.  So the admonishment on the T-shirt
11 actually not to read the book.
12 Q    Which, of course, is all the more reason t
13 read it: right?
14 A    Well, I don't know about that, but most pe
15 that read the T-shirt thought it was a pro-gun
16 T-shirt.
17 Q    Before we take a little break, is it your
18 testimony that prior to the start of your shift
19 April 20, 1999, you were not aware that there wa
20 going to be a meeting of the Caucasian employee
21 resource group?
22 A    I wasn't really sure.  I knew there was a
23 meeting that could happen at any time but I wasn
24 sure what day.  It could have been any time.  Un
25 the flyer was actually found and I was notified

Page 61

1 the flyer, I didn't know exactly about that meeting.

2 Q   You've confused me now.

3 A   Until I was notified of the flyer, I didn't

4 know the meeting was going to take place.

5 Q   Okay, and when were you notified of the flyer?

6 A   About a quarter until 3:00 before the shift

7 started in my shop.

8 Q   How did you become aware of that?

9 A   When Eric Hanson came and said hey, go check

10 out the flyer on the bulletin board in the hallway;

11 there's a green flyer about your group; they're

12 having a meeting.  That's when I asked my supervisor

13 to take some time off to go to the meeting.

14 Q   So your reference to the flyer that you just

15 talked about wasn't the offending flyer that caused

16 the start of this problem?

17 A   Oh, no.  This is the flyer announcing the

18 meeting, the CERG meeting, the last CERG meeting.

19 Q   Just for the purpose of the Record, I direct

20 your attention to what's been marked as Defendant's

21 Exhibit 17.  Sir, is this the flyer you made

22 reference to in your last series of testimony that

23 was -- I think you said was it green that gave you

24 notice --

25 A   Yeah.  This was green.  Yeah, this was green.

Page 62

1 This is on the bulletin board outside the hangar.

2 Q   I can't read it very well.  Do you happen to

3 know beside the exhibit sticker what that round

4 circle thing in the bottom right-hand corner is?

5 A   I haven't the foggiest idea.  Looks like a

6 soccer ball.

7        MR. CORDELL:  Is this a good time to take a

8 break?

9        MR. FRAZIER:  Sure.

10        (Following a short recess at 10:37

11 a.m., proceedings continued on the Record at 11:00

12 a.m.)

13 Q   Mr. Mahon, at the April 20, 1999 meeting, from

14 notes you produced to me, I've seen where you say

15 that Mr. Greg Hall made statements in that meeting

16 to the effect that political statements were

17 recruiting; do you know what I'm talking about?

18 A   Yeah.

19 Q   What did he say?

20 A   I'll quote verbatim.  He said, Dennis, I'm not

21 going to allow white supremacist, neo-Nazi or

22 skinhead material to be distributed on this base,

23 and I said, sir, first of all, my name is not

24 Dennis; I resent you saying that, but I said you

25 know, please explain -- at that time I said please

Page 63

1 explain what is wrong with the literature.

2 Q   Now, do you believe that you have a right to

3 express your own personal political beliefs in the

4 workplace?

5 A   Insofar as it affects current events I think

6 That's what most people -- especially during

7 election year, that's all you hear about.

8 Q   Do you believe that the message that is sent

9 by The Turner Diaries is a political message?

10 A   Well, it's a novel.  It has some strange

11 belief systems that were presented later in the

12 book.  The first chapter, like I said, I thought

13 was strictly a book about a bunch of people that

14 were being hunted down because they had weapons

15 guns, and I thought it was strictly a deal about

16 guy resisting government authority when they had

17 big gun raids.  It wasn't until much later that

18 found out what the rest of the book was about.

19        I know McVeigh was really, real heavy Secon

20 Amendment advocate.  I never met the man at a gu

21 show, but that's the only thing I know as far as

22 that goes.  The people around the base would tal

23 politics all the time.  Especially Clinton was a

24 topic.

25 Q   Do you believe that in connection with the

Page 64

1 pamphlet and wearing The Turner Diaries T-shirt

2 the April 20 meeting that you were singled out

3 because of your political views?

4 A   It became very apparent even at the meeting

5 that the whole subject concerned my twin brother

6 Dennis, especially when the vice-president of

7 maintenance addressed me twice as Dennis.  He ma

8 mean-spirited remark by not calling me by my pro

9 name.  There were several issues brought up at t

10 meeting, not just this material.  Also was a

11 statement made by a Robert Hosier that was extr

12 inflammatory that I think everybody in that mee

13 would testify to.

14 Q   I'm not sure either you understood or answ

15 my question.  Do you believe that you were sing

16 out by American Airlines based on your politica

17 views?

18 A   Yes, I think they singled me out for sure

19 because they assumed I had these political beli

20 They assumed things and they targeted me,

21 unwarranted.

22 Q   Is it your testimony that you don't have a

23 political beliefs whatsoever?

24 A   Everybody does.  I'm a right wing

25 conservative, Rush Limbaugh type, but I'm not a

DEPO OF DANIEL W. MAHON, 10-29-03

Page 65

1  hater or a blatant racist.
2  Q   You've testified or written in various places
3  that we'll talk about in more detail later that you
4  are not a card-carrying member of any white
5  supremacist group?
6  A   Never been.
7  Q   Since those are words you've used, what do you
8  mean by card-carrying?
9  A   A card-carrying member of any organization
10 would be a person that's been sworn in, a membership
11 number, an active part of a group.
12 Q   You've testified that there was a period of
13 time in which you were associated with the Caucasian
14 employees resource group but before you actually
15 joined; is that right?
16 A   I went to one meeting before I actually joined
17 up.
18 Q   Have there been groups, sir, that you have
19 been associated with that you have not been
20 card-carrying member of?
21 A   Associated? That's a big term. Other than
22 the people that my brother associated with, I knew
23 people by names, not personal friends or personal
24 acquaintances, just name familiarization. That was
25 all.

Page 67

1  Q   well, certainly it's fair to say that he's
2  been a controversial figure; wouldn't you agree?
3  A   Anybody that runs for mayor and has altern...
4  viewpoints I guess would be considered
5  controversial, sure.
6  Q   Let's go back a little farther in time. I
7  generally speaking. If I'm not saying it
8  accurately, point it out, but generally speakin...
9  your brother, Dennis, has been associated, if i...
10 fact not the leader of a section of the Ku Klu...
11 Klan; is that right?
12 A   Yes, he was. He was a leader in Missouri
13 until 1990, right around October. I gave him t...
14 months to vacate that position or go find anoth...
15 place to live, and he did. So I'm responsible
16 getting him out of that organization. I said y...
17 got three months to get rid of that thing or yo...
18 have to find another place to reside, which he ...
19 Q   And your brother, Dennis, has also receive...
20 attention for being detained in Canada as a res...
21 of pro-Nazi speeches that he made in Germany;
22 correct?
23 A   Canada, he was deported for a book on
24 immigration. There are -- certain publications
25 illegal up there, about 20 different publicatio...

Page 66

1  Q   And what type of groups are you talking about
2  your brother associating with?
3  A   The people he associated with, anti-government
4  militias, tax protests, some racist type people, but
5  they weren't associated with me.
6  Q   So is that the distinction that you've drawn;
7  you've been around and perhaps participated in
8  meetings of those but you've never been a
9  card-carrying member?
10 A   Participation, another big term. I
11 volunteered upon request to videotape certain
12 mayoral forums, certain rallies and provide a
13 rebuilt PA system, and that's as far as it went. As
14 much as my twin brother is my brother, I didn't
15 approve of all of his beliefs but I still love him
16 as my brother and I was protective of him, somewhat
17 protective.
18 Q   I've seen that statement before, that you
19 didn't approve of all of his beliefs. Which beliefs
20 do you and your brother share in common?
21 A   Basically taxation and gun control. That's
22 basically what it is. He's a very complicated
23 person, very complicated personality, and I really
24 don't know what his really total belief system is.
25 He's unique to himself.

Page 68

1  If you get caught, you'll be deported, and that
2  what happened to him. He was caught with a boo...
3  a British author, so he was deported.
4  Q   Other than the KKK, what organizations do ...
5  know that your brother has been associated with
6  would be considered anti-government, racist,
7  supremacist, things of that nature?
8  A   As far as being a membership of anything;
9  that what you are saying?
10 Q   I'm not trying to be that limiting.
11 A   The only person I know that he was involve...
12 with is Thomas Metzger in Fallbrook, California
13 That's the only person I know he ever really ha...
14 correspondence with actually.
15 Q   Known as Terrible Tommy; right?
16 A   Yeah, Terrible Tommy.
17 Q   Have you ever met Terrible Tommy?
18 A   One time I met him. He was a television
19 repairman, and as I do television repair work,
20 to ask his advice a few times but other than th...
21 we're not really considered friends. I don't
22 consider him really an acquaintance really. I
23 haven't spoken to him in, gosh, ten -- since
24 Dennis -- Dennis doesn't operate with WAR anymo...
25 He's not active. Since he left Tulsa, he's not...

Page 69

1  an active member of anything.

2  Q    When did he leave Tulsa; after your

3  termination?

4  A    Yeah.  That was 19 -- late -- no.  It was

5  about June of 1999.

6  Q    You've made reference to WAR and that stands

7  for White Aryan Resistance; correct?

8  A    Right.

9  Q    Were you involved in any fashion, whether you

10  were a card-carrying member or not, with WAR?

11  A    Well, as far as what I heard from my brother,

12  WAR isn't a membership organization.  They don't

13  have memberships; they have associations and they

14  sponsor concerts for these kids, little bald-headed

15  kids, but he really isn't -- it's not really an

16  organization per se.  He just puts out a little

17  newsletter and that's it.

18  Q    Do you believe that in addition to your own

19  political views, you were singled out by management

20  because of the views of your brother?

21  A    Absolutely.  The notes in the arbitration will

22  bring that out.  It brought my twin brother's name

23  in almost ever issue involved in the arbitration, so

24  I would say absolutely yes.

25  Q    I'm going to hand you what I'm going to

Page 70

1  mark --

2      MR. FRAZIER:  I don't need a copy, David.

3  I've got the transcript.

4  Q    What I'm labeling as Exhibit 9A, which I'll

5  represent to you is a copy that I have of the entire

6  transcript from the arbitration, three-day

7  arbitration of your discharge.  I will tell you for

8  some reason the copy that I got, there's a page here

9  or there missing, not of anything of consequence

10  that I know of, and when I get the missing pages,

11  I'll supplement, but have you seen a copy of the

12  transcript of your arbitration before today?

13  A    I've seen most of it, yeah.  I've gone through

14  periodically.  I didn't read all of them.  I just

15  don't have the time, but I pretty much went through

16  the arbitration.  I witnessed the whole proceeding

17  and know what transpired in those proceedings.

18  Q    So you do have copy of it, you and/or your

19  lawyer?

20  A    Yeah, we have copies.

21  Q    As you've read through it, have you written on

22  it, annotated it, whatever word you want to use, for

23  things you agree or disagree with?

24  A    Not really.  Like I said, I've been witness to

25  all the things that went on.  I have a pretty good

Page 71

1  memory of what was said, and I don't have time to

2  read every single page but --

3  Q    Well, not really, does that mean no, you have

4  not annotated or written --

5  A    No, I've not annotated any notations on the

6  transcripts.

7  Q    Does anything specifically come to mind that

8  in that transcript through the testimony on the

9  arbitration that you believe to be untrue?

10  A    I don't understand the question.  Anything

11  that was in these transcripts that I think is

12  untrue?

13  Q    Yes.

14  A    That American brought up?

15  Q    Anybody brought up.

16  A    Absolutely.  A lot of things are untrue.

17  Q    What ones do you recall?  I realize it's a

18  thick thing, but you're living this firsthand; you

19  attended the arbitration; you have the transcript.

20  What things are not true that were testified about

21  in the arbitration?

22  A    The innuendos that I'm a member or support

23  heavily white supremacist groups, that I support

24  them monetarily, that I support my brother

25  monetarily.

Page 72

1  Q    Is that untrue, completely untrue?

2  A    Absolutely untrue.

3  Q    Never gave any of these groups any money

4  through your brother or directly?

5  A    Never gave any money.  I don't give my brother

6  any money.  He makes it on his own.  The innuendos

7  that I had a so-called white supremacist agenda on

8  the literature was totally untrue.  That's just the

9  major big ones.  There are probably some other ones

10  I'd have to have time to look at.

11  Q    You've talked about innuendo, conclusions that

12  were reached as a result of the testimony; right?

13  A    (Witness nods head up and down).

14  Q    Do you recall any particular witness

15  testifying under oath and lying in that arbitration?

16  A    Oh, yes.  The woman at the drugstore, that I

17  to have been an out and out lie.  The statement she

18  made about a bomb threat.  That was absolutely --

19  Q    Well, is there anything else you remember

20  before I ask you about that?

21  A    Oh, I wish it happened just last year.  It's

22  hard to remember back that far.  I don't remember

23  anything else.  Just the whole general spirit of the

24  arbitration was based on a false premise that I wore

25  a T-shirt in there just to offend a bunch of people

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 73

1  They assumed that I went on my own to make this
2  literature up, which I was bothered at least six
3  times to be sure to put out this literature. That's
4  basically the two big things that I can recall that
5  were totally false.
6  Q   Let's talk about the testimony about the bomb
7  threat. Is that the same story about you and your
8  brother going to Walgreen's to drop some film off?
9  A   Yeah, to drop some film off.
10 Q   Is it true you and your brother went to
11 Walgreen's to drop some film off?
12 A   All the time.
13 Q   Which Walgreen's?
14 A   We went to the one on Pine and Sheridan. I
15 was doing a lot of buying and selling of collectable
16 model airplanes at the time and, of course, people
17 want pictures so we always had pictures to develop
18 and send out. That was before the age of computer
19 scanners and things. So we went there quite often,
20 but I don't ever believe my brother screaming out
21 loud that -- I don't even know what she said,
22 something about a threat against American.
23 Q   Something to the effect of if my brother
24 doesn't get his job back at American, that they're
25 going to see the biggest bomb they ever had?

Page 74

1  A   Yeah. This woman has obviously a big, big
2  imagination. Plus, if she took that really
3  seriously, if she did take it seriously, she's in
4  violation of law by not reporting that to the
5  authorities. If you hear a conspiracy to do an act
6  of violence like that, you are required by law to
7  report that to authorities. She did not do that.
8      This woman at her job, I know she has a lot of
9  the people that work for her at the restaurant that
10 she manages have a lot of complaints, and she has a
11 poor track record of management policies. So -- but
12 anyway, I think this woman has some problems.
13 Q   Do you think she was out to get you?
14 A   I think she didn't like my brother's politics
15 for sure, and she appeared to be extremely upset at
16 the arbitration, more upset than anybody who had
17 heard something six months before that. She
18 appeared to be emotionally disturbed to me.
19 Q   Possible she was scared of you and your
20 brother?
21 A   No. I think she is on some kind of
22 medication. I've heard she has had some surgeries
23 and some health and mental problems.
24 Q   At the time of the incident at Walgreen's, was
25 your brother drunk?

Page 75

1  A   He did most of his drinking on weekends. H
2  never did publicly drink. He didn't appear to b
3  drunk any time we went to stores. I wouldn't be
4  with him if he was snockered, I never would be w
5  him, but he was for the most part sober most of
6  time. Sometimes on the weekend he would imbibe
7  little bit.
8  Q   When did the incident at Walgreen's occur;
9  a weekend?
10 A   No. I think it was -- we usually went duri
11 the week. That's when he did all of his busines
12 I don't know exactly what day it was, but I know
13 wasn't drunk and I know he didn't say it.
14 Q   Did he say anything that has a ring of trut
15 from what this witness testified about?
16 A   I don't recall him ever saying anything abo
17 my situation at American at all. He certainly
18 didn't say anything about a bomb going off. Tha
19 one thing he wouldn't have said, but I didn't he
20 him say anything at all.
21 Q   So it's possible he said it and you didn't
22 hear it; is that true?
23 A   Well, if she was in the area -- I don't kno
24 where she was standing at the time, but if he ba
25 that out, I'm sure the person he was talking to

Page 76

1  the counter would have heard it, and I have no
2  inclination of anything like that. It's a big
3  store. Anything is possible. I don't know, but
4  know I don't think he would have said that. I n
5  heard him say it.
6  Q   You worked at American roughly fourteen yea
7  is that right?
8  A   Just shy of fourteen years, uh-huh.
9  Q   Limiting it to your work group, in other
10 words, the people that work out at the base here
11 Tulsa, generally speaking is the majority of the
12 people that work out there white?
13 A   In my department?
14 Q   Yes.
15 A   Yeah. My whole crew -- well, the crew I la
16 worked with were all Caucasians. The crews I wo
17 with before that were mixed. Even at my
18 arbitration, I had two mixed members on my crew,
19 Hispanic American and Asian, Barney, and we had
20 another guy, yeah. We had mixed. The entire do
21 worked with was mixed.
22 Q   From your -- what you see when you drive in
23 work and go into the parking lot and you walk
24 through the buildings, go to your work station,
25 isn't it true that the vast majority of the peop

Page 77

1  that worked in Tulsa for American Airlines are
2  Caucasian?
3  A    That applies to any corporation. Majority of
4  people usually are Caucasian, yeah. We've had some
5  mighty fine people out there.
6  Q    Despite the fact that the majority of the
7  people that work for American Airlines are
8  Caucasian, do you recognize that American also hires
9  people of all nationalities and colors?
10 A    Absolutely. Some of the best people I've
11 worked with are of other cultures and races.
12 Q    Do you agree from your time at American
13 Airlines, that American has policies to encourage
14 diversity and respect for all groups of people?
15 A    Sure. It's been a policy for most companies.
16 Q    Did you understand at the time you worked
17 there that American had an anti-discrimination
18 policy prohibiting discrimination based on anybody's
19 race?
20 A    For hiring purposes, yeah, they do.
21 Q    Any kind of practices. Did you understand
22 that discrimination was not tolerated at American?
23 A    Right. That's the policy for a long time.
24 Q    And that was true of any race, discrimination
25 against whites, for example?

Page 79

1  Q    Why did you think that the company wouldn't
2  allow Caucasians to have a resource group?
3  A    I didn't think that it would be somewhat, o
4  not really encouraged.
5  Q    Because?
6  A    Just my gut feeling. It was a gut feeling.
7  Q    Because?
8  A    Because I got a gut feeling.
9  Q    Is that the best you can do to answer that
10 question?
11 A    I think they would consider that racist. T
12 company would consider that a racist group to ha
13 that form up.
14 Q    What was your purpose in joining the group?
15 A    I joined after the first meeting just to se
16 what they had to say and to warn them about not
17 getting too far in certain areas. I wanted them
18 be very watchful on what they do because they're
19 under a watchful eye.
20 Q    Because you were experienced with the compe
21 right?
22 A    Management was heavily represented in all
23 these meetings. So I said you are being watched
24 be very careful of what you do.
25 Q    Generally speaking, from your observation i

Page 78

1  A    Right. For any people at all, yeah.
2  Q    Now, there were more employee resource groups
3  than just the Caucasian one; correct?
4  A    As far as I know, there was like 20 of them.
5  Q    Do you remember the names of any of them?
6  A    African American, gay and lesbian, GLEAN.
7  There was Muslim American, people over 40 group.
8  There was female and women, and different occupation
9  group. There were a lot of different groups, just
10 probably around 20 or 30 in all.
11 Q    Mr. Mahon, did you join or participate in any
12 of those groups besides the Caucasian employees
13 resource group?
14 A    No, I didn't. I wasn't that -- for one thing,
15 I wasn't concerned that much about it. I didn't
16 even know it was a Caucasian resource group for a
17 long time. It had been in operation for six months.
18 I had no idea it was in operation even.
19 Q    Why did you decide to join the Caucasian
20 resource group?
21 A    One of the guys at work said there's a
22 Caucasian resource group. I said I don't believe
23 they would allow it, and so he said they have
24 meetings once a month, and I started to go to one of
25 their meetings just as a curious observer.

Page 80

1  terms of the work group that you're in and on th
2  base, are the majority of management positions a
3  American held by white people?
4  A    First of all, I'm not in a WAR group. I wa
5  to make that perfectly certain.
6  Q    I apologize. Work group.
7  A    I'm sorry, work group. Let's get back to t
8  question again so I understand what you're askin
9  here.
10 Q    From your observations, both in your work
11 group and knowledge of the base in Tulsa in gene
12 isn't it true that the vast majority of people i
13 management positions are white people?
14 A    Oh, absolutely, absolutely. They tried ver
15 desperately to get more people of different race
16 come into management, but a lot of people don't
17 to get in management there. That's a common thi
18 They have a hard time filling management, gettin
19 anybody in there. They have a bad reputation.
20 Q    Have any of your supervisors during your ti
21 out at American been non-white?
22 A    I'm trying to think. We've had a lot of
23 supervisors.
24 Q    Any that you recall being non-white?
25 A    Not that I can recall. We had a handicappe

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 81

```
 1  supervisor, my last one.
 2  Q    Of the managers you've had over the years,
 3  were any of them non-white?
 4  A    At American?
 5  Q    Yes, sir.
 6  A    Not that I know of, not that I can remember.
 7  Q    Were any of your crew chiefs at American other
 8  than Caucasian?
 9  A    Let me think.  Is that considered acting crew
10  chiefs or people at temporary crew chiefs?
11  Q    Let's not get down into the temporary.  That's
12  a little bit --
13  A    I'd say no.
14  Q    You're clearly a white male; right?
15  A    Yeah.
16  Q    Did anybody else help you prepare the flyer
17  that was handed out at the diversity fair?
18  A    No.  Just me.  I went to the library and hit
19  the books in four hours.
20  Q    Are you aware of any non-Caucasians who have
21  distributed a pamphlet or flyer suggesting racial
22  superiority of their race?
23  A    It was brought to my attention that the
24  African Americans had one on football and sports.
25  That wasn't considered hateful, but it was their own
```

Page 82

```
 1  developed literature.
 2  Q    Other than that, are you aware of anybody ever
 3  distributing a flyer that was considered to be
 4  hateful and supremacist to a particular race?
 5  A    I've never seen any out there.
 6  Q    Generally speaking, do you believe that
 7  American Airlines discriminates against white
 8  people?
 9  A    Generally I'd say no, generally no.
10  Q    Okay.  In this particular instance, do you
11  believe you were discriminated against because of
12  your race or your political beliefs?
13  A    Either or both.  Probably both.
14  Q    There was testimony to the effect, as I
15  recall, that somebody named Tim Vinson --
16  A    Right, Tim Vinson.
17  Q    -- also wore a Turner Diaries T-shirt to work;
18  is that right?
19  A    That's correct.  At the arbitration he said he
20  wore it for four or five days, I forget, one of the
21  two.  He wore it to work.
22  Q    Do you know when he wore it to work?
23  A    I don't recall exactly when.
24  Q    Do you remember if it was the same year as
25  your termination, or do you even know?
```

Page 83

```
 1  A    Same year I'm sure.
 2  Q    How do you know that?
 3  A    Because he said he wore it recently.  He sa
 4  he recently wore one.  I'll have to check the no
 5  in the arbitration but --
 6  Q    Are you and Tim friends?
 7  A    I think I met him one time because their
 8  hangar was right next to our hangar, and he had
 9  big Harley Davidson motorcycle we talked about,
10  we weren't like buddies.
11  Q    Did you ever discuss your political views a
12  find you shared common views?
13  A    Not to speak of.
14  Q    At all?
15  A    We just talked about the job at hand and hi
16  motorcycle situation.  Oh, I did fix a VCR for h
17  one time.
18  Q    What race is Mr. Vinson?
19  A    He's Caucasian, possibly some Indian mixtur
20  but he's from the area, from Oklahoma.  Like mos
21  Oklahomans, they have a little bit of something
22  them, you know.
23  Q    Are you aware of anybody other than Mr. Vin
24  and yourself ever wearing a Turner Diaries T-shi
25  to the workplace at American Airlines?
```

Page 84

```
 1  A    Any other people wearing Turner Diaries,
 2  that's the only one I have knowledge of.
 3  Q    Are you aware of any non-white, non-Caucasi
 4  person who has worn a T-shirt depicting a book th
 5  promotes white supremacy?
 6  A    No, I have not.
 7  Q    Are you aware of any non-Caucasians or
 8  whites -- excuse me or non-whites that have worn
 9  T-shirts depicting a book that promotes anti-Sem
10  views?
11  A    Just the one that Linda Dill made reference
12  to, the Malcolm X T-shirt, and that was not a boo
13  It was just depicting a scene that she was offend
14  by is the only one I know of.
15  Q    Who was Malcolm X or is he?
16  A    He was a black leader in the '50's and '60'
17  He was a separatist, actually a very articulate
18  but he promoted racial separation and very
19  anti-government.
20  Q    To your knowledge did Malcolm X promote rac
21  violence?
22  A    He had a statement as necessary, but I don'
23  know what that would mean, but that could mean
24  anything.  Some of the people objected to that
25  T-shirt, but I saw some Louis Farrakhan out there
```

Page 85

1 too. A lot of Christian was distributed out of my
2 toolbox.
3 Q   A lot of what?
4 A   Christian material.
5 Q   The person that wore the Malcolm X T-shirt,
6 did you see it with your own eyes or did you just
7 hear it?
8 A   No. This was testimony at arbitration when
9 the subject got on T-shirts.
10 Q   So in terms -- you don't know who wore it,
11 when it was worn, anything other than what was
12 testified to in the arbitration; is that right?
13 A   Well, I did see at -- one time I did see a
14 T-shirt. One of the stock clerks -- some black
15 Muslims wore T-shirts and the hats, but I didn't
16 find it really -- it didn't bother me. The Malcolm
17 X T-shirt did not bother me at all. I never
18 complained about it.
19 Q   Let me ask you to look at a series of
20 documents which are copies of exhibits from the
21 arbitration that depict various T-shirts that
22 witnesses testified they have worn to work that were
23 offered in support of your case in the arbitration.
24 I hand you what's been marked as Defendant's Exhibit
25 23. Here's Defendant's Exhibit 23. Do you

TULSA FREELANCE REPORTERS
918-587-2878

Page 86

1 recognize that exhibit, sir?
2 A   Yes, I do. It's one of the T-shirts that were
3 presented at the arbitration.
4 Q   Were you present when the testimony was given
5 about this T-shirt?
6 A   I was present when this was shown.
7 Q   Does this T-shirt in your mind have anything
8 to do with white supremacy or racial cleansing?
9 A   Well, it shows obnoxious, very obnoxious
10 wording in it that would probably be very, very
11 offensive to a lot of people, especially the
12 Christian people and the Muslims.
13 Q   You're an intellectual man. You wouldn't
14 disagree with me, would you, that this is by no
15 means on par with The Turner Diaries book?
16 A   It doesn't show any racist or supremacist
17 meaning. Its just kind of a bar-type T-shirt I
18 guess.
19 Q   Might be crude but it doesn't talk about
20 killing people, does it?
21 A   No, it doesn't say anything about that. It's
22 just very crude, obnoxious.
23 Q   I hand you what's marked as Defendant's
24 Exhibit 24. I apologize. Once these exhibits get
25 copied so many times, sometimes they're hard to

TULSA FREELANCE REPORTERS
918-587-2878

Page 87

1 read, but I believe it shows some mice in a
2 mousetrap and one of them's neck is stuck in the
3 trap and says when you're down and out, everyone
4 wants to screw you. Were you present when the
5 testimony was given regarding this T-shirt?
6 A   Yes, I was.
7 Q   And the person that wore that T-shirt
8 admitted, did he not, that it had nothing to do
9 racial violence or cleansing?
10 A   No. It's just very uncouth. I mean it's n
11 a very -- it would be very offensive to a Christ
12 or somebody that had a lot of ethics, morals.
13 Q   Because of the word screw?
14 A   Yeah, the meaning of it, yeah.
15 Q   And as before, this isn't anywhere near on
16 with the message that The Turner Diaries book se
17 is it?
18 A   The Turner Diaries book, right, but the
19 T-shirt is just strictly anti-gun as far as I ca
20 see.
21 Q   But, you know, as you testified earlier tod
22 if somebody knows --
23 A   If they had read the book, right, right, if
24 they read the book, yeah.
25 Q   Defendant's Exhibit 25, there's a series of

TULSA FREELANCE REPORTERS
918-587-2878

Page 88

1 these T-shirts that were introduced and I'll cal
2 them the big Johnson T-shirts. Do you recall wh
3 had this collection of T-shirts?
4 A   Who wore this T-shirt? I don't know who wo
5 these T-shirts, what individuals. It was just
6 presented, people that had been told to go home
7 change or take the T-shirt off or whatever.
8 Q   This has sexual connotation to it; right?
9 A   Yeah. I would say if you were familiar wit
10 this term, right, it would have a sexual context
11 Q   But it doesn't have anything to do with mur
12 or racial violence, does it?
13 A   No. Just a sexual type T-shirt thing.
14 Q   As before, it's certainly not on par with T
15 Turner Diaries T-shirt, is it?
16 A   Not quite. As a matter of fact, it's very
17 small. You would have to be right up front to s
18 this. That's a very small writing on that T-shi
19 Q   Defendant's Exhibit 26, do you recall that
20 T-shirt being offered in evidence at your
21 arbitration?
22 A   That's another sexual, very sexist type
23 T-shirt. It could be offensive to certain peopl
24 Q   Certainly not on par with The Turner Diarie
25 and systematic killing of Jews and non-whites, i

TULSA FREELANCE REPORTERS
918-587-2878

Page 89

1  it?
2  A    Not quite, but it's still offensive.
3  Q    Defendant's Exhibit 27, same question.  Is
4  there any basis that you can give me that this is
5  anywhere of the same caliber in offensiveness with
6  regard to racial violence and intimidation as The
7  Turner Diaries?
8  A    It's the same.  It's obnoxious and very
9  sexist, but it's not quite the same as Turner, not
10 the same type of T-shirt.
11 Q    Not the same message, is it?
12 A    Well, like I said, the message in the T-shirt
13 is different than the book, but that's my opinion.
14 Q    Same series of questions to Exhibit 28.  Would
15 you admit, sir, that while this may have a sexual
16 context to it, it doesn't send a message of racial
17 violence and intimidation?
18 A    Right.  It's strictly a sexual type message.
19 Q    Defendant's Exhibit 29, would you also agree
20 that that T-shirt isn't in any way close to the
21 message that's given by The Turner Diaries?
22 A    This is a biker-type T-shirt, yeah.
23 Q    Not even in the same league, is it?
24 A    It's a different T-shirt, right.
25 Q    Finally, Defendant's Exhibit 30, a T-shirt

TULSA FREELANCE REPORTERS
918-587-2878

Page 90

1  from what's purported to be a gentleman's club in
2  Tulsa, Oklahoma.  That doesn't send any message of
3  racial violence, does it?
4  A    No.  It's a sexual type of advertisement
5  there.
6  Q    From the point in time that you authored and
7  had the pamphlet distributed that began this series
8  of events, have you ever apologized for doing that?
9  A    Are we referring to T-shirt or the literature?
10 Q    Starting with the literature.
11 A    No.  I never apologized for actually producing
12 it because I saw nothing wrong with the content of
13 the literature.
14 Q    I hand you the pamphlet, Defendant's Exhibit
15 12.  Mr. Mahon, is this in fact a copy of the
16 pamphlet that you authored and gave to the Caucasian
17 employee resource group to be handed out at the
18 diversity fair?
19 A    That it is.  That's a copy of it.
20 Q    I know you've been questioned at length or
21 questioned about it in various contexts at length,
22 so let me just see if I can summarize some of that
23 testimony.  Each of the aviators shown in this
24 pamphlet are Caucasian; correct?
25 A    Actually not.  This Helene Dutrieu, she was

TULSA FREELANCE REPORTERS
918-587-2878

Page 91

1  mixed Mediterranean and French.  She was not what
2  you would call Aryan or a totally white person.
3  Q    Other than that, are they all Aryan or total
4  white?
5  A    Yeah.
6  Q    Do you recognize that several of the persons
7  depicted in this flyer are believed to have white
8  supremacist or anti-Semitic views?
9  A    I don't think Amelia Earhart is.  I don't know
10 of anybody -- I don't think the Wright Brothers
11 were.  The Semitic people are also Arab people.
12 Semitic people are also Arabs, so when you say
13 anti-Semitic, I assume you're talking about Arabs
14 and Israelis and Hebrews.  I don't know of anybody
15 here that's -- that has those ideologies at all.
16 Q    Let me talk about the mechanics of the
17 preparation of this.  You said you went to the
18 library and looked some things up and made some
19 copies.  Is the first page of Defendant's Exhibit
20 a copy of a page of an existing book?
21 A    It's a copy of a book called Who's Who of
22 Aviation at the Central Library in Tulsa, a very,
23 very complete compilation of history of aviation
24 from its inception all the way to the present day.
25 Basically I went to the older areas of the pioneer

TULSA FREELANCE REPORTERS
918-587-2878

Page 92

1  and just basically took pictures and stories of who
2  these people were.  That's about it.
3  Q    I'm trying to understand how it was put
4  together.  The first page, is that a page taken
5  directly from a book or is it a collection of things
6  that you got from various places in the book and
7  assembled all on one page?
8  A    It's a collection of pictures in the first
9  area of the book from 1900 to approximately 1930.
10 Q    With respect to the second page, are those
11 pictures that you selected from different places in
12 the book and assembled on this one page?
13 A    Right.
14 Q    The typing on it, did you do the typing?
15 A    I typed -- I did the, yeah, subtitles, right.
16 All this is my typing.
17 Q    So you are personally responsible for
18 capitalizing one of the areas deemed to be
19 offensive, quota, they are all members of the
20 capital W white and capital R race, closed quote;
21 that true?
22 A    The entire last -- entire last sentence is
23 capitalized.
24 Q    Second sentence.
25 A    Well, that's the proper pronoun.  That's a

TULSA FREELANCE REPORTERS
918-587-2878

Page 93

1  noun.  It's a proper pronoun, so that would be
2  normally capitalized because that's considered --
3  white race is a connotation of a people.  So if
4  there's any kind of message, there was no message
5  there.  It was just the proper pronoun, the way I
6  was taught in school to write letters.
7  Q    Immediately following sentence, the second
8  word of it is race, is it not?
9  A    Yeah.
10  Q    It's not capitalized, is it?
11  A    Looks like it is.
12  Q    Check again.
13  A    I can't read it that well.  Yes, it is, you're
14  right.  It's capitalized.
15  Q    So you typed it.  Were you alone when you
16  typed it?
17  A    Yeah.  As bad of a typist I am, I did type it.
18  Q    Were you at your house?
19  A    I have an old typewriter that still works.
20  Q    And once you had assembled the pictures, did
21  you make those copies of the --
22  A    The copies of the --
23  Q    Of the pictures at the library and then bring
24  them home and type on it?
25  A    Right.  That's what I did.  I got the pictures

Page 94

1  at the library.  I cut the pictures out and then I
2  basically -- when I got done with it, laid them out
3  and went to Kinko's and I Kinko'd it and made about
4  25 copies each.
5  Q    I find this interesting because it was news to
6  me.  You testified that you were pressured into
7  doing this?
8  A    Right.  She --
9  Q    She being Linda Dill?
10  A    Yeah, Linda mainly.  She called me on a
11  Tuesday and said I've got to have this stuff by
12  Thursday, and I told her, I said that's going to be
13  awful hard to do.  I said, number one, no
14  guidelines; number two, I'll have to take a vacation
15  day to do it because I'm so busy.  As I said, I ran
16  an appliance repair business at the time and I was
17  hard pressed.  I said I'll try to do it, and I went
18  to the library early and got it done, but I packaged
19  them up and put down please proofread because I had
20  to give it to the people at the fair.
21  Q    Who did you give these packages -- you said
22  there were two packages of these?
23  A    Yeah.  Because they were going to be set up at
24  the -- let's see.  Two different buildings on the
25  compound.  Linda Dill had one area and Craig Nichols

Page 95

1  had the other area, so I gave one for her and she
2  said to give one to Nichols.  So there's just two
3  and both the manila envelopes did -- I put down w
4  a heavy black grease pencil please proofread.
5  Q    Do those envelopes still exist as far as you
6  know?
7  A    No.  Because I gave them -- I gave the
8  envelopes to them.  I said please proofread becau
9  I'm not sure about this literature, so --
10  Q    You testified Linda Dill pressured you.  Did
11  she do that in person; did she call you on the
12  phone; how did that come about?
13  A    She did that at the last meeting before the
14  fair.  She said are you going to have this
15  literature done, and that's when she told me to d
16  some literature based on aviation because I told
17  I'm an aviation nut; I'm a tremendous aviation
18  historian and I like looking into the early days
19  aviation, and then she called me again Tuesday an
20  then she called me Wednesday to see if I was goin
21  to have the stuff done.  So I got two other calls
22  between the time she initially charged me with do
23  this job for her.
24  Q    From the time you were charged to do it unti
25  the time you produced it, was it roughly a week o

Page 96

1  how long was it?
2  A    The last meeting was -- well, the meeting
3  before the last meeting, it was about approximate
4  three or four weeks I think.  At first I didn't t
5  her seriously.  She's -- you know how people talk
6  and not mean anything, but when she started calli
7  me up and asking me about this, I realized she is
8  pretty serious about it, and both times I said I
9  have no guidelines; I have no idea what you want,
10  and she said just do something as pertains to
11  aviation as it pertains to white people.  That's
12  she said.  I said, well --
13  Q    Do you believe she had some discriminatoria
14  supremacist motive in asking you to do it that we
15  A    I don't really know.  I know her supervisor.
16  The manager of her area was totally against them
17  starting this group.  Linda Dill and Craig are fr
18  the same work area.
19  Q    APU shop?
20  A    APU shop.
21  Q    And were they trying to say told you so or -
22  A    No, I have no idea.  I just know later on I
23  found out this gentleman was really against anyth
24  they were doing.
25  Q    At the first meeting that you've described

TULSA FREELANCE REPORTERS
918-587-2878

Page 97

1  where you were asked to prepare this, there's been
2  testimony that -- it was given by Mr. Kelly and
3  written down at the time of the events to the effect
4  that you told the members there that were
5  participating in the conversation that your brother,
6  Dennis, was good at doing this kind of stuff and did
7  you want it wild or mild. You've heard that before,
8  haven't you?
9  A    I never said that at all.
10 Q    What did you say?
11 A    I think I may have said I may have to borrow
12 my brother's typewriter to get this done. He was
13 actually out of town those two days.
14 Q    The two days that it was prepared; right?
15 A    Yeah, two days I prepared it, and he didn't
16 come back until after this whole thing went down.
17 He was gone.
18 Q    Did you say or use the phrase do you want it
19 wild or mild?
20 A    No, I never said anything like that. That has
21 to be fabrication. No.
22 Q    In the meeting -- strike that. When you first
23 attended a Caucasian employee resource meeting and
24 you've testified that you expressed to those persons
25 whether they thought it would be a problem with you

Page 98

1  joining the group, tell me in as exact detail as you
2  can exactly what that conversation was.
3  A    Okay. I went to the APU shop and I talked to
4  Linda and Craig, and I said, well, what you guys are
5  doing you are going to be watched very closely and
6  you need to watch every step you do, and he said,
7  well, we've got a real good group of people who
8  joined, and I said, well, I probably shouldn't
9  really join, and she said absolutely no problem, we
10 would love to have you, come to a meeting, and I was
11 invited to a meeting, and I said I'll try to make
12 the next meeting, which I did. That's exactly what
13 she said, no problem at all. I did mention about my
14 brother's politics, that he ran for mayor and he is
15 kind of controversial, and she said no problem.
16 Q    Did you ever tell Linda or whoever you were
17 talking to at the time that your family had been
18 investigated in the Oklahoma City bombing?
19 A    I wasn't ever investigated. Dennis was. He
20 went to two Oklahoma City grand jury investigations.
21 He was found absolutely no involvement by the FBI
22 and ATF. All the investigative agencies, after a
23 thorough investigation, found no involvement.
24 Q    What I'm trying to establish --
25 A    I never did tell her that.

Page 99

1  -- is not the truth of that. I'm trying t
2  establish what the exchange was.
3  A    I never mentioned that because it was past
4  history. This is 1999.
5  Q    In the context of the propriety of you joi
6  and whether that would cause problems for the g
7  did you give any information about your brother
8  his views or your concerns that the company wou
9  scrutinize that group as a result of you being
10 member?
11 A    Yeah, I did say that. I said because of m
12 brother's politics and he's run for mayor and h
13 quite controversial, I said I really shouldn't
14 your group, but she said come to a meeting, no
15 problem.
16 Q    And was the next meeting where they asked
17 to prepare the pamphlet?
18 A    Next meeting they brought up the diversity
19 fair and -- the first meeting I didn't join. T
20 next meeting is when I joined, and that's when
21 asked me about making some literature for the
22 upcoming diversity fair, and that's when she st
23 putting the pressure on me to do this literatur
24 Q    When she asked you to do this and started
25 putting pressure on you to do it, did you under

Page 100

1  this literature was going to be distributed in
2  workplace?
3  A    At the diversity fair, yes. She mentioned
4  many other groups have their own individual
5  literature, too.
6  Q    Let me direct your attention to Defendant'
7  Exhibit 10, and while she is doing that, let me
8  you this question: Did Linda Dill, Craig Nicho
9  any of the other leaders of the group ever tell
10 their views on what the purpose of the group wa
11 for?
12 A    At the minutes of the meetings, all they w
13 talk about is what their concerns were concerni
14 different things. They never did say -- other
15 the piece of literature that they first had for
16 diversity group functions, they never harped on
17 too much. Basically they got into the meat of
18 meetings, the latest controversies that were go
19 on in the shops and just the usual stuff people
20 about. There wasn't anything heavy that I coul
21 detect. There was some controversy about the
22 homosexual group getting $75,000 from the compa
23 when nobody else did. That was a big, big issu
24 the last meeting but that's the only thing I
25 remember getting a lot of information on or

Page 101

1  controversy about.

2  Q    And these meetings would last what, 40, 50

3  minutes?

4  A    Oh, 45 minutes to an hour seems like.

5  Q    In the course of that meeting, those meetings

6  that you attended, were there issues discussed about

7  people's perceptions that the company's efforts at

8  diversity had gone too far?

9  A    I don't really recall.  It's been so long, but

10  they basically said what the other diversity groups

11  are up to and what they're allowed to do and things

12  that were happening in the diversity council.  For

13  instance, they talked about picnics that people were

14  having, and they talked about the Muslims being

15  allowed to having their meetings at the library, one

16  of the libraries downtown for extra room, just

17  general type things that were going on within the

18  diversity council and the other groups, nothing

19  hatred or condescending or in any way you could call

20  supremacist that I could detect.

21  Q    I apologize if I've asked you this.  I don't

22  think I have.  What caused you to join the Caucasian

23  employee resource group?

24  A    I was talked into it.  Linda is a very

25  charming and very persuasive lady, and I said I do

Page 102

1  have a lot of videos on aviation, a lot of

2  documentaries on some of the aviation greats of the

3  country, documentary on Wright brothers, all these

4  different things I could have brought in and shown

5  to people, just things concerning the aviation

6  industry, a lot of models I could show and pictures

7  and frames, just general aviation stuff, plane talk.

8  Q    As I understand your testimony, though, the

9  first contact with that group with Linda Dill was

10  made by you; is that right?

11  A    What happened is -- I don't know how I found

12  out where they were located.  I have no idea how --

13  I don't really know because I went to the APU

14  shop and I didn't know that was where they were -- I

15  had no idea that's where they were at, but somebody

16  must have found a piece of literature someplace.

17  That's what it must have been.  I must have found

18  her flyer, initial flyer, and I did contact them,

19  and I wanted to give some warning about the

20  possibility of management watching them.  I said you

21  are being very watched by -- look at all the

22  management who show up at your meetings.  So you

23  need to be really kind of careful of where you tread

24  and be advised that you're being monitored very

25  closely, which I think was pretty good advice

Page 103

1  anyway, and then she persuaded me, just come to

2  of our meetings and find out what we were all a

3  and I said, well, I wouldn't mind doing that, j

4  to check you out but, like I said, this group w

5  operation six months before I even had any idea

6  even checking into it at all.

7  Q    Defendant's Exhibit 10, is this the initia

8  flyer that you saw that caused you to start che

9  into the Caucasian employee resource group?

10  A    Yeah.  This is probably one I found up on

11  bulletin board.  This is probably it.

12  Q    The back side of the bottom right-hand cor

13  states that employee resource groups must show

14  consistency with AMR goals and the diversity ad

15  council's visions, goals and objectives; do you

16  that?

17  A    Right, I see that.

18  Q    And that the group must support company

19  policies on a harassment-free workplace and

20  non-discrimination?

21  A    Yeah, that's there.

22  Q    Did you agree that as a condition of join

23  one of these groups to support those two issues

24  A    Sure.  It's part of the deal, to be proud

25  who you are and not put anybody else down; just

Page 10

1  be aware and have some pride of being.  That's

2  it.

3  Q    I hand you what's been marked as Defendan

4  Exhibit 7.  While she's doing that, the compan

5  efforts at eradicating discrimination and prom

6  a diverse and harassment-free environment had

7  going on for a number of years; right?

8  A    It's been a policy a long time.

9  Q    There had been training done by the compe

10  right?

11  A    Training, I don't know about training.  W

12  never saw videos or anything like that, nothin

13  would call formal training, no.

14  Q    You're aware the company had a written po

15  against unlawful harassment?

16  A    Yeah.  We were forced to sign that.

17  Q    I hand you what's marked as Defendant's

18  Exhibit 7.  Is that one example of a written p

19  against unlawful harassment?

20  A    Right.  We were all basically forced to s

21  it, required signature.

22  Q    Did you object to signing it?

23  A    Well, some of the supervisors -- some of

24  union guys said you didn't have to, but I saw

25  nothing in there that would hurt me or hurt an

Page 105

1  else, so I signed it. Everybody else signed it.
2  Q   Look at the second page of Exhibit 7. My
3  understanding is that you refused to sign this; is
4  that correct?
5  A   Chose not to sign. Why did I sign it then?
6  My signature is on here?
7  Q   That's just your name handwritten.
8  A   No. That's where we had to sign it. That was
9  a signature.
10 Q   Do we need to go back and look at a signature?
11 Is that your signature or just your name printed
12 out?
13 A   Probably my name. It look -- it's not my
14 signature, but why would something be on there?
15 Q   Do you recall refusing to sign this document
16 for fear that it might come back to haunt you later.
17 A   What date was it here?
18 Q   This document is a 1995 document.
19 A   '95.
20 Q   February 6th, 1995.
21 A   Well, I remember reading it, but I might have
22 refused to sign it because a lot of people said it's
23 a lot of vague statements in here.
24 Q   Did you understand that the anti-harassment
25 policy included not harassing somebody because of

Page 106

1  their race or religion, national origin, ancestry,
2  et cetera?
3  A   Yeah. Well, I think I chose not to sign it
4  because we already signed previous documents
5  concerning this. Plus this is a company regulation,
6  too. It's part of the company, the employee
7  handbook, and it's also in the company procedural
8  manual. So I think the reason I refused to sign it,
9  basically because it's already part of the company's
10 policy.
11 Q   Did you understand that if you unlawfully
12 harassed somebody because of their race, national
13 origin and et cetera, that your employment could be
14 terminated?
15A  Oh, absolutely. If I went on my way and
16 threatened anybody or caused a threat of any kind,
17 physical, absolutely, and there's been many people
18 fired recently since I've been fired for that
19 reason, threatening notes on people's toolboxes, and
20 I understand they all got their jobs back because
21 they didn't really receive counseling but,
22 absolutely, if there's a threat made, vandalism,
23 anything like that, sure, you should be fired.
24 Q   In your opinion does the threat have to be
25 verbal?

Page 107

1  A   Well, it has to be a direct implied threat,
2  yeah. If you get in somebody's face and say I'
3  going to hurt you, a threatening phone call to
4  house, yeah, absolutely, that's threatening. I
5  criminal offense actually.
6  Q   I hand you what's been marked as Defendant
7  Exhibit No. 8. Defendant's 8, sir, do you reco
8  that as a written policy of American Airlines
9  involving work environment in general and
10 specifically on policies against discrimination
11 harassment?
12 A   I don't recall ever seeing this before, bu
13 when did this come out? What date did this
14 publication come out? There it is. 11 --
15 Q   -- 1-1999.
16 A   That's way after I was terminated.
17 Q   L othetask it differently. You're aware t
18 for quite sometime the company had a written po
19 against harassment and intimidation?
20 A   It's in there in the procedural manual, t
21 rules of conduct, yeah, but this came out afte
22 fact.
23 Q   Some kind of clean-up questions. As it
24 respects the April 20, 1999 meeting where you w
25 The Turner Diaries T-shirt, did anybody call yo

Page 108

1  either warn you or ask you not to come to that
2  meeting?
3  A   I didn't receive any calls about it on my
4  phone. I didn't have a cell phone at the time
5  don't recall ever getting a phone call saying
6  meeting was even taking place. I got a phone
7  about the problem with the literature twice on
8  Q   From whom?
9  A   Linda.
10 Q   Both times from Linda?
11 A   I think once from Linda one day and the n
12 was from Craig; I'm pretty sure it was Craig.
13 said we've got a problem with the literature a
14 we're thinking about disbanding the group. I
15 well, shouldn't be anything with it; I said an
16 going to get fired. He said no, and I said do
17 worry about it because I thought it was a pass
18 fluke.
19 Q   Were the two phone calls fairly close in
20 to the actual diversity fair?
21 A   They were -- it was -- actually one was a
22 diversity fair.
23 Q   It caused quite a stir that very day?
24 A   Yeah. Actually that afternoon is when I
25 started getting the calls, late afternoon befo

DEPO OF DANIEL W. MAHON, 10-29-03

Page 109

1   went to work, but then the next day I got a call,
2   too.
3   Q    Did either of the two calls from Dill or
4   Nichols you've just described warn you or ask you
5   not to attend any more meetings because of the
6   problems it might make?
7   A    No.  They just said they were going to have a
8   meeting with Greg Hall, and I asked if I should come
9   to that meeting that afternoon or that next day, the
10  next morning, and I said, well, do you think I ought
11  to come and she said no, no, no, just let this thing
12  die; I said okay, I won't come.  That's the meeting
13  I thought they were referring to when they said the
14  meeting with him, with Greg Hall, HR and a lot
15  of other people in management.
16  Q    I understand now.  That clears that up.  After
17  the meeting with Greg Hall, did anybody report to
18  you what had happened, what he said, things of that
19  nature?
20  A    Well, she called back and said they're
21  thinking about canceling the group and the big
22  concern about the literature and that's about it.
23  She said -- I said is anybody getting threatened
24  with being fired and she said no; they just want to
25  stop the group from functioning for awhile.

Page 110

1   Q    Did either Linda Dill, Craig Nichols or any of
2   the other leaders of the group ever advise you that
3   they felt like the pamphlet you had made, what is
4   Exhibit 12, had gone too far?
5   A    No.  Even Linda said, she said we find nothing
6   wrong with it, with the literature.  Even Flora
7   Washington at the arbitration, she heads up the
8   diversity action -- activity council in Dallas, said
9   she found nothing inherently hatred about the
10  literature.  So the group, Linda Dill and Craig said
11  they didn't find anything wrong with it because they
12  both read it and they said they put it out and they
13  could see nothing wrong distributed in the
14  literature.
15  Q    These gun shows that you go to from time to
16  time, do you actually work at the gun shows?
17  A    You mean work for Wanamaker or just set up and
18  show?
19  Q    Set up.
20  A    Yeah.  I set up until about '92 or '91 is the
21  last time I set up.
22  Q    What type of booth did you set up?
23  A    I used to have a diversified table, everything
24  from old holsters to World War II memorabilia.
25  Q    Nazi stuff?

Page 111

1   A    Well, there's no Nazi -- if you call it Ger
2   collectable knives, yeah, daggers.  Luftwaffe,
3   of that early Luftwaffe, SS, were extremely
4   valuable.  Original condition could run up to a
5   thousand dollars.  I did have a few ones that w
6   in bad conditions that I had that I was collect
7   but it was mainly everything.  You name it.  I
8   lot of stuff.
9   Q    Was there a business name that you went un
10  A    No.  Just personal name, a table.  You hav
11  table and reserve a table and you just pay it a
12  use it for a weekend.  I think my last time was
13  is the last time I set up at a gun show.
14  Q    Regardless of whether you agree with it or
15  not, whether it's factually accurate, would you
16  admit that prior to your termination and before
17  actually the whole events about the pamphlets
18  started, that over a period of time you had bee
19  suspected by American and talked to about bring
20  white supremacist ideas into the workplace?
21  A    Nobody ever actually talked to me about
22  anything like that.  Of course, you know, there
23  absolutely no evidence of any recruiting inform
24  ever been taken in to American.  Like I said, m
25  of the guys in my crew, I've had people all rac

Page 112

1   I've worked with and they've all enjoyed my com
2   I've gone the extra mile for these people.  I n
3   had an altercation or argument based on race,
4   basically politics, talked a lot about Clinton
5   the election things.
6        I was a pretty busy body.  When I got to w
7   there was plenty of work to keep me busy.  I di
8   a lot of TV and VCR work on slow days, but ther
9   absolutely no inclination to even think about d
10  anything like that on the job.
11  Q    But the company asked you about it; right?
12  had been taken to HR, interviewed, questioned a
13  wearing various paraphernalia to work?
14  A    What I remember in HR is when a lady's car
15  vandalized and I was brought in there, and ther
16  an FBI agent that talked to me about some thing
17  and that's the only thing I really remember of
18  importance.
19  Q    Do you remember the testimony at the
20  arbitration by one of your co-workers that he h
21  observed you wearing a KKK hat and belt buckle?
22  A    I never wore anything at work that had KKK
23  Swastika or anything written on it, never, neve
24  anything that said KKK on it.
25  Q    Is that witness mistaken then in his

Page 113

1  testimony?
2  A  Well, he may have saw something but I had
3  nothing that actually said KKK or Ku Klux Klan
4  written on it.
5  Q  Let's not mince words.  Did you have anything
6  that to a person educated in those particular areas
7  would recognize as a symbol of the KKK?
8  A  I wore a hat with a rebel flag and if you want
9  -- people may construe that and there are still
10  people who think that that and KKK are one and the
11  same.
12  Q  What about the belt buckle; what did it have
13  on it?
14  A  No belt buckles.  I had one with an NRA and I
15  had one with a gun, a 45 automatic that would clip
16  on, and I had one, a Scottish cross, and that was
17  all I remember wearing.  I had one that had my name
18  on it I wore for a long time; it had Dan on it, but
19  I don't know too many people that pay attention to
20  belt buckles.  I don't know too many people walking
21  around looking down.
22  Q  Before we take our lunch break, I need to
23  satisfy some curiosity.  Between the day of your
24  discharge and the date that you left town to go to
25  work for Aero Taxi in Rockford, you've listed in

TULSA FREELANCE REPORTERS
918-587-2878

Page 114

1  your answers to our interrogatories, and feel free
2  to refer to them if you want; they are Exhibit 3.
3  You indicated that your employment was White Beret;
4  is that correct?
5  A  Yeah, White Beret Enterprises.  We did car
6  repair, electronics repair, household repair,
7  general type repair work.
8  Q  I hand you Defendant's Exhibit 13 if you need
9  to refresh your recollection.  When you say we did
10  repair, who are you referring to?
11  A  Excuse me.  I'm sorry.  I was looking.
12  Q  When you were saying that we did repair work
13  in the context of White Beret, who are you referring
14  to?
15  A  My brother and I both worked together on
16  things.
17  Q  And is White Beret Enterprises an actual
18  company; is it just a name you do business under?
19  A  It's just a name that we just did business
20  under because it was a unique name.  There's a White
21  Hat Cleaners in town.  It's a nation-wide franchise
22  that they also call themselves the White Hat
23  Cleaners.  I mean White Beret is -- the Army used a
24  beret for many years as an intelligence, elite
25  intelligence unit, and we thought it would be kind

TULSA FREELANCE REPORTERS
918-587-2878

Page 115

1  of cool.
2  Q  How long had you and your brother done
3  business from time to time as White Beret
4  Enterprises?
5  A  Actually when I got fired, that's when we
6  really went big on it.
7  Q  How about before then?
8  A  Before then it was just stuff at American,
9  repair work.  I was just too busy to do that.
10  Q  I'm talking about the use of the term White
11  Beret Enterprises.  How long had that been going
12  A  Well, I guess since about 1990, about 1997
13  guess, around there, '96, '97.  I used to do a
14  of work for people at the company.
15  Q  Is there any significance to the term White
16  Beret?
17  A  No.  Just cliche.
18  Q  Didn't stand for anything?
19  A  White Hat Cleaners, same thing, just White
20  Beret.
21  Q  I'll hand you an exhibit that was marked a
22  introduced in your arbitration, which is now
23  Defendant's Exhibit 32.  I take it you recogniz
24  that document, don't you, sir?
25  A  My brother put that out back in the '80's.

TULSA FREELANCE REPORTERS
918-587-2878

Page 116

1  Approximately a year after that, yeah, October
2  1990, he gave it up.
3  Q  And it's a publication called the White Be
4  correct?
5  A  Yeah.  That wasn't White Beret Enterprises
6  We just called it that.
7  Q  Is that the same usage you had when you wo
8  under that company or that trade name after you
9  terminated?
10  A  No, I don't think so.  I think it was just
11  coincidence more than anything.  It had no raci
12  connotation at all because I did a lot of repai
13  work for -- I lived in a mixed neighborhood in
14  Tulsa and most of my clients were African Ameri
15  or Mexican American, so they had no problem wit
16  Q  Second page of Exhibit 32 under white patr
17  of the month, you're familiar with that paragra
18  are you not?
19  A  Uh-huh.
20  Q  Do you deny -- strike that.  Before we go,
21  wrote this pamphlet?
22  A  At that time I think it was a guy by the n
23  of Jim Moran.  Is this Oklahoma or Missouri?  I
24  doesn't say, does it?  Kansas City.  It's all f
25  Kansas City, these clippings here.

TULSA FREELANCE REPORTERS
918-587-2878

# DEPO OF DANIEL W. MAHON, 10-29-03

1  Q    Was your brother involved in writing this at
2  the time?
3  A    No, I don't think so because he was -- in 1990
4  he quit putting these out a long time before then.
5  Q    Look at the second page, bottom right-hand
6  corner and see if you don't recognize the signature
7  D. W. Mahon.
8  A    Okay. Maybe he did, okay. Must have been the
9  last one because he quit putting this out very
10  shortly after that.
11  Q    This particular version of publication
12  attributes to a Daniel M; is that you, Daniel M, top
13  right, excuse me, top second page, white patriot of
14  the month?
15  A    Yeah, that's me.
16  Q    That's you?
17  A    Yeah.
18  Q    It claims there that you've given tremendous
19  efforts in the financial support of the struggle; is
20  that true?
21  A    Well, not really. It was basically the
22  equipment. The camcorder was a $1,500 camcorder,
23  but I did weddings and parties and everything else,
24  and PA system was about 50 bucks. I rebuilt it,
25  but --

1  Q    Did you supply a portable generator?
2  A    Yeah. I've had that for a long time.
3  Q    Did you supply a large tent for the rally in
4  Oklahoma On September 23rd?
5  A    Again, I've had that for a long time. I do a
6  lot of camping out, so that's, you know --
7  Q    There's a reference in here, quote, Daniel
8  also built the cross, closed that. Is that the KKK
9  cross that was used at that rally?
10  A    Yeah. I may have supplied the hardware for it
11  but that's -- other people built it.
12  Q    It says you built it. Is that an untruth?
13  A    I think that's an untruth because I don't
14  think I'm going to be able to drive it down the road
15  with my little 1990 Buick. A little pickup truck
16  with a huge cross in the back would look a little
17  unusual.
18  Q    It also says you have a large collection of
19  Klan and national socialist white power merchandise;
20  is that true?
21  A    Basically all collectable stuff, yeah. It's
22  national socialist World War II paraphernalia, yeah,
23  the old German bayonets and things, rifles, because
24  I am kind of into that historical context. All that
25  stuff is pretty valuable. So I did have some

1  collections of those things.
2  Q    Do you have a large collection of Klan
3  material?
4  A    I had some antique Klan -- back in the '20
5  they got various collectors and I also sold Tay
6  cutlery, the little novelty knives for $4, which
7  made $2 apiece on, and actually made in Japan,
8  also had a king knife and some Israeli officer
9  knives. I had a lot of collectable things that
10  people -- that I would buy and sell and make mo
11  Q    Is it true that you also supplied many whi
12  resistance group with T-shirts?
13  A    No. A lot of people sell on my table at t
14  gun shows and I charged them $2 apiece for the
15  T-shirts I sold for them, so I made a little mo
16  on it and they were novelty items, strictly nov
17  People would buy them and say, oh, look what I
18  and they could show it to their friends and say
19  cool, where did you get that. You know, it's l
20  novelty. As a matter of fact, the best knife I
21  was a black crew chief for another company and
22  polished it up with black gold and he was real
23  to get it, just as a conversation piece.
24  Q    At the time that this article was written
25  the events that are described in it occurred, y

1  were employed by American Airlines; true?
2  A    Yeah, I was still with American Airlines.
3  Q    Did you ever make any effort to retract or
4  tell the readers of this publication that your
5  brother had said untrue things about you in thi
6  document?
7  A    Well, nobody at American got this document
8  This is a very small coverage. I think only 10
9  people in the whole country got this, if that.
10  it's not something you would buy at a local tab
11  distributorship. So nobody at American would h
12  ever seen this. To my knowledge nobody would
13  know it.
14  Q    My question was different. Did you ever e
15  an attempt to reach the audience of this letter
16  tell them what your brother had said about you
17  not true?
18  A    Not really because I didn't think it was a
19  big issue. It doesn't say I'm a white patriot.
20  doesn't say I'm a member or activist, just talk
21  about it a little bit and that was it.
22      MR. CORDELL: Let's go ahead and take o
23  lunch break.
24      (Following a lunch recess at 12:26
25  p.m., proceedings continued on the Record at 2:

DEPO OF DANIEL W. MAHON, 10-29-03

Page 121

1   p.m.)
2   Q   Mr. Mahon, I direct your attention, if you
3   would, to Exhibit 5, your answers to our discovery,
4   the next one. I said 5. I meant Exhibit 3. I have
5   a few follow-up questions. Earlier in the
6   deposition I asked you about a doctor, Karen Bader.
7   Is that again the only doctor you've seen over the
8   last seven years?
9   A   Last one I've seen basically in the last seven
10  years.
11  Q   Would she be the only source of medical
12  evidence or testimony that you somehow suffered
13  physically or emotionally from your termination at
14  American?
15  A   She's the only one I've actually had any time
16  in the last seven years. She's the only doctor I've
17  ever had since I was terminated.
18  Q   Has part of her treatment of you had anything
19  to do with psychological counseling, treatment for
20  depression, chemical dependency, anything like that?
21  A   No. It's strictly a chronic condition that
22  maybe it's just that desert atmosphere or may be
23  anything. Who knows. It's just that it's gotten
24  worse since I was terminated.
25  Q   And how do you describe the psoriasis; is it a

TULSA FREELANCE REPORTERS
918-587-2876

Page 122

1   scaling of your hands?
2   A   It's mainly on my hands. This is starting to
3   heal a little bit, but I've got scars on my knuckles
4   and sometimes in the middle of the summer it
5   actually gets in my palms. I can't grab tools very
6   good.
7   Q   Cracking, dryness?
8   A   Cracking and sores that won't heal very easy.
9   It's painful, but I'm under medication now and it
10  seems to help.
11  Q   Good. Interrogatory No. 5, you were answering
12  questions about what you've done and how much you've
13  made since you left American. Do you know what your
14  current rate of pay and expected annual gross
15  earnings at Alaska Airlines?
16  A   It's going to be the same as last year, about
17  42,000 before taxes.
18  Q   Is that without bonuses, including overtime?
19  A   We don't get overtime there. Don't get
20  overtime at all.
21  Q   Does it factor in any bonuses you might get?
22  A   No. We don't get bonuses. No profit sharing
23  as of yet.
24  Q   What kind of health plans, if any, or benefit
25  plans do you get at Alaska Airlines?

TULSA FREELANCE REPORTERS
918-587-2876

Page 123

1   A   Standard HMO and dental, 80 percent. The
2   dental I think is -- I think it's a deductible,
3   standard dental plan, Aetna, Aetna group.
4   Q   And do you have flight privileges at Alaska?
5   A   Yeah. Very good flight privileges, yes, I
6   Q   Do you also have what is known in the indu—
7   as OAL privileges, other airline?
8   A   Yes, I do.
9   Q   All right. So other than the difference i—
10  what you were making at American as opposed to w—
11  you're now making at Alaska, are the benefit
12  packages roughly the same?
13  A   They're pretty similar. I was PacifiCare
14  American and I'm with PacifiCare here for my reg—
15  health and Aetna is dental, but PacifiCare. I'—
16  with the same type of program, same price.
17  Q   Is your take-home pay or your gross earnin—
18  governed by a contract; is it a union position?
19  A   It's a union. We have AMFA. That's our
20  union. We're contractual.
21  Q   Are you considered an AMT or what
22  classification do they use at that airline?
23  A   I'm actually classified as an AV, avionics
24  tech, line mechanics, line avionics man.
25  Q   So you work at a line station?

TULSA FREELANCE REPORTERS
918-587-2876

Page 124

1   A   Yeah. I work up at Sky Harbor Airport,
2   midnight maintenance. We have three overnight
3   airplanes, and sometimes I'm there by myself, a—
4   they go out mornings between 6:30 and 9:00.
5   Q   Is that Phoenix?
6   A   Sky Harbor Phoenix, Sky Harbor Airport, Sk—
7   Harbor International Airport in Phoenix. We're —
8   Terminal 2.
9   Q   And roughly how far from your home or how
10  do you have to drive to get to your job?
11  A   It's approximately eight and a half miles
12  total.
13  Q   Eight and a half?
14  A   Yeah.
15  Q   So very close?
16  A   Absolutely.
17  Q   So basically you live in Phoenix?
18  A   Well, Tempe is actually Tempe. It's actua—
19  considered Tempe.
20  Q   When you go over that one street, I can't
21  remember what it's called, you go into Tempe; r—
22  A   Yeah. You do from Phoenix and Tempe and t—
23  Tempe into Mesa on the same street. Street jus—
24  changes names. It gets confusing down there be—
25  everything kind of runs into each other.

TULSA FREELANCE REPORTERS
918-587-2876

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 125

1 Q    You've indicated here from September of 2000
2 to February 2001, as we discussed, you worked for
3 Aero Taxi of Rockford. How much were you making
4 there?
5 A    I was making 14.50 an hour.
6 Q    Do the math for me. What does that work out
7 on an annual gross?
8 A    I don't have a computer.
9 Q    Do you remember approximately how much it was?
10 A    I'd say 36,000 a year, something like that.
11 Q    And that company shut down; right?
12 A    Yeah. They went bankrupt for a pilot mistake.
13 Q    Cause an air crash or something?
14 A    No. They lost a contract with UPS and it
15 caused them some financial pain.
16 Q    For the period of February 2001 until you went
17 to work at Alaska Airlines April 9, 2001, did you
18 stay in Rockford, Illinois?
19 A    Right. They sent me a relocation check and I
20 left approximately last part of March of 2001, yeah,
21 March. I started working April 9th is my first day
22 I started.
23 Q    So with the relocation check, et cetera,
24 basically did you have uninterrupted income during
25 that transaction?

TULSA FREELANCE REPORTERS
918-587-2878

Page 126

1 A    Yeah, uninterrupted income.
2 Q    Then we talked a little bit earlier about
3 working with White Beret Enterprises June '99 to
4 September 2000. How much did you make there?
5 A    Oh, it was kind of an ad hoc business. I
6 would say maybe 15,000 at the time we were just
7 doing it. It was a short time.
8 Q    Would that be actual cash money?
9 A    Yeah.
10 Q    Did you work for trade or --
11 A    Yeah, I did a lot of barter work mainly. It's
12 hard to determine. I would say mainly 20,000. 20
13 would be pretty accurate.
14 Q    The next page, 4, you have given us a list of
15 the various places you sought employment. In each
16 case you've indicated what you did to make contact
17 but you don't show here what the result was. UPS
18 Air, did you ever hear back from them?
19 A    No, no response from them.
20 Q    From any of these did you hear a response?
21 A    Just United and Southwest, and Air Wisconsin
22 did an interview with. I got a card back from
23 Northwest, a card said that I was on their records
24 for six months. Midwest Express, I did an interview
25 with them. Horizon Air, no response. Airborne

TULSA FREELANCE REPORTERS
918-587-2878

Page 127

1 Express, no response.
2 Q    Is it your contention in this case that
3 American Airlines in any way interfered with yo
4 ability to get a job with another air carrier a
5 your termination?
6 A    I don't believe there was any interference
7 all in that situation.
8 Q    Let's talk a little bit about your witness
9 list beginning at Page 6. You've identified La
10 Poffen, P-O-F-F-E-N, as a former crew chief. W
11 do you expect Mr. Poffen to testify about?
12 A    He was my crew chief for about eight years
13 He taught me how to work on TV's. I spent a lo
14 time with him learning TV repair. He would be
15 very good character witness about my performanc
16 behavior on the job.
17 Q    Does he have any to your knowledge from wh
18 he's told you or you know, have any knowledge a
19 any comparable employees wearing a comparable
20 T-shirt and not getting fired for it?
21 A    He retired back in '96 I believe, so he wa
22 even an active employee at the time I had this
23 problem with American; however, he was my crew
24 for many, many years. He wouldn't probably kno
25 anything about that.

TULSA FREELANCE REPORTERS
918-587-2878

Page 128

1 Q    So he would fall in the category of a
2 character witness?
3 A    Probably a character witness would be the
4 thing, yes.
5 Q    What about Woody Ribbe?
6 A    Woody Ribbe, yeah, he's my T-shirt man. H
7 the one I bought T-shirts from all the time.
8 Q    T-shirt man?
9 A    Yes. I bought at least 20 T-shirts from h
10 airline type T-shirts, nostalgic airline T-shir
11 advertising T-shirts, and --
12 Q    But you didn't buy The Turner Diaries T-sh
13 from him?
14 A    No. He just came by during lunchtime with
15 big bags of T-shirts and I bought several of th
16 because I'm an air aviation type person and he
17 lot of antique-looking things, so I bought them
18 He's a real good character witness. His Chines
19 wife, I'm very familiar with. I've been to her
20 house numerous times and did some repair work f
21 them. He's still an active inspector out there
22 been there for 32 years, and I think he would b
23 excellent -- both character and verify my work
24 habits because he inspected a lot of my work.
25 Q    From your perception of the arbitration an

TULSA FREELANCE REPORTERS
918-587-2878

Page 129

1    your understanding of what rules and regulations you
2    were accused of violating, did anybody ever take
3    issue with your work ability or quality?
4    A    No one that I recall ever took issue with my
5    work.  As a matter of fact, most of the people
6    praised my work.  I helped make a training film out
7    there on my own time.  Nothing but a lot of -- I'm
8    not saying I walk on water but most people didn't
9    have a problem with my work.  They seemed to believe
10   I was a very good avionics man and I usually did a
11   good eight hour day for them.
12   Q    For people who aren't familiar with the
13   industry, what is avionics; what did you do?
14   A    Okay.  Avionics is a real broad term.  It's
15   basically aircraft electronics, and it involves
16   repair, servicing, maintaining and modifying
17   aircraft systems, basically anything on an airplane
18   that has a wire going to it, including the
19   navigation system, computers, lighting, hydraulic
20   control, flight control, pressurization,
21   instrumentation.  Anything that's got to do with
22   instrumentation or any wiring at all in the airplane
23   is an avionicsman job.  That's what I do today at
24   Alaska.  The airplanes come in.  I talk to the
25   pilots about any problem the aircraft may have, and

Page 130

1    we look at what we call the pie ripped off, and then
2    we have scheduled maintenance that we do every
3    night.  So it's a very fulfilling life.  There's a
4    lot of challenges and a lot of fun sometimes.
5    Q    While I fully understand that you disagree
6    with the innuendo that you would ever have any
7    intention of causing an aircraft to crash, as a
8    technical matter would you have that ability?
9    A    Well, any man, mechanic or otherwise, that
10   works an airplanes, including the people that
11   service the food, the people that fuel the airplane,
12   the people that wash the airplane, the customer
13   service agents, all people have access to everything
14   around an airplane.  So anybody that has access to
15   aircraft has potential, under extreme conditions, to
16   do damage; however, I've done this work for 30
17   years.  My family, my friends -- I have utmost
18   respect for what can go wrong with an airplane.
19      In the Coast Guard I was involved in a rescue
20   effort of an downed Eastern Airlines L1011 in
21   December of '73, and I witnessed firsthand the
22   destruction and the unbelievable pain and injury
23   that can be caused by an airplane that contacts the
24   earth in the wrong way.  So I have utmost respect
25   and am very, very cautious about my work and make

Page 131

1    sure it's done right, so that when a plane goes
2    very satisfied it's going to make a safe flight
3    Q    Don Anderson, how does he fit into this?
4    A    Don was my -- he was the other half of the
5    double D team.
6    Q    The what?
7    A    Double D team.  His name is Don and, of
8    course, my name is Daniel.  It goes back a long
9    time.  Nobody would work with him on a crew for
10   long time.  Nobody -- he was the kind of guy that
11   was kind of hard to get along with, but once I got
12   chance to work with Don, I realized he was high
13   intelligent, highly motivated person, and we got
14   the point where we worked together all the time
15   we got to be called the double D team and whenev
16   an airplane came in, what they call a drop-in, t
17   was an airplane that came -- in the fleet that wo
18   come in with a serious problem that needed to h
19   fixed at that time, which is overtime, and some
20   we would get it done in an hour, hour and a hal
21   So we had a reputation in the 727 product line,
22   I remember Don well.  He's is a wonderful perso
23   work with.  I wish I was still working with him
24   Q    Does he have any personal knowledge as far
25   you know about a similarly situated person to

Page 132

1    yourself offering the flyer and wearing the T-s
2    A    Don was off my dock at the time this event
3    took place.  He became a crew chief on the adjo
4    maintenance area.  So he wasn't in my immediate
5    working environment for the last, oh, last six
6    months I was there, although we took breaks tog
7    and saw each other quite a bit, but he was an a
8    race car driver and a hunter.  So he never disc
9    much except for the airplane thing and the work
10   environment, things that were going on on the d
11   So he was just a real conscientious hard-workin
12   guy.  Sometimes you couldn't stop him.  He woul
13   want to work through breaks and lunch.
14   Q    Violate that unwritten --
15   A    Workaholic to the extreme.
16   Q    Violate that unwritten union rule, huh?
17   A    Yeah.  Sometimes -- well, of course, I was
18   same way.  I wanted to get things done and take
19   easy the rest of the night.  Get things done pr
20   quickly.
21   Q    So he would just testify about your work
22   habits and personality?
23   A    Oh, yeah.  He would be a good character
24   witness.
25   Q    We need to make it easier on the court

Page 133

1  reporter to take turns speaking. Help me and I'll
2  help you. Mark Bass, who he is and how does he fit
3  into this?
4  A    I just saw Mark Bass yesterday. He was my
5  supervisor for five years on the 727 line. He's an
6  ex-Marine, been around the whole world a lot, and he
7  was a real good supervisor, and he was fired a year
8  before I was terminated, and he is here in town. He
9  drives a truck for Schneider now. He just lost his
10 wife recently, and I took him out for dinner night
11 before last. Real nice man.
12 Q    What did he get fired for?
13 A    He never did exactly say why. It was a
14 conflict between him and a higher manager named Glen
15 Brock, and I never really did want to delve into it,
16 but it was a pretty painful thing. They just built
17 a home, but he's really a nice man. He was a good
18 supervisor, one of the best ones I ever had.
19 Q    Category of character witness but without any
20 knowledge of other people wearing T-shirts and the
21 like?
22 A    Well, he was gone the year before I had this
23 problem, so he would have no knowledge of this
24 situation. I would just say he was my boss, my
25 supervisor, and I was responsible to him with the

Page 134

1  job. He was my direct management over me.
2  Q    Lynn and Roger Bloxham, those are the people
3  you stayed with last night?
4  A    Yeah. Interesting. I stayed with them two
5  nights this week. They're Libertarian party. He's
6  running for a position in Tulsa County next year or
7  this coming election. Very articulate, educated
8  Libertarians. They've done a lot of good in the
9  community. I've known them for at least seven
10 years. Roger is an aviation enthusiast. He's
11 building a home-built airplane. I'm trying to help
12 him do things right, but he's a real good character
13 witness.
14 Q    For those that aren't actively involved in
15 politics, what is a Libertarian as far as you know?
16 A    Libertarian, oh, gosh, it's another broad
17 term. They're people that believe less government
18 is better than big government. They'd like to see
19 some of the drug laws liberalized. They're pro
20 Second Amendment, pro choice basically, basically
21 pro choice. They're even pro homosexual rights,
22 believe it or not.
23 Q    That's an unusual mix, isn't it?
24 A    Yeah. Pro civil rights. They just believe
25 that people should be allowed to do what they want

Page 135

1  to do as long as it doesn't hurt other people,
2  they're very much against this thing in Iraq ri
3  now, and I think Bush is on the most hated list
4  they've ever had. They're very anti-Republican
5  right now in the system.
6  Q    Do you belong to any recognized political
7  party?
8  A    I'm an independent, and I do consider myse
9  more Libertarian than either one of the other
10 parties.
11 Q    Mr. Robert Bales, who he is?
12 A    Bob Bales, he was a guy I worked with for
13 long time and we were friends on the dock. He
14 present at the arbitration. He showed me some
15 T-shirts that he wore that they didn't have a
16 problem with.
17 Q    Is he the guy that talked about the big
18 Johnson T-shirts?
19 A    Yeah, yeah, I think it was one of them. H
20 and his wife are really good friends. I've don
21 lot of work for them. I rebuilt his car engine
22 Cougar. A lot of these people I've done a lot
23 work for and work with. He would be a pretty g
24 witness for my character and my technical abili
25 Q    Let's make it through the list. Mr. Jack

Page 136

1  Carner, what category does he fall in; a person
2  has knowledge of the issues in the case or just
3  character witness?
4  A    He's also -- he retired about the same ti
5  Larry Poffen, and he runs a gun shop here in to
6  pawn shop, gun shop, and I've known him a long
7  and see him at the bingo halls a lot and I stil
8  him occasionally.
9  Q    Which gun shop does he run?
10 A    The Bullet Hole. He's part owner, I'm pr
11 sure he's part owner of it. It's over on Memor
12 and 11th Street, 9th Street.
13 Q    Is that the one that sells reloading?
14 A    Yeah. He sells a lot of reloading stuff,
15 of used stuff.
16 Q    Mr. Cooley?
17 A    Lee Cooley, he was also an avionics man.
18 retired several years ago. I worked with him e
19 a bit and as a matter of fact, I sent him a kit
20 an American Airlines Electra awhile back. I me
21 with him every time I come in town. He comes
22 little meeting at the restaurant and he's alway
23 there. He's a very good man. Right now he is
24 helping some orphans. He never had a family so
25 but he would be a really good character witness

Page 137

1  my performance and work duties.
2  Q   You mentioned the restaurant before lunch
3  today.  Are you talking about the same place and if
4  so, which restaurant?
5  A   We used to meet at Denny's -- I mean Wendy's,
6  I'm sorry, Wendy's, Wendy's near Admiral and
7  Sheridan, Memorial, just right down between Sheridan
8  and Memorial, Wendy's on the north side.  We meet
9  there every single time I come into town, except
10 this time because obviously we've got this stuff
11 going on.
12 Q   When you were talking about the witness at
13 Walgreen's incident as I call it, I think you made
14 some reference to her as managing the restaurant?
15 A   I think she was part owner or manager of the
16 Family Diner because I've seen her.  I used to eat
17 there all the time and I would see her behind there
18 ordering people around, and that's on Harvard and
19 Admiral on the north side of the street.
20 Q   So when she showed up at the arbitration, you
21 even knew who she was?
22 A   It's been a long time since, of course, the
23 arbitration.  I thought she was somebody that worked
24 at the car glass place where I used to get glass for
25 my cars.  They could be identical twins.  I thought

TULSA FREELANCE REPORTERS
918-587-2878

Page 139

1  granddaughter, and he's a BMW man and we like
2  and talk mechanics, and he was my crew chief,
3  would testify that I never made any derogatory
4  statements or any type of issues in the shop an
5  Q   Is Ian Caucasian?
6  A   Yeah, he's Caucasian, but he's from -- I t
7  he's from England or New Zealand.  He has a rea
8  heavy British type accent.  Real nice guy.  One
9  the best people to work for out there.  He's a
10 guy.
11 Q   Mark Ihnen?
12 A   Mark Ihnen, tractor man.  Yeah, he's a cr
13 chief on the dock that I last worked with on
14 midnights, a midnight crew chief.  He also test
15 at the arbitration.  I've been to his place a
16 times, fixed his TV once or twice.  He's a good
17 He's volunteer fireman.  As a matter of fact, h
18 teaches fire science at one of the universities
19 in Oklahoma.  I forgot which one.  He goes once
20 week and teaches fire training.  I don't know
21 still does but he did then.  He would be a good
22 character reference, witness.  He's been a crew
23 chief for about five years out there.
24 Q   Does he, to your understanding, have any
25 knowledge about other persons doing the same th

TULSA FREELANCE REPORTERS
918-587-2878

Page 138

1  it was her, and she bolted past me with this
2  surprised look.  I didn't think -- because I was
3  walking out when she was walking in.  It was during
4  an intermission of the arbitration, but she did look
5  kind of upset, and she showed a lot of emotional,
6  very, very emotional during this arbitration, more
7  than I would think a person that heard something six
8  months ago or a year ago.  Very disturbed lady.
9  Q   J. C. Brown was the union board member on the
10 panel; right?
11 A   Yeah, J. C., I believe he's still a committee
12 member of the union.
13 Q   What's his role in this case?
14 A   He witnessed a company representative at the
15 arbitration say verbatim that no matter what the
16 arbitrator decides, we will not put Mr. Mahon back
17 to work and that was kind of -- I would say that was
18 undermining the arbitration process by saying that
19 in front of the arbitrator.
20 Q   And that was part of the case you filed that
21 the Tenth Circuit threw out?
22 A   Exactly.
23 Q   Ian Fenwick?
24 A   Ian, he was my last crew chief before I was
25 terminated.  He has a biracial daughter or

TULSA FREELANCE REPORTERS
918-587-2878

Page 140

1  that you did and not getting fired for it?
2  A   I don't really know.  He never received
3  questions on that at the arbitration.  He just
4  person I worked for and worked with and been t
5  house.  That's about all I can say about Mark.
6  Q   There's some overlap between these witnes
7  and the ones that appeared at the arbitration.
8  respect to that overlap, are you aware of any
9  information that you expect that witness or
10 witnesses could testify now that they did not
11 arbitration?
12 A   You mean the witnesses that were pointed
13 I don't know really.  It's hard to say.  I don
14 know.  I couldn't answer that question.
15 Q   For example --
16 A   I wouldn't know what --
17 Q   Before lunch we talked about the exhibit
18 the White Beret publication and the article on
19 as the white patriot.  That was brought in the
20 arbitration and there was never any evidence
21 introduced from your testimony or anybody else
22 that subject.
23 A   Yeah.
24 Q   For example, using that just as an exampl
25 are there any witnesses that appeared at that

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 141

1  arbitration that could have addressed any of these
2  issues to your knowledge that didn't?
3  A    As far as that White Beret publication here?
4  Q    Any of the issues.
5  A    They had no knowledge of any of that stuff.
6  Most people would never have seen that stuff. They
7  never would have had the opportunity to see it.
8  Q    Mr. Charles Kountze?
9  A    Kountze, Charles Kountze, well, he's been a
10 friend of ours for several years. He's up in Ann
11 Arbor, Michigan. He gave my brother a car last
12 month, a 1999 Malibu, and he's a very wealthy
13 person, and he's been kind of a friend of ours off
14 and on for the last seven or eight years. He's
15 trying -- he wants to write a book on Dennis.
16 Q    On Dennis?
17 A    He wants to write a book on Dennis, his
18 experience in life, and he comes down and he is kind
19 of a buddy, professional college student most of his
20 life. He hasn't done a lot of work in his life but
21 he's had a lot of money to spend and he's very
22 wealthy, and it's kind of nice to have wealthy
23 friends occasionally who can help you out.
24 Q    Where did you say he lives?
25 A    Ann Arbor, Michigan, but he comes down and

TULSA FREELANCE REPORTERS
918-587-2878

Page 142

1  visits quite a bit. He does a lot of traveling, a
2  traveling man.
3  Q    Speaking of writing a book, Dr. William Pierce
4  who wrote The Turner Diaries, had you ever met him?
5  A    William Pierce, I've never met him. I've seen
6  him in video. My brother I think went up and saw
7  him at someplace back in the mid '80's I think it
8  was, but I don't recall meeting him. He's deceased,
9  I understand now, because they had a big article in
10 the paper about him. He died a couple of years ago.
11 Q    Did you understand that he espoused certain
12 white separatist ideas?
13 A    Like I said, I just heard his name mentioned a
14 few times. Somebody said he was a professor of
15 physics. Like I said, Dennis mentioned his name a
16 couple of times but I never talked to the man or met
17 him. A lot of names got thrown around. They're
18 just names to me. He knows so many people.
19 Probably thousands.
20 Q    Dale Lance, who is he?
21 A    Oh, Dale, he sat next to me in the
22 arbitration. He took notes. He was kind of my -- I
23 don't know. I guess you would call it escort me
24 around, took me to lunch. Didn't really know him
25 that well, but he's a good mechanic and he knows a

TULSA FREELANCE REPORTERS
918-587-2878

Page 143

1  lot of people out there. I talked to him basic
2  at the arbitration, talked to him quite a bit.
3  took me to restaurants and stuff during lunchti
4  and breaks.
5  Q    Did the union appoint him as your caretake
6  or --
7  A    Well, he was there every day at the
8  arbitration, every single day all three days, a
9  just sat next to me, next to Kevin Creaser, and
10 took notes. He was there to observe more than
11 anything.
12 Q    Is he a union officer?
13 A    I think he was a steward. I think he was
14 going to run for a union position, a high posit
15 at that time, but at the time of the arbitratio
16 think he was just a steward, union steward ther
17 observe and take notes and stuff.
18 Q    Seems odd. Your son, Willie, William Rica
19 Mahon?
20 A    Yeah, right.
21 Q    Other than -- don't take this the wrong wa
22 but other than being a good father, what knowle
23 could your son have about whether or not other
24 people in the workplace did comparable things t
25 and weren't fired?

TULSA FREELANCE REPORTERS
918-587-2878

Page 144

1  A    Well, he -- when this went down, he was li
2  in Chandler, Arizona, so he had no knowledge of
3  went down. He didn't really acknowledge the
4  workplace other than the fact I worked overtime
5  the time. He never had a chance to see me. I'
6  sending him to mechanic school now, but America
7  made a lot of accusations about me trying to ha
8  conspiracy to kill my son and my ex-wife. They
9  made statement about me not insuring or my life
10 insurance not authorizing -- authorizing a
11 percentage to go to my son. So I think he woul
12 a good witness to -- as me as a father and me a
13 working man and how I conducted myself.
14 Q    I've seen or read somewhere that your brot
15 Dennis, at some point in time disapproved of yo
16 being married to a Philippino lady; is that tru
17 not?
18 A    He actually did her way over here from the
19 Philippines. Now, when he was working for Boei
20 couldn't have gotten her over here without his
21 because I was still in the Navy making peanuts,
22 I think he didn't like her character because wh
23 she got here, she seemed to get a little more
24 materialistic than when I was with her in the
25 Philippines. First time we went to a mega mall

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 145

```
 1   there was sort of a transformation there that took
 2   place, but he gets along with her just fine now.
 3   We've been to her house and fixed her car.
 4   Q    Did he publicly announce his disapproval of
 5   your marriage to her and having a biracial son?
 6   A    Publicly?  You mean like in print and --
 7   Q    Well, within those circles that he operates
 8   in.
 9   A    No, probably never mentioned it.  It was just
10   a personal situation.
11   Q    What would your ex-wife have to add to this
12   particular legal issue?
13   A    Oh, she would add quite a bit.  The fact that
14   I'm being labeled as a terrorist, a hater, a devil,
15   a racist, all this stuff, I think she would testify
16   that I've probably been the most model ex-husband a
17   person has ever asked for.  I helped her with a down
18   payment for her house in Phoenix.  I've been to her
19   house on numerous occasions to fix her appliances
20   and air conditioning and both her cars.  So she -- I
21   think she would be a very good -- testify to my
22   character and I behaved myself when you're married
23   and not married.
24   Q    Would she have any knowledge of any alleged
25   involvement with racist groups?
```

TULSA FREELANCE REPORTERS
918-587-2878

Page 146

```
 1   A    Oh, no.
 2   Q    KKK?
 3   A    No, I don't think -- she has no knowledge of
 4   anything.  She had a problem with Dennis and some of
 5   his belief systems, of course.  She was a little
 6   nervous about it, but now we've been to her house
 7   numerous occasions.  She had us over last
 8   Thanksgiving and had a good time and had some of her
 9   Philippino friends over.
10        See, I don't think my brother is really a
11   hater.  I think he was more of a separatist.  When
12   he gave that speech to the Blank Panther militia in
13   Dallas in 1993, they gave him a standing ovation.
14   When he ran for mayor, he got I think a standing
15   ovation from the black Christian forum over here in
16   north Tulsa when he ran for mayor.  They booed the
17   standing mayor, Miss Savage.  My brother goes up
18   there and talks, he says I live in north Tulsa with
19   you people and I actually am trying to get
20   businesses back in this community and fix the roads
21   for you people, and so they enjoyed his speech a
22   lot.  I don't think he's being labeled -- I mean
23   he's not as bad as people label him to be.
24   Q    That may be an appropriate place to ask this
25   question.  You've talked kind of in bits and pieces
```

TULSA FREELANCE REPORTERS
918-587-2876

Page 147

```
 1   about belief systems, your brother's as opposed
 2   yours, on some of your political philosophies a
 3   where you fall in the spectrum of independent,
 4   Libertarian and things like that.  Tell me what
 5   belief system is involving racial identity.
 6   A    What do you mean racial identity?  I don't
 7   understand what you mean.  What race are you or
 8   race you live with yourself as?
 9   Q    Let me try to pick a better example.  Do y
10   believe that the races are properly kept separa
11   A    Well, Louis Farrakhan, when his lieutenant
12   talked to my brother on the phone for a long ti
13   they feel the races generally do better when th
14   have their own determination, self-determination
15   My brother believes basically, as well as some
16   the other separatist groups around the country,
17   people are generally more content when they hav
18   their own leaders and their own industries, but
19   never once wanted to attack a biracial couple o
20   people wanted to congregate, he had nothing aga
21   it.  He was all for people having the right to
22   associate if they want to, with who they want t
23   That's all I know he knows.  You would have to
24   him.
25   Q    I believe the question was, what do you
```

TULSA FREELANCE REPORTERS
918-587-2878

Page 148

```
 1   believe?
 2   A    Oh, what do I believe?  Okay.  I believe
 3   freedom.  Libertarianism means total freedom,
 4   freedom of association, freedom of using -- be
 5   around who you want to, believing what you want
 6   as long as you don't cause personal harm to any
 7   That's the way it's always been.  If I was a ra
 8   I wouldn't be living in the most racially diver
 9   city in America, besides LA; it's Phoenix, and
10   lived nine years in a multi-racial neighborhood
11   Tulsa.  I've had an African American right acro
12   the street, Mexican Americans cattycorner, Ind
13   Everybody in that area, we got along fine; no
14   problems at all.
15   Q    So then what caused you to want to affili
16   yourself with a group that tried to stand out a
17   being only Caucasian?
18   A    Well, I think private being is okay.  I
19   thought that would be good to have all the rac
20   cultures represented out there.  Like I said,
21   basically got talked into it.  I personally di
22   really want to join, but Linda Dill had that ki
23   a charm, you know.  You know, if she would have
24   250 pounds with a beard and mustache, I probab
25   wouldn't have joined, but she talked me into i
```

TULSA FREELANCE REPORTERS
918-587-2878

Page 149

1    Q    You indicated on the same subject matter area
2    that you did recognize the Turner Diaries to be
3    anti-government?
4    A    Well, that's the impression I got in the first
5    chapter.  It was mainly anti-government, governments
6    were taking guns from everybody around the country,
7    and this individual was arrested and he escaped and
8    formed his own little group.
9    Q    Are you concerned about the efforts to pass
10   gun control laws?
11   A    I've always been to a certain degree.  I'm
12   very scared of the Patriots Act.  Search and seizure
13   laws have been apple gated.  Sneak and peek, no more
14   federal warrants for wire taps.  I'm very concerned
15   about the lack of how we're losing freedoms from
16   this Patriots Act, and I think the government
17   eventually will plan on gun control, confiscation of
18   guns.  Some of our freedom of free speech will be
19   taken away, but it's a passing concern.  I'm not
20   totally obsessed by it, but the Libertarians, we all
21   have that passing concern.
22   Q    What about the increasing power of the Federal
23   Emergency Management?
24   A    FEMA?
25   Q    FEMA.  Some people are pretty concerned about

Page 151

1    about it on -- at first I didn't know what it w
2    I just thought somebody threw a pipe bomb into
3    building, but when they said that many people d
4    it was pretty horrific.  It was a pretty big sh
5    to everybody.
6    Q    Do you remember the date of the Oklahoma C
7    bombing?
8    A    19th of April of '95, yeah.
9    Q    After you bought The Turner Diaries book,
10   isn't it true that you testified that you were
11   of the tie that was made between Timothy McVeig
12   The Turner Diaries?
13   A    Well, April 19th is also the anniversary o
14   Waco, which I think maybe played a big signific
15   part of that day they chose, that he or whoever
16   involved chose to bomb the building.  I think i
17   definitely his retaliatory act against what hap
18   in Waco because it happened on the anniversary
19   Waco, but there's a lot of conjecture of things
20   happened and how it led up to it and stuff, so
21   Q    And when you wore The Turner Diaries T-shi
22   on April 20, you did admit you thought it was a
23   anti-government or anti-establishment statement
24   correct?
25   A    The book is anti-government.  I don't reme

Page 150

1    that.
2    A    It's a concern.  It really is.
3    Q    Why is that?
4    A    Because as Americans, we're used to going
5    where we want to without papers; we're used to
6    saying things we want to say and having the freedom
7    to do hobbies involved, and I think that FEMA is
8    going to put a crunch on our basic freedoms.
9    Q    You mentioned Waco and the Branch Davidians.
10   Do you believe what occurred there was an
11   infringement of somebody's rights?
12   A    I think it was an atrocity, yeah.  I think the
13   government killed almost 80 real good innocent
14   people, most of them -- many, many African Americans
15   and Asian Americans and Hispanic Americans in that
16   group were burned alive, and I think it was a ugly
17   blight upon the American history, as well as Ruby
18   Ridge when they killed that woman with her baby, but
19   it's becoming an emotional subject.  I don't really
20   want to discuss that.
21   Q    You were living in Oklahoma at the time of the
22   Oklahoma City bombing, were you not?
23   A    I remember the morning very well as a matter
24   of fact, yeah.  I was at a restaurant eating
25   breakfast at Tallies when they first said something

Page 152

1    admitting that I wore that just because of Waco
2    American Airlines picked that date for that mee
3    for some reason.  I don't know why.  Also they
4    mentioned it was Adolph Hitler's birthday and I
5    didn't even know what birthday Hitler was born
6    So American Airlines must have more knowledge o
7    dates and places than I do, but there was no
8    connection.
9    Q    Are you aware that your brother is quoted
10   he made the comment that the Oklahoma City bomb
11   was a beautiful thing?
12   A    I think what he said, he said -- the only
13   thing I remember him saying about it to Fox New
14   network when they came down for an interview, h
15   said he's glad that someone finally took it to
16   government but he should have done it at 3:00 i
17   morning, that's what he said, when there was no
18   lost.  He never approved of all the people dyin
19   there.  He said it's just too bad they didn't d
20   at 3:00 in the morning.
21   Q    Often times a person's religion plays a ro
22   in their belief systems.  You agree with that I
23   assume?
24   A    Sure.  Religion is a great part of people'
25   lives.

Page 153

1  Q    I understand at some point in time, maybe
2  earlier in your life, maybe until today, you were a
3  member of the Seventh Adventist?
4  A    Seventh Day Adventist, yeah.
5  Q    Is that still the case?
6  A    No. I fell away from it. I'm a back slider.
7  They're very legalistic. You couldn't eat certain
8  things. You couldn't drink any alcoholic beverages
9  at all. You couldn't work from Sabbath, Friday
10 sundown to Saturday sundown, and as I grew into that
11 religion, I realized that although the people were
12 very nice in the church and they treated me great,
13 it just got to be a little bit legalistic and I fell
14 away. When I was in the Service, I was a very
15 strong member of it.
16 Q    In fact, while you were in the Service, you
17 applied to be released from the Service as a
18 conscientious objection; is that correct?
19 A    Exactly. They wanted me to participate in the
20 nuclear bombing problem, a nuclear loading program
21 of loading nuclear weapons, and I said my religion
22 prevents me from loading weapons of mass
23 destruction. So they said you can't do that unless
24 you file for a conscientious object 1AO
25 classification, so I got paperwork to do that. The

TULSA FREELANCE REPORTERS
918-587-2878

Page 154

1  process is pretty involved. I had to see a
2  psychiatrist for an hour or two. Then I had to see
3  the chaplain on board the base, Navy chaplain, the
4  Catholic and Protestant, and they all agreed my
5  beliefs were sincere and they finally approved that
6  category.
7       I still had to work on the airplanes and I
8  still had to go to see with the squadron. I still
9  did my job as an avionics man but I didn't have to
10 load that nuclear ordnance.
11 Q    If you are no longer with the Seventh Day
12 Adventist church, are you with some other organized
13 religion?
14 A    Pretty much agnostic now. I see all these
15 religions all trying to gain strength in the world,
16 and I've pretty much assumed or come to the
17 conclusion that we need to have a big stadium and
18 put Allah and Jesus and Vishnu, Buddha, Yawway and
19 all these different gods in there and let them
20 hammer it out and we'll worship the one that wins.
21 That's kind of how I feel about it now.
22 Q    Evan Sirois, is that how you pronounce his
23 name?
24 A    Sirois, Sirois. He's a gentleman from -- he's
25 a Vietnam veteran, highly decorated, and been out

TULSA FREELANCE REPORTERS
918-587-2878

Page 155

1  there probably 16 years. I worked with him qui
2  bit out there. Came to me for a lot of advice.
3  He'd been a mechanic and he got to avionics a l
4  later in his career, so he came to me a lot of
5  for training, informal training on the airplane
6  Born-again Christian, very conservative. I've
7  out to dinner with him on many occasions since
8  fired and before. Real good character witness.
9  son is a doctor now and a real honest, hardy ma
10 He could also testify to my behavior, my psycho
11 my performance on the job, my basic psyche, wha
12 believe. Another good man. He's been out ther
13 long time.
14 Q    Why don't we have a break so everybody can
15 a little refreshed and --
16 A    Can I get some coffee?
17 Q    Yes.
18      (Following a short recess at 2:59 p.m
19 proceedings continued on the Record at 3:23 p.m
20 Q    Mr. Mahon, following up, after a break, to
21 list of people that you believe would be witnes
22 on your behalf in this case, we had made it dow
23 your list to Bob Pierce and I assume Debbie Pie
24 A    Yeah.
25 Q    Who are they, please?

TULSA FREELANCE REPORTERS
918-587-2878

Page 156

1  A    They're next door neighbors, one house dow
2  from me. They have been my neighbors for rough
3  eight years, a real nice couple, got two kids.
4  worked on his cars. He works on my stuff. We
5  garage sales together, and he's a fan of Harley
6  Davidson motorcycles, got two of them, and they
7  the ones that have been there the longest. I
8  thought they might be nice.
9  Q    Do they have any idea of what went on in t
10 workplace and whether employees similar to you
11 terminated or not terminated?
12 A    Not really. Him and my brother got to
13 drinking beer a lot. They liked to drink beer.
14 Q    Drank a lot of beer.
15 A    Drinking a lot of beer, dealing with the
16 Harley there, but I used to fix the TV for them
17 their appliances and stuff. So they were kind
18 regular kind of people.
19 Q    Steve Waddel, he testified, didn't he, at
20 the --
21 A    No. Steve is another friend of ours. I'v
22 had him as a friend a long time. I've worked o
23 truck a lot. As a matter of fact, we rebuilt a
24 wreck when he got in a wreck. He works at
25 Whirlpool. Known him about seven or eight year

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 157

1   He's just kind of a regular working class guy,
2   middle class, nothing special about him but he's a
3   pretty honest-hearted guy. I just done a lot of
4   work for him, fixed TV's for him, his trucks all the
5   time, put a garage door on his house.
6   Q    Ralph Schubert?
7   A    Ralph, he did testify at the arbitration. He
8   was my crew chief for about two and a half years.
9   He's retired, just recently retired. Been at
10  American for I think 28 years or 30 years, and he
11  used to go a lot of these political forums. He's --
12  what do you call it, the town hall meeting, and we
13  used to see him there a lot, fairly political
14  active, big NRA supporter, conservative person, and
15  he's been my friend a long time.
16  Q    Did he work at American?
17  A    He works at American, right.
18  Q    I'm sorry.
19  A    He was my crew chief for three years, almost
20  three years.
21  Q    Does Mr. Schubert, from what he's told you or
22  you know, have any information about whether a
23  similarly situated employee to you had done the same
24  kind of things you did but didn't get fired?
25  A    I don't think he has any knowledge of anything

TULSA FREELANCE REPORTERS
918-587-2878

Page 158

1   to be written in cursive?
2   A    Which is --
3   Q    As opposed to printing, cursive handwriting?
4   A    Yeah, yeah, it was my handwriting, yeah.
5   Q    Is this how you write in cursive or is this
6   somebody else's handwriting?
7   A    No. It's mine. That's how I write; that's
8   how I write. Of course, now I'm older, I probably
9   write older, but that's how I write.
10  Q    I guess I had never seen other than your
11  signature any writing in cursive. In the left
12  margin of the first page of this exhibit there's a
13  note that says, Gene, should you print Daniel M
14  in the place of I?
15  A    There's a big cross thing here. I don't
16  recall doing that. I don't recall putting this
17  scribbling on here.
18  Q    Did anybody ever write a letter for you or
19  draft a letter for you to send out?
20  A    Should you print Daniel Mahon in place of I?
21  I have no idea -- this is not my writing here;
22  that's not my writing.
23  Q    The printing in the margin is not your
24  printing?
25  A    That's not my printing, and also this thing

TULSA FREELANCE REPORTERS
918-587-2878

Page 159

1   like that. I don't think so.
2   Q    Eugene Hough?
3   A    Eugene Hough, yeah. He's my attorney friend.
4   He does domestic cases, bankruptcy, divorces, this
5   type of thing. I've known him for about nine years.
6   Done a lot of work on his vehicles. I was his
7   personal mechanic and home repairman. I know him
8   and his wife quite well. Another conservative type
9   person, pro-gun. Real nice guy. He's been in town
10  here a long time.
11  Q    Your interactions with him were on a friend
12  basis as opposed to a formal attorney-client
13  privilege?
14  A    We have a professional attorney-client
15  relationship with my house. When I got the quit
16  claim, he did the paperwork for the transferring the
17  house over.
18  Q    But as it respects this litigation, was he
19  ever your attorney?
20  A    No, no.
21  Q    I hand you what's been marked as Defendant's
22  Deposition Exhibit 41. Can you identify that?
23  A    It was a letter I think I sent to the ACLU
24  that they didn't take the case.
25  Q    On the first page the majority of it appears

TULSA FREELANCE REPORTERS
918-587-2878

Page 160

1   here is also not -- I don't know what is involved
2   here.
3   Q    Turning over to Page 4, which also has Bates
4   stamped 118 on it, you'll see that the handwriting
5   changes from cursive to printing.
6   A    That's my printing; that's definitely my
7   printing, and it's definitely my writing. I don't
8   know if I just probably went to a different day
9   sometimes to make things more clear, I do that
10  occasionally. I made a mistake on aircraft
11  paperwork, too. Sometimes I'll start writing and I
12  should be printing and vice versa.
13  Q    The reference on the first page to Gene, do
14  you call your friend Mr. Hough Gene as opposed to
15  Eugene?
16  A    What page is this?
17  Q    The very front page in the margin.
18  A    I've always called him Gene and that's his --
19  just Gene.
20  Q    Did Gene ever insist you write a letter?
21  A    No. Only thing I used Gene for was my quit
22  claim on the house, and I did ask him to take this
23  case but he said I'm not interested in it. He
24  wasn't interested in looking into it, so he didn't
25  take it.

TULSA FREELANCE REPORTERS
918-587-2878

## DEPO OF DANIEL W. MAHON, 10-29-03

### Page 161

1  Q    Did he ever offer or help you review anything
2  you had written, such as this letter?
3  A    No, he never looked at anything.  I just asked
4  him if he would help out and he said I'm too busy, I
5  can't do it; I'm not interested in that case.
6  Q    Did you in fact send this letter out to the
7  ACLU?
8  A    I believe I did.  I believe I sent that to
9  Kansas City.
10  Q    Can you tell me by looking at it what the date
11  of this letter is?
12  A    Not dated.  I probably sent that out between
13  the time that the arbitration decision came down and
14  the time I got Bob.  I also contacted Gerry Spence
15  and a Prepaid Legal attorney I met with.
16  Q    This letter is entirely written by you; is
17  that what you are telling me?
18  A    Sure looks like it.  I don't know about this
19  thing in the side here but it definitely is my --
20  this is my letter.  That's my writing.
21  Q    It has your name at least in the signature
22  page on Page 10?
23  A    Yeah.  This is my letter.
24  Q    Do you consider that for this purpose to be
25  your signature to this letter?

### Page 162

1  A    Yeah.  That's the way I would do it.
2  Q    Was this letter sent to the ACLU written in
3  longhand form or did you have it typed up or do you
4  remember either way?
5  A    I sent this letter as is.  I think I put it in
6  a manila envelope and sent it off to the Kansas City
7  chapter of the ACLU.
8  Q    Did you try to be careful and accurate when
9  you wrote this letter?
10  A    As accurate as I could.
11  Q    Did you embellish it; did you take any
12  liberties with the facts in it at all?
13  A    Well, again, I would have to go through it to
14  make sure because it's been a little while ago since
15  I wrote it.
16  Q    Take your time to read it.  That will make my
17  questioning go more quickly later.
18  A    One date may be off.  I think it was 1990 I'm
19  almost positive that he quit, not '91.
20  Q    Tell me where you're looking.
21  A    Second page, approximately -- yeah, second
22  page about two inches up where it says 1988 and
23  September of 1991.  I think it was around October of
24  1990 that they finally let go of him.
25  Q    Have you heard that your brother, Dennis, said

### Page 163

1  the Klan wasn't violent enough or progressive e
2  for his tastes?
3  A    Um, I don't recall it.  He may have said i
4  when he was out.  He was gone quite a bit doing
5  interviews with people.  He didn't spend a lot
6  time at the place.  He was actually out of town
7  lot.  Dick Kurtenbach, that was his attorney fo
8  ACLU in his case against Kansas City.  I did ha
9  F-29 after the showing of the -- airing of the
10  Winfrey Show.  Mayoral -- ran for mayor.  Okay.
11  Talked about when I was called in with the FBI
12  the FBI was at American.  That's accurate.  199
13  that doesn't sound right.  No way I was in that
14  group that long.
15  Q    Talking about the Caucasian employee resou
16  group?
17  A    Yeah.  That's not right.  There's no way I
18  in there a whole year, no way, no way.  I don't
19  think they were in operation then.  That date i
20  wrong.  It has to be spring, early spring of 19
21  That's January of 1999.  These dates are one ye
22  off.
23  Q    You are referring to on or about the first
24  week of January?
25  A    They weren't even in operation then.

### Page 164

1  Q    I met privately with Linda Dill and Craig
2  Nichols?
3  A    Yeah.  It has to be January of '99, has t
4  Okay.  April 20th, after I checked the bulletin
5  board, I was notified to check bulletin board a
6  found out about the meeting.  Other than those
7  dates, it looks fairly accurate.
8  Q    Let me ask you a few follow-up questions.
9  begin the letter by saying as a member and supp
10  of the ACLU for many years.  Are you a member o
11  ACLU?
12  A    Yes, I am.
13  Q    Is that one organization of which you are
14  card-carrying member?
15  A    Right.  I do have an ACLU card.
16  Q    As you recall, does it make you remember a
17  other groups that you're officially a member of
18  A    I'm a member of PETA.  I'm also a member o
19  the National Peace Alliance, National Peace Mem
20  Fund.  I'm a member of several assertive pro-pe
21  organizations, NRA, many organizations.
22  Q    Any others that you can think of?
23  A    Not that I can think of now but they're ou
24  there.  There's quite a few.
25  Q    Do you keep a list of them; do you keep yo

DEPO OF DANIEL W. MAHON, 10-29-03

Page 165

1 cards with you; how do you know?

2 A   Well, I have a pretty thick wallet.  I do have
3 some in any -- I have a lot of things.  That
4 obviously is one of them.

5 Q   Christian Seniors Association, do you mind if
6 I grab it here?

7 A   There's several of them in the -- I wish I had
8 known that because I have a whole bunch of stuff at
9 the place I'm staying, a bunch of my records and
10 things.  I also belong to World Wildlife Fund.
11 That's another one.  Amnesty International.  That's
12 all I can think of right now.

13 Q   Okay.

14 A   My wallet would be two inches thick if I put
15 all those cards in there.

16 Q   How do you afford all those dues?  That's more
17 things than I can imagine belonging to.

18 A   I live in a travel trailer.

19 Q   Bottom of the first page of Exhibit 41 talks
20 about spring of 1999, two years after the separation
21 from your wife, your identical twin brother lost his
22 job after Braniff Airlines went broke in Kansas
23 City, Missouri?

24 A   Yeah.  They went bankrupt for the third time.

25 Q   Do you know whether your brother had ever been

Page 166

1 fired from another major airline?

2 A   He did get fired from TWA in 1989 after he
3 appeared on the Oprah Winfrey Show.  He took a half
4 an hour off his night shift to catch a flight to
5 Chicago to do the show, and nothing happened until
6 they aired the show and then after that they fired
7 him for missing time off work, which he actually was
8 approved to take.  His job was already finished on
9 the airplane, so he had some downtime anyway.  They
10 were waiting for avionics to get done, and they
11 called him in and said you missed an unauthorized
12 absentee, a half hour off work, and they fired him.

13 Q   Are you aware that he was accused of urinating
14 on the presidential seal of Air Force One?

15 A   All too aware.

16 Q   Is it true?

17 A   Yeah, it is true.  As a matter of fact, I got
18 visitation by the president's Secret Service
19 organization about that, a very disturbing visit.
20 Got a note on my door at the house, a little calling
21 card said that Agent Rafferty of the Secret Service
22 needs to talk to you about a very urgent problem,
23 and later on he made an appearance and he wanted --
24 first he thought I was Dennis and he said, Dennis,
25 you need to come outside, we need to talk.  I said

Page 167

1 I'm not Dennis, so I showed him my ID to prove
2 wasn't Dennis, and he said we have to question
3 about a possible threat against the United Stat
4 president, and I said what happened, and he sai
5 about six months ago your brother while working
6 Wichita urinated in the Oval Office of U. S. Ai
7 Force One, a 747.  Although the aircraft was st
8 under Boeing's auspices, it wasn't really relea
9 to the president's fleet, so the FBI wasn't rea
10 involved; it was just the Secret Service, and h
11 rather threatening, and I said, well, I'll let
12 know where he is as long as you promise not to
13 any personal harm.  He basically said unless yo
14 brother admits to wanting to kill the president
15 will not be arrested.  So I gave him the wherea
16 of where my brother was and I said he's at Bran
17 Airlines, Kansas City International Airport, li
18 crew, he's there right now.

19     And about an hour later I got a call from
20 brother and he said you're not going to believe
21 happened; he said this real old graveled experi
22 Secret Service agent came on the job with Barne
23 Fife, a young rather exuberant sidekick, and th
24 asked me if I urinated on President Bush's airp
25 and my brother said yes, I did, and the head ag

Page 168

1 started laughing uncontrollable.  He says we la
2 so hard when we heard it, we didn't really beli
3 it.  He said do you want to kill President Bush
4 my brother said I'd like to kill his policies b
5 don't want to kill the man.  He said okay, can
6 take a quick picture and thumbprint and we'll b
7 our way.  Meanwhile, the younger man was kind o
8 in-your-face kind of guy.  My brother said can
9 tell Barney Fife to take a coffee break and I'l
10 deal with you, and he told -- the older agent t
11 Barney Fife, Barney Fife, take a coffee break.
12 they got his thumbprint and a picture and that
13 the end of it, but they claim they have over 35
14 threats against high officials every day and th
15 have to investigate every single one.  They're
16 pretty much busy people, but it was a no event,
17 non-event.

18 Q   Well --

19 A   I guess he had to urinate pretty bad.  I c
20 know what happened there.

21 Q   Did he go on the presidential seal on the
22 outside of the airplane?

23 A   No.  He was actually inside the chair.

24 Q   He peed on the president's chair?

25 A   Yeah, and his table and the carpeting.  He

DEPO OF DANIEL W. MAHON, 10-29-03

Page 169

1   baptized it quite well.  Agent said are you glad you
2   did it.  He said I would do it in a heart beat; if I
3   had the chance, I would do it again in a heart beat.
4   Q    What do you think about that?
5   A    Comical.  You know, I mean I know he wouldn't
6   jeopardize any airplane to cause a serious --
7   jeopardize safety, but he saw the people look in his
8   toolbox and he kind of figured his termination was
9   very short coming, so he decided to leave his
10  essence in the Oval Office.  A little bit of
11  disinfectant cleaner took care of it.
12  Q    Page 2 of your letter here in Exhibit 41 where
13  you're talking at the top, let me interject at this
14  point that identical twins more often than not have
15  a markedly different relationship with each other
16  than with other siblings do.  As young children, we
17  played with the same toys, built model airplanes
18  together, went fishing together, et cetera.  My twin
19  and I shared the same interests, hobbies and the
20  same politics.  Most people wouldn't understand it.
21  It's a twin thing I guess.  Is that an accurate
22  statement?
23  A    Well, except for totally the politics aren't
24  always the same.  The hobbies aren't always the
25  same.  He has different hobbies now.  But we did go

Page 170

1   in the military together and we taught each other
2   how to do things, the airplane thing and the
3   fishing, and both had interest in firearms.  I would
4   say quite a bit of things were quite alike.  Of
5   course, when you share your life with someone with
6   the same identical DNA, you're going to be somewhat
7   similar.  I don't see how that could be different,
8   but as we grew older, I think like everyone, we had
9   different ideologies about a lot of things.
10  Q    Then in the next paragraph you talked about
11  his involvement in the KKK, and then you make a
12  statement I thought was curious.  I believe he may
13  have developed these negative beliefs from some
14  experience while on riot duty in Miami, Florida in
15  1980.
16  A    Yeah.
17  Q    What is that all about?
18  A    I think he had a traumatic experience on
19  National Guard duty during May of 1980.  He worked
20  for Eastern three days, on the job three days, and
21  he got called out for National Guard duty.  It was a
22  pretty bloody situation took place May 3rd.
23  Eighteen people died the first night.  He was put
24  right in the thick of it, and he had to use his
25  firearm, military firearm on a person, and the

Page 171

1   policeman next to him died of a heart attack.
2   tried to revive him and it didn't work.
3       A week after that he went on -- the Cubans
4   a problem with Castro.  Mariolitto, Mariolite
5   Botliff, he was a Cuban.  Castro allowed a grea
6   deal of his prisoners and criminals to come to
7   country under the guise of some type of emergenc
8   Cuba and it was -- it caused the National Guard
9   be activated for 40 days to guard all these
10  entrants.  Most of them were from mental
11  institutions and hardened criminals; very few o
12  what you would say decent Cubans were brought.
13  Castro basically did a dirty trick, and my brot
14  was involved in that for 40 days in that situati
15  guarding all of these people.
16      So he -- I think he established some of hi
17  belief systems from that experience.  I think i
18  different after that time.
19  Q    Was the riot you referred to involving rac
20  A    Yes, it was.  Basically it involved four C
21  police officers beating an African American to
22  with the billy clubs, and it was a motorcycle c
23  that got ugly, and it was on -- close to a week
24  and it got out of control, and National Guard g
25  brought in to help quell it, and it was traumat

Page 172

1   for him.
2   Q    You said it was May 3rd, 1980?
3   A    1980, May 3rd or May 13th, one of the two,
4   not exactly sure, I think it was May 3rd but it
5   have been May 13th.  It was during the month of
6   But anyway, that's his own experience he went
7   through.
8   Q    You say later in that page that you agreed
9   allow your brother to rent a room at your house
10  $125 a month?
11  A    That's right.
12  Q    And he agreed not to engage in any illega
13  activity?
14  A    He never has -- never at any time had he e
15  engaged in anything illegal.  All his activiti
16  were constitutionally protected, including his
17  for mayor twice.  He never advocated wholesale
18  violence against anyone.  I did tell him that h
19  one year to get out of this KKK business, which
20  did, or not one year.  I'm sorry.  Within 90 da
21  him coming in, 90 days he resigned.
22  Q    What was the basis of your talking him out
23  the KKK?
24  A    After seeing a lot of people that are in t
25  I considered them kind of uneducated, low-life

DEPO OF DANIEL W. MAHON, 10-29-03

Page 173

1  people. He was I think trying to reform it, trying
2  to get people to go -- getting the politics instead
3  of the violent talk, and he did get attacked three
4  times by skinheads for that reason. He got beat up
5  twice.
6  Q    And so your brother went from the Ku Klux Klan
7  to the White Aryan Resistance?
8  A    Yeah. He got rid of that Klan thing all
9  together, and later on he started talking to Tom
10 Metzger. Used to be White American Political Party
11 and then changed it to WAR, White Aryan Resistance,
12 which that's kind of what he went with. It was more
13 of a political organization than this Klan thing
14 because the Klan drew a lot of drunks and wife
15 beaters and people of this nature.
16 Q    And his association or involvement with WAR
17 continued until the two of you all left Tulsa; is
18 that right?
19 A    Way before that. He really -- after the
20 bombing, Tom Metzger basically said you're no longer
21 an organizer or an activist with this organization.
22 So after the bombing, that was it. It was no more
23 anything, except just an occasional phone call, you
24 know, how you doing, Tom. He called him
25 occasionally, but there was no other activity

Page 174

1  involved. As a matter of fact, Tom Metzger's son
2  got out of the whole thing a couple of years ago.
3  Q    Did what?
4  A    His own son is no longer associated with his
5  father. He's out of that thing, too, so --
6  Q    We're going to return to this exhibit so you
7  may want to keep your hand there, but in the
8  meantime would you turn to Defendant's Exhibit 31.
9  Do you recognize that, sir?
10 A    I don't recognize this. I don't know these
11 individuals at all.
12 Q    You haven't seen a document like this before
13 in your life?
14 A    Not this. I've never seen this. I don't know
15 where it came from or whether he faxed this to
16 people. I have no idea. I just don't know who
17 these people are. I've never heard of them before.
18 Q    This is the WAR that we're just talking about,
19 isn't it, White Aryan Resistance?
20 A    Yeah, WAR network, that is, yeah.
21 Q    And the telephone number on your first page is
22 your home phone number; correct?
23 A    Yeah. We shared a phone number.
24 Q    And the P. O. Box, is that a shared P. O. Box?
25 A    Yeah. A lot of people share P. O. Boxes for

Page 175

1  ease of expenses and stuff. A lot of businesses
2  it. I get a lot of parts to my TV service thro
3  the P. O. Box and all kinds of mail, junk mail.
4  Q    Clearly, you testified that you were conce
5  with you being associated with your brother's
6  activities; right?
7  A    I don't see how a post office box really m
8  you -- he got his mail and I got my mail. It w
9  simple as that. There was no post office avail
10 so we just got one box and used it, a big one.
11 Q    So did you condone him using your P. O. Bo
12 and your home telephone number to conduct his W
13 activities?
14 A    He didn't really mail much to that P. O. B
15 or get much stuff. Most of the stuff was just
16 mail and stuff that I ordered through my collec
17 and my model airplane stuff. If he did, I'm su
18 got a few things, but I don't necessarily -- th
19 wasn't addressed to some type of a racial title
20 was strictly the box in my name; it was my P. O
21 Box. It wasn't like White Beret Enterprise box
22 it wasn't KKK or WAR. It was just Daniel Mahon
23 box.
24 Q    But you knew he was using your box and you
25 phone number for WAR activities?

Page 176

1  A    Well, he had his own phone line in his roo
2  He had his own hotline that he had set up and h
3  used that to call people and things of this nat
4  but he had access to the main phone, sure. It'
5  small house, 985 cubic feet or square feet, it
6  wasn't a big house, but I never heard any sedit
7  talk being talked about. It was just a shared
8  phone. People do it all the time, share phone
9  numbers to save money.
10 Q    My question was, you did know he was using
11 documents such as this one, Exhibit 31, your
12 telephone number and your P. O. Box; correct?
13 A    Oh, yeah, he used it. No problem about th
14 Q    And you knew it?
15 A    Absolutely. How am I not going to know it
16 Q    We talked a little bit about William Pier
17 Have you ever met Mr. Metzger, Tommy Metzger?
18 A    I met him one time, yeah. He came back -
19 excuse me -- to Tulsa for a short visit, and I
20 few words with him about TV's, how's the TV rep
21 business, and I had some TV problems I talked
22 about.
23 Q    Are you aware that Mr. Metzger has for qu
24 some time operated a video -- excuse me, a webs
25 and a recorded racist hotline service out of

Page 177

1  California?
2  A    More than that.  I think he had cable access
3  in about 25 states I think if I'm not mistaken.
4  Q    Are you aware that in the course of the
5  dispute between you and American Airlines, the
6  arbitration, and for a period of time at least
7  following that, Tommy Metzger was publishing
8  commentary and stating opinions on his publications
9  about you?
10  A    Internet, I think somebody let him know on the
11  Internet what's going on.  I don't have a computer.
12  At that time none of us used a computer, except to
13  look up parts for an airplane, but, yeah, he did put
14  something on there about that and I don't know how
15  he got the information at all.
16  Q    So he didn't interview you to get that
17  information?
18  A    No.  I don't talk to Tom Metzger at all.
19  Q    Did your brother, as far as you know, give him
20  that information?
21  A    I don't think he did.  He could have got that
22  from any number of sources.  I was very disturbed he
23  put that on there because he had no business putting
24  that on there.
25  Q    As are other people.  The telephone service

TULSA FREELANCE REPORTERS
918-587-2878

Page 178

1  that your brother operated was called the
2  Dial-A-Racist Hotline; right?
3  A    Right.  That was his own phone.
4  Q    That went into his room in the house?
5  A    Yeah.  That was plumbed into his -- wired into
6  his bedroom, yeah.
7  Q    And he would leave a tape recording on the
8  answering machine in there for people to dial and
9  listen to?
10  A    Yeah.  They had to voluntarily dial in.  It
11  wasn't a dial-out service.
12  Q    Let me direct your attention to a calling card
13  I believe you've seen before today.  Would you
14  identify that for me?
15  A    Yes.  My brother's -- I don't know who this is
16  Aryan separatist thing is.  Oak Hurst, something I
17  can't recognize.  The other I do as Dennis'.
18  Q    It says Oklahoma White Aryan Resistance, P. O.
19  Box 434, Catoosa, Oklahoma.  That's your P. O. Box;
20  right?
21  A    Yes, it is.
22  Q    Which of the two numbers on here, I think I
23  know, but of the number for White Aryan Resistance,
24  as opposed to the Oklahoma Aryan Separatist Party,
25  was your brother's phone number?

TULSA FREELANCE REPORTERS
918-587-2878

Page 179

1  A    His was the top one.  The bottom one was C
2  Howe.  I do remember she had a thing set up, Ca
3  did.
4  Q    This is the same Carol Howe that was
5  implicated in the Oklahoma City bombing?
6  A    Implicated or testified for?  She was a
7  witness for other things.
8  Q    And wasn't it through that connection that
9  your brother was suspected of having been invol
10  A    Yeah.  She became an informant, later drop
11  her for being unreliable, but she did make some
12  trouble for my brother.
13  Q    Now, were you aware that your brother was
14  operating the Dial-A-Racist Hotline out of your
15  house?
16  A    Oh, absolutely.  It's a small house.  It's
17  985 square foot house, so I knew he had a hotli
18  I said if you do any illegal activity, you got
19  go.
20  Q    Is the message or messages that are contai
21  on that hotline anything that disturbs you?
22  A    I actually didn't hear much of the message
23  That was his domain.  I never went into his roo
24  any reason because I had nothing to go in there
25  I ran my little repair business out in the gara

TULSA FREELANCE REPORTERS
918-587-2878

Page 180

1  and he kept his deal there.  It's two separate
2  deals.
3  Q    Did you oppose any of the activities that
4  was conducting out of your home?
5  A    Well, the deal was anything illegal, he's
6  to go.  As long as you're doing a constitutiona
7  protected activity, you can stay, but as soon a
8  do something illegal, you got to go.
9  Q    Did the two of you all talk about the line
10  between what's illegal and what's constitutiona
11  protected activity?
12  A    Basically I said if any police come and ar
13  you for anything, you'll have to find another p
14  to live.
15  Q    I direct your attention to what's been mar
16  as Defendant's Exhibit 19.  It's a transcript o
17  telephone call recording placed to 918-834-4272
18  August 17th, 1999.  This was also an exhibit I
19  believe at your arbitration.
20  A    Right.  I remember that.
21  Q    Have you ever taken the opportunity to rea
22  that transcript?
23  A    I don't see anything about American Airlin
24  in here but I guess it's his hotline, one of th
25  messages here.

TULSA FREELANCE REPORTERS
918-587-2878

Page 181

1  Q    This timing-wise was after the date of your
2  termination and before the arbitration; is that
3  correct?

4  A    August -- yeah, I think it was. August 17th
5  sounds about halfway between -- before --

6  Q    It states in part send $3 or more to your
7  host, Dennis Mahon, and that's P. O. Box 434,
8  Catoosa; that's your P. O. Box; right?

9  A    Uh-huh.

10  Q    And he refers to Tom Metzger International
11  Aryan Update as a source for people to go to;
12  correct?

13  A    It's just another -- yeah. He has a hotline,
14  too, several hotlines around the country.

15  Q    And he gives the telephone number for Metzger;
16  correct?

17  A    Yeah. He used to always do that but that's
18  all he did for him.

19  Q    Page 4, quote, now I predict a major
20  earthquake at American in the next few months.

21  A    I'm sorry.

22  Q    I also predict a major airline crash. I'm not
23  going to say which airline but I just feel within
24  the next two months I'm afraid we're going to lose
25  one, period, closed quote. Have you found that?

TULSA FREELANCE REPORTERS
918-587-2878

Page 182

1  A    That came up at the arbitration, that message.

2  Q    Now, do you think that that kind of statement
3  is appropriate?

4  A    Well, he predicts because of safety
5  violations, that it's very possible. People predict
6  things all the time. If you picked up a National
7  Inquirer, you would see all kinds of predictions
8  that people make about all kinds of things. He
9  doesn't get specific. He doesn't name any major
10  airline, any major flight, any major time or date.
11  He just makes a blanket statement that he thinks
12  that -- he told me because of safety violations of
13  certain airlines, but there's no inference that this
14  is American or any other airline that I can see
15  here.

16  Q    He told you he was going to make this
17  prediction on the Dial-A-Racist Hotline?

18  A    No. I found out about it when the union
19  called and let me know that there's something on the
20  hotline that's not good. So I went and replayed it
21  and verified it and I said, hey, you got to take it
22  off, so he took it off immediately. It was only on
23  for approximately 24 hours.

24  Q    Once you said, hey, you got to take it off and
25  he took it off, was that the end of the

TULSA FREELANCE REPORTERS
918-587-2878

Page 183

1  Dial-A-Racist Hotline or?

2  A    That was the end of that message. I said
3  don't be referring to things like that on your
4  hotline; that's not going to work.

5  Q    Was that the end of the Dial-A-Racist Hotl
6  A    No. It stayed on for another three to fou
7  weeks and then he shut it down.

8  Q    As you pointed out here in the transcript
9  August 17, 1999, it doesn't mention American
10  Airlines, does it?

11  A    What he did here, after he took this off,
12  redid his message and he explained what he mean
13  that. He made a retraction.

14  Q    But this first one doesn't even mention
15  American Airlines, does it?

16  A    No, nothing. There's no inference of any
17  carrier or anything.

18  Q    I direct your attention to the transcript
19  the following day, which I think you've just
20  testified was where he changed the message. Th
21  Defendant's Exhibit 20. Have you read that
22  transcript before today, sir? It states 6:30 a
23  night August 17th. I just changed my message,
24  ladies and gentlemen, because certain small
25  pusillanimous cowards have misinterpreted my me

TULSA FREELANCE REPORTERS
918-587-2878

Page 18

1  of this morning. Do you see that?

2  A    Yes, sir.

3  Q    Do you know what pusillanimous cowards he
4  referring to?

5  A    I don't know what pusi -- I don't know wh
6  that means. I'm sorry, I'm not very good at my
7  vocabulary. I know what a coward is but I don
8  know what this other name is. Do you have any
9  what that means? I don't know.

10  Q    Were you -- the next paragraph talks abou
11  this morning I made a prophecy; I had a dream.
12  saw an airline crash. I saw buildings collaps
13  you see that?

14  A    Uh-huh.

15  Q    Did Dennis tell you that he had a dream w
16  that in it?

17  A    Yeah. He says he dreams all the time, ma
18  after he has a little too much of that vodka o
19  whatever he drinks maybe. I don't know, but h
20  talk about things he sees in his dreams.

21  Q    Okay. The bottom of the page he says in
22  quote, I don't know which airline but probably
23  said American because they have a bad safety r
24  closed quote. Do you see that?

25  A    Yeah, I do certainly see it.

TULSA FREELANCE REPORTERS
918-587-2878

Page 185

1 Q    We just read the transcript from the day
2 before and it doesn't mention American Airlines,
3 does it?
4 A    I don't know what he -- it must have been one
5 of his heavy inebriation type days.
6 Q    So at that point in time at least you knew he
7 had made what he called a prophecy of a threat
8 against American Airlines; correct?
9 A    Yeah.  Probably he said American, and yet he
10 didn't say American, so I don't know what went on
11 there at all.
12 Q    That's pretty serious, wouldn't you agree?
13 A    If that's what he said, but he didn't --
14 probably said American because they have a bad
15 safety record.  He prophesized that American may
16 have an accident because of a bad safety record.
17 Well, their safety record has been pretty bad the
18 last eight or ten years, but I don't think he meant
19 that he's going to make it happen or anybody else.
20 It's not really a threat.  It's more of just a
21 prediction, a dream of something he dreamed.
22 Q    Is that an example of somebody that's playing
23 it close to the line in terms of constitutionally
24 protected speech as opposed to a direct threat?
25 A    I would say it is getting close; however, like

Page 186

1 I said, legally the FBI was called in to look at
2 this and they said you can predict anything; you can
3 predict the world is going to break in half, and
4 unless you are doing something to make it happen,
5 you really can't be arrested for it.  So he was
6 found -- after an investigation with the FBI, there
7 was no cause for any more investigation on it, so --
8 he also predicted an earthquake.
9 Q    Do you -- as his twin brother working for the
10 airline, that's not something you would want to be
11 associated with, is it?
12 A    Well, I'm not happy he said it.  I don't know
13 why he said it.  My twin brother is a heavy drinker
14 and he gets a little wild, but I think he's
15 basically a harmless person.  He's never hurt
16 anybody or caused any pain to anybody.  He does say
17 things that are somewhat off the cuff, but not too
18 many people called.  This is not like a big hotline
19 thing.  I think maybe five calls a night at most.  I
20 don't know how many calls he got, but I hardly ever
21 heard the telephone go off.
22 Q    Is it true that the union representing you in
23 your grievance asked or told your brother to shut
24 down the Dial-A-Racist Hotline for awhile until the
25 case was over?

Page 187

1 A    Yeah.  They contacted me about it and I sa
2 don't know anything about this.  He said, well,
3 talking about airplane situations.  So I confro
4 my brother and said you need to take it off the
5 it's really not appropriate, and he said, well,
6 change it and explain what I meant by that.  So
7 I said, he's not a teenager; he's not my depend
8 He's a very stubborn and very -- sometimes hard
9 deal with, but he is my twin brother and I don'
10 want to see him get hurt, but he does stupid th
11 I have to admit that.  He does do stupid things
12 Q    Did the Dial-A-Racist Hotline go off the a
13 for awhile while the arbitration was getting re
14 A    I think it went off the air not too long a
15 that because at that point in time I was puttin
16 house up for sale and I started garage saling a
17 started giving him my property.
18 Q    The arbitration was in November of '99;
19 correct?
20 A    Yeah.
21 Q    And the decision came out in March of 2000
22 A    Yeah.
23 Q    March 8th of 2000?
24 A    Yeah.
25 Q    Let me give you direction to turn attentio

Page 188

1 direction to Defendant's Exhibit 21.  This is
2 another certified copy of a transcript by telep
3 recording on 834-4274, which has previously bee
4 identified as the line going into your brother'
5 room at the house.
6 A    Uh-huh.
7 Q    This is dated April 17th, 2000, so that pl
8 it after the date of the arbitration decision;
9 correct?
10 A    Right.
11 Q    Bottom of that page it says in part, Danie
12 Mahon has been on this message machine.  Do you
13 that?
14 A    Has been on or he discussed me on this mes
15 machine?
16 Q    That was going to be my next question.  Wa
17 literally that you were on it or your name had
18 up on it?
19 A    I think my name had come up on it, he
20 mentioned my name before, because I never did a
21 message.
22 Q    Then you have -- he says here in part, my
23 brother, Daniel Mahon, has never been political
24 active or an activist of any sort; do you see t
25 A    Right.

Page 189

1  Q   And you've testified to that?
2  A   I've not been a spokesman for this situation.
3  Q   Then he goes through kind of talking about his
4  view of your belief system and he concludes but he
5  does support certain things I believe in?
6  A   Yeah.
7  Q   But he does not believe in everything I
8  believe in?
9  A   That's probably correct.
10 Q   What type of things that Dennis believes in do
11 you support?
12 A   Oh, just Second Amendment rights, opposed to
13 uncontrolled immigration. I think that's wrong.
14 High taxation for sure. That's about really all I
15 believe in that he believes in. I believe in
16 freedom of association. That's -- you should have
17 the right to have the friends you want to have.
18 Q   The vice-president involved in your
19 termination was Greg Hall; correct?
20 A   Right. Greg Hall was his name.
21 Q   And you didn't think very highly of him, did
22 you?
23 A   Well, he called me Dennis twice at the
24 meeting. That kind of put everything on a bad
25 footing when he knew who I was. I thought that was

TULSA FREELANCE REPORTERS
918-587-2878

Page 190

1  a little bit tacky of him to do that.
2  Q   Are you aware that, as is reflected in this
3  message, that your brother spun a tale about how he
4  had circumvented somebody's $2,500 security system
5  and left his calling card on the person's kitchen
6  table?
7  A   I don't have the slightest idea what we're
8  talking about here.
9  Q   Page 4. I'll read it. Okay, quote, a friend
10 of mine just got a $2,500 security system put into
11 his house he just moved into and we had a little
12 talk and I said look, you took off the day and I
13 will show you how fast I can circumvent your
14 security system and I will put my calling card on
15 your kitchen table. Okay. It took me approximately
16 three and a half minutes to totally neutralize his
17 $2,500 security system, take out video cameras and I
18 was able to jimmy a window, get in and put my
19 calling card on his kitchen table. In less than a
20 minute and a half I was gone. Ha, ha. How do I
21 know how to do this? Because one of my best friends
22 was an installer and he knows. There's basic things
23 that these systems have to have and without these
24 two basic things, you ain't got no security system.
25 So a lot of my enemies are spending a lot of on own

TULSA FREELANCE REPORTERS
918-587-2878

Page 191

1  security systems but that don't make you secure,
2  boy. Does that refresh your recollection?
3  A   Well, this is the first time I've seen it b
4  it must be something he put on there. I don't k
5  who he's talking about. He did have some enemie
6  Congressman Kees was one of the biggest ones and
7  tried to implicate my brother in that bombing, b
8  time. He actually wrote a book about it. That
9  one of his big enemies. Maybe talking to somebo
10 like that. I don't know. I don't know who he's
11 talking to. He had a lot of imagined or real
12 enemies that I know of, mostly imagined I'm sure
13 Q   Do you agree that that could be read to hi
14 conveying to somebody that he could come defeat
15 somebody's security system and do harm to them?
16 A   He was referring it to some other person i
17 who?
18 Q   Well, kind of like the prophecy, he's not
19 saying it himself but he's saying I can envisio
20 situation where this could happen to somebody?
21 A   I guess anybody could do that if they knew
22 about electronics and how security systems work
23 don't recall him ever working in a security
24 business.
25 Q   Was your brother an avionics mechanic also

TULSA FREELANCE REPORTERS
918-587-2878

Page 192

1  A   No. He was systems, hydraulics and struct
2  He has no interest at all in electronics at all
3  Q   Next page, 5, talks about, quote, now Amer
4  Airlines update. Okay. Because of the publici
5  that Tom Metzger has -- has mentioned about my
6  brother losing his career, his hotline and my
7  hotline, we have received over $3,000 in cash
8  donations in a little over two weeks from peopl
9  over Oklahoma and Tulsa and some from out of st
10 They are so angry this 37-year old punk, race
11 traitor, the vice-president of maintenance at
12 Tulsa's engineering and maintenance section fir
13 Dan viciously and illegal, closed quote. Is he
14 referring to Greg Hall?
15 A   I don't know how old Greg Hall was.
16 Q   Is that who he is referring to?
17 A   It's possible. I don't know. He's talkin
18 about this money. I received a lot of money fr
19 lot of people when I was discharged.
20 Q   Did you keep track of who you got it from
21 how much?
22 A   Some, but there were some people that felt
23 that I was wrongly treated and I did get some c
24 from some generous people out there.
25 Q   Do you recall who sent you money?

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 193

1  A    Just different people.

2  Q    Don't recall any of their names?

3  A    No.  Some of them were just anonymous.

4  Q    Were all of them anonymous?

5  A    No.  One of them wasn't from an American

6  person.  Most of it came from a guy in another state

7  that heard about it.

8  Q    Tell me who that was.

9  A    He's deceased now.

10  Q    Who was it?

11  A    I'd have to look up -- oh, gosh it was a

12  donation.  It's been so long.  He's -- I don't

13  remember his name now.

14  Q    What was his connection with you?

15  A    He was a friend of my brother's and heard

16  about my demise and he sent -- he's a millionaire.

17  He's an inventor, and I can't remember the guy's

18  name but --

19  Q    Do you remember where he lived?

20  A    Up in the northeast area.  He's from that part

21  of the country.

22  Q    Was it Dr. Pierce?

23  A    No, it wasn't Dr. Pierce.  He died way before

24  Pierce.

25  Q    If you think about that name, let me know.

TULSA FREELANCE REPORTERS
918-587-2878

Page 194

1  Okay?

2  A    I didn't get no 6,000, though.  I wish.

3  Q    Page 7, bottom of the page, talks about being

4  sold out by politicians for the last 60 or 70 years

5  and states, ladies and gentlemen, it's too late,

6  referring politically.  Quote, the only solution for

7  white man now, the white man now is a violent

8  revolution I'm afraid or maybe a depression or

9  something, closed quote.  Do you see that?

10  A    Last page it was?

11  Q    Bottom of Page 7.

12  A    Oh, there it is, okay.  I see it.

13  Q    Does this reflect your brother's ideas as far

14  as you know?

15  A    Well, it's his hotline, his message.  As far

16  as depression, I don't know about that, but a

17  revolution, I don't know if the Arabs are going to

18  start something or not.  Looks like they've already

19  started stuff in this country.  It's just his

20  opinion.  Like I said, I don't know what he means

21  totally by it but I guess there's some kind of an

22  upheaval coming.  A lot of Christians have been

23  saying that for years.

24  Q    And you condone such a message like that even

25  after your arbitration decision in March?

TULSA FREELANCE REPORTERS
918-587-2878

Page 195

1  A    I don't condone or approve of anything he

2  does.

3  Q    But you allowed it to happen under your own

4  roof; right?

5  A    Well, like I said, it's his answering machine,

6  it's his bedroom; it's his life; it's his right as

7  a citizen of this country to say what he wants to

8  say until he presents a clear and present danger to

9  anyone or anything, constitutionally protected form

10  of free speech.  I don't particularly care for what

11  he says, but he's a big boy.  So am I, but -- at

12  least he was watching and not getting in any more

13  serious trouble.

14  Q    Let me show you what's been marked as

15  Defendant's Exhibit 22.  It's a March 12th, 2002

16  printoff of the Aryan Update from Terrible Tommy

17  Metzger's website.  I believe you tastified that you

18  were aware that your name and situation was being

19  discussed publicly on Mr. Metzger's --

20  A    Right.  I was aware of that.

21  Q    The second -- beginning that the bottom of

22  Page 1, Terrible Tommy Says speaking of anal

23  orifices, our friend, the Mahon brothers, have been

24  shafted by American Airlines again in Tulsa

25  Oklahoma.  Do you see that one?

TULSA FREELANCE REPORTERS
918-587-2878

Page 196

1  A    Sure do.

2  Q    Have you read that before today?

3  A    I think he was referring to when Dennis was

4  hired in 1997, and he worked less than one day and

5  he was terminated.

6  Q    Go on to the next page, second paragraph.

7  Dennis lives with his brother, Danny, who is not

8  involved in his brother's operations.  Several

9  months ago American Airlines, where Danny worked,

10  conspired to rid themselves of Danny's presence.  Do

11  you see that?

12  A    Right.

13  Q    Do you agree with the characterization of the

14  situation at American Airlines?

15  A    Conspired to rid themselves, there's some

16  truth to it I think, yeah.

17  Q    Were you fired for the most part for having a

18  brother who would not knuckle under to anti-white

19  attacks from the Iron Heel?

20  A    I think I was harassed and basically conspired

21  to be terminated because of my brother's ideology

22  and his political activities, yeah, I think so.  I'm

23  convinced of that.

24  Q    Is there truth in that the arbitrator

25  commented off the Record that if Mahon had been

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 197

1  black, he would be sitting in a beach in a townhouse
2  with the money a good lawyer would have gotten out
3  of American Airlines?
4  A    Arbitrator? No. I think that was a statement
5  by one of the committeemen.
6  Q    Who?
7  A    I think Mike Rial made that statement to me
8  before the arbitration.
9  Q    Read the rest of that section to yourself and
10 tell me if there's anything about it that you
11 disagree with, please.
12 A    Are we talking about the airline being
13 convicted of a felony?
14 Q    That whole article.
15 A    Just this page here?
16 Q    Well, as you can see, it's kind of an article,
17 if you will. It goes on to the next break with
18 stars.
19 A    Well, looks like one man's opinion of what is
20 going on with the airline industry. I don't know if
21 all this stuff is factual or not. I know American
22 has been sued by a lot of black and Hispanic
23 workers, and the Value Jet guy knew who was involved
24 in that. He was a Hispanic man, but he used to work
25 for -- he worked for jet, Value Jet.

Page 198

1  Q    That's specifically about you, isn't it?
2  A    Yeah, a lot of it is. This first two
3  paragraphs here is.
4  Q    Were you aware that Metzger was putting this
5  on his website and publishing it to the nation?
6  A    No. I don't have a computer at the time. I
7  still don't have one. I use one at work, but I
8  didn't know that this was put on there. Nobody at
9  American let me know about it. My brother doesn't
10 have any access to a computer.
11 Q    Is it your testimony, whether you looked at it
12 yourself on the computer or not, you weren't aware
13 that Metzger was talking about you?
14 A    I had no idea this was on his website at all.
15 I don't have --
16 Q    Do you approve of or endorse the comments that
17 he made about you in this article?
18 A    I don't approve of him putting my name in his
19 publication, no, or anything. I don't like him
20 using my name. Dennis is fine but I don't like him
21 using my name, and he was told about that. He's
22 another stubborn soul.
23 Q    Did you know the Reverend Bob Butler?
24 A    Robert Butler?
25 Q    Yes, sir.

Page 199

1  A    Yeah. I was up there one time.
2  Q    Who is he?
3  A    He's a pastor of the Aryan Nations Church
4  Jesus Christ Christian. I went up there to set
5  table and sold a bunch of crap and made some mo
6  Q    Did you ever say that threats are counter
7  productive and it would hurt the Klan image?
8  A    Did he ever do that?
9  Q    Did you say that?
10 A    Did I ever make threats to hurt the Klan's
11 image?
12 Q    Let me rephrase. Did you ever say to anyb
13 threats are counter productive and hurt the Kla
14 image?
15 A    I don't recall saying that.
16 Q    Do you believe that?
17 A    Threats -- I don't know. Threats are thre
18 People do it all the time. Like I said, I wasn'
19 involved in the Klan that much except just to o
20 a little bit of help with the video and audio.
21 brother I think tried to reform it. He tried t
22 the crap out of it and tried to get people educ
23 and get off the violent talk, and he got beat u
24 times for that. Some of the people turned on h
25 so he said probably -- there's going to be good

Page 200

1  bad people. There's some Klansmen that I think
2  -- some of them just want to be proud of who th
3  are.
4  Q    Have you ever expressed your views on raci
5  pride?
6  A    Publicly, no.
7  Q    Privately?
8  A    Privately, I just said we've done a lot fo
9  the world, a lot of inventions, a lot of techno
10 but nothing derogatory to another. I never sai
11 anybody is inferior, superior. I'm just saying
12 white race had a lot of a creativity, and now I
13 think the Chinese and Japanese have taken over
14 the advancements in electronics and technology,
15 I've never said anything bad about any particul
16 other peoples.
17 Q    Have you ever expressed or said words to t
18 effect that if all white men took off three day
19 from work at the same time the country would st
20 A    I don't recall. I just said we needed to
21 unionize. The unions need to be stronger and s
22 getting more militant with the companies becaus
23 they're sending all this stuff overseas. I hav
24 mentioned that several times to the union.
25 Q    But you never -- is it your testimony you

Page 201

1  never said that in the context that without white
2  men, our economy as we know it could not function?
3  A    I don't recall saying that.
4  Q    Do you believe that?
5  A    Our economy right now, it would function --
6  without Mexican labor in this country, our economy
7  would fail because we don't have enough people to do
8  it. That's kind of the way things are going. We're
9  depending on foreign labor to do all the manual
10  labor now. Nobody wants to do the dirty work
11  anymore. I've said that many times but I don't
12  know. The white race to me is -- everybody is just
13  hanging on. Everybody -- I got more in common with
14  poor working class blacks than I do with rich white
15  people.
16  Q    Look at Exhibit 13, please. I'm going to hand
17  you. This is the written statement of Keith Kelly
18  that was entered in your arbitration concerning the
19  events of the March 9, 1999 Caucasian employee
20  resource group. Do you know the document I'm
21  talking about?
22  A    I'm not sure what we're --
23  Q    Please read it to yourself and my question, as
24  you are reading it so you can answer it afterwards,
25  is what about this, if anything, is untrue?

Page 202

1  A    He was really good at doing research on the
2  library and Internet. My brother was computer
3  illiterate. That's definitely a false statement
4  there. I don't know about the rest of it.
5  Q    Go ahead and read the rest of it.
6  A    Said talked about Carol Howe and a bombing at
7  a crew meeting.
8  Q    Did you?
9  A    No. I never mentioned that woman at all. I
10  saw his car and filmed a Second Amendment rally and
11  saw an AA sticker on his windshield. Talked about
12  the trouble that caused him. I don't have any
13  problem with that sticker. What Second Amendment
14  foundation. I haven't the slightest idea what he's
15  talking about. Ten years ago he was wearing an
16  Aryan nations belt buckle and trying to talk to me
17  at great length about what he and his brother were
18  doing. Dan offered me books and tapes. This guy is
19  a supervisor. He wasn't even in my work area, this guy
20  Kelly. He was not ever in my work area. If he did
21  come over, he tried to entice me to talking about
22  selling books, World War II books and books about
23  Germany, and he was in violation of company
24  regulations to go out of his work area to incite
25  this type of talk.

Page 203

1  Q    So is that not true?
2  A    That's not true. His brother was on the T
3  show 20/20 discussing neo-Nazi philosophy in
4  Germany. I don't know if he was on 20/20 or not
5  He was on one show but it wasn't 20/20, and he
6  wasn't really talking neo-Nazi stuff in Germany
7  was there visiting the bombed-out church and pu
8  bouquet of roses on it is what he did. Offered
9  book and tapes? I offered him books and tapes
10  Adolf Hitler. Why would I want to offer somebo
11  I mean I'd sell it to him. If I had some histo
12  books on that subject, I probably would sell it
13  don't ever give that stuff away to anybody. He
14  would have to go to a gun show to even see that
15  of stuff. Tapes, I have a lot of German marchi
16  songs of that era, Luftwaffe and the Kriegsmari
17  which is the German Navy. I did collect a lot
18  those old marching songs, but I told him -- his
19  brother is an ex-Grand Wizard. He was never a
20  Wizard of anything. He was the -- they call it
21  Imperial but not a Grand.
22  Q    Is Imperial below the Grand?
23  A    I'm not really sure. It's different, I kn
24  that, in Missouri when he was in that thing. A
25  of this stuff is all -- this thing about Intern

Page 204

1  library Internet, that's totally inaccurate. I
2  my brother didn't even know what a computer was
3  then. Well, he also -- this individual got one
4  the literature. Instead of telling his people
5  to let it go out, he let it out, and at that ti
6  became -- flew to Dallas with it and created a
7  stink, but this man could have stopped that thi
8  from going out because he saw it first.
9  Q    Tell me about that.
10  A    It came out in the arbitration. It's all
11  the arbitration notes.
12  Q    Did you give it to him to review before it
13  published?
14  A    No. Linda Dill and he came by the fair an
15  looked it over and just took it with them inste
16  immediately come back and saying that's it.
17  Q    So you don't mean to say he was shown it
18  before you all actually showed up at the fair a
19  passed it out; right?
20  A    No. He showed up right at the fair when i
21  started and reviewed it and instead of stopping
22  right there, he just kept it and let it go for
23  hours and let more people get it.
24  Q    You don't know whether he looked at it, do
25  you?

DEPO OF DANIEL W. MAHON, 10-29-03

Page 205

1  A    He took it. I would imagine he looked at it
2  if he took a copy of it. I think it's in the
3  arbitration notes on that.
4  Q    Do you recall his testimony when he said that
5  he took it and stuck it in his pocket and didn't
6  look at it until sometime later after he started
7  getting calls?
8  A    You can do that, too, if you want to, but I
9  would imagine someone getting that literature,
10 anything controversial would be looked at pretty
11 quickly.
12     MR. FRAZIER:  David, we take a break?
13     MR. CORDELL:  Sure.
14     (Following a short recess at 4:40 p.m.,
15 proceedings continued on the Record at 4:47 p.m.)
16 Q    Sir, I'm going to hand you a document marked
17 Defendant's Exhibit 33. It's some documents that
18 were produced out of your records. Identify that
19 for me, please.
20 A    Yes.
21 Q    What is it?
22 A    It's just kind of a compilation of the events
23 that took place at that April 20th meeting.
24 Q    It has your signature on the bottom, does it
25 not?

TULSA FREELANCE REPORTERS
918-587-2878

Page 206

1  A    Yeah, May 10th.
2  Q    So was this prepared the day that you were
3  terminated?
4  A    Right, that same day.
5  Q    Before or after the 29F meeting where you got
6  your final advisory?
7  A    Yeah, this was probably after the final
8  advisory came out, probably the very next day.
9  Q    Well, it's dated May 10. Was that the day you
10 wrote it?
11 A    That's what I said, yeah. Well, yeah, May
12 10th in the morning is when I got called in, that's
13 right. So it would have been later on that day,
14 that's right.
15 Q    What was the reason for you writing this
16 statement at the time?
17 A    Just to keep a current memory. It's kind of
18 like just what happened why it was still fresh in my
19 mind in print.
20 Q    Did somebody asked you to prepare it?
21 A    No. I did it on my own.
22 Q    Did you give a copy of it to the union?
23 A    I'm sure I did.
24 Q    Is it entirely factually correct?
25 A    I would say it's factual to the best of my

TULSA FREELANCE REPORTERS
918-587-2878

Page 207

1  knowledge what happened. I didn't have a tape
2  recorder going but I would say, yeah, I would s
3  it's factual.
4  Q    Could you testify any better about it toda
5  terms of your recollection than you could at th
6  time you were recalling the events on May 10, 1
7  A    Gosh, probably not. I mean we're talking
8  years ago.
9  Q    I hand you what's marked as Defendant's
10 Exhibit 34. Identify that for the Record for m
11 please.
12 A    It's just a rough copy of the chronologica
13 history of some of what I feel is harassment an
14 intimidation at AA.
15 Q    It's dated May 12th, 1999; is that correct
16 A    Did I put a date on it? May 12th, right.
17 Q    You certified that the previous statements
18 factual and true; is that right?
19 A    I did.
20 Q    Who were you making the statement for?
21 A    I think I made this to the union and also
22 any attorneys that might take a look at this ca
23 just to give added info to the case that this
24 harassment had been going on for numerous year
25 before I got terminated.

TULSA FREELANCE REPORTERS
918-587-2878

Page 208

1  Q    Were you consulting with lawyers between
2  date of your termination, May 10, 1999, and the
3  of arbitration in November of that year?
4  A    No, I wasn't. I really hadn't had any --
5  after the arbitration decision did I start a la
6  hunt.
7  Q    Did you plan on suing American Airlines e
8  since you got fired even if you got reinstated?
9  A    When -- after the arbitration, the union
10 committeeman said after this is all over, you
11 to sue American from everything they've got.
12 Q    Is that Mr. Rial or J. C. Brown?
13 A    I think it was Mr. Rile, Mike Rial. He's
14 longer in that position anymore. He's no longe
15 union committeeman.
16 Q    I hand you what's marked as Defendant's
17 Exhibit 35, once again a set of notes produced
18 your records dated February 14, 2001. Identify
19 that, please.
20 A    Something I wrote post day termination.
21 a flight I was on, a TWA flight, and the flight
22 cancelled due to mechanical and I was directed
23 the AA counter, and they -- this is way before
24 They took me off to the side immediately and p
25 off to the side and asked me to get my luggage

TULSA FREELANCE REPORTERS
918-587-2878

Page 209

1  walk about 400 feet down the terminal to the X-ray
2  machine, and I thought it was a little unusual that
3  that happened. I thought it was somewhat
4  suspicious, and I just took note of it. That's all
5  there is.
6  Q   Is it completely -- is Exhibit 35 factually
7  correct?
8  A   For the most part, I would call it factually
9  correct. It's written right after it happened, so I
10 would say it's factual.
11 Q   Handing you what's been marked as Exhibit 36,
12 once again it's some more notes produced from your
13 files. Is that your handwriting?
14 A   It certainly is. It's my penmanship.
15 Q   Did you prepare this document?
16 A   This document, yes, I did.
17 Q   I know we've talked about some witnesses and I
18 don't want to go back over old ground. Look at No.
19 7, Eric Hanson. You say in part Eric was first to
20 tell me about the flyer, the notice on the bulletin
21 board the day of the April 20 CERG meeting. Eric
22 noted how surprised I was upon learning of the
23 bulletin board flyer.
24 A   Are we talking about --
25 Q   That page front page, yes.

TULSA FREELANCE REPORTERS
918-587-2878

Page 210

1  A   Am I on the right one here?
2  Q   It's on the back side of the first page, sir.
3  A   I'm sorry. Okay. I got it. Okay.
4  Q   And that is Mahon 149 for the Bates record
5  reference.
6  A   Yeah. Eric was on my crew. He told me about
7  the flyer on the bulletin board.
8  Q   What do you mean by Eric noted how surprised I
9  was upon learning of the bulletin board flyer?
10 A   Well, he noted that I had no idea about this
11 meeting because I jumped up and I said I got to ask
12 the supervisor if I can get off for a couple of
13 hours. So that's the first thing I said, I want to
14 go to the meeting, I need to get permission. So I
15 talked to my crew chief first because you go through
16 the crew chief and then go to the supervisor because
17 the crew chief knows how much work has to be done
18 and what the manpower is, so you go through him
19 first and then you go through the supervisor on the
20 dock to see if it's okay. Both said it was okay.
21 Q   Earlier today you mentioned the name of Floria
22 Washington. Did you know her prior to April 20,
23 1999?
24 A   Floria Washington, no. I never met her
25 before. She is from Dallas and she heads up the

TULSA FREELANCE REPORTERS
918-587-2878

Page 211

1  diversity program, one of the people that heads
2  the diversity program, and she mentioned at the
3  arbitration that she didn't find anything unusual
4  bad about the letter. She said it didn't look
5  a message of hatred is basically what she said.
6  think she said it looked like they're just toot
7  their own horn, which all of them do.
8  Q   The Record will reflect what in fact she
9  testified to, but let me ask you this: Did you
10 that Floria Washington is African American?
11 A   Yeah. She was at the meeting, at the
12 diversity or the arbitration. She testified fo
13 this.
14 Q   Do you recall her also being at the April
15 1999 meeting where Greg Hall said certain things
16 that you testified about?
17 A   Yeah, I believe she was at another table,
18 right.
19 Q   Mr. Robert Hosey, do you know who that is?
20 A   Yeah, I certainly do. Most of the people
21 remember him there. He made a statement that wa
22 little bit shocking.
23 Q   And what was that statement?
24 A   The question arose at the meeting of why th
25 homosexual lesbian group received $75,000 cash

TULSA FREELANCE REPORTERS
918-587-2878

Page 212

1  advertise in some of the gay publications around
2  country. That was a big question. Mr. Robert
3  answered that question, I quote verbatim, in th
4  '60's most of the people that flew our airline
5  fat white families he said, but now we have a
6  diversified flying public, including people of
7  different genders and different sexual -- what
8  the words -- alternate lifestyles. Exactly wha
9  said, of alternate lifestyles, and this is the
10 reason why the GLEAN group, the gay lesbian emp
11 action something group, received this big grant
12 money, and that was -- when he said that statem
13 about white fat families, there was a silence t
14 you could hear a feather hit the floor.
15 Q   Were you present in that meeting?
16 A   (Witness nods head up and down).
17 Q   Where did that meeting occur?
18 A   That was the last CERG meeting, last meeti
19 on April 20th.
20 Q   Are you sure about that or was this a repo
21 that was given to you?
22 A   I heard it and several of these witnesses
23 heard it. There were numerous people that -- W
24 Taube was there; he heard it; he was sitting ne
25 me. There were other members present that hear

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 213

1  statement.
2  Q    Through what you saw, what race is Mr. Hosey?
3  A    He's African American. I had never seen him
4  before. I think he comes from Dallas and he arrived
5  from Dallas for the meeting.
6  Q    Knowing what you did about The Turner Diaries
7  T-shirt and wearing it at that time, did it ever
8  occur to you that African American persons attending
9  that meeting might be greatly offended and
10  intimidated?
11  A    I don't think anybody knew anything about it.
12  Most people -- like I said, I didn't notice anyone
13  looking at me, except when I talked to Mr. Hall. I
14  didn't notice any unusual looks or any type of
15  gestures that would appear that anybody had a
16  problem. There was no complaints about the T-shirt
17  the rest of the work day.
18  Q    Look back at Defendant's Exhibit 33, please.
19  These are your May 10, 1999 notes. Two paragraphs
20  above your signature.
21  A    Which one is it? 33?
22  Q    Yes.
23  A    Here it is. The first page?
24  Q    Second page, two paragraphs above your
25  signature.

Page 215

1  Q    In the middle of the paragraph, it says Mr
2  anyway, during the meeting Mr. Hall described t
3  flyer as neo-Nazi and white supremacist, et cet
4  He said any belief system is recruiting and any
5  recruiting will be terminated. Is that true he
6  that?
7  A    He did say that. He said any belief syste
8  that are recruited will not be tolerated.
9  Q    Do you then say in this regard, quote, I g
10  anyone who may have personal beliefs that don't
11  his standards will have to go, exclamation mark
12  A    Yeah. I had an opinion or the impression
13  that's what he was saying, that I make the deci
14  who believes what here. That's the impression
15  from the statement.
16  Q    And you don't agree with that I take it?
17  A    No. I don't believe anybody should dictat
18  other people's religions or belief systems.
19  Q    All right. At the bottom of that same pag
20  hope you didn't put it away, you say normally t
21  company policy is to order the employee to go h
22  or to change or turn it inside out, referring t
23  T-shirts. I received no complaint from anyone
24  day it was worn. I had worn on numerous times
25  before with no problems. Do you see that?

Page 214

1  A    Two paragraphs, okay.
2  Q    You state, quote, The Turner Diaries has not
3  been in the news or media in over four years. I
4  would estimate that nine out of ten people have not
5  heard of The Turner Diaries, let alone ever read
6  them, closed quote.
7  A    Yeah, I wrote that. Ever since the McVeigh
8  situation, there wasn't any mention of it that I
9  ever heard on the media, the TV or the newspaper.
10  Most people I think -- even the union said they were
11  asked questions and most people said Ted Turner, a
12  book about Ted Turner. They didn't have any idea
13  what the book was about.
14  Q    But you knew about it even back at the time it
15  first received media publicity, didn't you?
16  A    Yeah, I'd heard of it book, yeah. That's what
17  piqued my interest in picking up a copy of it
18  because somebody said McVeigh -- the book told
19  McVeigh what to do, but I think it wasn't a huge
20  part of the book, so --
21  Q    Turn now, if you will, to the long page
22  document we talked about some, Defendant's Exhibit
23  41. For the Record reference it's on Page 121, and
24  on your handwriting top right it says Page 7.
25  A    Okay. I have Page 7 here.

Page 216

1  A    I had worn on -- I had worn -- I don't kno
2  I was referring to that T-shirt or not. I had
3  something.
4  Q    Isn't it your testimony that the only time
5  wore The Turner Diaries T shit was on April 20t
6  A    Yeah. I had worn other T-shirts that were
7  controversial. Like I said, I wore the one wit
8  Clinton, several NRA T-shirts, but not that one
9  had worn similar T-shirts on numerous times but
10  that one.
11  Q    But not ones that expressed --
12  A    Not The Turner Diaries.
13  Q    -- racial cleansing and murder of races;
14  right?
15  A    Yeah. I just wore pro-gun T-shirts.
16  Q    Let me hand you what's been marked as
17  Defendant's Exhibit 42. This was taken from yo
18  files and begins with Bates stamp 131. Do you
19  recognize your signature on the second page?
20  A    Yeah.
21  Q    Is this a letter that you drafted?
22  A    Oh, I think this is -- I don't know who wr
23  this letter, if it was -- to tell you the hones
24  God truth, I don't know where this came from.
25  didn't type it. I could never type that good.

Page 217

1  doesn't say where this -- I can't recognize this
2  thing at all.
3  Q   But that is your signature on it?
4  A   Yeah.  It was addressed to Turpen.
5  Q   Former attorney general of Oklahoma; correct?
6  A   Right.  I went to him to check on this case to
7  see if he would take the case.
8  Q   Did you actually meet with him?
9  A   I met with his secretary and she took the
10  input in the input section, and then I got contacted
11  that he would not take the case, but I just don't --
12  this is obviously a very professionally done deal.
13  It had to be done by an office -- I may have had
14  people do it.  I just don't remember doing this.  I
15  didn't type this.  I may have sent this in but it
16  had to be typed by another entity like Kinko's or
17  another supply company of some kind.
18  Q   Also looks like maybe you addressed it or sent
19  it to Mr. Rex Thompson.  Who he is?
20  A   He's one of the attorneys.
21  Q   With whom?
22  A   With the Turpen group.  He's one of their
23  associates.  I mean I'm sure I did it.  I just don't
24  remember typing this.  I maybe went to an office
25  supply company and had them professionally --

Page 218

1  Q   The next to the last statement says, and I
2  quote, in point in fact, the company fired me
3  because of the company's perception, open paren,
4  albeit erroneous perception, closed paren, of my
5  social and political beliefs, closed quotes; is that
6  accurate?
7  A   Pretty much so.  I think I was fired for --
8  not necessarily for beliefs but for the perception,
9  erroneous firing.  I don't understand what point in
10  point in fact -- I don't think I could ever think --
11  what does that mean?  I don't know what -- what does
12  that mean, in point in fact?  I don't know.  I just
13  don't know where that came from.
14  Q   Isn't that a pretty good summary of what this
15  is all about, that you feel like you were terminated
16  because of your political and religious beliefs?
17  A   Perceived religious and political beliefs, a
18  perception that people had are probably false.  They
19  assumed that I believed certain things.  They
20  assumed I did certain things, which I don't.  It was
21  all probably a big misunderstanding for the most
22  part, but there was no offer of any type of
23  counseling or any type of -- there's no way they
24  tried to resolve the problem at all.  It went all
25  the way to a termination rather than work with me.

Page 219

1  I'm sure we could have resolved that in some of
2  manner, but I'm very confused about this last o
3  here.
4  Q   Isn't it true this really all has to do wi
5  how the company dealt with Dennis Mahon's -- ex
6  me. Daniel Mahon, even though I made the mista
7  Isn't it true that this is all about how the co
8  dealt with Daniel Mahon; it doesn't have anythi
9  else to do with anybody else at the company?
10  A   This should not -- my brother should never
11  involved in this whole affair.  He had really
12  nothing to do with it, and all the accusations
13  innuendos about my brother, I think, were uncal
14  for.  I think the main thrust of this whole fir
15  was due to his activities.  I've done nothing t
16  warrant that type of treatment.  I've been a mo
17  employee up until that point.  If there was a
18  mistake made, it was a mistake in judgment.  I
19  it could have been resolved in a much more
20  appropriate manner than how it turned out.  Tha
21  the only thing I can say about it.
22  Q   Mr. Mahon, nobody else did the same thing
23  did at American and was treated any differently
24  they?
25  A   Everybody else that wore a T-shirt that p

Page 220

1  found offensive, which were many, were asked t
2  kindly go home and change it, put a pair of --
3  out a pair of coveralls.  There was no complain
4  made that day it was worn.  Another person wore
5  same T-shirt, had no problem.  American Airlin
6  should have went to a uniform policy, paid unif
7  policy like the other airlines did many, many
8  ago and they never would have had these problem
9  with T-shirt.  Everyone I worked for since the
10  even at the little tiny outfit in Rockford, Il
11  supplied workshirts with your name.  It's good
12  morale to have everybody wearing the same appar
13  anyway, but that's one solution I think they s
14  have looked at, and they never did anything ab
15  that either.
16  Q   Are you aware that you have made the stat
17  that you believe that what happened to you ent
18  you to be paid 10 million dollars?
19  A   That's a good long figure.  There are peo
20  that made a lot more in litigation.  I hope we
21  resolve this in some other way.  10 million is
22  high amount, it absolutely is, but sometimes
23  corporations have to be taken to task through
24  monetary judgments to not do some mistakes aga
25  think it was a mistake what they did.  I don't

# DEPO OF DANIEL W. MAHON, 10-29-03

Page 221

1  to see this happen to anybody ever again. I have
2  hundreds of people I like out there, good
3  associates, good workers. I don't want to see this
4  happen to anybody else, black, white, Muslim,
5  Christian, Jewish. I don't want anybody to go
6  through what I've gone through for wearing a
7  T-shirt.
8  Q    We also asked you the question of in essence
9  whether you want to be reinstated or go back to work
10 for American Airlines. Do you recall that?
11 A    Yes, I do recall that. I wouldn't mind
12 getting reinstated but not in Tulsa, only in an out
13 station like Chicago.
14 Q    Do you believe that would be workable in light
15 of your history with the company?
16 A    An off station would be workable, not in
17 Tulsa. Just too much I guess you call it bad blood,
18 too much controversy.
19 Q    I hand you what I'm marking as Defendant's
20 Exhibit 37 regarding your employment inquiries as of
21 October 9, 2000. This is a collection of documents
22 from your files that have appeared to do with your
23 job search. My question is simple. Is this a
24 complete record of all the efforts as of October 9,
25 2000 you had made to find another job?

TULSA FREELANCE REPORTERS
918-587-2878

Page 222

1  A    I don't see United on here. That's one that
2  appears to be missing is United. The rest of them
3  are complete.
4  Q    Last page of this exhibit appears to be in
5  somebody's handwriting, probably not even yours,
6  that talks about what you were making where, how
7  much you had in life insurance, et cetera. Do you
8  recognize that handwriting?
9  A    Last page?
10 Q    Of that same exhibit.
11 A    I don't see it.
12 Q    Maybe it came off. It's the second page,
13 Bates 136.
14 A    Okay.
15 Q    Is that your handwriting?
16 A    Yeah, looks like it.
17 Q    Is this an accurate summary in what you were
18 making, where, et cetera, like we talked about
19 earlier today?
20 A    I never did work for Wisconsin Air but Aero
21 Taxi at 14.50, yeah.
22 Q    This appears to me to be at the point in time
23 where you were choosing to go to Alaska Airlines
24 lines?
25 A    Right, I think it was because this happened --

TULSA FREELANCE REPORTERS
918-587-2878

Page 223

1  Alaska called me before I even -- I applied with
2  Alaska before Aero Taxi went under and I went t
3  for an interview before we actually got laid of
4  then they hired me about a month later.
5  Q    I hand you what's been marked as Defendant
6  Exhibit 38, which appears to be minutes of a
7  Caucasian employee resource meeting dated Februa
8  9th, 1999. This likewise came from your files,
9  Bates stamped 137. Do you recognize that, sir?
10 A    Page 38 or Exhibit 38?
11 Q    Yes, sir.
12 A    I do recognize that. That's their agenda
13 that meeting I think it was or issues that were
14 presented.
15 Q    Are these minutes of the meeting or an age
16 for the meeting? Let me give you a suggestion.
17 A    Must have been minutes because they had
18 attendance and they had time start and time stop
19 So it must have been the minutes of what took p
20 during that last meeting on the 9th.
21 Q    Did you start receiving minutes from the C
22 before you joined?
23 A    I think I got this at the first meeting th
24 was allowed to go see or to -- I was a member a
25 this time but they have these there and were

TULSA FREELANCE REPORTERS
918-587-2878

Page 224

1  distributed to everybody. They don't normally
2  distribute to these at every meeting. The meet
3  before they --
4  Q    Approved the minutes?
5  A    Must have approved these minutes. That's
6  they said basically the minutes look like.
7  Q    Did you circle the issue about the gay les
8  alliance against defamation?
9  A    I don't remember circling that, but that w
10 one of the issues they were going to bring up.
11 Q    I hand you what's been marked as Defendant
12 Exhibit 39, a memorandum to all base maintenanc
13 employees dated January 28th, 1997 from Larry
14 Laster, also contained in your files. Do you
15 recognize that document, sir?
16 A    Well, I don't recognize it but I'm sure it
17 looks like something that was put out by the
18 management, yeah.
19 Q    Do you understand this is evidence of a
20 communication by management as of the expectati
21 all employees to adapt to and support a diverse
22 workplace?
23 A    It's not a read and sign. It's just a gen
24 handout that they put out at the base.
25 Q    And you kept a copy of that in your files

TULSA FREELANCE REPORTERS
918-587-2878

DEPO OF DANIEL W. MAHON, 10-29-03

Page 225

1  some reason; is that right?
2  A    I don't know how I got this, but January 28th,
3  '97.  I don't know if I would have kept it that
4  long.
5  Q    Finally, let me hand you what's been marked as
6  Defendant's Exhibit 40.  It's more housekeeping.
7  Handbook receipt and acknowledgement dated January
8  6th, 1988.  Is that your signature?
9  A    That is my signature.
10 Q    And did you receive the handbook and
11 acknowledge that you read it and would abide by its
12 terms?
13 A    I don't recall what handbook but I'm sure I
14 probably went through it.  I think I had the
15 contract.  I know that.  I don't have this handbook
16 handy.  This came out in 1988.  Wow.  I'm sure I
17 don't have it now.  1988, that's twelve, thirteen
18 years ago.
19 Q    In one of your documents you made reference to
20 the fact that when you joined the Caucasian employee
21 resource group, you were given a form to fill out,
22 that among the questions asked were what you could
23 do to help the group?
24 A    I remember that form, right.
25 Q    Did you keep the form?

Page 226

1  A    No, but I know what it had on it.  I put down
2  I would help with videotaping any picnics or any
3  activities, and I would present talks and
4  presentations on the history of aviation.
5  Q    Did you ever tell somebody that you and
6  someone else shot enough shotgun shells into a
7  Jewish businessman's house that it looked like Swiss
8  cheese?
9  A    A Jewish businessman's house?
10 Q    Yes.
11 A    When did this happen?
12 Q    My question is, did you ever tell anybody
13 that?
14 A    No, never.
15 Q    Did that in fact occur?
16 A    No.  I don't normally shoot people's houses
17 up, even on Halloween wouldn't do that.
18 Q    Did the KKK ever tell you to get rid of your
19 wife and child?
20 A    Nope.  They never even mentioned anything like
21 that.  My brother never did.  He was a little upset
22 that she wouldn't feed me right.
23 Q    What do you mean by that?
24 A    In Florida she gave me pee wee eggs in the
25 morning and he got mad because I was losing weight

Page 227

1  and blamed her for not feeding me right, and he
2  into an argument.  I'll never forget that.
3  Q    Did your brother live with you all in Flor
4  also?
5  A    He lived across the street with a lady fri
6  that he had met there, a real nice lady named H
7  He was there with her from '81 right until the
8  '84 or '85 when we left Eastern.
9  Q    On our breaks have you had a chance to tal
10 your lawyer about that it's important for you t
11 give me Lisa's last name in terms of the person
12 destroyed the original shirt?
13 A    Well, her name is actually Millie.  Her mi
14 name is -- she's a neighbor and she's a good fr
15 Her sister died recently and I took care of her
16 home, took her to buy dog food, and she became
17 kind of a real good friend, and she was there w
18 told her about the firing and she saw me basica
19 just throw the T-shirt in the dumpster and out
20 went.
21 Q    But earlier you told me it was a married w
22 you were having an affair with; is that correct
23 A    Well, she had a guy living there.  I thoug
24 they were married, but she's just a very kind o
25 lady and kind of concerned about me, always loo

Page 228

1  in on us.
2  Q    Did you have a physical relationship with
3  A    No.  It was just -- she kind of adopted us
4  like her own kids, you know.
5  Q    She was a neighbor.  What's her last name?
6  A    Redman.  It's on one of these --
7  Q    Millie Redman?
8  A    Mildred, yeah.
9  Q    Earlier today we talked about your explana
10 of the grounds for why you feel like you were
11 treated unfairly.  Do you remember we had three
12 categories; the last one we decided was no long
13 part of this deal; right; do you remember those
14 three?
15 A    Uh-huh.
16 Q    Yes?
17 A    You'll have to review it.  I'm a little bi
18 sleepy now.  I'm not as alert as I should be.
19 You'll have to review what we're talking about
20 Q    I asked you to describe for me in your own
21 words how you felt like the company had
22 discriminated against you based on your race an
23 told me three things.  No one else from the
24 Caucasian employee resource group was disciplin
25 Second, other people had worn T-shirts that mig

Page 229

1  considered offensive in the workplace and weren't
2  terminated and, three, the company hadn't followed
3  the peak performance and commitment?
4    A    Right, peak performance.
5    Q    We decided that peak performance was no longer
6  part of this because of what the court decided?
7    A    Right.  That was one of the planks they didn't
8  go with us on.
9    Q    Sure.  Have you told me everything today that
10  you know, believe or have evidence of that supports
11  your claims for the violation of Section 1981?
12    A    Yeah.  I've gone through thoroughly all the
13  facets and all the particulars of this case that are
14  pertinent.  Everything is there in the open.
15    Q    Have I exhausted your knowledge of this
16  perspective in terms of what evidence you might
17  possibly offer the court in addition to what you
18  testified in support of your 1981 claim?
19    A    Yeah.  There's not anything else to offer, to
20  add to this.  This is it.  There's no more I can
21  think of at all.
22         MR. FRAZIER:  I've got some brief cross
23  examination if you're finished.
24         MR. CORDELL:  Give me a couple of minutes
25  with my client and I'll be right back before I turn

TULSA FREELANCE REPORTERS
918-587-2878

Page 230

1  over the witness.
2         (Following a short recess at 5:24 p.m.,
3  proceedings continued on the Record at 5:28 p.m.)
4              EXAMINATION
5  BY MR. FRAZIER:
6    Q    Good afternoon, Mr. Mahon.  It's been quite a
7  long day so I'll be brief if I can.  I'm going to
8  hand you a T-shirt here that we've been talking
9  about and I'll ask you to please hold it up for the
10  camera, the front of it, and, if you would, please
11  describe what you see on the front of that T-shirt.
12  Begin with telling me what's written on that T-shirt
13  on the front.
14    A    On the front?
15    Q    Yes.
16    A    Just says --
17    Q    Other side.
18    A    Turner Diaries and with that guy's name,
19  Andrew McDonald.
20    Q    Okay, and is there a photograph on the cover?
21    A    Picture of two people, a book cover and two
22  people shooting a firearm or firearms.
23    Q    Did it look like they're shooting at a target
24  to you?
25    A    No.  Just holding them.

TULSA FREELANCE REPORTERS
918-587-2878

Page 231

1    Q    Turn the shirt around.  What does it say on
2  the back of that shirt?
3    A    What will you do when your government comes to
4  take away your guns.
5    Q    That's not exactly what it says.
6    A    Comes to take away your guns.
7    Q    Would you start over on that?
8    A    What will you do when they come to take your
9  guns.
10    Q    What else does it say underneath that?
11    A    Warning.  The FBI has labeled this the most
12  dangerous book in America.
13    Q    Under that?
14    A    Just National Vanguard Books and P. O. Box
15  Hillsboro, West Virginia.
16    Q    So this is a book that's sold to the public?
17    A    Can I put it down now?
18    Q    Yeah, you can put it down.
19         MR. CORDELL:  Do you want -- I'm sorry.
20  Since he didn't complete it, do you want him to read
21  the rest of what's on the back?
22    Q    Sure.  Go ahead and read the website also,
23  Mahon.
24    A    It says HTTP, diagonal, WWW.NATVAN.COM and
25  other one says HTTP, diagonal, WWW.NATALL.COM.

TULSA FREELANCE REPORTERS
918-587-2878

Page 232

1    Q    Now, this book, The Turner Diaries -- well,
2  first of all, let me back up.  What is it about that
3  shirt, if anything, in your opinion about that
4  particular shirt, what message of racial hatred do
5  you believe is sent by that shirt, if any?
6    A    The shirt itself just says --
7    Q    Do you believe that shirt sends a message of
8  racial hatred?
9    A    No.  It's a message of gun control.  It
10  discusses gun control.
11    Q    When you wore that shirt to the meeting, the
12  April 20th, '99 meeting, did you have any message
13  that you were trying to send of racial hatred when
14  you wore that shirt?
15    A    No.  It was the only shirt I had to wear that
16  day and I wore it and nothing happened.  I mean
17  nothing happened that day, nothing happened.
18    Q    So when you first started reading the back
19  you said what will you do when the government comes
20  to take your guns, but it actually says what will
21  you do when they come to take your guns.
22    A    They.
23    Q    Is it your opinion that that phrase means what
24  will you do when the government comes to take your
25  guns?

TULSA FREELANCE REPORTERS
918-587-2878

Page 233

1  A    Pretty much because that is who normally comes
2  to take away guns is a government entity or
3  authorities.
4  Q    Now, being a historian of Germany, do you
5  recall before Adolph Hitler ultimately gained
6  control of the German government, do you recall him
7  taking the citizens' guns away?
8  A    Actually I have -- I used to have a Berliner
9  Achtung dated in '35 and it had adds for a Walthar
10 PPK.  It's my understanding from the National
11 Socialist period that he did take away guns from the
12 Communist groups because they were perceived as a
13 threat to the reforms.
14 Q    He took away the guns from the people that he
15 felt were a threat to his government?
16 A    Yeah, the Communist party at that time, yeah.
17 Q    To his Nazi party?
18 A    Yeah.
19 Q    This shirt -- in your opinion does this shirt
20 represent the rights of Americans in their Second
21 Amendment to bear arms?
22 A    Yes.  Basically it's the message that there's
23 always entities out there that would like to disarm
24 the American people to get more control over the
25 populous.

Page 234

1  Q    Would you agree with me that the founding
2  fathers when they put the Second Amendment in our
3  Constitution, that the whole notion behind the right
4  to keep and bear arms was to protect the American
5  way of life so that we would never have a repeat of
6  history like what happened in Germany?
7  A    Right.
8       MR. CORDELL:  I object to the form of the
9  question.  Unless you declare your own client as
10 being a hostile witness, you don't have the right to
11 lead him.  Object as leading.
12 Q    What do you believe that the Second Amendment
13 is for?
14 A    Second Amendment was put in place by our
15 forefathers as an insurance policy because in their
16 infinite knowledge of governments, any government,
17 regardless of how benevolent, can sometimes turn
18 despotic.  The Second Amendment guarantees the other
19 nine amendments.  It guarantees the First Amendment
20 especially, the Third Amendment, all the amendments.
21 It was put in there as a last-minute ditch insurance
22 policy that big governments would have to deal with
23 an armed populous.  It was strictly a freedom that
24 they thought should be in there just in case even
25 the best government in the world ever went bad and

Page 235

1  it was just there to ensure that those rights w
2  be upheld.
3  Q    I want to show you a photograph which has
4  Mahon Bates No. 201 on it.  Would you please ta
5  look at that photograph and tell me what that
6  photograph depicts.
7  A    Depicts around 1979 me and my wife at that
8  time.
9  Q    Can you hold that up for the camera?
10 A    (Witness complied.)
11 Q    I notice your wife appears to be of an eth
12 origin that perhaps from -- is she from the
13 Philippines?
14 A    Yes, Polynesian.  She's Philippine heritag
15 That's where -- I met her in the Navy in Subic
16 Philippines.  She is from a small town near Sub
17 Bay.
18 Q    You fell in love with her and you married
19 A    Yeah.  Well, we got engaged there and I
20 married her here in Washington, the state of
21 Washington.
22 Q    And did you have any children from that un
23 A    We had a son.
24 Q    And do you still have contact with your so
25 A    Oh, absolutely.  We go out at least twice

Page 236

1  week for dinner and go gambling.
2  Q    So would it be fair on my part to conclude
3  that your son is half Polynesian and half -- of
4  mixed heritage?
5  A    Yeah, he's of mixed heritage, biracial.
6  Q    How does it make you feel that American
7  Airlines has accused you of being a white
8  supremacist?
9  A    Oh, they're misled; they're wrong.  They'v
10 got wrong information from someplace.  Even too
11 and my ex-wife get along just fine.  Even her n
12 husband asks me to come over and work on the ca
13 the time for him when he can't fix it.  Suprema
14 no, I'm definitely not a white supremacist.
15 Q    Now, the Turner Diaries, American Airlines
16 made a big point about the fact that the book T
17 Turner Diaries makes mention of the systematic
18 killing of non-whites, Jews and race traitors.
19 according to the definition of a race traitor a
20 outlined in the Turner Diaries, wouldn't you be
21 considered a race traitor under the idealogy of
22 Pierce?
23 A    I think there's more people would betray t
24 race as a governmental entity to flood the coun
25 with other peoples.  I don't know if it was

Page 237

1  actually -- I never got to that part of the book but
2  as I said, I read the first chapter and that's as
3  far as I got but, yeah, I would be -- it would be
4  upsetting to have a total idealogy based on that,
5  yeah.
6  Q    And Dr. Pierce in his book talks about the day
7  of the rope. Have you ever read that section of the
8  book?
9  A    No, not that section. That was later in the
10 book. As far as I know, it wasn't in the first
11 chapter, anything about that. The book is a novel,
12 and there are a lot of ugly books out there in the
13 world. Road Warrior talks about killing thousands
14 of Arab people.
15 Q    Now, do you think Dr. Pierce, if he were
16 around today, would agree with marrying someone from
17 another country?
18 A    Well, he would probably not agree with it but
19 he wouldn't do anything to stop it. He wouldn't go
20 out of his way to hurt anybody in a mixed
21 relationship. He was a very gifted man, but he was
22 wrong in some of his idealogy I'm sure.
23 Q    Now, here's another photograph that's marked
24 Mahon Bates No. 190. Is that a photograph of your
25 son?

Page 239

1  same exact T-shirt that you just held up for the
2  camera, either four or five days in a row to
3  American Airlines?
4  A    At the arbitration he testified that he wore
5  this T-shirt I think four days in his work area
6  which is heavily represented by management.
7  Q    And he's a Caucasian male?
8  A    Yeah. I think his wife is part Native
9  American.
10 Q    Do you know if he was ever terminated for
11 wearing this shirt or given any kind of --
12 A    He was not terminated or given any kind of
13 disciplinary action for wearing the T-shirt.
14 Q    Okay, and you said earlier that I believe
15 you're the first person that's ever been terminated
16 for wearing a T-shirt at American Airlines?
17 A    In the history of American, nobody has been
18 fired for a T-shirt.
19 Q    Now, was it the exact same shirt -- that Mr.
20 Vinson told you that he wore this exact same shirt
21 four to five days at American Airlines?
22 A    Yeah. At the arbitration he showed that
23 T-shirt and he said it was the exact same T-shirt he
24 wore.
25 Q    And no disciplinary action was taken?

Page 238

1  A    Yeah. That's when we were watching the cruise
2  ships go out of Miami. That was just after I got
3  down there.
4  Q    Would you hold that up for the camera, please?
5  A    (Witness complied).
6  Q    Now, have you ever married a Caucasian woman?
7  A    I've had relationships with several since
8  then.
9  Q    But you've only been married once; correct?
10 A    Only been married once, correct.
11 Q    And she was a Polynesian woman?
12 A    Yeah.
13 Q    Are you a white supremacist?
14 A    No. I don't believe the white race is purer
15 than any other race. They're somewhat gifted in
16 some things, but every race I believe has gifts. A
17 lot of Japanese and Chinese right now I think are
18 tremendously gifted in the technologies.
19 Q    Let me ask you about an employee by the name
20 of Tim Vinson. You had some conversations with Mr.
21 Vinson; is that correct?
22 A    Yeah. I fixed his VCR, and he worked the next
23 hangar over to my hangar.
24 Q    Now, did Mr. Vinson tell you that he wore The
25 Turner Diaries T-shirt, and I'm talking about the

Page 240

1  A    No disciplinary action whatsoever.
2  Q    Do you know how long he worked for the company
3  at that point?
4  A    I think five years.
5  Q    Okay, and how long had you worked for the
6  company at the time of your termination?
7  A    Just shy of fourteen years.
8  Q    Do you have the ability to dictate what, say,
9  for instance, what Tom Metzger puts on his website?
10 A    I have absolutely no ability at all. Tom
11 Metzger is just a vague personality that I really
12 don't know personally. I've talked to him on the
13 phone once or twice. Given the phone to my brother.
14 I don't have any rapport or any type of tight
15 relationship with him at all. He is his own person.
16 His own son left him. He's very, very domineering,
17 very aggressive.
18 Q    On that same note, do you have any ability to
19 control what your twin brother, Dennis Mahon, say,
20 either on his racist hotline; do you have any
21 ability to control that?
22 A    No. He puts on what he wants to do. He's
23 a -- very straightforward, stubborn type of
24 individual, a very Alpha type personality. I can't
25 control any more what he does than he can control

Page 241

1  me.

2  Q    So you can't control him going to Tom Metzger

3  and telling him about you being fired from American

4  Airlines if that in fact happened?

5  A    There's no way I could have stopped him

6  without having knowledge of it.

7  Q    Did you ever at any time ask Mr. Metzger to

8  put your story on his White Aryan Resistance

9  hotline?

10  A    No, not even once, not even entertain the

11  idea. Tom Metzger and me are not in any way

12  associated.

13  Q    Now, do you remember recently we went to

14  Denver to the United States Court of Appeals; do you

15  remember that?

16  A    Absolutely.

17  Q    And after the decision was rendered, there was

18  a newspaper article in the Daily Oklahoman. Do you

19  recall that newspaper article?

20  A    Absolutely. It was about ten paragraphs.

21  Q    Did you read that thoroughly?

22  A    Yeah, I read the article thoroughly.

23  Q    Do you remember what the American Airlines

24  company spokesman said with regard to why discipline

25  was taken against you for wearing the shirt, as

Page 242

1  opposed to the other person?

2  A    In the article he claimed that the other

3  person wore the T-shirt without the same implied

4  meaning than I did. He said the other person didn't

5  wear it for the same reason that I wore it

6  basically.

7  Q    Do you believe that -- do you believe in ESP,

8  that people can read other people's minds?

9  A    Only in fairy tale books. It's generally not

10  an acceptable phenomenon.

11  Q    So in your opinion, Mr. Vinson wearing this

12  shirt four or five days in a row, do you think he

13  was intending on sending a message to American

14  Airlines?

15  A    I don't know his mind. I have no idea what

16  his -- what he was trying to convey; if he wore it

17  because it's the last thing he had to wear. Who

18  knows? I don't know the man that well, but I

19  couldn't say one way or the other.

20  Q    But you wore the shirt one time and were

21  fired?

22  A    One day, yeah.

23  Q    Now, the day that you wore this shirt, when

24  you put that shirt on that morning, when you left

25  for work, did you have any idea that there was going

Page 243

1  to be a Caucasian employee resource meeting to

2  discuss the pamphlet that had been handed out at

3  diversity fair?

4  A    I had no idea if there was going to be a

5  meeting that day or not. Until I was notified by

6  Eric Hanson that there was a flyer on the bulletin

7  board that announced the meeting, I had no idea a

8  meeting was going to take place that day.

9  Q    And you already had that shirt on when you

10  found out about that meeting; correct?

11  A    I was already at work, yeah, already there.

12  Q    Did you ever have any confrontations of any

13  sort with Robert Hosey before the April 20th, '9

14  meeting?

15  A    I didn't know who he was even. I had no idea

16  who he was until he came into the meeting and he

17  said he was from Dallas and he was in the diversity

18  council.

19  Q    And he was an African American gentleman, was

20  he not?

21  A    Yes, he was.

22  Q    Now, at the meeting was it mentioned to you by

23  anyone in authority that that shirt had any racial

24  connotations?

25  A    Nobody made any comment about it or even

Page 244

1  looked at it that I could tell at the meeting.

2  Q    In fact, if I remember correctly from the

3  arbitration transcript, didn't they have to go look

4  up what The Turner Diaries were?

5        MR. CORDELL: Object to the form of the

6  question. The transcript says what it says.

7  Q    Do you believe Mr. Hosey or any of the other

8  members at that meeting even knew what The Turner

9  Diaries were?

10  A    Probably not because they had to put me out of

11  service to investigate it first. There was no

12  mention of the T-shirt, and they put me out of

13  service to determine if that was a bad T-shirt.

14  They had to search, probably heavily search the

15  Internet or whatever to find the T-shirt, the

16  meaning of the T-shirt.

17  Q    And is it your understanding that even after

18  Vinson testified at the arbitration that he wore

19  this same particular shirt four to five days in a

20  row, do you know if there was ever any action taken

21  against him after that arbitration?

22  A    Not to my knowledge. Of course, I was out of

23  work. I have no ability to find out, but to my

24  knowledge, there was no action taken against him

25  whatsoever.

Page 245

1  Q    Would you agree that you're similarly situated
2  with Mr. Vinson in that you're both Caucasian males?
3  A    Right, we're both Caucasian males.
4  Q    And you both wore Turner Diaries T-shirts to
5  American Airlines?
6  A    Yes.
7  Q    He was not terminated; correct?
8  A    He was not terminated.
9  Q    You were terminated?
10  A    I was terminated.
11  Q    Do you feel like you were singled out?
12  A    Yes, I do.  I think I was targeted without
13  warrant and terminated without just cause.
14        MR. FRAZIER:  That's all I have.
15             CONTINUED EXAMINATION
16  BY MR. CORDELL:
17  Q    Just a few questions, sir, starting back
18  and -- starting now and going backwards.  Is it
19  correct then for me to understand the person you
20  believe you're similarly situated with is Mr.
21  Vinson?
22  A    Right.  He basically wore the same T-shirt and
23  was not affected by that T-shirt by wearing it.
24  Q    And is there anybody else that's similarly
25  situated to you in your opinion?
                TULSA FREELANCE REPORTERS
                     918-587-2878

Page 246

1  A    As far as anybody wearing that T-shirt, I
2  don't know of any other person that wore that
3  T-shirt.
4  Q    Okay.  Andrew McDonald, the person whose name
5  appears on the bottom of the front side of the
6  T-shirt and under whose name The Turner Diaries is
7  penned is actually Dr. William Pierce; correct?
8  A    Yeah.  I know that now, yes.
9  Q    In fact, here in the back of book you have
10  there's an article about the author and part of that
11  indicates very clearly that Dr. Pierce is the
12  chairman of the National Alliance?
13  A    The book I had is a smaller version and it did
14  not have this stuff on the back.  It did not have --
15  I never saw anything in the back of the book like
16  this page.  It was a smaller version.  It didn't
17  have any of that stuff I saw.
18  Q    Do you recognize that Dr. Pierce was the head
19  of the National Alliance?
20  A    Yeah, here it does.  I see it there.
21  Q    In fact, on this page that we're looking at
22  and one of the websites you read off the front of
23  the T-shirt is the website address for the National
24  Alliance; correct?
25  A    Right, that right here, these two here are the
                TULSA FREELANCE REPORTERS
                     918-587-2878

Page 247

1  addresses on the T-shirt, website, if you have
2  computer.
3  Q    What's the National Alliance?
4  A    I don't know.  It's some kind of a group.
5  Q    What kind of group?
6  A    Separatists of some kind obviously.  I do
7  know.  Since this man died, I don't know if it
8  been defunct or whether it's still a viable gro
9  I imagine it probably died at the same time he
10  A lot of these groups start up and if the foun
11  dies, his group dies, too.
12  Q    I'm sorry, did you finish?
13  A    Yes.
14  Q    With respect to the day in question, Apri
15  1999, obviously you testified that you hadn't
16  about the meeting before you went to work that
17  correct?
18  A    I didn't know the meeting was going to be
19  day.
20  Q    And you wore the T-shirt, went to the mee
21  we know; correct?
22  A    Yes, that's correct.
23  Q    Was that the only T-shirt you had availab
24  wear to that meeting?
25  A    That was the only T-shirt I had available
                TULSA FREELANCE REPORTERS
                     918-587-2878

Page 248

1  wear that day.  I had a big laundry load that
2  didn't get a chance to get cleaned and that wa
3  only one I had to wear.
4  Q    Directing your attention to Defendant's
5  Exhibit 33, please.  These are your notes date
6  10, 1999, the day you got fired.  Look at Page
7  A    Is that 32 or 33?
8  Q    33.
9  A    Well, I don't see here it here.  Here's 3
10  Hold it.  It must be right here.
11  Q    Here's a copy of it.
12  A    Okay.  It's one page, okay.
13  Q    We're looking at your May 10, 1999 notes;
14  correct?
15  A    Uh-huh.
16  Q    Yes?
17  A    Yes.  I see it here.
18  Q    You've already testified that these are
19  accurate; correct?
20  A    They're accurate to the best of my abilit
21  Q    Top of the second page says that the very
22  after two hours into the shift you found an ar
23  the right shoulder of the T-shirt that became
24  stained with Skydrol.  At the time I changed T
25  Turner Diaries with an older faded AA shirt th
                TULSA FREELANCE REPORTERS
                     918-587-2878

Page 249

1  always kept at the bottom of my toolbox.
2  A    Yeah.    It was my partner's toolbox but we
3  shared it, and we had a real old heavily soiled --
4  it was not an AA uniform shirt; it was an AA DC-10
5  T-shirt that we bought from this gentleman that sold
6  T-shirts and it was heavily soiled but didn't have
7  the Skydrol on it, so I had to put that on.
8  Q    So you could have worn that one to the
9  meeting?
10  A    I had no idea it was in there.    This is in the
11  very bottom, way back in the bottom of the toolbox.
12  I had to really dig for it.
13  Q    Doesn't it say an AA T-shirt that I always
14  kept in the bottom of my toolbox?
15  A    Well, that's wrong it was in there.    I don't
16  have that T-shirt.    That T-shirt I keep at the
17  house.    I don't have that T-shirt at work.    I don't
18  keep any of these T-shirts at work.
19  Q    Which version is correct, the version that you
20  wrote on May 10, 1999 or the one you just testified
21  to?
22  A    Well, just testified to.    There was a T-shirt
23  that I wore was in the bottom of my friend's
24  toolbox.
25  Q    And you had always kept it there, hadn't you?

Page 250

1  A    Well, it was there but I had no idea it was
2  there until I dug for it.    I had to dig for it to
3  get it.    It was heavily soiled, very dirty, dusty
4  old T-shirt.
5  Q    Now, you compared yourself with Vinson and you
6  say he's the one who you are similarly situated with
7  and he wasn't terminated for wearing the T-shirt.
8  Once again, as you stated in Exhibit 42, is it your
9  belief that the reason the company fired you was
10  because of the company's perception, albeit an
11  erroneous perception, of my social and political
12  beliefs?
13  A    Right.    I think that's correct.
14      MR. CORDELL:    That's all I have.
15          CONTINUED EXAMINATION
16  BY MR. FRAZIER:
17  Q    Mr. Mahon, briefly what does the concept equal
18  protection mean to you?
19  A    Equal protection means basic fairness of
20  treating everyone equally.    If a certain issue comes
21  up, that everybody, no matter who they are, gets
22  treated the same under that condition, under that
23  issue.
24  Q    Do you believe in that idea?
25  A    Yes, absolutely, absolutely.

Page 251

1  Q    Now, let's just say for the sake of
2  discussion, let's just say you wore that shirt
3  the meeting on purpose.    Let's say you intended
4  wear that shirt and send a message that day.    I
5  not saying you did, but let's just assume for t
6  sake of argument that you intended to send a me
7  on April 20th of 1999.    Don't you still believe
8  in order for you to get equal protection, that
9  should be treated the same as Mr. Vinson, who w
10  the same shirt?
11  A    Absolutely.    That's part of the fairness
12  doctrine of equal protection.
13      MR. FRAZIER:    That's all I have.
14          CONTINUED EXAMINATION
15  BY MR. CORDELL:
16  Q    One last question.    Mr. Vinson is white,
17  he?
18  A    He's Caucasian.
19      MR. CORDELL:    Okay.
20      MR. FRAZIER:    Read and sign, please.
21      (Whereupon, the deposition was
22  concluded at 5:54 p.m.)
23
24
25

Page 252

1          SIGNATURE PAGE
2
3      I, Daniel W. Mahon, do hereby certif
4  that the foregoing deposition was presented to
5  Lisa A. Steinmeyer as a true and correct trans
6  of the proceedings in the above styled and num
7  cause, and I now sign the same as true and cor
8      WITNESS my hand this _____ day
9  _____, 2003.
10
11
12
                        _____
                        DANIEL W. MAHON
13
14
15
16
17  SUBSCRIBED AND SWORN TO before me th
18  _____ day of _____, 2003.
19
20
21
                        _____
22                      Notary Public
23  My Commission Expires:
                        _____
24
25

Page 253

1          C E R T I F I C A T E

2

STATE OF OKLAHOMA  )
3                             )  SS.
COUNTY OF TULSA   )

4

5          I, Lisa A. Steinmeyer, Certified
6    Shorthand Reporter within and for Tulsa County,
7    State of Oklahoma, do hereby certify that the above
8    named witness was by me first duly sworn to testify
9    the truth, the whole truth and nothing but the truth
10   in the case aforesaid, and that I reported in
11   stenograph his deposition; that my stenograph notes
12   were thereafter transcribed and reduced to
13   typewritten form under my supervision, as the same
14   appears herein.
15         I further certify that the foregoing 252
16   pages contain a full, true and correct transcript of
17   the deposition taken at such time and place.
18         I further certify that I am not attorney
19   for or relative to either of said parties, or
20   otherwise interested in the event of said action.
21         WITNESS MY HAND AND SEAL this 4th day of
22   November, 2003.
23

               LISA A. STEINMEYER, CRR
24                CSR No. 386
25

          TULSA FREELANCE REPORTERS
               918-587-2878

Page 254

1          CORRECTIONS TO THE DEPOSITION OF
               DANIEL W. MAHON

2

3    PAGE AND LINE NUMBER                    CORRECTION

4

5

6

7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT E

# EXHIBIT E

# AMR DIVERSITY

*Respecting Differences*

## AMR's Diversity Advisory Council

Revised 2/18/99

## 1999 Diversity Advisory Council Members

**African-American**
Nathan Cage — 817-224-0212
Rose Striplin — 918-292-3277

**Asian Cultural Association**
Alan Yee — 817-967-4194
Alice Liu — 817-931-6912

**Caucasian Employees**
Craig Nichols — 918-292-0253
Linda Dill — 918-292-0258

**Christian Employees**
Sheila Yancey-Bicknell — 817-967-2035
Carol Kastner — 817-967-9831

**Employees With Disabilities**
Alan Thompson — 817-967-4060
Lorraine Bergen — 817-425-3225

**Gay, Lesbian, Bisexual, Transgender**
Robbin Burr — 972-425-7394
Randy Soderstrom — 817-931-7117

**Indian Employees**
Dinesh Parmar — 817-931-7660
Sukumar Bhasker — 817-264-7932

**Jewish Employees**
Michael Heymann — 817-931-6487
Francine Rubin — 817-963-5080

**Latino American**
Rafael Fantauzzi — 817-967-0876
Pedro Mari — 918-292-2284

**Muslim Employees**
Susan Odeh — 817-963-2489
Reza Hussain — 817-264-2368

**Native American Employees**
Jimmy Tramel — 918-292-2448

**Women In AAviation**
Regina Stewart — 918-292-3762
Barbara Bush — 817-224-0089

**Work & Family Balance**
Carole Sturm — 817-963-5668
Amy Hill — 817-967-2951

**40 Plus/Senior Employees**
Diane White — 972-266-1255

⇒ Promote tolerance and respect for all other employees.

⇒ Open membership to all AMR employees.

⇒ Have no financial or organizational relationship to groups outside of AMR.

⇒ Fill out an application with the Diversity Advisory Council.

Most importantly, the Employee Resource Group must be willing to identify **business objectives** that the group can help achieve, for example, the promotion or mentoring of minority employees, proposing flexible hours for working parents, proposing solutions for accommodating customers or employees with disabilities. Employee Resource Groups are not forums for the advancement of political or moral viewpoints — the work they do must relate to the business.

## How Do I Find Out More?

More detailed information about The Diversity Advisory Council can be found in SABRE Star Record F*DIV.

Diversity Advisory Council members are also eager to hear from you! You can reach them by sending an E-Mail to Diversity, boardmail to MD 5105 HDQ, or by calling the Diversity voice mail telephone number at 817-931-7117.

DEFENDANT'S DEPOSIT
EXHIBIT
10
GAO 800-631-6989

# EXHIBIT F

# EXHIBIT F

# QUESTIONS AND ANSWERS FOR DIVERSITY INFORMATION FAIRS

1.  Q: What is the Diversity Council?

    A: A group of AMR employees elected by their respective employee resource group members (ERG) to assist and educate the AMR Executive Steering Committee on issues important to AMR employees and customers. The council meets once per month to address issues and concerns of employees and customers throughout AMR.

    Council members also participate in training activities specifically designed to help them perform their roles on the council and in their respective employee resource groups.

2. Q: Is the Diversity Council necessary?

    A: Yes. Corporations around the world have realized the importance of understanding and utilizing the resources available from the people who come from many different cultures, backgrounds etc.

    The AMR Diversity Programs allows employees to voluntarily organize and participate in employee resource groups that represent their interests. The council allows representatives from these groups from all levels of the organization to educate, present and inform senior management management of the issues most important to them. Sometimes these issues are also important to our customers. Therefore, we become a stronger and more competitive company because we benefit from the input of the diversity council.

3. Q: Does having separate employee resource groups (ERGs) promote more division and segregation among employees who are different?

    A: No. As each group is represented, they will bring forward their input into issues of importance to their group and in turn issues common to other groups as well. Many employees thrive in employee resource groups where there are others who share their common culture, religion, interests, etc. As a result, some employees feel more a part of the AMR family. ERGs serve as sources of information about the company, career development and resources in the communities in which the employees live.

EXHIBIT
Arbitration
Union    10

All ERGs are required to respect other resource group members and find areas of common interests. ERGs may work jointly on projects and issues of common concern. At the same time, ERG members learn more about others who are different from themselves. In other words, the AMR diversity community is growing and is a network of people who support not just their own group, but support each other throughout the AMR diversity community.

4. Q: Are you guys for real? How can all the different groups get along together?

A: Yes. We are for real. We are committed to have a workforce where differences are respected among employees and customers. OK. None of us are perfect, but those who participate in diversity try very hard to work through our differences. We do not always agree with one another. But, we respect that others may think and act in a matter that is different from our own. Some of our best ideas and solutions start with opposing opinions.

5. Q: Does upper management listen to what you say?

A: AMR executives are an active part of the diversity council. They currently meet with the council twice per year to address specific issues and concerns. Members of senior management also support employee resource groups as sponsors. Diversity Advisory Council members have access to senior managers through sponsorship and other activities all year. Upper management does listen and realizes the importance of diversity at AMR.

6. Q: What the employee resource groups represented on the council?

A: African-American ERG, (AAERG), Asian Cultural Assoc. (ACA), Caucasian ERG (CARG), Christian ERG (CERG), Work/Family Balance, Employees with Disabilities, Women in Aviation, Gay/Lesbian/Transgender Bisexual Employees (GLEAM), Indian Employees (IERG), Jewish Employees, Latin Employees (LERG), Muslim Employees (MERG), Native American Employees (NAERG), 40 Plus Employees.

7. Q: How do I start a resource group?

A: If there is a group represented at the info. fair that you would like to start at your location, contact the diversity council representatives for that resource group. Contact information should be located on the brochures available at the info. fair.

If you would like to start a brand new resource group, a petition should be made to the diversity council. The council will evaluate the petition based on the value the group would provide to employees and customers of AMR. The purpose of the group must be consistent with the vision, goals and initiatives of AMR diversity.

8.  Q: How can I participate?
    A: Anyone can participate. The success of employee resource groups depends on the energy and commitment of its members. You can join any ERG that you have in interest in supporting. Membership is open to all.

9. Q: Are all the council members management?
    A: No. Membership in ERGs is open to all employees. The elected representatives to the council represent employees from various parts of our business and from all levels of the organization. There is no requirement that council members come from any particular part of the corporations or any particular level of management.

10.  Q: Why is there a need for racial/ethnic employee resource groups?
    A: Diversity as a concept is not designed to exclude any group of employees. All employee resource groups have goals and activities that are consistent with AMR's diversity vision and goals.

# EXHIBIT G

# EXHIBIT G

DAC Special Session
Talking Points for ERG Members
3/25/99

- At the DAC InfoFair held in Tulsa on March 11, the Caucasian Employee Resource Group (CERG) distributed a flyer celebrating "Caucasians in Aviation"

- We were informed by CERG officers/members that the flyer was developed by individuals believed to have an affiliation with local extremist groups. Some of the comments on the flyer were similar to rhetoric used by those groups in a racist nature

- The material was not made available to Diversity Programs for review prior to its distribution and leaders of the CERG indicate that they did not review the material. A number of employees and some members of management were offended by its message

- As a result of the ensuing controversy surrounding the flyer, effective immediately, the Caucasian Employees Resource Group has been suspended from participation on the Diversity Advisory Council and all privileges associated with being a recognized employee resource group have also been suspended for six months

- The six-month period will allow the CERG to review their mission and vision. They will be allowed to submit an application for re-admittance to the Council at the end of the six-month period

There are several issues associated with American Airlines' response to the content of the flyer and the action the company was required to take

- It is AMR's policy to provide a workplace free of all forms of harassment and discrimination

- ANY communication that suggests AMR tolerates racist attitudes or that AMR sanctions the formation of groups that espouse racist or extremist ideas is unacceptable

- Because the perspective that was suggested in the flyer is completely contrary to the principles and initiatives of diversity, action must be taken

- The Company is taking the action described above because:

  - The reputation of the Company is at stake

  - The reputation of the Diversity Advisory Council is at stake

  - The credibility of all Employee Resource Groups are at stake

1

EXHIBIT
Arbitratin
Company

The leaders of the CERG have indicated that the comments in the flyer do not reflect the values of their group. Nevertheless, the impact of the comments has made this issue one that must be dealt with at a corporate level rather than by the Council.

We are all saddened by the outcome of this issue. The CERG is a valuable member of the Diversity Advisory Council family and will receive the support necessary to enable it to return as a contributing member. We encourage CERG leaders and members to seek the advice and council of management and those Council members who are able to provide the guidance they need.

DAC25A

# EXHIBIT H

# EXHIBIT H

## AMERICAN AIRLINES CAUCASIAN EMPLOYEES RESOURCE GROUP
## SALUTE THE FOLLOWING AVIATION PIONEERS



Wilbur Wright
FIRST POWERED FLIGHT



Bleriot
FIRST TO FLY THE ENGLISH CHANNEL



James H. Doolittle
FIRST TO FLY MEDIUM
BOMBER OFF AIRCRAFT
CARRIER



Fransisco Brack-Papa
ITALIAN AIR RACE PIONEER



Werner Von Braun
PIONEERED MODERN ROCKETRY



Hugo Junkers
MADE FIRST ALL METAL
COMMERCIAL AIRLINER



Amelia Earhart
PIONEER WOMAN
AVIATOR





Helene Dutrieu
SECOND WOMAN IN
HISTORY TO LEARN TO FLY

CONTINUED ON PAGE    TWO


DEFENDANT'S DEPOSITION
EXHIBIT
12

AGE 2









OUND THE WORLD FLIGHT
SET ALTITUDE RECORD

Captain Edward Rickenback
AMERICAN WWI ACE
AND LEADER OF E.A.L.









Gen. Chuck Yeager
FIRST TO BREAK
SOUND BARRIER

Charles A Lindbergh
FIRST TO FLY SOLO
ACROSS ATLANTIC OCEAN

These famous men and women who made aviation history all have one thing in common.  They are all members of the White Race. A race of EXPLORERS, discoverers, scientists, and philosophers.  We are proud of the accomplishments of our noble Race in the past, present, and future.

FOR MORE INFORMATION ON THE CAUCASION EMPLOYEE RESOURCE GROUP,

CONTACT:    LINDA DILL, ICS  292-0258
       OR    CRAIG NICHOLS  ICS  292-0253
             MAIL DROP 510 TULE

# EXHIBIT I

# EXHIBIT I



DEFENDANT'S DEPOSIT
EXHIBIT
15

What will you do when they come to take your guns?

# EXHIBIT J

# EXHIBIT J

DATE:        May 10, 1999

TO:          Daniel W. Mahon
             Employee # 056628

REF:         Final Advisory (Discharge)

On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee Resource Group. The purpose of the meeting, which senior Maintenance and Engineering management also attended, was to discuss the role of American Airlines' employee resource groups in supporting diversity in our workplace and to discuss the recent 6-month suspension of the Caucasian Employee Resource Group. American suspended the Group after it handed out a flyer that advocated white supremacy at the Diversity Info Fair, a company event. The Group's conduct violated a basic tenet of the AMR Diversity Advisory Council. This tenet is that no group can form and be recognized as an Employee Resource Group that is in opposition to another group. You admitted during the April 20 meeting that you wrote the flyer and supplied it to the group for distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with the words "The Turner Diaries" printed on it. "The Turner Diaries" is a book written by a leader of one of the largest and most organized neo-Nazi groups in the country. It is widely regarded as a white supremacist and anti-Semitic terrorist manual. "The Turner Diaries" describes the systematic killing of "Jews", "non-whites", and "race traitors" in order to establish an "Aryan" world. The book is also infamous as having been found in the car of Timothy McVeigh at the time of his arrest for bombing the Murrah Federal Building in Oklahoma City. The cover of the book shows a drawing of two people pointing firearms as if in combat. Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your T-shirt, as well as the flyer that you wrote. In response to your actions and to the complaints received, American conducted an investigation. The 29(f) investigation was initiated on Monday, April 26, 1999. The investigation covered the complaints received, as well as your actions with white supremacist organizations and their members.

As a result of this investigation, American has concluded that:

- By writing the flyer and supplying it for distribution at the Diversity Info Fair and by wearing your "The Turner Diaries" T-shirt to work and to the April 20 meeting, you harassed and intimidated other employees in a manner that tended to create a racially hostile work environment.

1

DEFENDANT'S DEPOSITION EXHIBIT

Daniel W. Mahon - Final Advisory (Discharge)

- Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

- Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

Rule 32 -    "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

Rule 24 -    "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

Rule 22 -    "See that your conduct reflects credit upon AA. This includes paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."

As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, and as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.

You are hereby discharged from your employment with American Airlines, effective this date. All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter. Any pay due to you will be paid upon surrender of all Company property. Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have.


_Tom Snyder_                                      _7867 / 2216_
Tom Snyder, Production Supervisor              Business Unit / Shop


cc:    Field Human Resources
        Personnel File – MD 122 / TUL


2

# EXHIBIT K

# EXHIBIT K

EXHIBIT K

Rex Thompson

Dear ~~Mike Turpen~~, a Tty.

I have been terminated from my employment with American Airlines. Enclosed is a copy of the Opinion and Award of the Arbitration Panel (Exhibit "A"). As you will note, by a 2 to 1 vote, the Panel found that I was terminated for just cause. Succinctly stated, my termination was based upon my alleged political and social views

I was hired by American Airlines ("the company") on March 17, 1986, as an aircraft avionics mechanic. My employment record, as well as the statements of three crew chiefs, that I was an "exceptional if not model mechanic, and "never talked about the KKK or political views at work and never was intimidating."

In addition -- although not reflected in Exhibit "A" -- my wife, Myrna, is a Filipino. Although my twin brother, Dennis Mahon, has long been involved in such activities, I have never been a member of the Klan nor of any other white racialist organization.

By sorting through the verbose rhetoric of the Panel's majority opinion, you may glean the thin factual basis for my termination.

#### #1: The Diversity Fair Pamphlet.

By way of background, The company encourages the formation of Employee Resource Groups (ERG) to represent employees with "unique racial, ethnic, cultural or lifestyle differences." I was a member of the Caucasian Employee Resource Group (CERG) at The company. Other examples of the Tulsa groups include, inter alia: (1) African-American ERG, (2) Asian Cultural Association, (3) Christian ERG, (4) Employees with Disabilities ERG, (5) Gay, Lesbian, Bisexual, Transgender ERG, (6) Indian ERG, and (7) Jewish ERG.

On March 11, 1999, CERG was a participant in a "Diversity Fair" conducted by The company. CERG was encouraged by The company -- as were the other Employee Resource Groups -- to get a booth at the fair and do a project providing information and understanding about the ERG.

I was not present at this fair, although I did write a pamphlet entitled "Caucasians in Aviation" (Exhibit "B") which was distributed at the fair. Significantly, this pamphlet (Exhibit "B") was tendered by CERG to management prior to the Fair, and no objection was raised by the officials of the company. Nonetheless, after the Fair,

DEFENDANT'S DEPOSITION EXHIBIT
42

management officials belatedly deemed the existence of "white supremacist/neo-nazi overtones" in the wording of the pamphlet.[1]  On this basis, The company suspended the privileges of CERG for six months.

#2: The Turner Diary T-Shirt

On April 20, 1999, Robert Hosey, Manager of Diversity Programs for the Company, conducted a meeting to announce the suspension of CERG.  I attended that meeting, wearing a T-shirt that showed the cover to a book entitled The Turner Diaries. Substantial evidence was submitted at the grievance hearing (Exhibit "A") that other employees had worn "offensive T-shirts" and were told by the Company to "change them or turn them inside out."  Regardless, the Arbitration Panel ruled in favor of the Company, finding that such conduct "was a deliberate expression of deeply held racist and social beliefs."

In summary, I have never been accused of verbally harassing or intimidating my fellow workers at The company.  Nor has anyone accused me of using racial epithets at work, or even discussing politics.  All I did was to write a pamphlet and wear a Turner Diaries T-shirt.  In retrospect, the latter was perhaps an error in judgment, but hardly a public display of my "racial and ethnic hatred oozing from its ugly depths."

In point if fact, The company fired me because of the Company's perception (albeit an erroneous perception) of my social and political beliefs.

I would greatly appreciate any information or assistance you can provide to me in this matter.

Sincerely,

Daniel W. Mahon

---

[1]  "These famous men and women who made aviation history all have one thing in common.  They are all members of the White Race.  A race of EXPLORERS, discoverers, scientists, and philosophers.  We are proud of the accomplishments of our noble Race in the past, present, and future."