IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

**F I L E D**

SEP = 9 2004

**Phil Lombardi, Clerk**
**U.S. DISTRICT COURT**

DANIEL W. MAHON,                              )
                                                             )
            Plaintiff,                                )
                                                             )
vs.                                                       )        Case No. 00-CV-1008-E
                                                             )
AMERICAN AIRLINES, INC.,             )
a Delaware Corporation                     )
                                                             )
            Defendant                            )

**ORDER**

Now before the Court is the Motion for Summary Judgment of the Defendant,

American Airlines, Inc. ("American") (Docket #29).  The Plaintiff, Daniel W. Mahon

("Mahon") is a former employee of American whose employment was terminated in May of

1999.  Thereafter, he filed a complaint alleging seven claims, to wit: (1) breach of contract;

(2) denial of due process as guaranteed by the Fifth and Fourteenth Amendments and 42

U.S.C. §§ 1981, 1983 and 1985; (3) denial of free speech as guaranteed by the First

Amendment and §1983; (4) denial of equal protection of the laws as guaranteed by the Fifth

and Fourteenth Amendments; (5) intentional infliction of mental distress; (6) negligent

infliction of mental distress; and (7) intentional interference with contractual relations.  This

Court had previously dismissed all claims pursuant to Rule 12 (b)(6) of the Fed. R. Civ. P.

The 10th Circuit Court of Appeals affirmed the dismissal on all claims except the equal

protection component of Mahon's due process claim under §1981 and remanded the case for

1

further proceedings. *See, Mahon v. American Airlines, Inc.*, 71 Fed. Appx. 32 (10th Cir. 2003). American has now moved for summary judgment on the lone remaining claim.

**DISCUSSION**

**A. Facts**

The Court finds that the following material facts are not in dispute. Mahon, a white male, was employed by American from 1986 through May 10, 1999 at its Maintenance & Engineering base in Tulsa, Oklahoma (the "Base"). During his employment with American, Mahon was a member of the Transport Workers Union of America, AFL-CIO, Local 514 ("TWU"). Mahon, a Federal Aviation Authority licensed Airframe and Powerplant mechanic, worked on Dock 2-B as an Avionics Technician at the time of his termination.

Mahon is the identical twin brother of Dennis Mahon. Dennis Mahon is the former Imperial Dragon of the Missouri Ku Klux Klan and is the founder of the White Aryan Resistance. While renting a room from Mahon, Dennis Mahon operated the "Dial-A-Racist" hotline from the Mahon premises.

Mahon believes that as a general matter American does not discriminate against white employees, but that in his particular case, he was discriminated against because of his race and/or his political beliefs. Mahon admits that American prohibits discrimination, including that against white employees, and American promotes diversity among its workforce. Mahon admits that the majority of employees at American during his employment were white. All of Mahon's managers, supervisors and crew chiefs at American were white.

In connection with American's corporate diversity program to promote tolerance and respect among its diverse workforce, American employees organized Employee Resource Groups ("ERG") which represented various racial, ethnic, cultural or lifestyle groups, including, but not limited to: (1) the African-American ERG; (2) the Asian Culture Association; (3) the Christian ERG; (4) Employees with Disabilities ERG; (5) the Gay, Lesbian, Bisexual and Transgender ERG; (6) the Jewish ERG; and (7) the Caucasian ERG ("CERG"). Every ERG was required to support company policies on a harassment-free workplace and non-discrimination. In March, 1999, Mahon became a member of the CERG.

American sponsored Diversity Fairs to promote diversity and to provide a forum for every ERG to provide information about their particular group. On March 11, 1999, a Diversity Fair was held at the Base. In connection with its participation in the Diversity Fair, CERG distributed an informational pamphlet at its two booths. Mahon prepared the pamphlet and did so without any assistance from other CERG members. The pamphlet is reproduced in Appendix "A" to this Order.

Within hours of its distribution, American received a strong negative response to the CERG pamphlet from a variety of employees, including African-Americans, who reported to management that they were concerned and upset that such offensive material was distributed at the Base. On March 25, 1999, American suspended CERG's privileges for six months for distributing the offensive pamphlet.

On April 20, 1999, a scheduled meeting was held to explain to CERG members

American's decision to suspend CERG. Robert Hosey (an African-American), Manager of Diversity, directed the meeting which was attended by other management representatives, including the vice president in charge of the Base. Mahon attended the April 20th meeting wearing a "Turner Diaries" t-shirt. During the meeting, Mahon acknowledged authoring the CERG pamphlet. The front of the "Turner Diaries" t-shirt worn by Mahon to the meeting depicts a man aiming a rifle. Mahon admits that the beliefs expressed in the Turner Diaries are inappropriate for the workplace. Mahon knew at the time he wore the Turner Diaries t-shirt to the April 20th meeting that he risked offending those who were familiar with the book. Mahon did not believe the Turner Diaries t-shirt sent a message of racial hatred, but rather, Mahon believed that the shirt was supporting the Second Amendment right to own guns. Mahon testified that he was not trying to send a message of racial hatred when he wore the t-shirt to the meeting, but rather, it was the only clean shirt he had at the time. The t-shirt in question is reproduced in Appendix "B" to this order.

Mahon testified that he is not a white supremacist and that he had previously been married to a Polynesian woman and has a bi-racial son. Mahon acknowledges that all races contribute to society and that no race is superior to another.

Following the April 20th meeting, American conducted an investigation of Mahon regarding the pamphlet and the wearing of the Turner Diaries t-shirt which included meetings with Mahon on April 26, 1999 and May 10, 1999. On May 10, 1999, American terminated Mahon's employment. Mahon was terminated by his superior, Greg Hall (a white employee)

who was the Vice-President of Maintenance and Engineering at American Airlines, and who attended the CERG meeting on April 20, 1999. The Final Advisory memo terminating Mahon's employment is reproduced in Appendix "C" to this Order.

Mahon filed a grievance with the TWU regarding his termination. Thereafter, a three day arbitration of Mahon's termination was held before the Tulsa Area Board of Adjustment (the "Board"). The Board found that:

> [t]he Turner Diaries is rank with tales of murder and terrorism based on ethnic and racial matters reaped upon minorities. It also contains a virtual bomb making recipe used to create the source of "immense" damage reaped upon a government building. While technically fictitious, it is all too real to the some 160 victims (and their families) of Timothy McVeigh. Such references have a special significance in Oklahoma which cannot immediately be appreciated by others from other areas of the country.

The Board upheld Mahon's termination. In doing so, the Board made the following finding:

> At the root of the conduct (Mahon's) was hate for blacks, Jews and other minorities. This philosophy has no place being expressed in the workplace. This is especially true where the Employer has engaged in so many efforts to establish a work environment free from racial hostility and harassment. Under these circumstances, discharge was appropriate.

Mahon understood that an employee could be terminated for harassing another employee because of their race or national origin. Mahon testified that Tom Vinson (a white employee) is the person most similarly situated to Mahon because he allegedly wore a Turner Diaries t-shirt to work and Vinson was not disciplined because of the shirt.

**B. Summary Judgment Standard**

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Windon Third Oil & Gas v. FDIC*, 805 F.2d 342 (10th Cir. 1986). In *Celotex*, the court stated:

> The plain language of Rule 56(c) mandates the entry of summary judgment... and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 317 (1986). To survive a motion for summary judgment, the nonmovant "must establish that there is a genuine issue of material facts..." The evidence and inferences therefrom must be viewed in a light most favorable to the nonmoving party. *Conaway v. Smith*, 853 F.2d 789, 792 n. 4 (10th Cir. 1988). Unless the moving party can demonstrate its entitlement beyond a reasonable doubt, summary judgment must be denied. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir. 1980).

**C. Plaintiff's Equal Protection Claim**

Mahon's complaint alleges that American's termination of his employment violated 42 U.S.C. §1981 in that Mahon was allegedly treated different than others who were similarly situated. Mahon's claim is one of "reverse discrimination", i.e., he claims he was terminated because he is a member of the Caucasian race.

6

Under §1981, American is prohibited from racial discrimination in "the making, performance, modification, and termination of contracts, and the employment of all benefits, privileges, terms, and conditions of the contractual relationship" and Mahon must show that American intentionally discriminated against him because of his race. *Reynolds v. School District No.1* , 69 F.3d 1523, 1533 (10th Cir. 1995). Mahon can prove his case by direct evidence of intentional discrimination or by using circumstantial evidence. Mahon has presented only circumstantial evidence of the alleged discrimination.

In the case of circumstantial evidence of discrimination, the courts have developed a system of presentation of the evidence which shifts the burden of production between the plaintiff and the defendant at different stages. The *prima facie* "framework" developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and clarified in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and, more recently, *St. Mary's Honor Center v. Hicks*, 113 S.Ct.2742 (1993), is to be applied in analyzing such *circumstantial* evidence. This framework is intended to determine the true reasons that prompted an employer's action and ensure that the plaintiff has the opportunity to demonstrate that any stated justifications for such action are merely pretexts for discrimination or another illegal motive. *See Burdine*, 450 U.S. at 255-56. *McDonnell Douglas* establishes an allocation of the burden of production and an order for the presentation of proof involving three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's

rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine,* 450 U.S. at 252-53 (quoting *McDonnell Douglas,* 411 U.S. at 802).

If a *prima facie* case is established, it "creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254. However, once the defendant employer articulates a legitimate nondiscriminatory reason for its decision, the presumption "simply drops out of the picture." *St. Mary's Honor Center,* 113 S.Ct. at 2749 (citing *Burdine,* 450 U.S. at 255).

In order to establish a *prima facie* case that his discharge was a result of intentional discrimination, a plaintiff must ordinarily show that: (1) he belongs to a protected class or minority; (2) he was qualified for the job from which he was discharged; (3) he was discharged despite his qualifications; and (4) after his discharge, the position remained open and the employer sought applicants whose qualifications were no better than plaintiff's. *Trujillo v. Grand Junction Regional Center,* 928 F.2d 973, 977 (10th Cir. 1991). In reverse discrimination cases--where, as in the present case, the plaintiff is not a member of a racial minority or the female gender-- the Tenth Circuit has modified the first element of this *prima facie* case: "[I]n lieu of showing that he belongs to a protected group, [a plaintiff may simply] establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Notari v. Denver Water Dept.* 971 F.2d 585, 589 (10th Cir. 1992). In addition, the reverse discrimination plaintiff is

8

given an alternative means by which he may establish a *prima facie* case: By presenting "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status, the challenged employment decision would have favored the plaintiff." *Id* at 590 "[T]he plaintiff must allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Id.* If a plaintiff utilizes this alternative means of proving a *prima facie* case, however, the plaintiff does not get the benefit of a presumption of intentional discrimination; such a presumption arises only when plaintiff's evidence meets the modified four-step *prima facie* test. *Id.*

Furthermore, the court of appeals has explained the difference between direct evidence of discriminatory intent and circumstantial evidence that discrimination may have played a part in an employment decision:

> [E]vidence of "an existing policy which itself constitutes discrimination" is direct evidence of discrimination. In contrast, ... statements which are merely expressions of personal opinion or bias do not constitute direct evidence of discrimination. Because such statements require the trier of fact to infer that discrimination was a motivating cause of an employment decision, they are at most circumstantial evidence of discriminatory intent.

*E.E.O.C. v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996)

In the present case, The Court has examined the deposition excerpts submitted by both parties in relation to American's motion for summary judgment. In summary, Mahon has not submitted evidence of "the existence of background circumstances that would support an inference that defendant is one of those unusual employers who discriminates against the

9

majority". Neither has he submitted "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." Mahon testified that he did not believe that, as a general rule, American discriminated against white employees, but he thought that in his case, American did discriminate based upon race. The record is clear that most of the employees, supervisors and crew chiefs were white and the supervisor that terminated Mahon was white. This evidence goes to disprove the proposition that American was one of those unusual employers that discriminated against the majority.

In addition, none of the evidence shows that Mahon was treated differently than a non-white employee would have been treated in similar circumstances. Mahon cannot identify a non-white employee that was as racially insensitive as he was and that was treated differently than he was.[1] The employee that was identified as being the most similarly situated was another white employee who allegedly wore a Turner Diaries t-shirt to work and was not disciplined. If there was discrimination present in how American dealt with Mahon and Mr. Vinson, it had nothing to do with race. It is well established that a federal court is not to act as a super personnel department and try to determine if a plaintiff's termination was "just". The Court is only concerned with terminations that occur because of discrimination based upon impermissible factors. *Salquero v. City of Clovis*, 336 F.3d 1168,

---

[1]Contrary to American's assertion, Mahon did not need to identify a non-white employee that wore a t-shirt that espoused white supremacy. Such a requirement would be futile. But Mahon did need to present evidence of a non-white employee that exhibited bigoted tendencies in a fashion similar to the acts of Mahon and who was treated differently than Mahon.

1177 (10th Cir. 2004).

Mahon has not provided the Court with any evidence to establish background circumstances to support the inference that American is one of those unusual employers that discriminates against the majority. In addition, Mahnon's evidence falls drastically short of a reasonable probability, that but for Mahon's race the challenged employment decision would have favored Mahon. Therefore, the Court finds that Mahon has failed to establish a *prima facie* case of reverse racial discrimination, and American is entitled to summary judgment as a matter of law.

If the Court assumes, for the sake of this motion, that Mahon was successful in proving a *prima facie* case, American has proffered evidence of a legitimate, non-discriminatory reason for the employment termination and, therefore, the burden would shift back to Mahon to show that the proffered reason was only a pretext for discrimination. Mahon has failed to do this. When the record, as a whole, is viewed in the light most favorable to Mahon, no reasonable fact finder could determine that American's termination of Mahon's employment because of his racially offensive conduct was only a pretext to discrimination against Mahon because he is a Caucasian.

Therefore, the Court finds that the Defendant is entitled to summary judgment as a matter of law on the Plaintiff's remaining equal protection claim.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the Defendant's Motion for Summary Judgment (Docket #29) is hereby GRANTED.

Dated this 9th day of Sept, 2004.

JAMES O. ELLISON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

AMERICAN AIRLINES CAUCASIAN EMPLOYEES RESOURCE GROUP
SALUTE THE FOLLOWING AVIATION PIONEERS



Wilbur Wright
FIRST POWERED FLIGHT



Bleriot
FIRST TO FLY THE ENGLISH CHANNEL



James H. Doolittle
FIRST TO FLY MEDIUM
BOMBER OFF AIRCRAFT
CARRIER



Fransisco Brack-Papa
ITALIAN AIR RACE PIONEER



Werner Von Braun
PIONEERED MODERN ROCKETRY



Hugo Junkers
MADE FIRST ALL METAL
COMMERCIAL AIRLINER



Amelia Earhart
PIONEER WOMAN
AVIATOR





Helene Dutrieu
SECOND WOMAN IN
HISTORY TO LEARN TO FLY

CONTINUED ON PAGE   TWO

APPENDIX "A"

AGE 2





OUND THE WORLD FLIGHT
SET ALTITUDE RECORD







Captain Edward Rickenback
AMERICAN WWI ACE
AND LEADER OF E.A.L.









Gen. Chuck Yeager
FIRST TO BREAK
SOUND BARRIER



Charles A Lindbergh
FIRST TO FLY SOLO
ACROSS ATLANTIC OCEAN

These famous men and women who made aviation history all have one thing in common. They are all members of the White Race. A race of EXPLORERS, discoverers, scientists, and phiosophers. We are proud of the accomplishments of our noble Race in the past, present, and future.

FOR MORE INFORMATION ON THE CAUCASION EMPLOYEE RESOURCE GROUP,

CONTACT:    LINDA DILL, ICS  292-0258
       OR   CRAIG NICHOLS  ICS  292-0253
            MAIL DROP 610 TULE

DATE:        May 10, 1999

TO:          Daniel W. Mahon
             Employee # 056628

REF:         Final Advisory (Discharge)

On Tuesday, April 20, 1999, you attended a meeting of the Caucasian Employee
Resource Group.  The purpose of the meeting, which senior Maintenance and
Engineering management also attended, was to discuss the role of American
Airlines' employee resource groups in supporting diversity in our workplace and
to discuss the recent 6-month suspension of the Caucasian Employee Resource
Group.  American suspended the Group after it handed out a flyer that
advocated white supremacy at the Diversity Info Fair, a company event.  The
Group's conduct violated a basic tenet of the AMR Diversity Advisory Council.
This tenet is that no group can form and be recognized as an Employee
Resource Group that is in opposition to another group.  You admitted during the
April 20 meeting that you wrote the flyer and supplied it to the group for
distribution.

At the meeting, and at work on the day of the meeting, you wore a T-shirt with
the words "The Turner Diaries" printed on it.  "The Turner Diaries" is a book
written by a leader of one of the largest and most organized neo-Nazi groups in
the country.  It is widely regarded as a white supremacist and anti-Semitic
terrorist manual.  "The Turner Diaries" describes the systematic killing of "Jews",
"non-whites", and "race traitors" in order to establish an "Aryan" world.  The book
is also infamous as having been found in the car of Timothy McVeigh at the time
of his arrest for bombing the Murrah Federal Building in Oklahoma City.  The
cover of the book shows a drawing of two people pointing firearms as if in
combat.  Your T-shirt also showed a rendition of that cover.

American received a number of complaints from other employees regarding your
T-shirt, as well as the flyer that you wrote.  In response to your actions and to
the complaints received, American conducted an investigation.  The 29(f)
investigation was initiated on Monday, April 26, 1999.  The investigation covered
the complaints received, as well as your actions with white supremacist
organizations and their members.

As a result of this investigation, American has concluded that:

- By writing the flyer and supplying it for distribution at the Diversity Info Fair
  and by wearing your "The Turner Diaries" T-shirt to work and to the April 20
  meeting, you harassed and intimidated other employees in a manner that
  tended to create a racially hostile work environment.

APPENDIX "C"

DEFENDANT'S DEPOSITION EXHIBIT

Daniel W. Mahon - Final Advisory (Discharge)

- Your actions have adversely impacted the perception and reputation of American Airlines within our employee groups and in the community at large.

- Your actions as described above are a direct violation of American Airlines' Policy on Unlawful Harassment, which prohibits conduct that is harassing and that "creates an intimidating, hostile, or offensive work environment."

Your actions are also a direct violation of the following American Airlines' Policies and Procedures:

Rule 32 - "Threatening, intimidating, interfering with, or violent behavior toward another employee while either on or off duty is prohibited."

Rule 24 - "Consider the welfare of the Company and your fellow employees. Perform no act that is detrimental to either."

Rule 22 - "See that your conduct reflects credit upon AA. This includes paying your just debts, thereby avoiding complaint from creditors or garnishment proceedings."

As an employer of a widely diverse workforce, as an employer in an industry that must guarantee the highest standard of safety to the flying public, and as an employer in the Tulsa, Oklahoma Community, American Airlines cannot and will not tolerate conduct of this type.

You are hereby discharged from your employment with American Airlines, effective this date. All Company property, including but not limited to, AA identification cards, badges of any kind, and keys assigned to you, are to be returned to me and are not to be used for any purpose after the date of this letter. Any pay due to you will be paid upon surrender of all Company property. Please contact me about any questions regarding benefits, Credit Union membership, etc., which you may have.

*Tom Snyder*                                           7867 / 2216
Tom Snyder, Production Supervisor          Business Unit 7 Shop

cc:    Field Human Resources
       Personnel File – MD 122 / TUL

2